## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *on behalf of itself and those similarly situated*, 1101 Vermont Ave. NW, Suite 710 Washington, DC 20005, and<br><br>TENNESSEE FAIR HOUSING COUNCIL, 107 Music City Cir., Suite 318 Nashville, TN 37214<br><br>               Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, 451 7th St. SW Washington, DC 20410, and<br><br>SCOTT TURNER, *in his official capacity as Secretary of Housing and Urban Development*, 451 7th St. SW Washington, DC 20410,<br><br>               Defendants. | Case No. 1:25-cv-01965<br><br>**CLASS ACTION COMPLAINT** |

## INTRODUCTION

1.      This case concerns the U.S. Department of Housing and Urban Development's ("HUD" or "Defendant") refusal to abide by the Constitution and laws duly enacted by Congress and to spend funds that Congress has appropriated. HUD is flouting its obligation to administer a fair housing grant program established and funded by Congress. This abdication of duty will inflict devastating harm on Plaintiffs, who are non-profit organizations that rely on their grant relationships with HUD to provide essential housing services within their communities. Those communities, in turn, will be left with no effective enforcement of the Fair Housing Act, 42

U.S.C. 3601, et seq., which prohibits discrimination in housing based on race, national origin, sex, disability, religion, and familial status.

2.      Congress amended the Fair Housing Act ("FHA" or "the Act") in 1992 to establish the Fair Housing Initiatives Program ("FHIP"), which provides grants to certain private, nonprofit fair housing organizations—like Plaintiffs here—to facilitate enforcement of the Act. *See* 42 U.S.C. § 3616a. For more than three decades, Congress has annually appropriated funds for FHIP.

3.      FHIP funding is essential to preventing and remedying housing discrimination. Congress created FHIP with the express goal of filling a gap in enforcement of the Fair Housing Act, and the federal government has repeatedly recognized that fair housing organizations funded by FHIP do just that: they facilitate meritorious claims, collect critical evidence of discrimination, and provide much-needed services to housing consumers. Congress and HUD rely on fair housing organizations for their work, and fair housing organizations rely on Congress and HUD for funding.

4.      Despite more than thirty years of unbroken interdependence between the federal government and fair housing organizations, HUD is now ignoring its FHIP mandate by refusing to spend appropriated funds. HUD is neither administering existing grants nor awarding new grants from pending application cycles. Specifically, HUD is refusing to implement the second and third years of existing multi-year awards and refusing to make additional grant awards under the FY2024 funding cycle.

5.      Federal agencies are generally required to spend funds appropriated by Congress for specific purposes. And here, the plain text of the FHA additionally requires HUD to award

and administer FHIP grants whenever Congress appropriates funds for that purpose, as it has done every year since establishing FHIP. *See* 42 U.S.C. § 3616a.

6.    Consistent with Congressional appropriations legislation, the FHA, and applicable regulations, HUD announced the award of dozens of multi-year Private Enforcement Initiative ("PEI") grants in both 2023 and 2024. These PEI grants are three-year FHIP awards for bread-and-butter fair housing enforcement activities. These multi-year grants recognize the important reliance interest FHIP grant recipients have in receiving consistent, year-over-year funding to hire staff, enter into leases, undertake complex investigations and litigation, and otherwise engage in ongoing activities that do not end after a single grant year.

7.    The periods of performance for these ongoing PEI grants run into calendar years 2026 and 2027. Ordinarily, prior to a grant year expiring, HUD works with grantees to finalize the agency forms reflecting the agreed-upon activities, deliverables, and payment schedules for the second and third years of these grants. Finalized agreements are necessary to ensure that PEI recipients will receive payment for work performed under their grants. Since April 2025, HUD has refused to facilitate multi-year grants. Because the first years of these grants have begun to expire, HUD's refusal to facilitate the second and third years is creating gaps in funding.

8.    In addition to these ongoing PEI grants, HUD issued Notices of Funding Opportunity ("NOFOs") for new FHIP awards in September 2024. These NOFOs solicited applications for three types of grants, all of which are required by the Act whenever Congress appropriates FHIP funding: further multi-year PEI awards (largely to replace those that are expiring this year), Fair Housing Organization Initiative ("FHOI") awards, and Education and Outreach Initiative ("EOI") awards (collectively "the FY2024 NOFOs"). Applications for these awards were submitted by the end of November 2024.

9.    In the ordinary course, HUD would have immediately started a review and selection process, with recipients announced in early 2025. To date, HUD has not awarded any new FHIP grants from the FY2024 NOFOs.

10.    Both the continued funding for existing PEI grants and the additional awards contemplated by the FY2024 NOFOs are funded through the Consolidated Appropriations Act of 2024, Pub. L. 118–42 (hereinafter "FY2024 Appropriations Act").

11.    Any funds from this appropriation that are not obligated by September 30, 2025 will lapse and cease to be available. HUD's refusal to implement existing PEI grants and to administer the FY2024 NOFOs risks the complete loss of the appropriated funds. This loss of funding will harm Plaintiffs, NFHA members, and members of the class. Many affected organizations will be forced to curtail or cease operations, which will harm the individuals who rely on the services of privates fair housing organizations to access housing—senior citizens, disabled veterans, people with disabilities, voucher recipients, survivors of domestic violence, and other home seekers.

12.    Plaintiffs are the National Fair Housing Alliance ("NFHA"), on behalf of itself and a class of fair housing organizations with at least one full year left on active PEI grants that have been unable to negotiate years two and three with HUD ("Active PEI Class"), and the Tennessee Fair Housing Council ("TFHC"). Both NFHA and TFHC applied for FHIP awards under the as-of-yet unresolved FY2024 NOFOs.

13.    HUD made the decision not to continue its ordinary and planned expenditures of appropriated FHIP funds more than two months ago, and HUD has implemented this decision in the intervening months by withholding FHIP funding, yet the Administration has not made a request to Congress to rescind the FY2024 FHIP appropriation.

14.    HUD's decision to impound appropriated FHIP funds rather than expend them violates the Administrative Procedure Act ("APA") and the U.S. Constitution. HUD's refusal to administer FHIP awards is an agency action unlawfully withheld or unreasonably delayed in violation of the APA because it contravenes the FHA, the FY2024 Appropriations Act, and applicable regulations. HUD's impoundment decision also violates the APA because it is an agency action that is arbitrary, capricious, and otherwise not in accordance with law. HUD's refusal to administer FHIP awards also violates separation of powers and the Appropriations Clause of the Constitution. Finally, HUD's refusal to implement existing PEI grants amounts to grant termination, yet HUD has not provided any notice or process to grant recipients in violation of the Due Process Clause.

