# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL FAIR HOUSING ALLIANCE, *on behalf of itself and those similarly situated*, and TENNESSEE FAIR HOUSING COUNCIL,

Plaintiffs,

v.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, and SCOTT TURNER, *in his official capacity as Secretary of Housing and Urban Development*,

Defendants.

Case No. 1:25-cv-01965-SLS

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 3

    I.     Congress developed FHIP to create and fund fair housing organizations to prevent and eliminate discriminatory housing practices ...................................................... 3

    II.    HUD implementation of FHIP to distribute funding to fair housing organizations 4

    III.   HUD's failure to award new FHIP grants and administer ongoing PEI grants ...... 8

         A. HUD's failure to award new FHIP monies appropriated by Congress .............. 8

         B. HUD's failure to process the current year of multi-year PEI grants ................ 10

    IV.   The harm to organizations denied FHIP funds ..................................................... 12

LEGAL STANDARD ....................................................................................................... 15

ARGUMENT .................................................................................................................. 15

    I.     Plaintiffs are likely to succeed on the merits of their claims. .............................. 15

         A. HUD's refusal to administer FHIP awards violates the Appropriations Clause. ...................................................................................................... 16

         B. HUD's refusal to administer FHIP awards violates separation of powers. ...... 17

         C. HUD's refusal to implement existing PEI awards violates procedural due process ....................................................................................................... 19

         D. HUD has unlawfully withheld administration of FY2024 FHIP funds. ........... 23

         E. HUD has unreasonably delayed action on Plaintiffs' FY2024 FHIP grant applications and continuing years' PEI funding ....................................... 29

         F. HUD's failure to award FY2024 FHIP Funds is arbitrary and capricious and contrary to law. ...................................................................................... 34

    II.    Plaintiffs will suffer irreparable harm absent a temporary restraining order. ....... 38

    III.   The balance of the equities and the public interest favor preliminary relief. ....... 42

CONCLUSION ............................................................................................................... 43

## TABLE OF AUTHORITIES

**Cases** ............................................................................................................................ **Page(s)**

*3883 Conn. LLC v. District of Columbia*,
    336 F.3d 1068 (D.C. Cir. 2003) ................................................................................20, 21

*Agua Caliente Band of Cahuilla Indians v. Mnuchin*,
    No. 20-cv-01136 (APM), 2020 WL 2331774 (D.D.C. May 11, 2020) ................................29

*Aids Vaccine Advocacy. Coalition v. U.S. Dep't of State*,
    770 F. Supp. 3d 121 (D.D.C. Mar. 10, 2025) ................................................................19, 27

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013) ........................................................................... *passim*

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*,
    770 F. Supp. 3d 822 (D. Md. 2025), *reconsideration denied*, No. 1:25-CV-
    00702-JRR, 2025 WL 863319 (D. Md. Mar. 19, 2025) ........................................................41

*Am. First Legal Found. v. Becerra*,
    No. 24-1092 (RC), 2024 WL 3741402 (D.D.C. Aug. 9, 2024)................................................29

*Am. Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)....................................................................................................................34

*Bd. of Regents v. Roth*,
    408 U.S. 564 (1972)..................................................................................................................20

*California v. U.S. Dep't of Educ.*,
    132 F.4th 92 (1st Cir. 2025)......................................................................................................42

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ..............................................................................15, 38, 40

*Cincinnati Soap Co. v. United States*,
    301 U.S. 308 (1937)..................................................................................................................16

*Clinton v. City of New York*,
    524 U.S. 417 (1998)..................................................................................................................16

*Cobell v. Norton*,
    240 F.3d 1081 (D.C. Cir. 2001) ..............................................................................................32

*Commc'ns & Control, Inc. v. F.C.C.*,
    374 F.3d 1329 (D.C. Cir. 2004)................................................................................................34

*CSL Plasma Inc. v. U.S. Customs & Border Prot.*,
    628 F. Supp. 3d 243 (D.D.C. 2022) .........................................................................................36

*Ctr. for Biological Diversity v. Zinke*,
  260 F. Supp. 3d 11 (D.D.C. 2017) ........................................................................24

*D.A.M. v. Barr*,
  474 F. Supp. 3d 45 (D.D.C. 2020) ........................................................................15

*Da Costa v. Immigr. Inv. Program*,
  80 F.4th 70 (D.C. Cir. 2024) .................................................................................33

*F.C.C. v. Fox Television Studios*,
  556 U.S. 502 (2009) ..............................................................................................34

*Goldberg v. Kelly*,
  397 U.S. 254 (1970) ..............................................................................................20

*Hall v. Johnson*,
  599 F. Supp. 2d 1 (D.D.C. 2009) ..........................................................................15

*Halverson v. Slater*,
  129 F.3d 180 (D.C. Cir. 1997) ..............................................................................21

*Harris Cnty. v. Kennedy*,
  -- F. Supp. 3d --, 2025 WL 1707665 (D.D.C. June 17, 2025) ...............................19

*Jud. Watch, Inc. v. Kerry*,
  844 F.3d 952 (D.C. Cir. 2016) ..............................................................................26

*Kirwa v. U.S. Dep't of Def.*,
  285 F. Supp. 3d 21 (D.D.C. 2017) ........................................................................26

*Ky. Dep't of Corr. v. Thompson*,
  490 U.S. 454 (1989) ..............................................................................................20

*La. Delta Serv. Corps. v. Corp. for Nat'l and Cmty. Serv.*,
  No. 25-378-JWD-RLB, 2025 WL 1787429 (M.D. La. June 27, 2025) ...................22

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) .............................................................................41, 43

*Lopez v. Fed. Aviation Admin.*,
  318 F.3d 242 (D.C. Cir. 2003) ..............................................................................21

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ..............................................................................................19

*Motevali v. Rubio*,
  No. 24-1029 (SLS), 2025 WL 885116 (D.D.C. Mar. 21, 2025) ...............30, 31, 33

*Nat. Ass'n of Reg. Councils v. Costle*,
    564 F.2d 583 (D.C. Cir. 1977) ........................................................................26

*Nat. Fed. Of the Blind v. U.S. Abilityone Comm'n*,
    421 F. Supp. 3d 102 (D. Md. 2019) ...........................................................26, 38

*Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*,
    763 F. Supp. 3d 36 (D.D.C. 2025) .............................................................17, 41

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................................42

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................................................23

*Olim v. Wakinekona*,
    461 U.S. 238 (1983) ......................................................................................20

*Open Am. v. Watergate Special Prosecution Force*,
    547 F.2d 605 (D.C. Cir. 1976) ........................................................................33

*Open Cmtys. All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) ................................................................41

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) .........................................................35, 37, 38

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ..................................................................42

*S. Educ. Found. v. U.S. Dep't of Educ.*,
    No. 25-1079 (PLF), 2025 WL 1453047 (D.D.C. May 21, 2025) ...........................42

*SAI v. Dep't of Homeland Sec.*,
    149 F. Supp. 3d 99 (D.D.C. 2015) ..................................................................33

*Spann v. Colonial Vill., Inc.*,
    899 F.2d 24 (D.C. Cir. 1990) .........................................................................32

*Tate v. Pompeo*,
    513 F. Supp. 3d 132 (D.D.C. 2021) ................................................................30

*Telecomms. Rsch. & Action Ctr. v. FCC ("TRAC")*,
    750 F.2d 70 (D.C. Cir. 1984) ...............................................................29, 31, 33

*Train v. City of New York*,
    420 U.S. 35 (1975) ..................................................................................16, 17

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992) .......................................................................23

*Trump v. United States*,
   603 U.S. 593 (2024) .......................................................................................18

*U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*,
   665 F.3d 1339 (D.C. Cir. 2012) ................................................................16, 18

*U.S. House of Representatives v. Burwell*,
   130 F. Supp. 3d 53 (D.D.C. 2015) .................................................................16

*U.S. Women's Chamber of Com. v. U.S. Small Bus. Admin.*,
   No. 1:04-cv-01889, 2005 WL 3244182 (D.D.C. Nov. 30, 2005) .........................33

*United States v. James Daniel Good Real Prop.*,
   510 U.S. 43 (1993) .........................................................................................22

*Widakuswara v. Lake*,
   --- F. Supp. 3d ---, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) ..........................28

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...........................................................................................42

**Regulations, Statutes, and Constitutional Provisions**

2 C.F.R. § 200.100 .............................................................................................37

2 C.F.R. § 200.200 *et seq* ....................................................................... *passim*

2 C.F.R. § 200.340 *et seq.* ...............................................................21, 22, 37

24 C.F.R. § 125 *et seq.* ........................................................................... *passim*

24 C.F.R § 85.1 ....................................................................................................5

24 C.F.R. 125.401 ...............................................................................................37

59 Fed. Reg. 44,596-01 (Aug. 29, 1994) ...........................................................37

2 U.S.C. § 683 .....................................................................................................27

5 U.S.C. § 551 *et seq* .................................................................................29, 34

5 U.S.C. § 706 .....................................................................................................34

31 U.S.C. § 1502 ...........................................................................................26, 30

42 U.S.C. § 3601 et seq .....................................................................................17

42 U.S.C. § 3616a ............................................................................................ *passim*

Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 370 (2024)............. *passim*

Housing and Community Development Act of 1992, Pub. L. 102–550, 106 Stat 3672 (1992), ............................................................................................... 3

U.S. Const. amend. V ....................................................................................... 19

U.S. Const. art. I, § 9, cl. 7 ............................................................................. 16

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) ....................................................... 25, 37

*Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92d Cong. 279, 282 (1971) ....................................................................................................... 16

Fair Hous. Initiatives Program – Fair Hous. Orgs. Initiative, Dep't of Hous. and Urb. Dev. (Sep. 20, 2024), https://www.grants.gov/search-results-detail/356476 ............................................................................................... 8

Fair Hous. Initiatives Program – Priv. Enf't Initiative, Dep't of Hous. and Urb. Dev. (Sep. 20, 2024), https://www.grants.gov/search-results-detail/356502 ............................ 8

Fair Hous. Initiatives Program – Priv. Enf't Initiative, Dep't of Hous. and Urb. Dev. (Sept. 29, 2023), https://www.grants.gov/search-results-detail/350423; ......................... 7

Fair Hous. Initiatives Program Educ. and Outreach Initiative, Dep't of Hous. and Urb. Dev. (Sep. 20, 2024), https://www.grants.gov/search-results-detail/356475 ............................................................................................... 8

Fair Hous. Initiatives Program Priv. Enf't Initiative, Dep't of Hous. and Urb. Dev. (Sept 12, 2022), https://www.grants.gov/search-results-detail/343465; ................................. 7