15.    Plaintiffs seek to compel HUD to abide by the law and to administer FHIP grants, including prospective injunctive relief ordering HUD to (1) administer existing PEI grants by implementing years two and three for the Active PEI Class; and (2) award and obligate outstanding FY2024 appropriations pursuant to the FY2024 NOFOs.

## JURISDICTION AND VENUE

16.    Plaintiffs bring this action under the U.S. Constitution and the APA, 5 U.S.C. §§ 551 *et seq.*

17.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1361.

18.    Venue is proper in this district because Defendants reside in, and a substantial part of the events or omissions giving rise to the claims occurred in, this judicial district. 28 U.S.C. § 1391(e).

19.    The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201–02 and Federal Rule of Civil Procedure 65.

## PARTIES

20.    Plaintiff National Fair Housing Alliance, Inc., is a national, nonprofit public service membership organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, D.C. NFHA was established in 1988 and has received and relied on FHIP grants since 1990. NFHA's mission is to end housing segregation and ensure equal housing opportunities for all people and communities through its housing and community development, education and outreach, responsible AI, member services, public policy and advocacy, consulting and compliance, and enforcement initiatives.

21.    NFHA represents approximately 170 private, nonprofit member organizations throughout the country, many of whom are eligible for FHIP funding, and 80 individual members. NFHA is the only national organization dedicated solely to ending housing discrimination and promoting residential integration. Many of the non-profit fair housing organizations that are NFHA members rely on FHIP funding for their day-to-day activities enforcing the FHA, and these members are harmed by HUD's failure to administer FHIP awards.

22.    NFHA has relied on FHIP grants for decades. Throughout that time, NFHA has consistently met or exceeded its goals for deliverables on its FHIP grants. NFHA received an excellent rating from HUD on its most recent performance assessment report for the first year of its active PEI award. NFHA timely applied for EOI and FHOI grants pursuant to the FY2024 NOFOs issued by HUD. NFHA meets all the eligibility requirements for the proposed award and submitted all requisite materials in support of its application.

23.    Plaintiff Tennessee Fair Housing Council is a 501(c)(3) non-profit organization based in Nashville, Tennessee. TFHC was established in 1995 and has received and relied on FHIP grants throughout its history, including for the last six years. Since 1995, TFHC has been

awarded 15 FHIP grants. Throughout that time, TFHC has consistently met or exceeded its goals for deliverables on its FHIP grants. TFHC received an excellent rating from HUD on its most recent performance assessment report for the second year of its previous PEI award.

24.     TFHC's previous multi-year PEI award expired on May 31, 2025. TFHC timely applied for a new PEI grant pursuant to the FY2024 NOFOs issued by HUD. TFHC meets all the eligibility requirements for the proposed award and submitted all requisite materials in support of its application.

24.     Defendant U.S. Department of Housing and Urban Development ("HUD") is an executive branch agency of the United States government. It is charged with administering a variety of federal housing programs, including the Fair Housing Initiative Program grants at issue in this Complaint.

25.     Defendant Scott Turner is sued in his official capacity as the Secretary of HUD.

## FACTUAL BACKGROUND

**Congress's Establishment of FHIP**

25.     Since the FHA was passed in 1968, non-profit organizations devoted to fair housing have played a pivotal role in making the statute's protections real. Throughout the country, these fair housing groups help individuals and families avoid homelessness, stave off evictions, find safe places to live, ensure that their homes are accessible, and seek redress for discrimination. In addition, fair housing organizations are uniquely situated to root out and redress systemic discrimination through testing and other investigative tools.

26.     During the 1970s and 1980s, fair housing organizations endeavored to advance the principles and goals of the FHA with minimal resources. The House Report on the Fair Housing Amendments Act of 1988 noted that "fair housing organizations are burdened with

primary enforcement responsibility" for the FHA, H.R. Rep. No. 711, 100th Cong., 2d Sess.

15–16, *reprinted in* 1988 U.S. Code Cong. Admin. News 2173, 2176–77 (footnotes omitted), but

they lacked sufficient resources to carry this burden.

27.     Beginning in 1987, fair housing groups worked with HUD to develop a program

that would provide direct funding to qualified, private, nonprofit fair housing organizations to

conduct fair housing education programs and to provide intake, testing, investigation,

conciliation, and/or litigation of verified complaints of housing discrimination to increase the

effectiveness of the FHA. With support from the Reagan administration and leadership from the

House and Senate, Congress approved a $3 million pilot program called the Fair Housing

Initiatives Program (FHIP) in the Housing and Community Development Act of 1987. The initial

two-year program was extended for two more years in 1990.

28.     Recognizing "the proven efficacy of" fair housing organizations that were serving

as "a necessary component of the fair housing enforcement system," Pub. L. 102–550,

§ 905(a)(9), Congress amended the FHA to provide sustainable support for these organizations.

It did so through the Housing and Community Development Act of 1992, which made FHIP

permanent and authorized FHIP funds to implement testing programs; establish new fair housing

organizations or expand capacity of existing ones; conduct special projects to respond to new or

sophisticated forms of housing discrimination; undertake larger, long-term enforcement activities

through multi-year funding agreements; and bring enforcement actions to ensure compliance

with the FHA. *See* 42 U.S.C. § 3616a.

29.     Since the 1992 amendment of the FHA, fair housing groups have continued to be

critical to enforcing fair housing laws. The U.S. Government Accountability Office noted the

effectiveness of the fair housing organization model in a comprehensive analysis of FHIP in

1997,[1] and in 2011, a HUD study concluded that FHIP grantees add enormous value to the

agency:

> When FHIP grantee organizations are the first point of contact for a complainant, the organization adds value in two ways: First, FHIP grantee organizations weed out cases that are not covered by civil rights statutes, as well as those cases in which the organization's investigations show a complaint lacks merit. This vetting saves resources for HUD and state agencies that do not have to investigate these cases. Second, the investigative evidence provided to HUD and state agencies for a complaint on which a FHIP grantee organization has signed on as a complainant or representative adds merit to those cases. These are the cases that are much more likely to end in a conciliation or cause finding than are other cases in which the complainant comes directly to HUD and state agencies. Of particularly high value is testing evidence, which is limited almost exclusively to the cases that involve a FHIP grantee organization.[2]

26.    To the extent Congress has appropriated funds, the FHA requires HUD to provide

three categories of funding: PEI grants, FHOI grants, and EOI grants. *See generally* 42 U.S.C.