HUD Pub. Affs., HUD Awards Over $30 Million to Fight Housing Discrimination, HUD Archives (Apr. 2, 2024), https://archives.hud.gov/news/2024/pr24-069.cfm ................................................. 31

HUD Pub. Affs., *HUD Awards Over $30 Million to Fight Housing Discrimination*, HUD Archives (Apr. 2, 2024), https://archives.hud.gov/news/2024/pr24-069.cfm ................................................. 7

HUD Pub. Affs., *HUD Awards Over $32 Million to Fight Housing Discrimination*, HUD Archives (Sept. 5, 2024), https://archives.hud.gov/news/2024/pr24-227.cfm ......................................... 11, 27

HUD Pub. Affs., HUD Awards Over $54 Million to 182 Grantees in 42 States to
    Fight Housing Discrimination, HUD Archives (Mar. 21, 2023),
    https://archives.hud.gov/news/2023/pr23-056.cfm;...............................................................31

HUD Pub. Affs., *HUD Awards Over $54 Million to 182 Grantees in 42 States to
    Fight Housing Discrimination*, HUD Archives (Jan. 2, 2025),
    https://archives.hud.gov/news/2023/pr23-056.cfm.................................................................7

Jesse Coburn, *Federal Investigators Were Preparing Two Texas Housing
    Discrimination Cases — Until Trump Took Over*, ProPublica (March 25,
    2025, 7:00 AM), https://www.propublica.org/article/trump-hud-texas-
    housing-discrimination-cases-dallas-houston .........................................................41

Nat'l Fair Hous. All., 2024 Fair Hous. Trends Report (2024),
    https://nationalfairhousing.org/wp-content/uploads/2023/04/2024-Fair-
    Housing-Trends-Report-FINAL_07.2024.pdf .................................................................32, 40

Roshanak Mehdipanah, *Without Affordable, Accessible, and Adequate Housing,
    Health Has No Foundation*, The Milbank Quarterly, 101 No. S1, 419, 425–26
    (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10126970/pdf/MILQ-101-
    419.pdf ....................................................................................................................32

## INTRODUCTION

Plaintiffs seek emergency relief to address concrete, ongoing, and compounding injuries arising from the United States Department of Housing and Urban Development's ("HUD") refusal to administer the Fair Housing Initiatives Program ("FHIP"). For more than thirty years, Congress has appropriated funding for FHIP and HUD has distributed the funding through grants to private nonprofit fair housing organizations, like Plaintiffs here. The organizations use this funding to accomplish what the federal government alone cannot: dedicated enforcement of the Fair Housing Act ("FHA") in vulnerable communities across the country. This partnership has proceeded without incident, and to great success, until now.

In abnegation of binding statutory and regulatory requirements, HUD is refusing to implement ongoing, multi-year grants that it awarded in years past, despite having earmarked portions of the Fiscal Year 2024 ("FY2024") appropriation for these specific awards. HUD is also refusing to award new FHIP grants from the FY2024 appropriation, despite also having earmarked funds for these awards and solicited applications from the limited pool of eligible nonprofits, as it has done every year since FHIP was established. The September 30, 2025 date after which the FY2024 funds no longer will be available is rapidly approaching, yet HUD is taking none of the steps necessary to ensure this money will be spent.

Make no mistake: HUD's misconduct has already inflicted real and present harm on FHIP recipients and applicants, and that irreparable harm is worsening every day. Those organizations that are in the middle of a multi-year grant period but have not been able to finalize the paperwork for the upcoming grant year are already being denied a central source of funding, if not the vast majority of their entire operating budgets. Plaintiff National Fair Housing Alliance ("NFHA") should have started the second year of its multi-year FHIP grant on July 1, but HUD refused to finalize the paperwork. Right now, NFHA is without the $400,000 annual grant that

1

HUD awarded it. Many of its member organizations are in the same boat—one was already forced to close because it simply could not absorb the gap in funding created by HUD's refusal to implement the next year of its multi-year FHIP award, and others are at risk of being forced to close or suffer irreparable harm to their operations soon.

Organizations that applied for new grants are likewise already experiencing harm from HUD's failure to select recipients. The prolonged and unexpected uncertainty as to whether a primary source of funding will be available has plunged these organizations into planning and budgeting chaos. This delay has also caused funding gaps: FHIP applicants have a reasonable expectation of receiving awards because only certain nonprofits qualify for this funding, yet HUD is refusing to make awards to anyone. Plaintiff Tennessee Fair Housing Council ("TFHC"), for example, ended its previous FHIP grant on May 31 and is now without FHIP funding because HUD has yet to issue new awards.

The circumstances that have brought Plaintiffs to the courthouse doors are dire. They are also unlawful. HUD's disregard of congressional appropriations flies in the face of the Appropriations Clause and separation-of-powers principles, which reserve the power of the purse for Congress alone. HUD's failure to provide multi-year grant recipients with notice or process before effectively terminating their grants also violates the Due Process Clause. HUD has violated the Administrative Procedure Act ("APA"), which prohibits agencies from doing precisely what HUD is doing: unlawfully denying or unreasonably withholding agency action. The APA also protects against behavior that is arbitrary, capricious, and contrary to law, yet HUD has provided no explanation for its about face, and certainly not one that could cure the agency's violation of the FHA, appropriations legislation, applicable regulations, and the Constitution. To stem the tide of harm, this Court should order HUD to implement existing

multi-year grants and to issue new FHIP awards. Without such intervention, many organizations'
days are numbered and the congressional purpose to fund fair housing enforcement will be
frustrated.

## FACTUAL BACKGROUND

I. **Congress developed FHIP to create and fund fair housing organizations to prevent
and eliminate discriminatory housing practices.**

Congress amended the FHA to establish FHIP in 1992, and FHIP has subsequently
served as the centerpiece for the prevention and remediation of housing discrimination in the
country. The fair housing organizations funded by FHIP monies are "a necessary component of
the fair housing enforcement system," Housing and Community Development Act of 1992, Pub.
L. 102–550, 106 Stat 3672 (1992), and are critical to advancing the purposes and provisions of
the FHA. The U.S. Government Accountability Office noted the effectiveness of fair housing
organizations in a comprehensive analysis of FHIP in 1997, (Gov't Acct. Off., Letter Report,
Fair Housing: Funding and Activities Under the Fair Housing Initiatives Program (1997),
available at https://perma.cc/DYA9-39WZ.'), and in 2011, a HUD study concluded that FHIP
organizations add enormous value to HUD's ability to enforce the Fair Housing Act. (U.S. Dep't
of Hous. and Urb. Dev., Off. of Pol'y Dev. and Rsch., Study of the Fair Housing Initiatives
Program (2011), at iii, available at https://www.huduser.gov/publications/pdf/fhip_2011.pdf).

The FHIP component of the FHA requires HUD to provide Congressionally appropriated
funding to nonprofit fair housing agencies under three general categories of funding. The monies
are for: grants to provide intake, testing, investigation, conciliation, and litigation of complaints
of housing discrimination to enforce the remedial goals of the FHA ("Private enforcement
initiatives" or "PEI" grants); to provide education and outreach services to disseminate
information about fair housing ("Education and outreach" or "EOI" grants); and to establish,

organize, and build the capacity of fair housing organizations ("Funding of fair housing organizations" or "FHOI" grants). *See* 42 U.S.C. § 3616a. All three types of FHIP grants are at issue here. *Id.*

Congress directed in the statute that HUD "shall use funds" for these specific purposes so long as appropriated funds are available. PEI grants encompass "a range of investigation and enforcement activities designed to" investigate housing discrimination, "discover and remedy discrimination in public and private real estate markets and real estate-related transactions," and develop models "to respond to new or sophisticated forms of discrimination." *Id.* at (b)(2). FHOI grants "shall . . . help establish, organize, and build the capacity of fair housing enforcement organizations, particularly in those areas of the country which are currently underserved by fair housing enforcement organizations as well as those areas where large concentrations of protected classes exist." *Id.* at (c)(2). EOI grants "shall" be used to "establish a national education and outreach program." *Id.* at (d)(1); *see also id.* at (d)(2)–(3) (also providing for funding to regional, local, and community-based programs). Congress has appropriated FHIP funds every year since creating FHIP.

## II.    HUD implementation of FHIP to distribute funding to fair housing organizations.

HUD has promulgated regulations to implement the programs described in the FHIP statute. *See generally* 24 C.F.R. § 125 *et seq.* The PEI regulation "provides funding . . . to investigate violations and obtain enforcement of the rights granted under the Fair Housing Act . . . .";  the FHOI regulation "provides funding to develop or expand the ability of existing eligible organizations to provide fair housing enforcement, and to establish . . . new fair housing enforcement organizations"; and the EOI regulation "provides funding [to support] education and outreach programs designed to inform members of the public concerning their rights and obligations under the provisions of fair housing laws." 24 C.F.R. §§ 125.301–125.501.

The FHIP regulations direct HUD to publish Notices of Funding Opportunity ("NOFO") that set forth the available amounts of awards, eligible applicants and activities, and selection criteria. 24 C.F.R. § 125.104(d).[1] FHIP NOFOs also "include the specific selection criteria for awards, and will indicate the relative weight of each criterion." *Id.*

In addition to HUD's own regulations, HUD has incorporated the Office of Management and Budget's ("OMB") Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, which impose additional requirements and obligations on federal agencies, including the requirements for NOFOs, recipient selection, agency disclosures, performance monitoring, and grant termination. *See* 24 C.F.R § 85.1 (incorporating 2 C.F.R. § 200.0 *et seq.*). OMB regulations require that HUD publish a NOFO for any openly competed grant award. 2 C.F.R. § 200.204. The regulations also require HUD to "design and execute a merit review process" for the applications it receives under that NOFO. 2 C.F.R. § 200.205. The merit review process is "an objective process of evaluating Federal award applications in accordance with the written standards of the Federal agency." *Id.* It must be "described or incorporated by reference in the applicable funding opportunity." *Id.* In practice, FHIP NOFOs typically require responses to four categories of questions: (1) an overview of the applicant's qualifications, (2) a description of the need for fair housing services, (3) a proposed budget and statement of work which outline the tasks to be accomplished, and (4) details about how the work under the grant will be evaluated. Ex. 1, Kemple Declaration, at ¶ 7. A typical application

---

[1] After Congress appropriates funds for FHIP, HUD first goes through a budgeting and planning process, which includes establishing NOFO forecasts, obtaining clearance, and publishing approved NOFOs. (U.S. Dep't of Hous. and Urb. Dev., HUD Exchange, Grants Management Lifecycle, available at https://www.hudexchange.info/onecpd/assets/Image/Grants-Management-Lifecycle-HUD.jpg).

from a fair housing organization for a FHIP covers 60–70 pages and details the proposed uses for the FHIP funds. *Id.*

Once the submission deadline for applying for FHIP grants closes, HUD convenes a Technical Evaluation Panel ("TEP") to evaluate the proposals under the guidelines of each grant category. Kemple Decl. at ¶ 10. Upon completion of its evaluation, the TEP applies the criteria under its merit review process to select the applicants that will be awarded the grants. *Id.*  For the PEI grant category in particular—which are generally the largest grants, span multiple years, and constitute a significant portion of organizations' overall budgets—organizations coming off an existing grant virtually always receive a new PEI grant, provided that the organization has performed well and has met the current grant requirements.  Kemple Decl. at ¶ 10. HUD has restricted eligibility for PEI grants to qualified fair housing organizations, which are organizations that have been engaged in intake, investigation, testing, and enforcement activities for at least two years and that are actively engaged in such activities at the time of the application, or organizations with comparable experience. *See* 24 C.F.R. § 125.401(b); 42 U.S.C. § 3616a(h)(1). Because of the eligibility requirements, if HUD does not award PEI grants to applicants who already are receiving them, there are almost no other eligible applicants for PEI funds. Kemple Decl. at ¶ 8. Organizations have come to reasonably rely on the expectation of the continuation of multi-year PEI funding in planning projects and making other critical decisions, which was the very purpose of making the PEI grants cover multiple years. Ex. 2, Rice Declaration at ¶ 18.