3616a. The purpose of these grants is to fund "programs or activities designed to obtain

enforcement of the rights granted by" the FHA. *Id.*

27.    For PEI grants, the FHA provides that "[t]he Secretary *shall* use funds made

available under this subsection to conduct, through contracts with private nonprofit fair housing

enforcement organizations, investigations of violations of the rights granted under [the FHA],

and such enforcement activities as appropriate to remedy such violations." 42 U.S.C.

§ 3616a(b)(1) (emphasis added). The Secretary shall use funds "to conduct, through contracts

with private nonprofit fair housing enforcement organizations, a range of investigation and

---

[1] Gov't Accounting Office, Letter Report, March 3, 1997, *Fair Housing: Funding and Activities Under the Fair Housing Initiatives Program*, available at https://www.govinfo.gov/content/pkg/GAOREPORTS-RCED-97-67/html/GAOREPORTS-RCED-97-67.htm.
[2] U.S. Dep't of Hous. and Urban Dev., Office of Policy Dev. and Research, *Study of the Fair Housing Initiatives Program* (2011), at iii, *available at* https://www.huduser.gov/publications/pdf/fhip_2011.pdf.

enforcement activities designed to" investigate housing discrimination, "discover and remedy discrimination in public and private real estate markets and real estate-related transactions," and develop models "to respond to new or sophisticated forms of discrimination" that violate the FHA. *Id.* at (b)(2). These investigation and enforcement activities include testing, technical assistance to local fair housing organizations, and funding for litigation costs. *Id.* In all relevant years, HUD has made PEI awards with a performance period of three or more years.

28.    For FHOI grants, the FHA provides that "the Secretary *shall* use funds made available under this section to enter into contracts or cooperative agreements with qualified fair housing enforcement organizations, other private nonprofit fair housing enforcement organizations, and nonprofit groups to build their capacity to provide fair housing enforcement." 42 U.S.C. § 3616a(c)(1) (emphasis added). In addition, "[t]he Secretary *shall* use funds made available under this section to help establish, organize, and build the capacity of fair housing enforcement organizations, particularly in those areas of the country which are currently underserved by fair housing enforcement organizations as well as those areas where large concentrations of protected classes exist." *Id.* at (c)(2) (emphasis added).

29.    For EOI grants, the FHA provides that "the Secretary *shall* establish a national education and outreach program fair housing groups to conduct education and outreach" to "prevent or eliminate discriminatory housing practices." *Id.* at (d)(1) (emphasis added); *see also id.* at (d)(2)–(3) The statute further mandates that the Secretary "*shall* establish or support education and outreach programs at the regional and local levels," and "*shall* provide funding to . . . support community-based education and outreach activities") (emphasis added).

30.    HUD promulgated regulations to implement the FHIP provision of the FHA. *See* 24 C.F.R. § 125 *et seq.* HUD defined "fair housing enforcement organization" as "any

organization, whether or not it is solely engaged in fair housing enforcement activities, that: (1) Is organized as a private, tax-exempt, nonprofit, charitable organization; (2) Is currently engaged in complaint intake, complaint investigation, testing for fair housing violations and enforcement of meritorious claims; and (3) Upon the receipt of FHIP funds will continue to be engaged in complaint intake, complaint investigation, testing for fair housing violations and enforcement of meritorious claims." 24 C.F.R. § 125.103.

31.     HUD defined "qualified fair housing enforcement organization" as "any organization, whether or not it is solely engaged in fair housing enforcement activities, that—(1) Is organized as a private, tax-exempt, nonprofit, charitable organization; (2) Has at least 2 years experience in complaint intake, complaint investigation, testing for fair housing violations and enforcement of meritorious claims; and (3) Is engaged in complaint intake, complaint investigation, testing for fair housing violations and enforcement of meritorious claims at the time of application for FHIP assistance." *Id.*

32.     HUD restricted eligibility for PEI grants to qualified fair housing organizations— those that have been engaged in intake, investigation, testing, and enforcement activities for at least two years and that are actively engaged in such activities at the time of the application—and to organizations with comparable enforcement experience. 24 C.F.R. § 125.401.

33.     HUD also specified that "FHIP funding is made available in accordance with the requirements of the authorizing statute (42 U.S.C. 3616 note), the regulation in this part, and Notices of Funding Availability (NOFAs), and is awarded through a grant or other funding instrument." 24 C.F.R. § 125.104(c).[3]

---

[3] The NOFAs referenced in the regulations are now called NOFOs.

34.     In addition to HUD's own regulations, HUD has incorporated the Office of Management and Budget's ("OMB") Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. *See* 24 C.F.R, § 85.1 (incorporating 2 C.F.R. § 200.0 *et seq*.).

35.     The OMB regulations impose additional requirements and obligations on federal agencies, including the requirements for NOFOs, recipient selection, agency disclosures, performance monitoring, and grant termination.

**The FHIP Application and Award Process**

36.     When Congress appropriates funds pursuant to Section 3616a, consistent with the requirements set forth in the FHA, HUD undertakes a budgeting and planning process, which includes establishing NOFO forecasts, obtaining clearance, and publishing approved NOFOs.[4]

37.     The NOFOs "announce amounts available for award, eligible applicants, and eligible activities, and may limit funding to one or more of the Initiatives." 24 C.F.R. § 125.104(d); *see also* 2 C.F.R. § 200.204. FHIP NOFOs also "include the specific selection criteria for awards, and will indicate the relative weight of each criterion." *Id.* NOFOs also include instructions for applicants about the funding process and how to apply. *Id.*

38.     Absent exigent circumstances, funding opportunities should remain open for at least sixty days. 2 C.F.R. § 200.204(b).

39.     Before a NOFO is published, the OMB regulations require HUD to create an Assistance Listing. An Assistance Listing is a posting in a public government database maintained by the General Services Administration ("GSA") that describes the grant program's

---

[4] U.S. Dep't of Hous. and Urban Dev., HUD Exchange, *Grants Management Lifecycle*, *available at* https://www.hudexchange.info/onecpd/assets/Image/Grants-Management-Lifecycle-HUD.jpg.

statutory requirements, eligibility requirements for applicants, program goals, estimated funding for the program and source of funds, and how the agency intends to measure progress. 2 C.F.R. § 200.203(b). The Assistance Listing links to the NOFO for more detail about the award.