HUD usually makes grant announcements for all types of FHIP awards within three or four months of the application due date. Kemple Decl. at ¶ 9.[2] The FHA requires HUD to notify Congress of the awards at least thirty days before entering into a grant agreement. 42 U.S.C. § 3616a(e).

Shortly after HUD selects and notifies FHIP award recipients, a HUD Government Technical Representative ("GTR") or Government Technical Monitor ("GTM") contacts the applying organization's representative to review the specific terms and conditions of the grant, including the details of grant reporting, the governing federal regulations, and HUD's Application and Award Policies and Procedures Guide. Kemple Decl. at ¶ 11. The organization and the HUD representative may also discuss the details of the proposed statement of work and the grant budget proposed by the organization. *Id.* Finally, the organization and HUD representative agree on a payment schedule and a start date. *Id.*

Once all of the terms of the new grant are negotiated and agreed upon, the organization and a HUD representative sign a HUD-1044, also known as an Assistance Award Agreement, and several associated forms. *Id.* at ¶ 12.

---

[2] For example, HUD announced its FY2023 PEI NOFO on September 29, 2023, applications closed on December 18, 2023, and HUD announced grantees on April 2, 2024. Fair Hous. Initiatives Program – Priv. Enf't Initiative, Dep't of Hous. and Urb. Dev. (Sept. 29, 2023), https://www.grants.gov/search-results-detail/350423; HUD Pub. Affs., *HUD Awards Over $30 Million to Fight Housing Discrimination*, HUD Archives (Apr. 2, 2024), https://archives.hud.gov/news/2024/pr24-069.cfm. Similarly, HUD announced its FY2022 PEI NOFO on September 12, 2022, applications closed on December 5, 2022, and HUD announced grantees on March 21, 2023. Fair Housing Initiatives Program Private Enforcement Initiative, Dep't of Hous. and Urb. Dev. (Sept 12, 2022), https://www.grants.gov/search-results-detail/343465; HUD Pub. Affs., *HUD Awards Over $54 Million to 182 Grantees in 42 States to Fight Housing Discrimination*, HUD Archives (Mar. 21, 2023), https://archives.hud.gov/news/2023/pr23-056.cfm.

Typically, it takes between two and four weeks from the grant award to complete and sign the required documents. At that point, in the normal sequence, the organization may begin work under the FHIP grant.

### III. HUD's failure to award new FHIP grants and administer ongoing PEI grants.

#### A. HUD's failure to award new FHIP monies appropriated by Congress.

January 2025, upon the change of administration, HUD's usual process for administering FHIP has stopped. Prior to that, HUD's administration of the program had begun in a typical fashion with Congress appropriating $86,355,000 for "contracts, grants, and other assistance, not otherwise provided for, as authorized by title VIII of the Civil Rights Act of 1968 (42 U.S.C. 3601 *et seq*.) and section 561 of the Housing and Community Development Act of 1987 (42 U.S.C. 3616a)." Consolidated Appropriations Act, 2024, Pub. L. No. 118–42, 138 Stat. 370 (2024) (hereinafter "FY2024 Appropriations Act"). On September 20 and 23, 2024, HUD published NOFOs announcing the availability of PEI, FHOI, and EOI:

1. approximately $9,691,793 in FY2024 funding for new PEI grants with a four-year performance period. Fair Hous. Initiatives Program – Priv. Enf't Initiative, Dep't of Hous. and Urb. Dev. (Sep. 20, 2024), https://www.grants.gov/search-results-detail/356502. *See also* Ex. 7, FY2024 PEI NOFO.

2. approximately $3,700,000 in funding under the FHOI program to help build the capacity of nonprofit fair housing organizations and establish new, separate organizations in areas that are underserved by existing organizations. Applications for these grants closed on November 19, 2024. Fair Hous. Initiatives Program – Fair Hous. Orgs. Initiative, Dep't of Hous. and Urb. Dev. (Sep. 20, 2024), https://www.grants.gov/search-results-detail/356476. *See also* Ex. 8, FY2024 FHOI NOFO.

3. approximately $8,350,000 in FY2024 funds under its EOI program "to develop, implement, carry out, and coordinate education and outreach programs designed to inform members of the public concerning their rights and obligations under the FHA." Fair Housing Initiatives Program Education and Outreach Initiative, Dep't of Hous. and Urb. Dev. (Sep. 20, 2024), https://www.grants.gov/search-results-detail/356475. *See also* Ex. 9, FY2024 EOI NOFO.

Many organizations timely applied for the grants announced in these NOFOs, including Plaintiff TFHC, which was in its third and final year of a PEI grant and had a May 31, 2025 end date for its performance period. Ex. 3, Lafferty Declaration at ¶ 13.

Then, the process stopped. Although HUD has a duty to "execute" the competitive merit review process set forth in the NOFO to select grant recipients, *see* 2 C.F.R. § 200.205, HUD has not processed the applications for the currently available FHIP funds and has provided no explanation for the failure to award the available grants as announced in September 2024. Time is running short to designate the FHIP grantees, as the FY2024 appropriations provides that the funds "remain available until September 30, 2025." FY2024 Appropriations Act. In order to award grants by September 30 and to provide Congress with 30 days' notice as required under the FHA, HUD must announce new grantees pursuant to the FY2024 NOFOs by no later than August 31, 2025—just a few weeks from now.

The organizations that have applied for and depend on FHIP funds as the primary part of their funding have been unable to get any information regarding the timing for review of the applications or the announcement of awards. Organizations seeking details about next year's funding have received responses from HUD representatives such as that sent to Plaintiff TFHC, "I am not sure. Sorry." Lafferty Decl. at ¶ 17. Thus, HUD has already drastically deviated from its normal funding timetable without any explanation.

**B.  HUD's failure to process the current year of multi-year PEI grants.**

For multi-year FHIP PEI grants, which recently have been awarded for three-year periods, HUD and the organization negotiate the first year at the commencement of the grant following the procedure described above for all new FHIP grants. Kemple Decl. at ¶ 16. The current active PEI grants were awarded under the FY2022 and FY2023 NOFOs, which made over $30 million —over $15 million for FY2022 and over $16 million for FY2023 – available for new PEI grants. A total of seventy-five organizations were awarded new three-year PEI grants with three-year grant periods that ran either from 2023–2026 or 2024–2027. (Ex. 4, FY2022 PEI NOFO; Ex. 5, FY2023 PEI NOFO). NFHA, for example, received a PEI award in 2024 and it had a grant performance period of July 1, 2024 through June 30, 2027. Rice Decl. at ¶ 12. Most of the organizations were awarded $1.275 million, evenly divided into $425,000 a year through the FY2022 and FY2023 PEI grant awards.

Historically, HUD reaches out to organizations with multi-year PEI grants one or two months before the expiration of the current year of their grant. HUD and the organization then complete negotiations and all necessary paperwork for the upcoming year of the grant. That timing allows the next grant year to begin immediately after the existing one ends and ensures continuous funding. (Kemple Decl. at ¶ 17. PEI multi-year grantees do not submit an additional application for subsequent years of funding, *Id.*, and organizations will receive funding for the subsequent years of a PEI grant if they have performed satisfactorily and appropriations permit. 24 C.F.R. § 125.401(a).

On September 5, 2024, HUD designated $31.7 million from Congress's FY2024 Appropriation to fund active PEI awards—to the seventy-five organizations going into the second and third years of their multi-year PEI grants that were first awarded through the FY2022

and FY2023 PEI NOFOs. HUD Pub. Affs., *HUD Awards Over $32 Million to Fight Housing Discrimination*, HUD Archives (Sept. 5, 2024), https://archives.hud.gov/news/2024/pr24-227.cfm.

For some, HUD negotiated the second and third years of their PEI grants—most in December 2024 or early January 2025—and those organizations have begun work under the next year of their grants. However, HUD is refusing to negotiate the next year for twenty-seven organizations with PEI multi-year grants ("Active PEI Plaintiffs"), creating a funding shortfall as their previous grant years end. HUD has not provided the permissions for those organizations to start work under the next year of the grant. Rice Decl. at ¶ 8.This means that those organizations cannot start their second or third grant year, creating a funding shortfall as their previous grant years end.

HUD has provided no explanation for its refusal to begin subsequent years of multi-year PEI grants. Rice Decl. at ¶ 20; Ex. 6, Tamez Declaration at ¶ 27. Active PEI Plaintiffs have emailed and called their GTRs and GTMs asking when they can begin the process for securing the next year of funding. Kemple Decl. at ¶ 22. The GTR/GTMs, in turn, have stated that HUD Headquarters has instructed them not to move forward with the second or third year of funding. *Id.*; *see also* Tamez Decl. at ¶ 28 (HUD GTR stating that she did not "have any updates regarding negotiations and the start of years 2 and 3"). A HUD grant officer has repeatedly told Plaintiff NFHA that her instructions from HUD headquarters are that she cannot move forward with the procedures necessary to begin year two. Rice Decl. at ¶ 7. The HUD representative has been unable to provide further information about the elements necessary to finalize the second year of NFHA's PEI grant. *Id.* Most of the twenty-seven organizations' existing PEI grant years have now ended, and they are currently facing a severe budget shortfall. As far as NFHA is

aware, all of the Active PEI Plaintiffs are in good standing with their current PEI grant, have received favorable performance reviews, and have not received any communication from HUD suggesting any substantive reason for the failure to process the next year of their grants. Kemple Decl. at ¶ 21.