40.     Following publication of a NOFO, qualified fair housing organizations may submit applications up to a designated deadline. Once the submission window has closed, HUD convenes a Technical Evaluation Panel ("TEP") to provide a sound, impartial, and comprehensive evaluation of proposals consistent with the guidelines of the applicable NOFO. HUD undertakes an initial screening, known as the threshold or intake review. During the threshold review, HUD sets aside ineligible applications and informs those applicants.

41.     Applications meeting the minimum eligibility requirements move forward to panel review in accordance with the NOFO rating factors. HUD may contact applicants during the review process to clarify application items or identify deficiencies for the applicant to cure.

42.     Upon completion of its evaluation, the TEP selects applications and secures internal approvals. HUD then assigns and commits funds for the awards, and the FHA requires HUD to notify Congress of the awards at least thirty days before entering into a grant agreement.

43.     HUD also issues a grant agreement or Notice of Award to recipients. The recipients and HUD then enter a negotiation phase. During this window, a HUD Government Technical Representative ("GTR") or Government Technical Monitor ("GTM") identified in the award document will work with grantees to develop a payment schedule based on the deliverable dates outlined in the recipient's Statement of Work.

44.     To finalize the award, the parties will have agreed upon all required administrative and program tasks outlined in the approved Statement of Work, all costs outlined in the approved budget, the period of performance for the grant and the approved payment

schedule. This agreement is reflected in an Assistance Award signed by both the recipient and by HUD, referred to as a HUD-1044. For multi-year grants, a HUD-1044 must be finalized for each grant year in the period of performance.

45.     HUD then administers the grants by obligating and contracting funds, reviewing and approving payments, and providing technical assistance, among other responsibilities.

46.     The grantee submits quarterly reports during the life of the FHIP grant, and the assigned HUD grant monitor tracks progress and performance.

47.     Once all administrative actions and work have been completed, the grantees submit final reports. HUD then reconciles the grant budget and drawdowns and closes out the awards.

48.     Under Section 200.1 of the OMB regulations, any action that a federal agency takes to "discontinue a Federal Award . . . before the planned end date of the period of performance" is defined as an award "Termination," unless that discontinuation occurs due to lack of available funds.

49.     HUD may lawfully "terminate" a federal award only on the bases set forth in 2 C.F.R. § 200.340, which include failure to comply with the terms and conditions of the award, termination by consent or request of the grantee, or, to the extent authorized by law, if an award no longer effectuates the program's goals or agency priorities. If HUD chooses to terminate on one of these bases, it must provide a written notice of termination as set forth in 2 C.F.R. § 200.341 and comply with the Administrative Procedures Act.

50.     Neither HUD's nor OMB's regulations permit the termination of a FHIP grant on any basis not set forth in 2 C.F.R. § 200.340 or pursuant to any other procedure. To the contrary, 24 C.F.R. § 125.401(a) further narrows HUD's authority with respect to multi-year PEI grants. It

14

sets out specific authorized bases for termination, providing that "[m]ulti-year funding [for PEI grants] may be contingent upon annual performance reviews and annual appropriations." By implication, HUD may not stop funding subsequent years of an otherwise-compliant PEI grant unless Congress has failed to appropriate funding for FHIP in those subsequent years, or unless HUD formally "terminates" the grant pursuant to § 200.340, *et seq*.

51.    When the first or second year of a PEI grant comes to an end, grantees sign an agreement governing the second or third year of the period of performance.

52.    HUD does not require applicants to submit another competitive grant application to receive continuing funds, nor could it lawfully do so without following the procedure for issuing a new Assistance Listing and NOFO.

53.    HUD policy, consistent with its statutory and regulatory requirements, is that each year of a continuing grant will be funded at the level indicated in the original award agreement without a formal request, subject to appropriations and compliance with program requirements. Consistent with Section 3616a and its implementing regulations, HUD's policy is to fund continuing years of compliant multi-year FHIP grants so long as Congress appropriates funds for FHIP (which it always has).

**Recent Congressional Appropriations for FHIP Funding**

54.    Congress has appropriated money for FHIP—both for new grants and continuing years of multi-year PEI grants—in all fiscal years relevant to this case.

55.    In 2022 and 2023, Congress appropriated $85,000,000 and $86,355,000, respectively, for grants under the FHIP provision, 42 U.S.C. § 3616a. *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117–103, 136 Stat. 750 "(FY2022 Appropriations Act");

Consolidated Appropriations Act, 2023, Pub. L. No. 117–328, 136 Stat. 5166 ("FY2023

Appropriations Act").

56.    In the Consolidated Appropriations Act for 2024, Congress appropriated

$86,355,000 for "contracts, grants, and other assistance, not otherwise provided for, as

authorized by title VIII of the Civil Rights Act of 1968 (42 U.S.C. 3601 et seq.) and section 561

of the Housing and Community Development Act of 1987 (42 U.S.C. 3616a)." Consolidated

Appropriations Act, 2024, Pub. L. No. 118–42, 138 Stat. 370. The FY2024 Appropriations Act

requires that such funds "remain available until September 30, 2025." *Id.*

57.    HUD has indicated that funds from the FY2024 Appropriations Act are designated

for new FHIP awards as well as ongoing PEI awards that were issued in the preceding two years.

**Currently Active PEI Awards**

58.    At all relevant times, HUD has issued PEI grants that have a multi-year period of

performance. A grant's "period of performance" is "the time interval between the start and end

date of a Federal award, which may include one or more budget periods." 2 C.F.R. § 200.1.

59.    On September 12, 2022, HUD published its FY2022 PEI NOFO, which

announced the availability of $15,000,000 through the PEI Multi-Year Funding Component to

fund new FY2022 grant awards. Individual applicants were eligible to receive up to $425,000 in

funding for the first year of a three-year PEI grant, with funding for a second and third year of

the grant subject to future years' appropriations.

60.    On March 21, 2023, HUD announced that it was awarding $14,575,000 in new

PEI grants.[5] These grants were issued pursuant to the FY2022 NOFO and were funded by

---

[5] HUD Public Affairs, *HUD Awards Over $54 Million to 182 Grantees in 42 States to Fight Housing Discrimination*, HUD Archives (Jan. 2, 2025), https://archives.hud.gov/news/2023/pr23-056.cfm.

FY2022 appropriations. Thirty-five organizations received new PEI grants, most of which received $425,000 for their first year[6].