## IV.    The harm to organizations denied FHIP funds.

The failures of HUD to administer funds appropriated by Congress under the FY2024 NOFOs and to finalize the second and third years of existing PEI grants is having destructive, irreversible impacts on fair housing organizations and the individuals and communities they serve. Rice Decl. at ¶ 13. Some organizations deprived of funding will be forced to close soon, many have already been forced to cut back staff, and all have had to limit the services they provide. Rice Decl. ¶ 13. Plaintiff TFHC will likely close in nine to twelve months if FHIP funding is not restored. Lafferty Decl. at ¶ 24. Like many of the Active PEI Grant Plaintiffs, the Fair Housing Council of South Texas anticipates having to close at the end of the year if the second year of its PEI grant is not finalized well before then. Tamez Decl. at ¶ 44.

The ultimate impact has already befallen NFHA member Greater Houston Fair Housing Center ("GHFHC"), which was in the middle of its multi-year PEI grant but has been forced to close due to HUD's failing to fund the next year of the grant. The closing of the organization, the only one of its kind in the area, will leave a significant gap in fair housing enforcement. The organization has ended its assistance with issues such as accessibility and reasonable accommodations for people with disabilities, sexual harassment, and racial discrimination. The large and diverse greater Houston area now is unserved by FHIP, leaving many vulnerable people without recourse for fair housing violations and other housing needs.

Without FHIP funding, organizations have terminated employees and are trying to operate with reduced staffs. Rice Decl. at ¶ 13, Tamez Decl. at ¶ 38 (describing eliminating staff dedicated to housing counseling, referrals, and complaint intakes); Lafferty Decl. at ¶ 19 (describing terminating the organization's test coordinator position, which has ended the organization's capacity to conduct systemic and follow-up testing). With fewer personnel, organizations are unable to help specific clients who need the organization's services. Lafferty Decl. at ¶ 23 (organization has had to limit taking on new clients); Tamez Decl. at ¶ 34 (organization has abandoned assisting 37 discrimination victims who have recently contacted the organization). The lack of funding is undermining staff morale as it creates doubt and instability and staff make the understandable decision to leave the underfunded organizations. Rice Decl. at ¶ 24, Lafferty Decl. at ¶ 19. If funding resumes, organizations will have an even harder time recruiting staff in a difficult hiring market. Rice Decl. at ¶ 14.

Organizations have stopped investigations, paused work with existing clients, and turned away new intakes reporting housing discrimination. Rice Decl. at ¶ 13. Organizations have cut back their direct advocacy for victims, housing counseling, education and outreach to consumers, housing providers, and local governments. Tamez Decl. at ¶ 40 (describing reductions in representing discrimination victims during the HUD administrative complaint process; testing activities of the housing industry; performing systemic investigations of housing discrimination; education and outreach activities; engaging in activities to advance fair housing policy and research; and providing consulting and technical assistance to housing providers, public housing authorities, government agencies, housing advocates, civil rights organizations, health science centers, and healthcare service providers). Fair housing organizations are having to narrow their service areas and limit their multi-jurisdictional work in ways that are leaving

communities without sufficient fair housing assistance. Rice Decl. at ¶ 20; Lafferty Decl. at ¶ 6 (cutting service area by one-third).

In addition, the absence of FHOI awards is preventing organizations like NFHA from supporting the development of new organizations like the one planned for North Carolina, which is now on hold despite the extreme need for fair housing services in the area. Rice Decl. at ¶ 26. Without FHOI grants, other organizations will be unable to carry out plans to expand their range of services to the communities in their area. Rice Decl. at ¶ 27. HUD's failure to award EOI grants also has a significant impact on the applicant organizations and the communities and people they try to reach with their information outreach. The EOI FHIP grants are critical to supporting the network of organizations engaged in education and outreach activities to create the very effective national education and outreach program that ensures awareness of fair housing issues. Rice Decl. at ¶ 31. For example, many organizations hold annual Fair Housing Month conferences to update and teach their communities about fair housing. Rice Decl. at ¶ 32. These conferences educate thousands of tenants, housing providers, real estate agents, appraisers, government officials, lenders, and landlords on their rights and responsibilities under the fair housing laws. *Id.* Because of the refusal to process the FY2024 EOI NOFO, fair housing organizations cannot plan for their 2026 Fair Housing Month Activities. *Id.*

The impairment of fair housing organizations' ability to provide fair housing services because of the absence of FHIP funding is happening at the same time as substantial cuts to state funding for fair housing services. Rice Decl. at ¶ 22. All of the organizations that have been unable to obtain FHIP funding for 2025 and 2026 because HUD has not awarded funds under the FY2024 NOFOs or failed to process the second or third years of PEI grants are suffering severe

harm that compounds on the organizations and the communities they serve every day funds are delayed. Rice Decl. at ¶ 9.

## LEGAL STANDARD

To secure a temporary restraining order, "the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if [an] injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The same standard applies to both temporary restraining orders and to preliminary injunctions."). Where, as here, the requested temporary relief would run against the government, "the final two . . . factors—balancing the equities and the public interest— merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). All factors favor the entry of immediate relief.

## ARGUMENT

### I.    Plaintiffs are likely to succeed on the merits of their claims.

HUD has abdicated its responsibility to administer FHIP, a responsibility that derives directly from the Constitution as well as the Fair Housing Act. Congress has appropriated FHIP funding, and HUD therefore must spend it. HUD's refusal to do so violates the Appropriations Clause and separation of powers, and contradicts specific mandates of the Fair Housing Act. As to the Active PEI Plaintiffs, HUD's failure to provide either notice or process before depriving organizations of their protected interests in their multi-year grants violates the Due Process Clause. HUD's conduct also constitutes agency action unlawfully withheld and unreasonably delayed and agency action that is arbitrary, capricious, and contrary to law. Plaintiffs are likely to succeed on all claims.

**A.  HUD's refusal to administer FHIP awards violates the Appropriations Clause.**

The Constitution empowers Congress alone to make appropriations, and HUD cannot lawfully disregard Congress's specific appropriation of FHIP funding. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. This Clause gives Congress "exclusive power" over federal spending. *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). The Founders intended the Appropriations Clause "as a restriction upon the disbursing authority of the Executive [Branch]." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937); *see also U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015) ("Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive."). When Congress has appropriated funding, "the President does not have unilateral authority to refuse to spend the funds." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). Nor may the President "decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken County*, 725 F.3d at 259.[3]

Defendants' refusal to administer duly appropriated FHIP funding plainly runs afoul of the Appropriations Clause. Congress has specifically appropriated $86,355,000 for FHIP

---

[3] *See also Train v. City of New York*, 420 U.S. 35 (1975); Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 1, 1969), *reprinted in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92d Cong. 279, 282 (1971) ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.")

"contracts, grants, and other assistance." FY2024 Appropriations Act.[4] In refusing to implement active PEI awards or to award new grants from the pending NOFOs, HUD is declining to disburse funds that Congress duly appropriated. HUD is thus flouting a congressional appropriation and violating the Appropriations Clause.

HUD's conduct is akin to the agency action the Supreme Court roundly rejected decades ago in *Train v. New York*, 420 U.S. 35 (1975). In *Train*, the Environmental Protection Agency attempted to spend less than the amount appropriated by Congress under the Federal Water Pollution Control Act Amendments of 1972, but the Court held that the agency must allot all appropriated funds. *Id.* at 47–48. More recently, Judge AliKhan of this Court determined that the Office of Management and Budget's ("OMB") failure to disburse appropriated funds likely ran afoul of the Appropriations Clause. *Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, 763 F. Supp. 3d 36, 55–56 (D.D.C. 2025). In *National Council*, Judge AliKhan granted a temporary restraining order in a case challenging OMB's temporary pause of agency grant, loan, and other assistance programs, determining that such an indefinite pause amounted to an attempt "to wrest the power of the purse away from the only branch of government entitled to wield it." *Id.* at 56. The same is true here: HUD is refusing to disburse duly appropriated FHIP funds, which amounts to an improper attempt to wrest control of appropriations away from Congress.

**B.  HUD's refusal to administer FHIP awards violates separation of powers.**

Beyond violating specific provisions in the Constitution, HUD's conduct violates the bedrock separation-of-powers principles that animate the structure of the federal government. It is indisputable that "[n]o matter the context," the executive's authority to act must "necessarily

---

[4] Section 3616a is the only section of the FHA that expressly contemplates grants, contracts, and cooperative agreements. *See generally* 42 U.S.C. § 3601 et seq.

'stem either from an act of Congress or from the Constitution itself.'" *Trump v. United States*,

603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585

(1952)). Unlike a scenario where Congress has authorized executive action or where Congress

and the executive share concurrent authority, when the executive acts in a manner "incompatible

with the expressed or implied will of Congress, [its] power is at its lowest ebb." *Sawyer*, 343

U.S. at 637. (Jackson, J., concurring). In such situations, the executive's actions must be

"scrutinized with caution," and they "can rely only upon [the President's] own constitutional

powers minus any constitutional powers of Congress over the matter." *Id.*

       Here, HUD's authority to act is at its lowest ebb because the refusal to administer FHIP

funding contradicts the express will of Congress as reflected in both the mandatory language of

Section 3616a of the FHA and the explicit appropriation of funds pursuant to Section 3616a. *See*

*infra* Section I.F. HUD's conduct is accordingly permissible only if it both derives from the

Constitution and does not encroach on Congress's power. Neither requirement is satisfied.

Nothing in the Constitution supplies HUD with authority to determine or disregard

appropriations; rather, Congress retains "exclusive power over the federal purse." *U.S. Dep't of*

*Navy*, 665 F.3d at 1346. Indeed, while on the D.C. Circuit, then-Judge Kavanaugh addressed this

issue head on: The President may not disregard a statutory mandate to spend funds "simply

because of policy objections." *In re Aiken County*, 725 F.3d at 259; *see also id.* at 261

n.1 (explaining that where a President has policy reasons "for wanting to spend less than the full

amount appropriated by Congress for a particular project or program," it remains the case that

"even the President does not have unilateral authority to refuse to spend the funds" and must

propose a rescission to Congress for its approval). HUD thus lacks the constitutional authority to

disregard lawful appropriations, and doing so wrongly trammels on Congress's exclusive appropriations prerogative.