61.     Recipients of these PEI grants entered into grant agreements with a three-year performance period beginning in 2023. The first year was funded from HUD's FY2022 budget as described in the FY2022 NOFO. Funding for the second and third grant years was subject to Congress appropriating sufficient funds in those years (i.e., subject to adequate FY2023 and FY2024 appropriations).

62.     On September 29, 2023, HUD published its FY2023 NOFO, which announced the availability of $16,704,250 through the PEI Multi-Year Funding Component to fund new FY2023 grant awards. Individual applicants were eligible to receive up to $425,000 per year for a three-year duration.

63.     On April 2, 2024, HUD announced that it was awarding $16,704,250 in new PEI grants.[7] These grants were issued to forty organizations, most of which received $425,000 for their first year.

64.     Recipients of these PEI grants entered into grant agreements with three-year performance periods beginning in 2024. The first year was funded from HUD's FY2023 budget as described in the FY2023 NOFO. Funding for the second and third years was subject to Congress appropriating sufficient funds in those years (i.e., subject to adequate FY2024 and FY2025 appropriations).

---

[6] *Fact Sheet: Fiscal Year 2022 Fair Housing Initiatives Program (FHIP) Grants State-by-State Awards*, U.S. Department of Housing and Urban Development, https://www.hud.gov/sites/dfiles/PA/documents/Fact-Sheet-FHIP-State-by-State.pdf.
[7] HUD Public Affairs, *HUD Awards Over $30 Million to Fight Housing Discrimination*, HUD Archives (Apr. 2, 2024), https://archives.hud.gov/news/2024/pr24-069.cfm.

**HUD's Refusal to Negotiate Years 2 and 3 of Active PEI Awards**

65.     On September 5, 2024, HUD designated $31.7 million from Congress's FY2024 Appropriation to fund active PEI awards.[8] HUD directed this portion of the FY2024 Appropriation to support the second and third years of seventy-five ongoing multi-year PEI grants first awarded through the FY2022 and FY2023 PEI NOFOs.

66.     HUD specified that forty second-year PEI recipients—the same forty organizations for which first-year funding was granted pursuant to the FY2023 PEI NOFO— would receive between $400,000 and $425,000 each for a total of $16,937,457.

67.     HUD also specified that each of thirty-five third-year PEI recipients—the same thirty-five organizations for which first-year funding was granted pursuant to the FY2022 PEI NOFO—would receive $425,000 and one third-year PEI recipient would receive $395,749.33 for a total of $14,845,759.33.

68.     Despite this announcement, HUD has refused to administer or implement these ongoing grants.

69.     Early in 2025, HUD representatives worked with as many as thirty-seven recipients of active PEI awards to facilitate the second and third years on their PEI awards. But HUD then made the decision to stop implementing active PEI awards.

70.     As early as April 16, HUD representatives shared with Active PEI Plaintiffs that HUD instructed them not to negotiate the required HUD-1044 contracts for upcoming years of active PEI grants. HUD has maintained this position and has refused to negotiate years two and three of active PEI grants even after the first year of the grant has completed—effectively

---

[8] HUD Public Affairs, *HUD Awards Over $32 Million to Fight Housing Discrimination*, HUD Archives (Sept. 5, 2024), https://archives.hud.gov/news/2024/pr24-227.cfm.

impounding these funds, which cannot be spent in accordance with their appropriated purpose without HUD taking these steps.

71.    For example, Plaintiff NFHA has an active three-year PEI grant, and the first year of that grant will end on June 30, 2025. However, a HUD grant officer has repeatedly told NFHA that HUD has instructed her that it cannot move forward with the procedures necessary to begin year two. The HUD representative has been unable to provide information about the elements necessary for completing NFHA's second-year HUD-1044, such as the statement of work, budget, payment schedule, performance, and deliverables schedule. HUD has similarly refused to negotiate years two and three for other Active PEI Plaintiffs.

72.    As of this filing, no Active PEI Plaintiff has an executed HUD-1044 for the upcoming year of its PEI award.

73.    Absent an executed HUD-1044, and the statement of work, budget, and deliverables described within it, grant recipients cannot do further work under their grants without risking undertaking activities and incurring expenses that HUD may subsequently refuse to approve. HUD has told some grant recipients not to do work on their grants at all.

74.    HUD has provided no explanation for its refusal to begin subsequent years of multi-year PEI grants, nor has HUD provided the Active PEI Class with any recourse to address its refusal to administer their existing grants.

75.    Consistent with HUD's decision not to administer FHIP awards, including existing PEI awards, President Trump released a proposed budget for Fiscal Year 2026 on May 2, and the proposal zeroes out FHIP funding entirely.[9]

---

[9] Office of Mgmt. and Budget, *Letter to The Honorable Susan Collins*, 27 (2025), *available at* https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf.

**HUD Issues NOFOs for Money Available Under its FY2024 Appropriations**

76.     Consistent with Congress's directives in the FY2024 Appropriations Act and Section 3616a(d), on September 20, 2024, HUD published a NOFO announcing the availability of approximately $8,350,000 in FY2024 funds under its EOI program "to develop, implement, carry out, and coordinate education and outreach programs designed to inform members of the public concerning their rights and obligations under the FHA."[10] HUD indicated that it expected to make approximately sixty-one EOI awards. Applications for these grants closed on November 19, 2024.

77.     Consistent with Congress's directives in the FY2024 Appropriations Act and Section 3616a(c), on September 20, 2024 HUD also published a NOFO announcing the availability of approximately $3,700,000 in funding under the FHOI program to help build the capacity of nonprofit fair housing organizations and establish new, separate organizations in areas that are underserved by existing organizations.[11] HUD indicated that it expected to make approximately eight FHOI awards. Applications for these grants closed on November 19, 2024.

78.     Consistent with Congress's directives in the FY2024 Appropriations Act and Section 3616a(b), on September 23, 2024, HUD published the FY2024 PEI NOFO, which formally announced the availability of approximately $9,691,793 in FY2024 funding for *new* PEI grants with a four-year performance period.[12] The NOFO indicated that HUD expected to

---

[10] Fair Housing Initiatives Program Education and Outreach Initiative, Dep't of Hous. and Urban Dev. (Sep. 20, 2024), https://www.grants.gov/search-results-detail/356475.

[11] Fair Housing Initiatives Program – Fair Housing Organizations Initiative, Dep't of Hous. and Urban Dev. (Sep. 20, 2024), https://www.grants.gov/search-results-detail/356476.