For that reason, courts in this District have held that agency refusals to disburse appropriated funds violate separation of powers. For example, in *Aids Vaccine Advocacy. Coalition v. U.S. Department' of State*, 770 F. Supp. 3d 121 (D.D.C. 2025), the court addressed a challenge to the suspension of foreign aid. Judge Ali found the plaintiffs likely to succeed on their separation-of-powers claim, finding that the suspension encroached on "Congress's own, core constitutional power to determine *whether and how much* money is spent." *Id.* at 147. So too here: Congress mandated that, whenever funding is appropriated under Section 3616a, HUD issues and administers grants—and Congress appropriated such funding in its Fiscal Year 2024 appropriations legislation. Similarly, Judge Cooper rejected the Department of Health and Human Service's attempt to cancel COVID-era grants for cause in *Harris County v. Kennedy*, -- F. Supp. 3d --, 2025 WL 1707665, at *8 (D.D.C. June 17, 2025). There, the Court held that "HHS's refusal to spend the appropriated grant funds is revealed as a quintessential policy choice by the Executive Branch," one that "cannot be squared with Congress's contrary legislative choices." *Id.* "When such a conflict arises, controlling law is clear: Congress's laws trump the President's preferences." *Id.* The separation-of-powers principles embedded in the Constitution require HUD to disburse Congress's FHIP appropriation.

## C. HUD's refusal to implement existing PEI awards violates procedural due process.

The Fifth Amendment's Due Process Clause provides that no person "shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner" before being "finally deprived of a property interest." *Mathews v.*

*Eldridge*, 424 U.S. 319, 333 (1976). Active PEI Plaintiffs have a vested property interest in their multi-year PEI awards, yet HUD has effectively terminated these awards with neither notice nor an opportunity to be heard. That violates due process.

Recipients of multi-year PEI awards have property interests in their ongoing awards. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). To determine whether a particular statute creates a constitutionally protected property interest, we ask whether the statute or implementing regulations place "substantive limitations on official discretion." *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983). Statutes or regulations limit official discretion if they contain "'explicitly mandatory language,' *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 463 (1989) (quoting *Hewitt v. Helms*, 459 U.S. 460, 471–72 (1983)). In *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970), for example, the Supreme Court held that because persons meeting state eligibility standards automatically qualified for benefits, eligible individuals had a protected property interest in the receipt of the benefits.

Here, the FHIP regulations, the NOFOs, and the OMB regulations all impose substantive limitations on HUD's discretion to deny continuing years' funding for the Active PEI Plaintiffs' multi-year awards, and thus imbue recipients with a protected property interest.[5] The FHIP

---

[5] The D.C. Circuit has distinguished between the property rights of "applicants" and the rights of "holders" of existing benefits. *3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1072 (D.C. Cir. 2003). There is no dispute that Active PEI Plaintiffs have already received PEI awards, so the question of HUD's discretion asks not how much latitude HUD has to make an

regulation permits multi-year awards to be "contingent upon annual performance reviews and annual appropriations," *see* 24 C.F.R. § 125.401(a); no other bases for mid-grant termination are identified. Adequate performance and ongoing appropriations are the only two grounds on which HUD may terminate multi-year PEI awards. *See Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) (finding that statute providing that the Navy Secretary "may delegate" powers to Coast Guard employees excluded the delegation of such powers to non-Coast Guard officials). Even were that not the case, the FHIP regulations do not expressly provide HUD with unfettered discretion to terminate multi-year PEI awards. *Accord Lopez v. Fed. Aviation Admin.*, 318 F.3d 242, 243 (D.C. Cir. 2003) (finding substantial discretion where statute and regulation explicitly permitted rescission "at any time for any reason"). The same is true of the NOFOs for existing PEI awards: the only contingencies mentioned are performance and appropriations. *See* Exs. 4 and 5. The articulation of specified bases for termination renders HUD's discretion "constrained sufficiently to give [Plaintiffs] an expectation in the continued effect of the [grants]—and therefore a property interest in them." *3883 Connecticut LLC*, 336 F.3d 1068, 1073 (discretion constrained where applicable laws listed five grounds for revocation and two for stop-work orders).

The OMB regulations are even more prescriptive and act as a further limitation on HUD's ability to terminate a grand midstream. HUD is permitted to terminate grants only for noncompliance, with consent, or when "an award no longer effectuates the program goals or agency priorities" so long as such termination is "pursuant to the terms and conditions of the Federal award[.]" 2 C.F.R. § 200.340(a)(4). In the event of a termination for cause, a hearing is

---

initial award, but rather how much discretion HUD has to terminate an existing award. *Id.* ("[O]ur inquiry focuses on the official's discretion to revoke or suspend the permit.").

required. 2 C.F.R. § 200.342. Based in large part on these limitations, a district court recently determined that a federal funding recipient "had a legitimate claim of entitlement to the [federal] award it had previously been granted." *La. Delta Serv. Corps. v. Corp. for Nat'l and Cmty. Serv.*, No. 25-378-JWD-RLB, 2025 WL 1787429, at *26 (M.D. La. June 27, 2025). The same is true of the Active PEI Plaintiffs.

Because of their protected property interests, PEI recipients are entitled to notice and an opportunity to be heard prior to termination of their grant funding. "[T]he general rule" is that due process "requir[es] predeprivation notice and hearing." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993). Here, HUD's refusal to implement years two and three of existing PEI grants has clearly metastasized into an unconstitutional deprivation. In refusing to finalize the documents necessary for ongoing PEI grants, HUD has disrupted organizations' activities, planning, and funding. At least one organization closed down entirely because of the disruption in its PEI grant, and others are scrambling to cover costs. *See supra* Section IV. Yet even now, HUD has not provided Active PEI Plaintiffs with notice of its termination decision or rationale, nor has HUD provided recipients with any opportunity to contest the deprivation. HUD has simply refused even to acknowledge that it is depriving Active PEI Plaintiffs of their funding. Post-deprivation notice and a hearing may suffice in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after" the deprivation of property, *James Daniel Good Real Prop.*, 510 U.S. at 53, but HUD has never explained or suggested why this case presents such an "extraordinary situation"—and in any event, Plaintiffs did not receive post-deprivation process (let alone notice).

HUD cannot defeat Plaintiffs' procedural due process claim by claiming that it is a contract claim for damages dressed in constitutional garb. The D.C. Circuit has held that

"litigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992). That rule applies equally to due process claims, which may be brought in district court even where they necessarily rest "on the premise that [a] contract with the government gave [the plaintiff] a constitutionally protected property interest." *Id.* HUD's utter failure to provide Active PEI Plaintiffs with any notice or process whatsoever before stripping them of multi-year PEI grants violated their procedural due process rights, and this Court may order the prospective injunctive relief necessary to redress this unconstitutional deprivation.

**D.  HUD has unlawfully withheld administration of FY2024 FHIP funds.**

When Congress instructs that an agency "shall" take an action, the agency is required by law to take that action. The Fair Housing Act obligates HUD to issue new FHIP grants and to continue enforcement under the PEI program if Congress makes funds available under the statute —as it has done every year since establishing FHIP. By refusing to take action on either front, HUD has unlawfully withheld the mandatory and nondiscretionary actions required by Section 3616a of the FHA and the regulatory regime that supports it.

Section 706(1) of the APA directs courts to compel agency action that is unlawfully withheld or unreasonably delayed. The statute applies when "an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original). When "an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act," even though it may not interfere with the agency's discretion regarding *how* it acts. *Id.* at 65. "[T]he 'law' that generates a mandatory duty need not be a

statute—it can also be an 'agency regulation[ ] that ha[s] the force of law[.]'" *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 21 (D.D.C. 2017) (quoting *Norton*, 542 U.S. at 64). HUD is required by law to spend Congress's FHIP appropriation, yet it has refused to do so.

      **1.   HUD has mandatory and nondiscretionary duty to act on new FY2024 NOFO applications and fund continuing years' grants when funding is available and performance is adequate.**

Section 3616a and its associated regulations set forth several mandatory, nondiscretionary duties for HUD when Congress appropriates FHIP funds. Section 3616a itself requires HUD to use available funds to enter into binding agreements with fair housing organizations to further the purposes set forth in Section 3616a: private fair housing enforcement, *see* 42 U.S.C. § 3616a(b)(1) ("[HUD] *shall* use funds made available under this subsection to conduct, through contracts with private nonprofit fair housing enforcement organizations, investigations of violations of [the FHA] and such enforcement activities as appropriate to remedy such violations"); fair housing organization capacity-building, *see* § 3616a(c)(2) ("[HUD] *shall* use funds made available under this section to enter into contracts or cooperative agreements with [fair housing organizations] organizing to build their capacity to provide fair housing enforcement"); and education and outreach, *see* § 3616a(d)(1)–(3) (requiring that HUD, "through contracts with [fair housing organizations], *shall*" both "establish a national education and outreach program" and "establish or support [such] programs at the regional and local levels.") (emphases added).

Section 3616a's mandatory language applies to the use of FY2024 funds, because Congress has made such funds "available" under Section 3616a. *See* FY2024 Appropriations Act (requiring that approximately $86 million for "contracts, grants, and other assistance" authorized by 42 U.S.C. § 3616a shall "remain available until September 30, 2025"). HUD has also

published NOFOs announcing that funding is available pursuant to all three FHIP initiatives described in Section 3616a, including continuing years' PEI funding. *See* Ex. 7 FY2024 PEI NOFO, Ex. 8, FY2024 FHOI NOFO, Ex. 9, FY2024 EOI NOFO.

### i.     HUD's duties regarding new FY2024 Applications

HUD regulations, including the OMB regulations that HUD has incorporated by reference, describe several more requirements that HUD must follow to administer FHIP awards. In advance of accepting applications for *new* FHIP grants, HUD must publish a Notice of Funding Opportunity. *See* 2 C.F.R. § 200.204 (agencies "must" publicly announce competitive funding opportunities). The agency then "*must* design and execute a merit review process of applications for discretionary Federal awards." 2 C.F.R. § 200.205 (emphasis added).[6] That merit review process "*must* be described or incorporated by reference in the applicable funding opportunity." *Id.* (emphasis added). Accordingly, each FY2024 NOFO describes the merit review process that HUD must follow in reviewing application for the initiative. *See* FY2024 PEI NOFO at 32; FY2024 FHOI NOFO at 31–32, FY2024 EOI NOFO at 33–34. Any funds remaining after grantees are selected must be reallocated first within the initiative and then to other FHIP Initiatives based on demand. FY2024 PEI NOFO at 45; FY2024 FHOI NOFO at 45–46; FY2024 EOI NOFO at 54–55. Thus, because FY2024 funds have been made available by Congress (and because HUD has published FY2024 NOFOs for all initiatives), Section 3616a and 2 C.F.R. § 200.205 require HUD to act and to make a decision on Plaintiffs' applications.