[12] Fair Housing Initiatives Program - Private Enforcement Initiative, Dep't of Hous. and Urban Dev. (Sep. 20, 2024), https://www.grants.gov/search-results-detail/356502.

make approximately twenty-three new awards from the funds available under the NOFO.

Applications for these grants closed on November 25, 2024.

79.    In addition to the funding for these new PEI grants, the FY2024 PEI NOFO also

confirmed the availability of the approximately $32 million in FY2024 funds for second- and

third-year PEI grants that was first announced on September 5, 2024, noting that $32,208,207 in

FY2024 funds "will be used to fund FY2023 (second year) and FY2022 (third year) grantees

outside of this NOFO."[13]

80.    All funds available in the FY2024 NOFOs were appropriated by Congress in the

FY2024 Appropriations Act.

81.    In recent years, when HUD has posted NOFOs announcing the availability of

funds for new FHIP grants in the fall, it has promptly made awards and announced recipients in

the early spring. For example, HUD announced its FY2023 PEI NOFO on September 29, 2023,

applications closed on December 18, 2023, and HUD announced grantees on April 2, 2024.

Similarly, HUD announced its FY2022 PEI NOFO on September 12, 2022, applications closed

on December 5, 2022, and HUD announced grantees on March 21, 2023.

82.    Consistent with its ordinary timeline, HUD's FY2024 NOFOs indicated that HUD

expected its evaluation period to last approximately ninety days, and that grantees would begin

their performance periods around April 30, 2025. *See supra* n. 13 at 11, 46.

83.    HUD has a duty to "execute" the competitive merit review process it has set forth

in the NOFO to select grant recipients. *See* 2 C.F.R. § 200.205. Section 3616a requires HUD to

---

[13] U.S. Dep't of Hous. and Urban Dev., Fair Housing Initiatives Program – Private Enforcement
Initiative Full Announcement, *available at* https://www.grants.gov/search-results-detail/356502.

make FHIP awards if funds are available. It also requires HUD to notify Congress of such awards at least 30 days before any grant agreement is finalized.

84.    Under the FY2024 Appropriations Act, FY2024 FHIP funds are available only until September 30, 2025.

85.    HUD's ordinary practice would be to convene a review panel, conduct the initial review, evaluate the eligible applications, select recipients, and work with recipients on finalizing the Assistance Award.

86.    To date, HUD has not announced or issued any new grants under any of the FY2024 NOFOs. No applicant for new FY2024 funds has received any indication from HUD that it intends to announce awards from FY2024 NOFOs or take any step towards doing so in the foreseeable future.

87.    To comply with the above provisions of Section 3616a, HUD must announce new grantees pursuant to the FY2024 NOFOs by no later than August 31, 2025. If it fails to do so before that date, then HUD will be unable to comply with the requirement in 42 U.S.C. § 3616a(e) to notify Congress of FHIP awards "not less than 30 days" before entering into a grant agreement.

88.    Consistent with the FY2024 Appropriations Act, HUD must obligate FHIP funds for new awards before the September 30 deadline. A failure to obligate these funds by then would constitute an unlawful impoundment.

89.    HUD has taken no action to withdraw its FY2024 NOFOs or the Assistance Listings associated with them. Nor has HUD taken any alternative steps towards obligating the FY2024 funds.

90.     HUD must expend the entire FY2024 FHIP appropriation unless Congress formally rescinds or defers the appropriation. If HUD would like the FY2024 FHIP appropriation rescinded, the Executive Branch must formally make a written request to Congress. Both Houses of Congress must then act on a bill rescinding the budget authority within 45 days after this written request, or else the funds must be made available for obligation. If HUD would like the FY2024 FHIP appropriation deferred, the Executive Branch must formally make a written request to Congress showing that the deferral satisfies enumerated criteria.

91.     President Trump conveyed a list of rescission proposals to Congress on May 28, 2025, but he did not seek rescission of the FY2024 FHIP appropriation, nor has the Executive Branch otherwise conveyed a request to Congress to rescind or defer the FY2024 FHIP Appropriation.

## INJURY TO PLAINTIFFS

92.     Plaintiff NFHA is a 501(c)(3) nonprofit membership organization that advocates for equal housing opportunity. NFHA's mission is to end housing segregation and ensure equal housing opportunities for all people and communities through its housing and community development, education and outreach, responsible AI, member services, public policy and advocacy, consulting and compliance, and enforcement initiatives.

93.     NFHA represents approximately 70 private, nonprofit fair housing organizations or operating members, 101 supporting member organizations, and 80 individual members.

94.     NFHA and its organizational members conduct activities to advance fair housing and fair lending for all and to enforce fair housing and fair lending laws, including engaging in fair housing policy and advocacy, enforcement, education and outreach; housing counseling; communicating and working with local community leaders on fair housing and lending rights;

and conducting training about fair housing and lending rights and responsibilities, the harmful effects of segregation and other discriminatory practices, and the need to counteract the effects of these harmful practices.

95.    NFHA applied a three-year PEI grant in November 2023, which it received in early 2024. The grant has a period of performance from July 1, 2024 through June 30, 2027. NFHA will complete the first year of the grant on June 30, 2025, but HUD has refused to negotiate year two of this three-year grant.

96.    NFHA timely applied for an EOI grant pursuant to HUD's FY2024 NOFOs. NFHA meets all the eligibility requirements for the proposed award and submitted all requisite materials in support of its application. To date, HUD has not awarded grants from the FY2024 EOI NOFO.

97.    NFHA also timely applied for an FHOI grant pursuant to HUD's FY2024 NOFOs. NFHA meets all the eligibility requirements for the proposed award and submitted all requisite materials in support of its application. To date, HUD has not awarded grants from the FY2024 FHOI NOFO.

98.    The first year of NFHA's current multiyear PEI award will expire on June 30, 2025, and HUD has refused to administer, implement, or finalize the next year of the award. HUD's failure to implement the second year of NFHA's active PEI grant is causing substantial harm to NFHA.

99.    Without years two and three of the PEI award, NFHA will lose $400,000 per year—money that would have effectuated Congress's goal of fair housing enforcement. This is a significant loss of funding that NFHA relied upon for staffing and operations.

100.    NFHA relies on multi-year PEI awards to provide consistency and stability. NFHA has undertaken long-term planning of fair housing enforcement activities, including systemic testing and investigations, in reliance on its ongoing PEI award. HUD's refusal to administer this award has caused budgeting confusion and lack of clarity as NFHA scrambles to cover costs and evaluate whether it may continue its planned work.