HUD has limited time to do so. Fiscal year funds will remain available for obligation only until September 30, 2025. *See* FY2024 Appropriations Act. At that point, HUD will be

---

[6] Black's Law Dictionary defines "execute" as, *inter alia*, "[t]o perform or complete (a contract or *duty*)" (emphasis added). Black's Law Dictionary (12th ed. 2024).

unable to enter into new grant agreements using FY2024 funds absent an order of this court.[7]

Moreover, Section 3616a(e) requires HUD to announce to Congress new FHIP grant recipients at

least thirty days before entering into any new agreement. Thus, to comply with both Section

3616a(e) and Congressional appropriations, HUD must announce *new* recipients no later than

August 30, 2025. If it does not, HUD cannot lawfully enter into grant agreements with new

recipients and FY2024 funds will revert to the treasury in contravention of Congress's intent.

    In short, HUD has a mandatory, nondiscretionary duty to use available FY2024 FHIP

funds for grant agreements while such funds are available. *See Jud. Watch, Inc. v. Kerry*, 844

F.3d 952, 954 (D.C. Cir. 2016) (holding that a statute providing that certain agency heads "shall"

request enforcement action under certain circumstances encompasses a mandatory,

nondiscretionary duty under Section 706(1) to make such a request when those circumstances

arise); *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 27, 41 (D.D.C. 2017) (statute providing

that the Department of Defense "shall determine" whether veteran citizenship applicants had

served honorably, which "shall be proved by a duly authenticated certification," created a

nondiscretionary duty to approve or deny the certification). And when, as here, that statutory

mandate is to be fulfilled through competitive grants, HUD has a mandatory, nondiscretionary

duty to execute the merit review process it has set up to evaluate and award such grants pursuant

to that process. 2 C.F.R. § 200.205; *Nat. Fed. Of the Blind v. U.S. Abilityone Comm'n*, 421 F.

Supp. 3d 102, 134 (D. Md. 2019) (acknowledging that the requirements of Section 200.205 are

mandatory). Finally, HUD has a mandatory, nondiscretionary duty to complete such actions

---

[7] This court has the authority to order that FY2024 funds remain available pending resolution of
this case. *See Nat. Ass'n of Reg. Councils v. Costle*, 564 F.2d 583, 588 (D.C. Cir. 1977)
(affirming the authority of a court to order than funds be held available beyond their statutory
lapse); 31 U.S.C. § 1502(b) (same).

before FY2024 funds become unavailable. *See In re Aiken Cty.*, 725 F.3d at 266 (the executive

has no discretion to "disregard … statutory obligations that apply to the Executive Branch, such

as . . . to implement or administer statutory projects or programs"); *Aids Vaccine Advoc. Coal.*,

770 F. Supp. 3d at 145 (the President may not disregard a statutory mandate to spend funds

"simply because of policy objections.") (quoting *Aiken Cty.*, 725 F.3d at 261 n.1).[8]

### ii.    HUD's duties regarding continuing years' grantees

HUD also has a statutory and regulatory obligation to fund the continuing years of Active

PEI Plaintiffs' grants, so long as two conditions are met: (1) appropriations must have been made

available; and (2) the organization must receive adequate performance reviews. *See* 42 U.S.C.

§ 3616a(b)(2) (requiring HUD to use funds under the PEI initiative for enforcement activities by

contracting with fair housing organizations); 24 C.F.R. § 125.401 (multi-year PEI funding "may

be contingent on annual performance reviews and annual appropriations").

Both conditions apply here. First, FY2024 funds have been made "available" for

continuing years PEI grants. Congress has appropriated the money under Section 3616a. *See*

FY2024 Appropriations Act. HUD has also earmarked approximately $32.2 million in FY2024

appropriations specifically for continuing PEI grants. Ex. 6, FY2024 PEI NOFO at 10

("approximately $32,208,207 in FY2024 appropriations for PEI *will be used* to fund continuing

FY2023 (second year) and FY2022 (third year) grantees outside of this NOFO") (emphasis

added); *see also* HUD Pub. Affs., *HUD Awards Over $32 Million to Fight Housing*

---

[8] While the Impoundment Control Act ("ICA") provides one potential avenue for the executive
to lawfully decline to spend appropriated funds, HUD has taken no action under the ICA to
attempt to return FHIP funds. Until such action is taken, and until Congress passes a recission
bill approving such a request in whole or in part, the appropriated funds must remain available.
*See* 2 U.S.C. § 683(b).

*Discrimination*, HUD Archives (Sept. 5, 2024), https://archives.hud.gov/news/2024/pr24-227.cfm.

Second, HUD has not informed any of the Active PEI Plaintiffs that their performance has been unsatisfactory or that there have been any compliance issues that might merit adverse action on the grants. To the contrary, Active PEI Plaintiffs have received satisfactory performance reviews. *See* Kemple Decl. at ¶ 21.[9] And as discussed in more detail in Section I.F, *infra*, HUD has followed none of the procedures that would be required to terminate a grant based on alleged noncompliance for any member of the proposed class.

In the absence of the permissible statutory and regulatory reasons to *deny* second- and third-year PEI funding, HUD is bound by its statutory obligation to use FHIP funds for PEI activities and must fund the continuing years' grants. *See Widakuswara v. Lake*, --- F. Supp. 3d ---, 2025 WL 1166400, at *15 (D.D.C. Apr. 22, 2025) (plaintiffs showed likelihood of success on a section 706(1) claim where the government provided no indication of any plans to lawfully use $260 million in appropriated funds to fulfill a statutory mandate). Put differently, HUD has no discretion to unilaterally decline to use available funds for continuing years' PEI grants when the conditions that would permit such a declination are not present. HUD is therefore bound by the plain text of 3616a, as confirmed by its own FY2024 NOFOs, to use the funds that have been earmarked for continuing years PEI grants.

Between the FHA, applicable regulations, and Congressional appropriations, HUD is required to both award new grants and implement existing PEI grants. HUD has wrongly flouted its obligations, and this Court should compel HUD to fulfill its legal commitments.

---

[9] Even if HUD had alleged that any individual grantee was out of compliance, it certainly has not alleged that *the entire Active PEI Class* is out of compliance, as would be necessary to justify its mass refusal to finalize second- and third-year awards.

### E.  HUD has unreasonably delayed action on Plaintiffs' FY2024 FHIP grant applications and continuing years' PEI funding.

The APA also requires agencies to "proceed to conclude a matter presented to [them]" in

a "reasonable time," 5 U.S.C. § 555(b). In considering whether an agency's delay is so

unreasonable as to warrant relief, the D.C. Circuit has set forth six factors to guide its discretion:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Telecomms. Rsch. & Action Ctr. v. FCC ("TRAC")*, 750 F.2d 70, 80 (D.C. Cir. 1984) (internal

quotations and citations omitted).[10]

HUD's failure to use FY2024 funds that have been set aside for new grants or continuing

PEI grants is not just unlawful, as described above, but unreasonable. Funding will remain

available for obligation only until September 30, 2025—and in the case of new FY2024 awards,

such funding must be announced before August 30, 2025 or it cannot be lawfully obligated. *See*

42 U.S.C. § 3616a(e). HUD is quickly running out of time to make these awards, and every day

---

[10] Although the *TRAC* court framed its test as relevant to assessing whether there had been an "unreasonable delay" that merited relief, some courts have also applied the *TRAC* factors to a claim alleging that an agency action had been "unlawfully withheld" under Section 706(1) insofar as the agency violated a statutory deadline or command. *See, e.g.*, *Agua Caliente Band of Cahuilla Indians v. Mnuchin*, No. 20-cv-01136 (APM), 2020 WL 2331774, at *4–5 (D.D.C. May 11, 2020) (applying the *TRAC* factors to a section 706(1) claim after a deadline has passed); *but see Am. First Legal Found. v. Becerra*, No. 24-1092 (RC), 2024 WL 3741402, at *10 (D.D.C. Aug. 9, 2024) (finding a likelihood of success on a section 706(1) claim predicated on a statutory violation without analyzing the *TRAC* factors). Because Plaintiffs are likely to prevail on their Section 706(1) claim for agency action unlawfully withheld whether applying the *TRAC* factors or not, the variation in approach does not change the outcome here.

that action is not taken has caused, and will continue to cause, significant harm to Plaintiffs and the Active PEI Class. *See infra* Section IV. HUD has offered no reason or explanation for why such funds cannot be used for their intended purpose—particularly regarding the Active PEI Plaintiffs, for whom funds have already been earmarked for nearly a year and for whom the unexpected funding shortfalls are having an immediate and dire effect.

The first and second[11] *TRAC* factors weigh strongly in Plaintiffs' favor. Together, these factors ask whether "there is any rhyme or reason—congressionally prescribed or otherwise—for the agency's delay." *Motevali v. Rubio*, No. 24-1029 (SLS), 2025 WL 885116, at *7 (D.D.C. Mar. 21, 2025) (cleaned up). Here, Congress has provided a "rule of reason": FY2024 funds must be obligated by September 30, 2025 or they will no longer be available. *See* FY2024 Appropriations Act; *see also* 31 U.S.C. § 1502(a) (appropriations and expenditures are not available past the period authorized by law).

Given that funds must be obligated by September 30 or else disappear, HUD's failure to administer FY2024 FHIP funds is clearly unreasonable. Regarding continuing years' PEI funding, HUD has already confirmed via a press release and in its FY2024 NOFOs that such funding is available for obligation. In the ordinary course, HUD would finalize the necessary paperwork to continue such funding thirty to sixty days before the expiration of an organization's first or second year of funding. Kemple Decl. at ¶ 17. Its delay in doing so here is eminently unreasonable: HUD's delay has created funding shortfalls that were entirely avoidable and hurt organizations that were performing well by HUD's own measures. Rice Decl. at ¶ 18. Moreover,

---

[11] The first factor—which is the "most important"—and the second factor may be considered together. *See Tate v. Pompeo*, 513 F. Supp. 3d 132, 147 (D.D.C. 2021).

the delay needlessly hurls the Active PEI Class towards a permanent loss of their FY2024 funding by the September 30 deadline without any explanation or reason.

HUD's delay in acting on Plaintiffs' FY2024 NOFOs is similarly unreasonable. In the last two years, new NOFO recipients have been announced in March or April. *See* HUD Pub. Affs., HUD Awards Over $54 Million to 182 Grantees in 42 States to Fight Housing Discrimination, HUD Archives (Mar. 21, 2023), https://archives.hud.gov/news/2023/pr23-056.cfm; HUD Pub. Affs., HUD Awards Over $30 Million to Fight Housing Discrimination, HUD Archives (Apr. 2, 2024), https://archives.hud.gov/news/2024/pr24-069.cfm. This typical timeline is for good reason: HUD needs sufficient time to comply with the 30-day post-announcement period imposed by Section 3616a(e) and to enter into grant agreement with each recipient organization, which can take weeks to finalize. Kemple Decl. at ¶ 13. By contrast, there is no rhyme or reason to HUD's apparent intention to disregard the statutory deadlines and established agency practice for FHIP administration.