101.    HUD's failure to award EOI and FHOI grants from the pending FY2024 NOFOs is also harming NFHA. As set forth in NFHA's grant applications, NFHA planned to use these funds to further the goals of the FHA. With the funds, NFHA planned to support the establishment of a new private, full-service fair housing organization in a number of ways, including:

- Provide fair housing assistance to North Carolina residents forced to relocate as the result of Hurricane Helene;
- Hire and train staff on state and federal fair housing laws;
- Train staff on how to conduct fair housing education and outreach to consumers, housing providers, government officials, and others involved in housing issues;
- Train staff on how to perform fair housing tests to investigate complaint-based and systemic discrimination in the rental, home sales, and mortgage lending markets;
- Perform intakes, investigations, and housing counseling for victims of housing discrimination;
- Recruit and train attorneys to assist victims of housing discrimination;
- File meritorious complaints;
- Complete systemic investigations;
- Conduct fair housing education and outreach;
- Publicize the work of the Fair Housing Council of North Carolina

102.    If HUD does not issue the FHOI awards, NFHA will not be able to support establishing a new fair housing organization in North Carolina, and the organization will not be created, leaving North Carolina without a full-service fair housing organization. The absence of a group providing fair housing services in the state is particularly harmful as there are critical fair housing issues facing North Carolina residents in the wake of Hurricane Helene.

103.    In addition to the direct injuries to NFHA, NFHA members are harmed by HUD's refusal to administer FHIP funding. Many of NFHA's organizational members rely on FHIP funding to conduct their day-to-day fair housing operations, and many could not survive in the absence of FHIP funding. HUD's refusal to implement active PEI awards and to award new grants from the pending NOFOs has caused NFHA's members to stop work, turn away clients, cancel leases, and lay off staff members. It also prevents NFHA members from partnering with NFHA itself on multi-jurisdictional investigations or projects. NFHA's members have also been plunged into budgeting chaos and confusion.

104.    HUD's failure to administrate FHIP also jeopardizes many NFHA members' ability to remain eligible for future PEI grants. Because PEI grants may only be awarded to organizations that currently engage in – and have recent experience with – complaint intake and investigation, testing for fair housing violation and enforcement of meritorious claims, the loss of FY2024 funding for PEI grants may reduce the likelihood that many grantees will be eligible in subsequent years.

105.    HUD's actions and failures to act have injured and are injuring NFHA members, such that many individual NFHA members would have standing to bring a suit.

106.    One NFHA member has already had to close due to HUD's failure to finalize a continuing year's PEI grant. The Greater Houston Fair Housing Center ("GHFHC"), which relied on FHIP funding to continue operations, closed its programs at the end of May 2025. GHFHC was in its second year of a three-year PEI grant, but HUD has been unwilling to finalize year three of the grant, which was GHFHC's only source of funding.

107.    Plaintiff TFHC is another NFHA member experiencing great harm. TFHC's PEI grant ended on May 31, 2025. Throughout the multi-year period of performance for this grant,

TFHC met or exceeded its goals for deliverables on this grant. TFHC received $375,000 for Year 1 and $425,000 per year for Years 2 and 3 through its PEI award, which accounted for 85% of its operating budget.

108.    In anticipation of the May 31 expiration of its PEI grant, TFHC applied for a new PEI grant through the FY2024 PEI NOFO. As before, TFHC sought $425,000 per year, an amount that would cover the vast majority of its annual $500,000 operating budget.

109.    Because PEI grants are limited to qualified and/or experienced fair housing organizations, because TFHC met all eligibility requirements, and because TFHC had met or exceeded its goals for the previous PEI grant and most recently had received an excellent performance rating from HUD, TFHC had a reasonable expectation of receiving a new PEI award from the FY2024 PEI NOFO.

110.    HUD's failure to issue new awards is causing TFHC substantial harm. In the absence of a new award, TFHC will begin terminating employees at the end of this month.

111.    The loss of funding and staff will directly limit the number of clients that TFHC is able to serve. In particular, TFHC will not be able to help FHA-protected clients who face evictions; will not be able to support unrepresented housing discrimination complainants as they navigate the upcoming closure of the Tennessee Human Rights Commission; and will not be able to help as many people with disabilities obtain reasonable accommodations.

112.    As a result of HUD's failure to issue new PEI awards, TFHC has already stopped all testing work and systemic investigations, including an active investigation into discriminatory advertising practices.

113.    The unavailability of a new PEI award will fundamentally alter TFHC's operations and may force the organization to close entirely if it cannot find replacement funding in the next year.

## CLASS ALLEGATIONS

114.    Plaintiff NFHA brings this Complaint as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) on behalf of itself and similarly situated grantees.

115.    Plaintiff NFHA seeks to certify a class consisting of: all other fair housing organizations who received multi-year PEI awards in 2023 or 2024 but who have been unable to negotiate their second or third years with HUD.

116.    This action is properly maintained as a class action for the following reasons:

a. ***Joinder.*** Joinder of all class members is impracticable because of the size, geographic dispersal, and financial precarity of the class. Thirty-six organizations received multi-year PEI awards from HUD but have been unable to negotiate their second and third years. The class is readily ascertainable because it is defined by objective factors. The proposed class includes organizations spread across the country in approximately twenty different states. Because class members are, by definition, non-profit organizations with limited resources, and because the conduct at issue in this case is further limiting class members' resources, it would not be possible for each organization to pursue claims individually.

b. ***Commonality.*** The claims alleged on behalf of the proposed class exclusively raise questions of law and fact that are common to the class. Each class member received a multi-year PEI grant pursuant to 42 U.S.C. § 3616a and associated regulations; each class member's grant should run for at least one additional year;

and each class member was in compliance with the terms of the grant. Common questions of law and fact include, among others:

   i.   Whether HUD may lawfully refuse to implement the second and third years of class members' active PEI grants;

   ii.   Whether HUD has provided class members with notice and an opportunity to be heard as required by both the OMB regulations and the Due Process Clause;

   iii.   Whether HUD's failure to administer active PEI grants creates an unlawful impoundment of Congressionally appropriated funds.

c.   **Typicality.** The claims of the class representative are typical of the class because the class representative received a multi-year PEI grant pursuant to the same statute and regulations as the other class members and, like other class members, has been unable to negotiate the contract for the next year of its PEI award.

d.   **Adequacy.** The class representative and class counsel will fairly and adequately represent the interests of the class. The class representative has no interests that are antagonistic to the interests of other class members, and class counsel have years of experience in class action and civil rights litigation.

e.   **Appropriateness for Injunctive and Declaratory Relief.** Defendant has acted or refused to act on grounds generally applicable to the class, refusing to negotiate class members' second and third years of their PEI awards. The requested relief, ordering HUD to administer FHIP awards, including by negotiating contracts for active PEI awards, will resolve all class members' harm.