Factors three and five[12] require assessment of "nature and extent of the interests prejudiced by delay," with due consideration that "delays . . . are less tolerable when human health and welfare are at stake." *TRAC*, 750 F.2d at 80. Factors three and five weigh in Plaintiffs' favor because, as discussed in more detail in Section IV, *infra*, HUD's delay has already jeopardized the viability of organizations providing critical public services. One NHFA member, Greater Houston Fair Housing Center, has already had to close operations based on HUD's refusal to finalize its third year of PEI funding. Rice Decl. at ¶ 10. Another member, San Antonio Fair Housing Council, Inc., d/b/a Fair Housing Council of South Texas ("FHCST"), has laid off

---

[12] Factors three and five are also routinely considered together. *See, e.g.*, *Motevali*, 2025 WL 885116, at *8.

seven staff members due to funding gaps caused by HUD's abrupt and unexplained refusal to finalize continuing years' grants. Tamez Decl. at ¶ 33. These are not ordinary economic harms; if FY2024 FHIP funds are not administered, Plaintiffs will lose funds forever that are existential to many organizations' sustainability and existence. *Cf. Cobell v. Norton*, 240 F.3d 1081, 1097 (D.C. Cir. 2001) (Indian Tribes had strong interest in compelling the government to respect its fiduciary trust obligations when the failure to do so would permanently deprive Tribes of an accounting of their own trust money).

HUD's delay also necessarily diminishes enforcement of the FHA, which harms the public welfare.[13] *See Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 31 (D.C. Cir. 1990) (noting that private enforcement of the FHA "overlap[s] with the public interest in open housing . . . embodied in the Fair Housing Act") (Ginsburg, J.). Private, local fair housing organizations process approximately 76% of fair housing complaints in the nation. National Fair Housing Alliance, 2024 Fair Housing Trends Report (2024), at 6, available at https://nationalfairhousing.org/wp-content/uploads/2023/04/2024-Fair-Housing-Trends-Report-FINAL_07.2024.pdf. But the funding shortfalls caused by HUD's inaction have prevented grantees from helping individuals who have filed fair housing complaints. For instance, FHCST has been unable to assist prospective clients such as an individual who was repeatedly sexually harassed by her building maintenance man; a former maintenance worker who had been told to deny repair services to any tenants perceived to be of African or Middle Eastern ancestry; and residents of a mobile home community where the property manager cut off utility service to

---

[13] Scholars have recognized that housing discrimination is linked to poorer health outcomes. *See, e.g.*, Roshanak Mehdipanah, Without Affordable, Accessible, and Adequate Housing, Health Has No Foundation, The Milbank Quarterly, 101 No. S1, 419, 425–26 (2023), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC10126970/pdf/MILQ-101-419.pdf (citing studies).

Latinos because he assumed they were not U.S. citizens. Tamez Decl. at ¶¶ 35, 37. The court should consider that, absent action by HUD, housing discrimination will almost certainly increase. *Cf. SAI v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 121 (D.D.C. 2015) (positively weighing a plaintiff's interest in adjudication of a complaint when agency's inaction "has the effect of perpetuating" alleged discrimination).

Factor four, whether there are "higher or competing" agency priorities, also favors Plaintiffs. *TRAC*, 750 F.2d at 80. HUD has articulated no competing priorities. Nor do Plaintiffs seek to "automatically go to the head of the line" by instructing HUD to take action in any particular sequence. *Cf. Open Am. v. Watergate Special Prosecution Force*, 547 F.2d 605, 615 (D.C. Cir. 1976). Rather, Plaintiffs simply seek compliance with HUD's statutory mandate to administer FHIP. Even if HUD has other priorities or has developed policy objections to FHIP, such objections "[do not] override the congressional mandate given to the [agency]." *U.S. Women's Chamber of Com. v. U.S. Small Bus. Admin.*, No. 1:04-cv-01889, 2005 WL 3244182, at *18 (D.D.C. Nov. 30, 2005); *see also In re Aiken Cty.*, 725 F.3d at 261 n.1 (noting that a President's policy reasons cannot justify refusing to spend appropriated funds).

Finally, the sixth factor is neutral because HUD has not provided any explanation whatsoever for its delay, and Plaintiffs therefore have insufficient information to know "whether there is any impropriety lurking behind agency lassitude." *Da Costa v. Immigr. Inv. Program*, 80 F.4th 330, 345 (D.C. Cir. 2023) (cleaned up); *see also Motevali*, 2025 WL 885116, at *8.

The lion's share of the *TRAC* factors – including the paramount "rule of reason" factor —weigh in favor of finding that HUD's delayed administration of FHIP funding is unreasonable. The Court should order preliminary relief before FY2024 funds are no longer available.

### F.  HUD's failure to award FY2024 FHIP Funds is arbitrary, capricious, and contrary to law.

The APA provides that a "reviewing court shall … hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). HUD's abrupt and unreasoned decision to stop administering FY2024 FHIP funds violates 5 U.S.C. § 706(2). After over three decades of uninterrupted interdependence between the federal government and fair housing organizations, HUD has changed its orientation toward FHIP, declining to administer the program without explanation, in defiance of the statutory and regulatory scheme, and despite Congress's appropriation of millions of dollars under Section 3616a.[14] HUD's action is arbitrary and capricious by any measure.

### 1.  HUD has provided no explanation and disregarded plaintiffs' reliance interests.

An agency must provide a satisfactory explanation for its actions, including a "rational connection between the facts found and the choice made." *Am. Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Under this standard, an agency may not abruptly depart from a settled course of conduct with no explanation. *Commc'ns & Control, Inc. v. F.C.C.*, 374 F.3d 1329, 1336 (D.C. Cir. 2004). An agency must also consider whether the agency policy has engendered "serious reliance interests that must be taken into account." *F.C.C. v. Fox Television Studios*, 556 U.S. 502, 515 (2009).

HUD has violated these precepts by providing *no explanation whatsoever* for its decisions to take no action on the FY2024 NOFO applications—thus changing course from its

---

[14] For the reasons explained in Plaintiffs' forthcoming opposition to Defendants' motion to dismiss, Defendants' failure to act is a final agency action subject to review. *See* 5 U.S.C. § 551(13) ("agency action" includes the "failure to act").

previously established course of conduct regarding the timing of such awards—and to stop funding continuing years' PEI grants. HUD has been completely silent regarding the FY2024 NOFOs: it has not notified applicants that their applications have been approved or denied, it has not made contact with applicants for the purpose of finalizing the terms and conditions of the award, and it has not explained why processing of the FY2024 NOFO applications is taking months longer than it has in previous years. *See, e.g.*, Kemple Decl. at ¶¶ 9, 13 (noting that, in prior years, HUD has announced grant recipients by the spring and that new grantees would begin work soon thereafter). Nor has HUD provided any explanation to the Active PEI Class as to why HUD has not finalized the second and third years of their awards. *See, e.g.*, Tamez Decl. at ¶ 28 (HUD GTR stating that she did not "have any updates regarding negotiations and the start of years 2 and 3"). Such action without *any* explanation violates "the most elementary precepts of administrative law." *See Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018) (Jackson, J.).

HUD's inaction also disregards Plaintiffs' significant reliance interests. The Active PEI Plaintiffs have been aware of Congress's appropriation of FY2024 funds for FHIP, and HUD announced that it had set aside funds for continuing years' grants nearly ten months ago. Given that Active PEI Plaintiffs have all received satisfactory scores on their progress reports, they reasonably expected HUD to finalize continued years' funding. They also reasonably expected that the paperwork for new grants would be executed prior to the end of their FY2023 grant years, as HUD ordinarily does to avoid funding gaps. Kemple Decl. at ¶ 18. New applicants under the FY2024 NOFOs also reasonably expected to receive an answer on their application by the spring, which has been HUD's practice and is necessary to prevent funding shortfalls. Kemple Decl. at ¶ 21. For example, Plaintiff TFHC's prior PEI grant ended on May 31, 2025.

Lafferty Decl. at ¶ 13. In the ordinary course, TFHC would know whether it would be receiving another PEI grant several months in advance of the end date of its current one and could plan accordingly. However, HUD's failure to consider this reliance interest in promptly deciding FY2024 applications makes such planning impossible. HUD's failure to consider these reliance interests violates the APA. *See CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 628 F. Supp. 3d 243, 260–61 (D.D.C. 2022) (agency's departure from settled pattern of behavior without sufficient explanation or consideration of plaintiffs' reliance interest was arbitrary and capricious).

### 2. HUD has acted contrary to statute, appropriations bills, and its own regulations.

HUD's failure to administer FHIP is also contrary to law, contrary to constitutional right, and without observance of procedure required by law.

*First*, HUD's decision not to administer FHIP violates Section 3616a of the Fair Housing Act, which makes such administration mandatory when Congress appropriates funds. *See supra* Section I.D.

*Second*, HUD's decision not to administer FHIP violates the FY2024 Appropriations Act. When Congress appropriates money for a project or program, the executive branch must use funds for that purpose, regardless of whether it agrees with the program's policy objectives. *In re Aiken Cty.*, 725 F.3d at 261 n.1. HUD's failure to use these funds for their purpose flouts the relevant appropriations bills. *See supra* Section I.A.

*Third*, HUD's decision not to administer FHIP violates the Appropriations Clause, the separation of powers, and, as to the Active PEI Class, the Due Process Clause of the Fifth Amendment. *See supra* Sections I.A, I.B, and I.C.

*Fourth*, HUD's decision not to administer FHIP violates several HUD and OMB regulations. Its failure to finalize continuing years' grants, despite the availability of FY2024 funds and the satisfactory performance of the Active PEI Plaintiffs, violates 24 C.F.R. § 125.401, which makes continued years' funding contingent on "annual performance reviews and annual appropriations." *See also* Fair Housing Initiatives Program, 59 Fed. Reg. 44,596-01(Aug. 29, 1994) (noting that multi-year funding would be "subject to annual appropriations and annual performance reviews upon which further funding would be contingent").

HUD's efforts to stop funding PEI grants midstream also amount to an unlawful termination of the grants without observance of the procedures set forth in 2 C.F.R. § 200.340 *et seq.* When HUD awards a grant that requires work across multiple years, that multi-year period is the "period of performance." 2 C.F.R. § 200.1. Any action taken by the agency to "discontinue a Federal award . . . at any time before the planned end date of the period of performance" is a "termination" of that award. *Id.*; *see also Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 78 (agency's effort to prematurely end a multi-year grant at the end of a budget year reviewed as a "termination"). OMB regulations circumscribe HUD's authority to terminate a grant: it may do so only for the reasons enumerated in 2 C.F.R. § 200.340, such as by consent or for noncompliance with the awards' terms, and only after serving the grantee with a written notice of termination and providing for a hearing opportunity. *See* 2 C.F.R. § 200.341(a) (requiring a notice with the reasons for termination, effective date, and portion of the award to be terminated, if applicable); 2 C.F.R. § 200.342 (requiring the recipient to be provided an opportunity to object to any remedy taken for noncompliance with a grant). HUD has not done so here, and it has invoked no other authority for its refusal to administer the second and third grant years.