## CAUSES OF ACTION

### Count I
### Administrative Procedures Act, 5 U.S.C. § 706(1)
### Brought by All Plaintiffs

117.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

118.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

119.    Congress appropriated $86,355,000 under Section 3616a in the FY2024 Appropriations Act. HUD awarded $31.7 million of that appropriation for second- and third-year funding for active PEI grants. HUD also issued NOFOs that earmarked approximately $21.7 million of that appropriation for new PEI, FHOI, and EOI awards.

120.    HUD is now refusing to administer or implement existing PEI grants and refusing to award new FHIP grants from the pending FY2024 NOFOs.

121.    HUD's refusal to administer FHIP grants violates the mandatory language in the FHIP provision of the FHA; violates the FY2024 Appropriations Act; and violates the regulations that govern FHIP grants.

122.    This Court can compel HUD to administer FHIP awards as required by law.

### Count II
### Administrative Procedures Act, 5 U.S.C. § 706(2)
### Brought by All Plaintiffs

123.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

124.    The APA provides that a reviewing court "shall" "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; that is "contrary to constitutional right, power, privilege, or immunity"; or that is "without observance of procedure required by law." 5 U.S.C. § 706(2).

125.    HUD has decided not to administer FHIP funding that was duly appropriated by Congress, both by refusing to administer or implement existing PEI grants and by refusing to award new FHIP grants from the pending FY2024 NOFOs.

126.    HUD's unexplained and unjustified refusal to administer FHIP funding is arbitrary, capricious, and an abuse of discretion.

127.    HUD's refusal to administer FHIP grants is contrary to law because it violates the mandatory language in the FHIP provision of the FHA, the FY2024 Appropriations Act, the regulations that govern FHIP grants, and the Constitution.

128.    HUD's refusal to administer FHIP grants is contrary to constitutional rights because it violates separation of powers, the Appropriations Clause, and the Due Process Clause.

129.    This Court can set aside HUD's decision and compel HUD to administer FHIP awards as required by law.

## Count III
## Appropriations Clause, U.S. Const. art. I, § 9, cl. 7
## Brought by All Plaintiffs

130.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

131.    This Court has inherent equitable power to enjoin Executive conduct that violates the Constitution.

132.    The Appropriations Clause of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]" U.S. Const. art. I, § 9, cl. 7. The Clause protects Congress's exclusive power over the federal purse. The Executive Branch does not have constitutional authority to override or disregard Congress's appropriations.

133.    HUD's unlawful impoundment of congressionally appropriated funds infringes on Congress's exclusive power over the federal purse. That exclusive power is conferred and protected in part by the Appropriations Clause, and the Executive has no constitutional authority to countermand it.

134.    This Court can compel HUD to abide by the Constitution by obligating and/or expending appropriated funds.

## Count IV
## Separation of Powers
## Brought by All Plaintiffs

135.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

136.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.

137.    HUD's unlawful impoundment of congressionally appropriated funds exceeds the Executive Branch's constitutional authority and impermissibly usurps the legislature's power, in violation of the Separation of Powers. *See* U.S. Const. art. II, § 3; U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1; U.S. Const. art. I, § 7, cl. 2.

138.    This Court can compel HUD to abide by the Constitution by obligating and/or expending appropriated funds.

## Count V
## Violation of the Due Process Clause, U.S. Const. amend. V
## Brought by Active PEI Plaintiffs

139.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

140.    The Due Process Clause of the Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

141.    HUD's refusal to negotiate second and third-year PEI contracts violates the Due Process Clause because it effectively terminates active PEI grants without notice or process in disregard of the Active PEI Plaintiffs' substantial reliance interests in their continued receipt of such funding.

142.    Active PEI Plaintiffs have a protected property interest in their continued receipt of PEI funding. A protected property interest lies where a party has a legitimate and reasonable reliance on a promise from the state, such as a grant agreement. Property rights protect those claims upon which people rely in their daily lives, and that reliance may not be arbitrarily undermined. HUD regulations provide that multi-year PEI grants can be terminated only for poor performance or lack of appropriations, and HUD has not made a finding that either applies.

143.    The degree of pre-deprivation process to which someone is entitled under the Due Process Clause depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication.

144.    The loss of active PEI grants would have a devastating effect on the Active PEI Plaintiffs, forcing many of them to close entirely. By contrast, HUD has no legitimate interest in allowing already appropriated and obligated funding to lapse.

145.    Given Active PEI Plaintiffs' weighty interest in their PEI grants and HUD's non-existent interest in abrogating those rights, the Active PEI Plaintiffs were entitled to meaningful pre-deprivation process, including notice and a meaningful opportunity to be heard. Plaintiffs did not receive any process at all.

146.    This Court can compel HUD to abide by the Constitution by administering Active PEI Plaintiffs' ongoing PEI awards.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that the Court grant them the following relief:

    a.   Certify a class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

    b.   Declare HUD's refusal to administer FHIP grants unlawful;

    c.   Order HUD to administer FHIP awards, including but not limited to requiring HUD to:

        i.   Ensure all outstanding FY2024 FHIP funds are obligated before September 30;

        ii.   Implement the second and third years of Active PEI Plaintiffs' ongoing PEI awards; and

        iii.   Issue awards and finalize contracts for the FY2024 NOFOs;

    d.   Award plaintiffs their costs and reasonable attorneys' fees; and

    e.   Order such additional relief as this Court deems just and appropriate.

Dated: June 24, 2025                Respectfully submitted,

                                      */s/ Lila Miller*
                                      Lila Miller (DC Bar No. 1643721)
                                      Reed Colfax (DC Bar No. 471730)
                                      Robert Hunter* (DC Bar No. 90031794)
                                        RELMAN COLFAX PLLC
                                      1225 19th Street NW, Suite 600
                                      Washington, DC 20036
                                      Tel: (202) 728-1888
                                      Fax: (202) 728-0848
                                      lmiller@relmanlaw.com
                                      rcolfax@relmanlaw.com
                                      rhunter@relmanlaw.com

                                      *Attorneys for Plaintiffs*

                                      *\* Application to D.D.C. Pending*