HUD's failure to take action on the FY2024 NOFOs also violates 2 C.F.R. § 200.205, which requires HUD to "execute" the merit review process set forth in its Notice of Funding Opportunity. "Execute" means to "perform or complete" a duty. Black's Law Dictionary (12th ed. 2024). As described in the FY2024 NOFOs, HUD's merit review process for FY2024 FHIP funds requires it to weigh factors such as the applicant's capacity, the extent of the need, the soundness of the applicant's approach, and program evaluation considerations. *See, e.g.*, Ex. 7, FY2024 PEI NOFO at 32. HUD's decision to take no action on the FY2024 NOFOs violates its regulatory duty to apply the criteria outlined in the NOFO and select recipients. *See Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 83 (agency acted contrary to law when it "undert[ook] to act in a manner that is contrary to its own regulations"); *U.S. Abilityone Comm'n*, 421 F. Supp. 3d at 133–34 (agencies are obligated to comply with Section 200.205 for competitive awards).

## II.    Plaintiffs will suffer irreparable harm absent a temporary restraining order.

An injunction is necessary when, absent prompt relief, the plaintiffs' injury is "beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. The injury must be "certain and great," and "actual and not theoretical." *Id.* Here, Plaintiffs have already suffered multiple forms of irreparable harm, and these injuries pose an existential threat to Plaintiffs' survival. One NFHA member and Active PEI Plaintiff shuttered operations at the end of May 2025, and others are poised to suffer the same fate. Short of closure, HUD's refusal to administer FHIP awards has forced Plaintiffs to lay off staff and cut core services. And because Plaintiffs are uniquely positioned to fill fair housing enforcement gaps, their injuries will have devastating effects on vulnerable communities and individuals across the country. Without this Court's immediate intervention, Plaintiffs' injuries will be "beyond remediation" for the reasons discussed below.

*First*, HUD's refusal to administer FHIP awards has already forced Plaintiffs to close offices, downsize, and lay off staff, posing an existential threat to TFHC and other NFHA members' survival. With each passing day of uncertainty, more staff and services will be reduced or eliminated. As a direct result of HUD's refusal to finalize its second year of a three-year PEI grant, the GHFHC, a NFHA member, closed its programs at the end of May 2025. *See* Rice. Decl. at ¶ 10. Since 1999, GHFHC has been a full service, community-based organization expanding housing opportunities in the metropolitan Houston area. After over 25 years, GHFHC closed its doors—four employees lost their jobs, and the greater Houston region is left without fair housing resources. Absent a decision on HUD's award, Plaintiff TFHC anticipates it can operate with reduced staff and services for another nine to twelve months before the organization will run out of funds. *See* Lafferty Decl. at ¶ 24.

Other NFHA members also predict they will be forced to close completely without FHIP funding. NFHA Member FHCST, which serves thirty-seven counties in the state, estimates that it may need to shut down operations by the end of the year. *See* Tamez Decl. at ¶ 44. Short of complete closure, TFHC and NFHA members have drastically reduced staff operations. For example, FHCST relied on its multi-year PEI grant to plan activities and hire staff for 2025. However, in March 2025, because of HUD's refusal to finalize the second year of the PEI grant, the FHCST laid off four full time staff members and three per diem staff members. *See* Tamez Decl. at ¶ 33. TFHC similarly had to lay off its experienced Test Coordinator in June 2025, and TFHC's Staff Attorney is departing this summer without a replacement, leaving the organization with only two staff members. *See* Lafferty Decl. at ¶ 24. Like most PEI recipients, FHCST and TFHC are small organizations with FHIP awards typically constituting the majority of their

annual budgets.[15] HUD's refusal to administer these grants necessarily creates a catastrophic budget shortfall for these organizations. These staff and programming cuts have caused dozens of people to lose their livelihoods.

*Second*, the deep drain on Plaintiffs' staff and operations means that Plaintiffs have and will continue to scale back the services funded by FHIP awards or administered by staff members that were laid off—with crushing consequences for their clients. Because of budgetary shortfalls, TFHC has completely stopped its testing program, scaled back educational activities, reduced assistance with reasonable accommodation requests, and can longer appear in court for eviction matters. *See* Lafferty Decl. at ¶¶ 21–22. Following the layoffs at FHCST, the organization was forced to abandon twenty-seven alleged victims of discrimination amid filing administrative complaints with HUD. *See* Tamez Decl. at ¶ 34. FHCST is reducing intakes, shutting down testing investigations mid-stream, and narrowing its assistance to disabled individuals with reasonable accommodation requests. *Id.* NFHA intended to use its anticipated additional FHIP grants under the FY2024 NOFOs to establish a new fair housing organization in North Carolina, which would have been the only one in the state and a crucial resource for North Carolina residents after Hurricane Helene. *See* Rice Decl. at ¶ 26.

Third, because plaintiffs are eliminating or reducing core programs supported by FHIP awards, communities will irreparably lose a unique resource for fair housing enforcement. FHCST will be forced to abandon several ongoing systemic investigations and NFHA will stall its plan to develop multi-jurisdictional investigations in Kansas City and Jackson. In 2024, private nonprofit organizations, like Plaintiffs here, processed over 75% of housing

---

[15] In the case of FHCST and TFHC, their PEI grants comprise around 85% of their operating budgets. Lafferty Decl. at ¶ 11; Tamez Decl. at ¶ 18.

discrimination complaints.[16] The gaps that local fair housing organizations must fill are increasing as states cut funding to agencies that investigate similar complaints and HUD drops ongoing investigations.[17] Without fair housing organizations, whole regions are left with a dearth of fair housing enforcement options. For example, potential Active PEI Plaintiffs in Montana and Oklahoma serve sprawling areas with low-income rural populations. Without continued PEI funding, these organizations cannot continue their work. *See* Rice Decl. at ¶ 8.

These injuries, where there "can be no do over and no redress," are precisely the kinds of injuries that courts have deemed irreparable. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (internal citations omitted). For example, in *Nationa'l Council of Nonprofits v. Office of Management and Budget*, the court found irreparable harm where organizations awaiting receipt of federal funds were forced to dismiss employees and cut programmatic work, injuries that created rippling harms to individuals dependent on plaintiffs' services. 763 F. Supp. 3d 36, 57 (D.D.C. 2025). Like the existential threat facing NFHA members here, the court noted that some programs might "simply disappear." *Id.* at 56; *see also Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 858–59 (D. Md. 2025), *reconsideration denied*, No. 1:25-CV-00702-JRR, 2025 WL 863319 (D. Md. Mar. 19, 2025) (finding a "clear showing" of irreparable harm because some plaintiffs will be forced to "shutter their programs entirely" and others will terminate staff who "rely on such funding for their livelihoods"). Additionally, courts have held that "perceptibly impair[ing] the organization's

---

[16] National Fair Housing Alliance, 2024 Fair Housing Trends Report (2024), at 6, https://nationalfairhousing.org/wp-content/uploads/2023/04/2024-Fair-Housing-Trends-Report-FINAL_07.2024.pdf.

[17] *See* Jesse Coburn, *Federal Investigators Were Preparing Two Texas Housing Discrimination Cases — Until Trump Took Over*, ProPublica (March 25, 2025, 7:00 AM), https://www.propublica.org/article/trump-hud-texas-housing-discrimination-cases-dallas-houston.

programs" can constitute irreparable harm. *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 177

(D.D.C. 2017) (quoting *League of Women Voters*, 838 F.3d at 8). Plaintiffs have suffered this

very harm because HUD's failure to administer FHIP grants frustrates the core of Plaintiffs'

organizational missions. *See* Rice Decl. at ¶¶ 3, 7 (describing NFHA's mission and impact of

budgetary gaps on NFHA and members). Immediate injunctive relief is the only way to protect

Plaintiffs and their clients from certain and irremediable harm.

### III.    The balance of the equities and the public interest favor preliminary relief.

The final two TRO prongs, the balance of equities and public interest, "merge" when the

government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[C]ourts must

balance the competing claims of injury and must consider the effect on each party of the granting

or withholding of the requested relief[,] ... pay[ing] particular regard for the public

consequences" that would result in granting the relief sought. *Winter v. Nat. Res. Def. Council,*

*Inc.*, 555 U.S. 7, 24 (2008) (quotation marks omitted).

Plaintiffs are likely to succeed in showing that HUD's refusal to administer FHIP funding

is unlawful, and the Government "cannot suffer harm from an injunction that merely ends an

unlawful practice[.]" *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting

*Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Nor can Defendants claim harm

from implementing a program with which they have a policy disagreement—that kind of

"theoretical harm[]" is dwarfed by the "concrete, irreparable harm in the form of programmatic

closures and loss of funding" that Plaintiffs face. *S. Educ. Found. v. U.S. Dep't of Educ.*,

No. 25-1079 (PLF), 2025 WL 1453047, at *17 (D.D.C. May 21, 2025) (granting preliminary

injunction to plaintiff non-profits challenging termination of grant to operate technical assistance

center). Disbursing appropriated funding for its lawful purpose is not an injury "of a type and

magnitude that grabs equities' emergency attention when compared to the harm" that is caused

by abruptly terminating statutorily mandated grants and disrupting settled expectations.

*California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025).

Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. By contrast, "[t]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (citation omitted). Here, the public has an interest not only in ending unlawful agency conduct, but also in the ongoing administration of FHIP funding. FHIP awards are designed to promote the protections embedded in the FHA, and they facilitate Plaintiffs' provision of critical fair housing services to individuals, families, and neighborhoods. The public interest favors immediate relief because the public itself will be harmed without it.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for a Temporary Restraining Order and enter the relief outlined in the attached proposed order.


Dated: July 7, 2025                    Respectfully submitted,

                                       /s/ Lila Miller
                                       Lila Miller (DC Bar No. 1643721)
                                       Reed Colfax (DC Bar No. 471730)
                                       Robert Hunter* (DC Bar No. 90031794)
                                       Relman Colfax PLLC
                                       1225 19th Street NW, Suite 600
                                       Washington, DC 20036
                                       Tel: (202) 728-1888
                                       Fax: (202) 728-0848
                                       lmiller@relmanlaw.com
                                       rcolfax@relmanlaw.com
                                       rhunter@relmanlaw.com

                                       *Attorneys for Plaintiffs*
                                       *\* Application to D.D.C. pending*