**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL FAIR HOUSING ALLIANCE, *on behalf of itself and those similarly situated*, and TENNESSEE FAIR HOUSING COUNCIL,

      Plaintiffs,

v.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SCOTT TURNER, *in his official capacity as Secretary of Housing and Urban Development*,

      Defendants.

Case No. 1:25-cv-01965-SLS

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION .............................................................................................. 1

FACTUAL AND PROCEDURAL HISTORY ..................................................... 3

    I.     Factual Background ............................................................................ 3

          A. Congress developed FHIP to create and fund fair housing organizations to combat discriminatory housing practices. ....................... 3

          B. HUD's implementation of FHIP to distribute funding to fair housing organizations. ................................................................................ 4

          C. HUD's failure to award new FHIP grants and administer ongoing PEI grants. . 6

          D. HUD's failure to process the current year of multi-year PEI grants. ................. 8

          E. The harm to organizations denied FHIP funds. .................................. 9

    II.    Procedural History ........................................................................... 10

LEGAL STANDARD ....................................................................................... 10

ARGUMENT ................................................................................................... 11

    I.     The Court cannot dismiss Plaintiffs' claims based on Defendants' unsupported revision of the factual narrative. ............................................................ 11

    II.    Plaintiffs' claims are ripe. ................................................................. 12

    III.   Plaintiffs have standing. .................................................................... 15

    IV.   The Tucker Act does not deprive this Court of jurisdiction. ................................ 17

    V.    Plaintiffs' APA claims properly seek review of agency action. ........................... 20

          A. Plaintiffs have adequately pleaded their Section 706(1) Claims ..................... 21

          B. Plaintiffs allege "final agency action" under Section 706(2) ........................... 23

    VI.   The challenged conduct is not committed to agency discretion. ......................... 29

    VII.  Plaintiffs have adequately alleged Appropriations Clause and separation of powers claims. ................................................................................................. 32

          A. Plaintiffs adequately allege an Appropriations Clause claim ........................... 32

          B. Plaintiffs adequately allege a separation of powers claim. .............................. 34

    VIII. Active PEI Plaintiffs adequately allege a Procedural Due Process claim ............ 35

CONCLUSION ................................................................................................ 38

## TABLE OF AUTHORITIES

**Cases**..............................................................................................................................**Page(s)**

*3883 Conn. LLC v. District of Columbia*,
    336 F.3d 1068 (D.C. Cir. 2003)................................................................................36, 37

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
    770 F. Supp. 3d 121 (D.D.C. 2025) .................................................................18, 19, 35

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ........................................................................30, 33, 34

*In re Al-Nashiri*,
    47 F.4th 820 (D.C. Cir. 2022)....................................................................................12

*Am. Oversight v. U.S. Dep't of Veterans Affs.*,
    498 F. Supp. 3d 145 (D.D.C. 2020) ...........................................................................21

*Anglers Conservation Network v. Pritzker*,
    809 F.3d 664 (D.C. Cir. 2016) ...................................................................................21

*Appalachian Power Co. v. EPA*,
    208 F.3d 1015 (D.C. Cir. 2000)...........................................................................27, 28

*Aracely, R. v. Nielsen*,
    319 F. Supp. 3d 110 (D.D.C. 2018) ...........................................................................24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................11

*Barry v. Barchi*,
    443 U.S. 55 (1979).....................................................................................................36

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................................11

*Bennett v. Spear*,
    520 U.S. 154 (1997)...................................................................................................24

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988)...................................................................................................18

*California v. Dep't of Educ.*,
    132 F.4th 92 (1st Cir. 2025).......................................................................................31

*Climate United Fund v. Citibank, N.A.*,
    --- F. Supp. 3d ---, 2025 WL 1131412 (D.D.C. Apr. 16, 2025)................................31

*Croplife Am. v. EPA,*
   329 F.3d 876 (D.C. Cir. 2003) ............................................................26

*Crowley Gov't Servs. v. GSA,*
   38 F.4th 1099 (D.C. Cir. 2022) ......................................................17, 20

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019).........................................................................29

*Dep't of Educ v. California,*
   145 S. Ct. 966 (2025) .......................................................................19

*Diamond Alt. Energy, LLC v. EPA,*
   606 U.S. ---, 2025 WL 1716141 (June 20, 2025) .................................16

*FDA v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024).........................................................................15

*FTC v. Standard Oil Co.,*
   449 U.S. 232 (1980).........................................................................27

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
   460 F.3d 13 (D.C. Cir. 2006) ............................................................24

*Gen. Elec. Co. v. EPA,*
   290 F.3d 377 (D.C. Cir. 2002) ..........................................................26

*Grell v. Trump,*
   330 F. Supp. 3d 311 (D.D.C. 2018) ...................................................11

*Halverson v. Slater,*
   129 F.3d 180 (D.C. Cir. 1997) ......................................................30, 37

*Harris Cnty.* v. *Kennedy,*
   No. 25-cv-1275 (CRC), 2025 WL 1707665 (D.D.C. Jun 17, 2025)........18, 23

*Kirwa v. U.S. Dep't of Def.,*
   285 F. Supp. 3d 21 (D.D.C. 2017) .................................................23, 31

*Ky. Dep't of Corrs. v. Thompson,*
   490 U.S. 454 (1989).........................................................................36

*La. Delta Serv. Corps v. Corp. for Nat'l and Cmty. Serv.,*
   No. 25-378-JWD-RLB, 2025 WL 1787429 (M.D. La. June 27, 2025).........37

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) .............................................................16

*Lincoln v. Vigil,*
    508 U.S. 182 (1993)............................................................................................32

*Lopez v. Fed. Aviation Admin.,*
    318 F.3d 242 (D.C. Cir. 2003)............................................................................37

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990)............................................................................................29

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)............................................................................................35

*Meina Xie v. Kerry,*
    780 F.3d 405 (D.C. Cir. 2015)............................................................................23

*Nat. Ass'n of Reg. Councils v. Costle,*
    564 F.2d 583 (D.C. Cir. 1977)............................................................................26

*Nat. Env't Dev. Ass'n Clean Air Project v. EPA,*
    752 F. 3d 999 (D.C. Cir. 2014)...........................................................................25

*Nat. Mining Ass'n v. Jackson,*
    768 F. Supp. 2d 34 (D.D.C. 2011)..........................................................26, 27, 28

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
    417 F.3d 1272 (D.C. Cir. 2005)..........................................................................24

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,*
    763 F. Supp. 3d 36 (D.D.C. 2025)...........................................................17, 27, 33

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior,*
    No. 20-3706 (RC), 2024 WL 1344450 (D.D.C. Mar. 9, 2024) ...........................21

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004)........................................................................................22, 29

*Open Cmtys. All. v. Carson,*
    286 F. Supp. 3d 148 (D.D.C. 2017)....................................................................16

*Pol'y & Rsch, LLC v. U.S. Dep't of Health & Hum. Servs.,*
    313 F. Supp. 3d 62 (D.D.C. 2018)......................................................................31

*Sparrow v. United Air Lines, Inc.,*
    216 F.3d 1111 (D.C. Cir. 2000)..........................................................................10

*Train v. City of New York,*
    420 U.S. 35 (1975)..............................................................................................34

*Vera Institute of Justice v. U.S. Department Of Justice*,
    No. 25-cv-1643 (APM), 2025 WL 1865160 (D.D.C. Jul.7, 2025)............................19, 20, 37

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018)............................................................................................................29

*Widakuswara v. Lake*,
    Case No. 1:25-cv-1015-RCL, 2025 WL 1166400 (D.D.C. Apr. 22, 2025)..........................19

*Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of President*,
    --- F. Supp. 3d ----, 2025 WL 1502329 (D.D.C. May 27, 2025) ...........................15

**Regulations, Statutes, and Constitutional Provisions**

2 C.F.R. § 200.204 *et seq.* .................................................................................. *passim*

2 C.F.R. § 200.340 *et seq.* ............................................................................28, 30, 37

24 C.F.R § 85.1 ..............................................................................................................5

24 C.F.R § 125 *et seq.* ...................................................................................... *passim*

5 U.S.C. § 551 ..............................................................................................................24

5 U.S.C. § 701 ..............................................................................................................29

31 U.S.C. § 1502 ...................................................................................................26, 30

42 U.S.C. § 3616a .............................................................................................. *passim*

Consolidated Appropriations Act, 2024, Pub. L. No. 118–42, 138 Stat. 370 (2024)...............6, 30

U.S. Const. amend. V.....................................................................................................35

**Other Authorities**

Fair Hous. Initiatives Program – Fair Hous. Orgs. Initiative, Dep't of Hous. and
    Urb. Dev. (Sep. 20, 2024), https://www.grants.gov/search-results-
    detail/356476.....................................................................................................................7

Fair Hous. Initiatives Program – Priv. Enf't Initiative, Dep't of Hous. and Urb.
    Dev. (Sep. 23, 2024), https://www.grants.gov/search-results-detail/356502 ...........................7

Fair Hous. Initiatives Program – Priv. Enf't Initiative, Dep't of Hous. and Urb.
    Dev. (Sept. 29, 2023), https://www.grants.gov/search-results-detail/350423; .........................6

Fair Hous. Initiatives Program Educ. and Outreach Initiative, Dep't of Hous. and
    Urb. Dev. (Sep. 20, 2024), https://www.grants.gov/search-results-
    detail/356475.....................................................................................................................7

Fair Hous. Initiatives Program Priv. Enf't Initiative, Dep't of Hous. and Urb. Dev.
(Sept 12, 2022), https://www.grants.gov/search-results-detail/343465 .....................................6

HUD Pub. Affs., *HUD Awards Over $30 Million to Fight Housing
Discrimination*, HUD Archives (Apr. 2, 2024),
https://archives.hud.gov/news/2024/pr24-069.cfm .....................................................6

HUD Pub. Affs., *HUD Awards Over $32 Million to Fight Housing
Discrimination*, HUD Archives (Sept. 5, 2024),
https://archives.hud.gov/news/2024/pr24-227.cfm .....................................................8

HUD Pub. Affs., *HUD Awards Over $54 Million to 182 Grantees in 42 States to
Fight Housing Discrimination*, HUD Archives (Mar. 21, 2023),
https://archives.hud.gov/news/2023/pr23-056.cfm .....................................................6

## INTRODUCTION

Recognizing the importance of the network of fair housing organizations throughout the country, Congress created the Fair Housing Initiatives Program ("FHIP") in 1992 to ensure that those organizations would have the resources necessary to help enforce the nation's civil rights laws. For over 30 years, congressional appropriation and United States Department of Housing and Urban Development ("HUD") distribution of FHIP funds served as the lifeblood to these private non-profit fair housing organizations, and they continued their central role in ensuring equal housing opportunity in all our communities. Then suddenly, without any meaningful consideration or reasoning, HUD abruptly abandoned the partnership. As the deadline for obligating this year's appropriated funds approaches, HUD sits on its hands and asserts that its refusal to administer the program cannot be challenged until the deadline passes—according to HUD, any claim is too early until it is too late. That is incorrect: as Plaintiffs have alleged in their Complaint, HUD is *currently* refusing to finalize subsequent years of existing grants and is *currently* refusing to process applications for new grants. Indeed, because of HUD's inaction, the agency has all but run out of time to proceed through the necessary process to administer the funds without Court intervention.

Contrary to Defendants' arguments, Plaintiffs have standing to challenge HUD's decision not to administer the current year of FHIP funds because the suspension of funding is already causing extraordinary harm to Plaintiffs. Organizations have terminated employees, turned away clients, cut back on programs, and many will shortly have to close if they have not done so already. HUD has made and implemented a decision, and that decision is causing harm. Plaintiffs thus bring ripe claims and assert cognizable injuries in fact.

Defendants' other threshold arguments are similarly unavailing. The Tucker Act does not apply, most obviously because most Plaintiffs do not even have contracts with HUD and none

1

seek to enforce any contractual terms. Plaintiffs' claims derive from the Constitution and statutes, not the terms and conditions of their grant awards. Plaintiffs have adequately pleaded a "discrete agency action" under Section 706(1) and a "final agency action" under Section 706(2) of the APA by alleging, based on a substantial course of conduct by HUD, that HUD has made the decision to stop the process of administering FHIP funds. Further, the challenged acts—HUD's refusal to spend FHIP-specific appropriations and HUD's functional termination of existing grants—are not unreviewable as committed to agency discretion. The FHA *requires* HUD to use funds appropriated under FHIP to issue FHIP awards, and the relevant statutes, regulations, and appropriations legislation *requires* HUD to use appropriated funds by September 30, 2025 in the manner contemplated by HUD and OMB regulations.

Each of Plaintiffs' substantive challenges to HUD's failure to administer FHIP funds is well-founded, and Defendants' arguments for dismissal of the claims are groundless. HUD's suggestion that Appropriations Clause would only require the Court to make the funds available for obligation misses the point. Congress has already made the funds available; Plaintiffs claim that HUD violates the Appropriations Clause by not obligating the funds as directed by Congress. As to separation of powers, HUD argues that no claim can be stated because the executive has discretion in how to spend appropriations, but again, that discretion is not unfettered, and HUD is completely withholding the funds—not just changing the direction of distribution. Finally, the Plaintiffs with existing multi-year grants have a protected interest, and thus a viable due process claim, because the only bases for termination of their multiyear awards are adequate performance and ongoing appropriations. The substance of each of Plaintiffs' claims is well-pleaded and Defendants present no persuasive argument to the contrary.

Defendants' Motion to Dismiss is mostly based on an inaccurate recasting of Plaintiffs' well-pleaded Complaint: HUD asks the Court to stray beyond the allegations in the Complaint and assume that the agency will satisfy its legal obligations by September 30. This is not a permissible path to dismissal; the sufficiency of Plaintiffs' claims must be measured by what Plaintiffs actually allege. By that measure, the allegations readily meet the applicable standards and Defendants' Motion should be denied in its entirety.

## FACTUAL AND PROCEDURAL HISTORY

### I.     Factual Background

#### A.     Congress developed FHIP to create and fund fair housing organizations to combat discriminatory housing practices.[1]

Congress amended the Fair Housing Act ("FHA") to establish the Fair Housing Initiatives Program ("FHIP") in 1992, and FHIP has subsequently served as the centerpiece for the prevention and remediation of housing discrimination in the country. Compl., ECF 1 ¶ 2. Under FHIP, HUD provides Congressionally appropriated funding to nonprofit fair housing agencies under three general categories: grants to provide intake, testing, investigation, conciliation, and litigation of complaints of housing discrimination to enforce the remedial goals of the FHA ("Private enforcement initiatives" or "PEI" grants); grants to provide education and outreach services to disseminate information about fair housing ("Education and outreach" or "EOI" grants); and grants to establish, organize, and build the capacity of fair housing organizations ("Funding of fair housing organizations" or "FHOI" grants). *See* 42 U.S.C. § 3616a; Compl. ¶¶ 26–29. All three types of FHIP grants are at issue here.

---

[1] All facts are taken from Plaintiffs' complaint, from the underlying regulations and statutes cited in Plaintiffs' Complaints, or from other documents incorporated by reference therein.

Congress directed in the statute that HUD "shall" use funds to enter into agreements with private fair housing organization for these specific purposes, so long as appropriated funds are available. 42 U.S.C. § 3616a(b)–(d); Compl. ¶¶ 27–29. PEI grants encompass "a range of investigation and enforcement activities designed to" investigate housing discrimination, "discover and remedy discrimination in public and private real estate markets and real estate-related transactions," and develop models "to respond to new or sophisticated forms of discrimination." 42 U.S.C. § 3616a(b)(2). Under the FHOI program, HUD "shall use funds made available . . . to help establish, organize, and build the capacity of fair housing enforcement organizations, particularly in those areas of the country which are currently underserved by fair housing enforcement organizations as well as those areas where large concentrations of protected classes exist." *Id.* at (c)(2). And EOI grants "shall" be used to "establish a national education and outreach program." *Id.* at (d)(1); *see also id.* at (d)(2)–(3) (also providing for funding to regional, local, and community-based programs). Congress has appropriated FHIP funds every year since creating FHIP. Compl. ¶ 5.

**B.    HUD's implementation of FHIP to distribute funding to fair housing organizations.**

HUD has promulgated regulations to implement the grant programs described in the FHIP statute. *See generally* 24 C.F.R. § 125 *et seq*. As set forth in the regulations, PEI grants "provide[ ] funding . . . to investigate violations and obtain enforcement of the rights granted under the Fair Housing Act . . . ."; FHOI grants "provide[] funding to develop or expand the ability of existing eligible organizations to provide fair housing enforcement, and to establish . . . new fair housing enforcement organizations"; and EOI grants "provide[] funding [to support] education and outreach programs designed to inform members of the public concerning their rights and obligations under the provisions of fair housing laws." 24 C.F.R. §§ 125.301–125.501.

The FHIP regulations also direct HUD to publish Notices of Funding Opportunity ("NOFO") that set forth the available amounts of awards, eligible applicants and activities, and selection criteria. 24 C.F.R. § 125.104(d).[2]

In addition to HUD's own regulations, HUD has incorporated the Office of Management and Budget's ("OMB") Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, which impose additional requirements and obligations on federal agencies, including the requirements for NOFOs, recipient selection, agency disclosures, performance monitoring, and grant termination. *See* 24 C.F.R § 85.1 (incorporating 2 C.F.R. § 200.0 *et seq*.). OMB regulations require that HUD publish a NOFO for any openly competed grant award. 2 C.F.R. § 200.204. The regulations also require HUD to "design and execute a merit review process" for the applications it receives under that NOFO. 2 C.F.R. § 200.205. The merit review process is "an objective process of evaluating Federal award applications in accordance with the written standards of the Federal agency." *Id.* It must be "described or incorporated by reference in the applicable funding opportunity." *Id.*

Once the submission deadline for applying for FHIP grants closes, HUD convenes a Technical Evaluation Panel ("TEP") to evaluate the proposals under the guidelines of each grant category. Compl. ¶ 40. Upon completion of its evaluation, the TEP applies the criteria from HUD's merit review process to select the applicants that will be awarded the grants. *Id.* ¶ 42. HUD usually makes grant announcements for all types of FHIP awards within three or four

---

[2] After Congress appropriates funds for FHIP, HUD first goes through a budgeting and planning process, which includes establishing NOFO forecasts, obtaining clearance, and publishing approved NOFOs. U.S. Dep't of Hous. and Urb. Dev., HUD Exchange, Grants Management Lifecycle, available at https://www.hudexchange.info/onecpd/assets/Image/Grants-Management-Lifecycle-HUD.jpg; Compl. ¶ 36.

months of the application due date. *Id*. ¶ 81.[3] The FHA requires HUD to notify Congress of the awards at least thirty days before entering into a grant agreement. 42 U.S.C. § 3616a(e).

Shortly after HUD selects and notifies FHIP award recipients, a HUD Government Technical Representative ("GTR") or Government Technical Monitor ("GTM") contacts the applying organization's representative to review the specific terms and conditions of the grant, the details of the proposed statement of work and the payment schedule and period of performance. Compl. ¶¶ 43–44. Once all the terms of the new grant are negotiated and agreed upon, the organization and a HUD representative sign a HUD-1044, also known as an Assistance Award Agreement, and several associated forms. *Id.*

### C.  HUD's failure to award new FHIP grants and administer ongoing PEI grants.

Since early this spring, HUD's usual process for administering FHIP has stopped. Compl. ¶ 13. HUD's administration of the program had begun in a typical fashion with Congress appropriating $86,355,000 in FY2024 money for "contracts, grants, and other assistance, not otherwise provided for, as authorized by title VIII of the Civil Rights Act of 1968 (42 U.S.C. 3601 *et seq*.) and section 561 of the Housing and Community Development Act of 1987 (42 U.S.C. 3616a)." Consolidated Appropriations Act, 2024, Pub. L. No. 118–42, 138 Stat. 370

---

[3] For example, HUD announced its FY2023 PEI NOFO on September 29, 2023, applications closed on December 18, 2023, and HUD announced grantees on April 2, 2024. Fair Hous. Initiatives Program – Priv. Enf't Initiative, Dep't of Hous. and Urb. Dev. (Sept. 29, 2023), https://www.grants.gov/search-results-detail/350423; HUD Pub. Affs., *HUD Awards Over $30 Million to Fight Housing Discrimination*, HUD Archives (Apr. 2, 2024), https://archives.hud.gov/news/2024/pr24-069.cfm. Similarly, HUD announced its FY2022 PEI NOFO on September 12, 2022, applications closed on December 5, 2022, and HUD announced grantees on March 21, 2023. Fair Hous. Initiatives Program Priv. Enf't Initiative, Dep't of Hous. and Urb. Dev. (Sept 12, 2022), https://www.grants.gov/search-results-detail/343465; HUD Pub. Affs., *HUD Awards Over $54 Million to 182 Grantees in 42 States to Fight Housing Discrimination*, HUD Archives (Mar. 21, 2023), https://archives.hud.gov/news/2023/pr23-056.cfm.

(2024) (hereinafter "FY2024 Appropriations Act"). On September 20 and 23, 2024, HUD

published NOFOs announcing the availability of PEI, FHOI, and EOI funds:

1. approximately $9,691,793 in FY2024 funding for new PEI grants with a four-year
   performance period "to carry out education and outreach and enforcement activities
   to prevent or eliminate discriminatory housing practices." Fair Hous. Initiatives Program –
   Priv. Enf't Initiative, Dep't of Hous. and Urb. Dev. (Sep. 23, 2024),
   https://www.grants.gov/search-results-detail/356502.

2. approximately $3,700,000 in FY2024 funding under the FHOI program to help build the
   capacity of nonprofit fair housing organizations and establish new, separate organizations
   in areas that are underserved by existing organizations. Fair Hous. Initiatives Program –
   Fair Hous. Orgs. Initiative, Dep't of Hous. and Urb. Dev. (Sep. 20, 2024),
   https://www.grants.gov/search-results-detail/356476.

3. approximately $8,350,000 in FY2024 funding under its EOI program "to develop,
   implement, carry out, and coordinate education and outreach programs designed to
   inform members of the public concerning their rights and obligations under the FHA."
   Fair Hous. Initiatives Program Educ. and Outreach Initiative, Dep't of Hous. and Urb.
   Dev. (Sep. 20, 2024), https://www.grants.gov/search-results-detail/356475.

*See also* Compl. ¶¶ 76–78.

Many organizations timely applied for the grants announced in these NOFOs, including

Plaintiff TFHC, which was in its third and final year of a PEI grant and had a May 31, 2025 end

date for its performance period, and NFHA, which applied for EOI and FHOI grants. Compl. ¶¶

96, 97, 107–08.

Then, the process stopped. *Id*. ¶ 13. Although HUD has a duty to execute the competitive

merit review process set forth in the NOFOs to select grant recipients, HUD has not processed

the applications for the currently available FHIP funds and has provided no explanation for the

failure to award the available grants as announced in September 2024. *Id*. ¶¶ 83, 86. The FY2024

NOFOs estimated that the evaluation period, would last approximately ninety days and that

grantees could start their FY2024 performance periods by approximately April 30, 2025. *Id*. ¶ 82.

Nevertheless, Plaintiffs have received no indication from HUD that it intends to announce

awards from the FY2024 NOFOs or take any step towards doing so in the foreseeable future. *Id*.

¶ 86. Time is running short to designate the FHIP grantees, as the FY2024 Appropriations Act provides that the funds "remain available until September 30, 2025." *Id*. ¶ 56. To award grants by September 30 and to provide Congress with thirty days' notice as required under the FHA, HUD must announce new grantees pursuant to the FY2024 NOFOs by no later than August 31, 2025. *Id*. ¶ 87.

       **D.**     **HUD's failure to process the current year of multi-year PEI grants.**

     All active PEI grants in this case have been awarded for three-year periods of performance. Compl. ¶¶ 61, 64. The current active PEI grants were awarded under the FY2022 and FY2023 NOFOs, which made more than $30 million—approximately $15 million for FY2022 and over $16 million for FY2023—available for new PEI grants. *Id*. ¶¶ 59–64. A total of seventy-five organizations were awarded new three-year PEI grants with three-year grant periods that ran either from 2023–2026 or 2024–2027. *Id*. ¶¶ 60, 63. NFHA, for example, received a PEI award in 2024 with a grant performance period of July 1, 2024 through June 30, 2027. *Id*. ¶ 95.

     Historically, HUD reaches out to organizations with multi-year PEI grants in advance of expiration of the current year of their grant. *Id*. ¶ 7. HUD and the grantee typically finalize the necessary forms to continue funding for the upcoming grant year, which ensures that there are not gaps in funding between grant years. *Id.* PEI multi-year grantees do not submit an additional application for subsequent years of funding, and organizations will receive funding for the subsequent years of a PEI grant if they have performed satisfactorily and appropriations permit. Compl. ¶ 52; 24 C.F.R. § 125.401(a).

     On September 5, 2024, HUD designated $31.7 million from Congress's FY2024 Appropriation to fund active PEI awards—to the seventy-five organizations going into the second and third years of their multi-year PEI grants that were first awarded through the FY2022 and FY2023 PEI NOFOs. Compl. ¶ 65; HUD Pub. Affs., *HUD Awards Over $32 Million to Fight*

*Housing Discrimination*, HUD Archives (Sept. 5, 2024),

https://archives.hud.gov/news/2024/pr24-227.cfm.

Some of these organizations negotiated the second and third years of their PEI grants with HUD early in 2025, enabling these organizations to begin work under the next year of their grants. Compl. ¶ 69. However, HUD is refusing to negotiate the next year for numerous organizations with PEI multi-year grants ("Active PEI Plaintiffs"), creating a funding shortfall as their previous grant years end. *Id*. ¶¶ 68–70. HUD has not provided the permissions for those organizations to start work under the next year of the grant. *Id*. ¶ 73. This means that those organizations cannot start their second or third grant year, creating a funding shortfall as their previous grant years end. *Id*. ¶¶ 70–71, 106.

HUD has provided no explanation for its refusal to begin subsequent years of multi-year PEI grants. *Id*. ¶ 74. A HUD grant officer has repeatedly told Plaintiff NFHA that her instructions from HUD headquarters are that she cannot move forward with the procedures necessary to begin year two. *Id*. ¶ 71. The HUD representative has been unable to provide further information about the elements necessary to finalize the second year of NFHA's PEI grant. *Id.* This delay has caused and is causing funding shortfalls for the Active PEI Plaintiffs. *Id*. ¶ 7. The Active PEI Plaintiffs are in good standing with their current PEI grants. *Id*. ¶ 116.b. They have not received any communication from HUD suggesting any substantive reason for the failure to process the next year of their grants. *Id*. ¶ 74.

E.    **The harm to organizations denied FHIP funds.**

HUD's failure to administer funds appropriated by Congress under the FY2024 NOFOs and to finalize the second and third years of existing PEI grants is having destructive, irreversible effects on fair housing organizations and the individuals and communities they serve. Compl. ¶¶ 103–06. As of June 2025, organizations like Tennessee Fair Housing Council have had to stop

testing work and systemic investigations and have had to begin terminating employees and limiting the number of clients they can serve. *Id*. ¶¶ 110–12. The ultimate impact has already befallen NFHA member Greater Houston Fair Housing Center ("GHFHC"), which was in the middle of its multi-year PEI grant but was forced to close due to HUD's failing to fund the next year of the grant. *Id*. ¶ 106. Plaintiff NFHA is also facing a financial shortfall of $400,000 over each of the next two years if continued years' PEI funding is not finalized, which impacts its staffing and operations and calls into question its ability to continue planned enforcement work. *Id*. ¶¶ 99, 100.

In addition, the absence of new EOI and FHOI awards is preventing organizations like NFHA from planning for education and outreach activities or supporting the development of new organizations, like the development of a full-service fair housing organization it had planned for North Carolina. *Id*. ¶ 101–02. The new organization would have provided fair housing assistance to North Carolina residents forced to relocate as a result of Hurricane Helene, among other services. *Id*. ¶ 101.

## II.    Procedural History

Plaintiffs filed suit on June 24, 2025, alleging violations of the Administrative Procedure Act, Appropriations Clause, Due Process Clause and Constitutional separation of powers. ECF 1. Defendants moved to dismiss the complaint on July 4, 2025. ECF 7. Plaintiffs moved for a temporary restraining order on July 7, 2025. ECF 11.

## LEGAL STANDARD

In deciding Defendants' motion to dismiss, under either Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant [P]laintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation omitted); *see,*

*e.g.*, *Grell v. Trump*, 330 F. Supp. 3d 311, 315 (D.D.C. 2018). "[D]etailed factual allegations"
are not necessary, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but "a complaint must
contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its
face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Thus,
the complaint's "[f]actual allegations must be enough to raise a right to relief above the
speculative level," *Twombly*, 550 U.S. at 555, although Defendants' motion may be denied even
if "recovery is very remote and unlikely." *Id*. at 556. Plaintiffs have satisfied this standard.

## ARGUMENT

I.  **The Court cannot dismiss Plaintiffs' claims based on Defendants' unsupported
    revision of the factual narrative.**

  The tentpoles of Plaintiffs' factual allegations are that HUD has decided not to administer
FHIP funding and that HUD is currently taking action (or withholding action) pursuant to this
decision. Plaintiffs allege that "HUD made the decision not to continue its ordinary and planned
expenditures of appropriated FHIP funds more than two months ago, and HUD has implemented
this decision in the intervening months by withholding FHIP funding[.]" Compl. ¶ 13; *see also
id.* ¶ 14 (referring to "HUD's decision to impound appropriated FHIP funds rather than expend
them"). These allegations are based on facts known to Plaintiffs and specified in the Complaint,
such as statements from HUD employees to fair housing organizations that they have been
"instructed" not to implement existing multiyear grants. *Id.* ¶ 70. That HUD has made the
decision not to expend the FHIP funds in question is further supported by the Complaint's
detailed allegations as to HUD's deviation from its well-established timelines and procedures for
negotiating subsequent grant years and making new FHIP awards, without any apparent
alternative explanation. *See, e.g.*, *id.* ¶¶ 65–91.

Plaintiffs' well-pleaded and credible allegations must be taken as true at the pleading stage, yet HUD ignores the core factual claim that HUD has made and implemented a decision to withhold FHIP funding. The bulk of HUD's arguments instead presume that no decision has been made and that no claim based on failure to administer or impoundment can exist until September 30—at which point, presumably, HUD would argue that the claim is brought too late. *See, e.g.*, Mot. at 1 ("Plaintiffs submit that HUD has taken too long to administer FHIP grant funds and therefore that it is likely that the agency will fail to do so altogether."); *id.* at 12 ("Plaintiffs' conjecture about HUD's program administration is not actionable under the APA."). HUD cannot ignore the actual allegations of completed agency decision, supply a preferred counterfactual without producing an administrative record to support it, and obtain dismissal based on its alternative narrative. Plaintiffs' claims must be measured against the allegations within the four corners of the Complaint. For the reasons set forth below, those well-pleaded allegations confer jurisdiction on this Court and sufficiently state claims for relief.

## II.    Plaintiffs' claims are ripe.

Defendants first assert that Plaintiffs claims are not yet ripe, but they do so only by misarticulating the claims and harm at issue. "The ripeness doctrine requires that the federal courts 'reserve[ ] judicial power for resolution of concrete and fully crystallized disputes.'" *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (quoting *Cobell v. Jewell*, 802 F.3d 12, 21 (D.C. Cir. 2015)). In determining ripeness, the Court considers "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* (quoting *Cobell*, 802 F.3d at 21).

Defendants contend that Plaintiffs' claims are little more than "speculation" and "conjecture" about a possible future lapse of appropriated FHIP funds, suggesting that the only challenged conduct is the creation of an irremediable impoundment on September 30. That

framing of the claims is incorrect. What Plaintiffs actually challenge is HUD's decision to depart from its normal timetable and procedures and ongoing refusal to implement existing multi-year grants or to select recipients for new FHIP awards. As alleged in the Complaint, HUD is expressly refusing to finalize years two and three of existing PEI awards as it normally would, *see* Compl. ¶¶ 70, 71 ("a HUD grant officer has repeatedly told NFHA that HUD has instructed her that it cannot move forward . . . [and] HUD has similarly refused to negotiate years two and three for other Active PEI Plaintiffs"). The first year of Plaintiff NFHA's active three-year grant has expired, meaning that HUD's unexplained and unreasonable refusal to finalize the second year of funding already has created a current, and growing, funding gap in NFHA's grant performance period. The dispute is concrete and fully crystalized; HUD already has violated the law by refusing to administer the subsequent year of NFHA's (and the other Active PEI Plaintiffs') PEI grants prior to the expiration of their current grant year—thereby causing a funding gap during the three-year performance period set forth in the grant award. *Id*. ¶¶ 61, 64. Contrary to Defendants' assertion, Active PEI Plaintiffs are currently suffering concrete harms— not just ones that will accrue at the September 30 deadline—because their current year of funding has expired and the challenged actions presently prevent the continuation of the next year of funding. The consequences *may* be even more permanent after September 30, but the harm is real and being felt by the Active PEI Plaintiffs now.

HUD has also failed to select new award recipients. *Id.* at ¶ 89 (alleging that HUD has not taken any steps toward obligating the FY2024 funds). Plaintiffs allege that this failure is pursuant to HUD's decision to withhold FHIP funding until the appropriations lapses, that HUD is already effectuating this decision through its current refusals to make awards on NOFOs that it has published and for which it has taken applications, and that its present inaction is contrary to

the law. *See, e.g.*, *Id.* ¶¶ 13–14. The Complaint also lays out why HUD's failure to select new FHIP recipients is already causing harm to applicants. *Id.* at ¶¶ 103–04, 110–12.

It is HUD that asks this Court to act on mere speculation, arguing that it is entitled to dismissal based on the mere possibility that—contrary to all the evidence cited in the Complaint as to HUD's current course of action—it may be on track to somehow make FHIP awards before September 30 without judicial intervention. (And rather than marshalling evidence or argument to demonstrate that this is even a possibility, HUD is attempting to evade production of the administrative record.)

In any event, it would now be practically impossible for HUD to make such awards without this Court's intervention. HUD has a duty to "execute" the competitive merit review process it has set forth in the NOFO to select grant recipients, *see* 2 C.F.R. § 200.205, and HUD itself estimated that this process would take approximately ninety days for the applications at issue, *see* Compl. ¶¶ 82–83. On top of that three-month window, Section 3616a(e) requires HUD to notify Congress of such awards at least 30 days before any grant agreement is finalized. HUD would have needed to start its review process by early June to announce new recipients thirty days before the FY2024 appropriation is to lapse. (And to the extent HUD plans to claim this process has begun, it cannot do so in a motion to dismiss but will have to produce the administrative record to show its progress.) It is even less feasible that HUD could withdraw the existing NOFOs and issue new ones, then complete the entire required process before the appropriations deadline—in addition to the four-month process just described, HUD would first need to publish an Assistance Listing and leave the application open for sixty days, making it a six-month endeavor. *Id.* ¶ 38 (citing 2 C.F.R. § 200.204(b)).

HUD has already made the decision not to make awards from the FY 2024 NOFOs as it ordinarily would and has embarked on a course of conduct pursuant to that decision that will run it afoul of the September 30 deadline barring this Court's intervention in the very near future. And Pending NOFO Plaintiffs are already experiencing harm from HUD's refusal to select recipients to date, which is alone adequate for a ripeness evaluation, and it further strains credulity to think this harm could be rectified by September 30 without Court intervention.

This dispute is therefore ripe for court review. It arises from conduct that has already started and remains ongoing; the Court need not speculate about what might happen in the future to evaluate what has happened in the past and what is happening right now. It would be perverse to permit HUD to evade scrutiny for its current behavior based on Defendants' apparent position that a challenge is too early until it is too late. *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of President*, --- F. Supp. 3d ----, 2025 WL 1502329, at *10 (D.D.C. May 27, 2025) (rejecting ripeness argument because challenged executive order contemplated "some action in the future" by agency heads and finding that claims could be resolved based on the effects already felt by the plaintiff). And while Plaintiffs will suffer extreme hardship in the absence of judicial review, *see infra* Section III, Defendants have articulated *no harm* related to responding to Plaintiffs' claims now. Defendants cannot defeat Plaintiffs' claims on ripeness grounds.

III.    **Plaintiffs have standing.**

Defendants next challenge standing on the theory that Plaintiffs lack an Article III injury in fact. This line of argument is essentially a repackaging of Defendants' ripeness arguments, and it fails for the same reasons.

The first prong of the Article III standing analysis, injury in fact, requires the plaintiff to demonstrate an injury that is "concrete," "particularized," and "actual or imminent, not speculative." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). As the Supreme Court

15

recently reaffirmed, "if a plaintiff is 'an object of the action (or forgone action) at issue,' then 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. ---, 2025 WL 1716141, at *7 (June 20, 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)). Here, Plaintiffs articulate actual and ongoing harm, in addition to imminent future harm of an existential magnitude.

As set forth in the Complaint, for Active PEI Plaintiffs, HUD's refusal to implement the second and third years of multi-year awards has already created substantial harms.[4] Organizations have lost up to $425,000 a year, which many rely on to conduct their day-to-day operations and could not survive without. Compl. ¶ 103. As a direct result of HUD's refusal to implement these ongoing grants, Plaintiffs have laid off employees, turned away clients, limited (if not eliminated) programs, and even closed down entirely. *Id.* ¶¶ 103, 106. These injuries plainly suffice for Article III standing. Similarly, organizations awaiting resolution of the pending NOFOs have had to curtail all aspects of their operations due to HUD's failure to administrate new FHIP awards. *Id.* at ¶¶ 110–13. These funding gaps are harming day-to-day operations and, for some organizations, will result in closure. *Id.* at ¶ 113. Under binding precedent, these injuries satisfy Article III. *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 177 (D.D.C. 2017) (recognizing harm from government action that "perceptibly impair[s] the organization's programs"); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir.

---

[4] Plaintiff NFHA challenges HUD's refusal to implement multi-year PEI awards on behalf of itself and a class of those similarly situated. As a membership organization, NFHA also has standing to seek relief for HUD's misconduct—both its refusal to implement multiyear grants and its refusal to award new FHIP grants—on behalf of its members, many of whom are injured and could sue in their own right. Plaintiff TFHC is one such member—HUD's failure to award grants from the pending NOFOs has caused a funding gap that is impairing TFHC's programs and activities and which, if not remedied, will likely force TFHC to close. Compl. ¶¶ 112–13.

2016) (same); *see also Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 56–57 (D.D.C. 2025) (harm where organizations awaiting receipt of federal funds were forced to dismiss employees and cut programmatic work). Plaintiffs thus adequately allege an Article III injury in fact.

## IV.    The Tucker Act does not deprive this Court of jurisdiction.

Defendants next argue that this Court lacks jurisdiction over Plaintiffs' claims as a result of the Tucker Act. Defendants are wrong. The Tucker Act deprives this Court of jurisdiction only when a claim is "at its essence contractual[.]" *Crowley Gov't Servs. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). The "longstanding test" in this Circuit to determine whether a claim is essentially contractual examines "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought." *Id.*

As an initial matter, Pending NOFO Plaintiffs do not even have contracts with HUD, and therefore certainly cannot seek to enforce any contractual terms. Nor is there necessarily any money involved in the relief they seek: Plaintiffs ask only for HUD to take action on their pending applications. HUD's NOFO-related jurisdictional arguments stop at the starting gate.

The Tucker Act is no more applicable to the Active PEI Plaintiffs' claims, which derive not from any current grant agreements with HUD but from Defendants' program-wide policy decision not to finalize the specific terms for subsequent grant years as the current years expire. Active PEI Plaintiffs' claims derive from the Constitution and statutes, *not* the terms and conditions of their grant awards. The Court must measure HUD's actions against the requirements of the Appropriations Clause, separation of powers, the Due Process Clause, and the APA, *not* contractual provisions. The authority supporting Plaintiffs' request for relief addresses constitutional and statutory claims, *not* contractual claims. Simply put, the source of

17

Plaintiffs' claims is not contractual in nature. As Judge Ali recently held in a comparable federal funding case, "it would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 137 (D.D.C. 2025); *see also Harris Cnty.* v. *Kennedy*, No. 25-cv-1275 (CRC), 2025 WL 1707665, at *5 (D.D.C. Jun 17, 2025) ("What matters for purposes of plaintiffs' separation-of-powers claim is that the Executive Branch allegedly did not spend funds that it was required to spend, not that the funds were earmarked for contractual grant payments. Had the funds been earmarked to fund, say, public awareness campaigns by HHS itself rather than grants to state and local governments, the separation-of-powers analysis would be the same.").

Neither is the relief sought money damages, as it would be in a contractual action. To be sure, after a court sets aside agency action, a natural consequence may be the release of funds withheld pursuant to that action. *Bowen v. Massachusetts*, 487 U.S. 879 (1988). In *Bowen*, the Court considered whether the APA provided jurisdiction to order the Secretary of Health and Human Services to undo his refusal to reimburse the plaintiff-state. The Court explained that its cases "have long recognized" that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* at 893. The Court concluded: "since the orders are for specific relief (they undo the Secretary's refusal to reimburse the State) rather than for money damages (they do not provide [monetary] relief that substitutes for that which ought to have been done) they are within the District Court's jurisdiction under § 702's waiver of sovereign immunity." *Id.* at 910. The same result should obtain here. Again, as Judge Ali recently reasoned: "Plaintiffs are not seeking compensation for

their losses due to the failure to pay them, which, as in any contract case, could be far greater

than the amount withheld pursuant to the agency policy; Plaintiffs seek only invalidation of the

policy, including the withholding of payment that flowed from it." *AIDS Vaccine Advoc. Coal.*,

770 F. Supp. 3d at 136.

Defendants ignore all of this and instead repeatedly say in conclusory fashion that this

case is "like" the Supreme Court's per curiam order in *Dep't of Educ v. California*, 145 S. Ct. 966

(2025). *See* Mot. at 10. But that interim order did not contain meaningful reasoning in the single

paragraph on jurisdiction, nor did it conclusively resolve jurisdiction even for that case, let alone

*sub silentio* overrule *Bowen* and its progeny, as Defendants suggest. *See, e.g.*, *Widakuswara v.*

*Lake*, Case No. 1:25-cv-1015-RCL, 2025 WL 1166400, at *9 (D.D.C. Apr. 22, 2025) ("But

*California* does not change the conclusion in the March 28 TRO, because *California* does not

change the governing law."). The facts in this case are materially distinct from *California*.

Plaintiffs here seek to compel HUD to review and select new FHIP recipients before the

obligation period lapses and to reestablish a prospective grantor/grantee relationship; they are not

seeking money owed for past work. And unlike Plaintiffs' claims here, the *California* plaintiffs'

claims, by their own description, did derive from the terms and conditions of their grant

agreements. Brief for Respondent at 23, *Dep't. of Educ. v. California*, , 145 S. Ct. 966 (Apr. 4,

2025) (No. 24A910).

Nor does the recent decision in *Vera Institute of Justice v. U.S. Department Of Justice*,

No. 25-cv-1643 (APM), 2025 WL 1865160, at *1 (D.D.C. Jul.7, 2025), affect this conclusion.

The APA claims at issue there derived from agency terminations of specific grants, which the

court found necessitated evaluating whether the terminations were permitted under the grant

terms and conditions. *Id.* at *1. Moreover, in *Vera*, the plaintiffs defended against a Tucker Act

challenge by arguing that their grants were not contracts within the meaning of the Tucker Act. *Id.* at *10. Here, Plaintiffs allege and challenge HUD's failure to administer a grant program after a certain date by adopting a policy of refusing to enter into contracts at all—whether the individual grant agreements would be contracts is irrelevant. Moreover, Plaintiffs challenge HUD's actions under appropriations legislation, the FHA, and FHIP regulations; HUD's violations of OMB termination regulations are confirmatory evidence of agency misconduct and the unreasoned nature of HUD's actions but are not necessary for Plaintiffs to succeed on their claims. And of course, the Pending NOFO Plaintiffs have no agreements with HUD whatsoever; they do not seek funding, they seek to compel HUD to undergo a review and selection process.[5]

At bottom, Defendants take the position that because HUD and Active PEI Plaintiffs entered into grant agreements for earlier years (not even the years that are now at issue), and because this case concerns funding, Plaintiffs' claims are necessarily contractual claims for money damages. But the D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley*, 38 F.4th at 1107. Consistent with this longstanding rule, this Court has jurisdiction over Plaintiffs' claims.

## V.    Plaintiffs' APA claims properly seek review of agency action.

Without distinguishing between Plaintiffs' separate APA causes of action, Defendants next argue that Plaintiffs' APA claims fail because Plaintiffs have not alleged final agency action.

---

[5] Notably, the analysis in *Vera* likewise confirms that the Tucker Act arguments do not deprive this Court of jurisdiction over Plaintiffs' constitutional claims. *Id.* at *6–7 (rejecting subject matter jurisdiction challenge under Tucker Act to due process claims and claims regarding separation of powers and the Spending and Appropriations Clause, among others).

But Plaintiffs need not do so under Section 706(1); they need only allege a failure to take a discrete and required agency action, as the Complaint here does. And in any event, Plaintiffs *have* alleged a final agency action, albeit one that HUD refuses to admit. As to the Section 706(2) claim, Plaintiffs have plainly alleged that HUD has made a decision not to administer FHIP funds and is acting in accordance with this decision, which satisfies the final agency action requirement. HUD may dispute that as a matter of fact, but that is not grounds for a motion to dismiss. Thus, Plaintiffs' APA claims should proceed.

### A.    Plaintiffs have adequately pleaded their Section 706(1) Claims

As a threshold matter, Plaintiffs need not allege a "final" agency action to plead their claim under Section 706(1), which challenges agency action that is unlawfully withheld or unreasonably delayed. *See, e.g.*, *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670–72 (D.C. Cir. 2016) (analyzing the scope of § 706(1) without regard to the test of "final agency action" under § 704); *Am. Oversight v. U.S. Dep't of Veterans Affs.*, 498 F. Supp. 3d 145, 157 (D.D.C. 2020) ("Here, Plaintiffs sue under § 706(1), and thus they need not identify a 'final agency action' or 'its functional equivalent.'"). The point of Plaintiffs' § 706(1) claim is that HUD has not performed the duties it must perform under the FHIP statute and its implementing regulations, which Plaintiffs seek to compel through this suit. *See* ECF 11-1 (Plaintiffs' Memorandum of Law in Support of Motion for a Temporary Restraining Order); *Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, No. 20-3706 (RC), 2024 WL 1344450, at *9 (D.D.C. Mar. 9, 2024) ("[A] Section 706(1) claim concerns agency action that has been unreasonably delayed, while a Section 706(2)(A) claim challenges a final agency action that has been taken."). And Plaintiffs' claims must proceed because Plaintiffs have plausibly alleged that HUD's refusal to perform these duties is both unlawful and unreasonable. HUD has caused Plaintiffs substantial harm and funding shortfalls, violated Congress's intent to use and obligate

funds for FHIP grants by September 30, 2025, and harmed the public health and welfare by diminishing anti-discrimination enforcement.

To the extent that Defendants also argue that the actions Plaintiffs seek to compel are not reviewable under the APA, this argument too lacks merit. It is true that, under Section 706(1), a court may only compel a "*discrete* agency action that [the agency] is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). But that is precisely what Plaintiffs have alleged. Regarding the Active PEI Plaintiffs, Plaintiffs have alleged that (1) HUD is required to use funds appropriated under 42 U.S.C. § 3616a, *see* Compl. ¶¶ 26–27; and that (2) pursuant to this duty, HUD is required to fund continuing years of existing PEI awards as long as money has been appropriated and organizations' performance is adequate, *see id.* ¶ 50; 24 C.F.R. § 125.401. And for the pending NOFO Plaintiffs, the Complaint alleges that HUD: (1) is required to use funds appropriated under 42 U.S.C. § 3616a, *see id.* ¶¶ 26–29; and that, (2) pursuant to this duty, HUD is required to execute its merit review process to make awards for the competitive grants it has announced, *see id.* ¶ 83, 2 C.F.R. § 200.205. Plaintiffs have further alleged that HUD has declined to perform its duty under the above statutes and regulations, including as to Plaintiffs. *See, e.g.*, *id.* ¶¶ 69–71; 86; 90–91.

These allegations are a far cry from *Norton*, where Plaintiffs lodged a broad attack on the Bureau of Land Management's alleged failure to "manage [federal lands] … so as not to impair the suitability of such areas for preservation as wilderness." 542 U.S. at 65 (quoting 43 U.S.C. § 1782(c)). The claim in *Norton* was unreviewable because Plaintiffs sought to compel an *objective* (preservation of areas for wilderness), not any particular *action* to ensure that objective. *Id.* at 66. Here, however, Plaintiffs seek concrete actions that are grounded in the statutory and regulatory text: HUD must, by statute, use appropriated funds for FHIP awards with qualifying

organizations – and under the circumstances present here, HUD must do so by (1) executing the requisite paperwork to finalize existing PEI grants (2) and by executing its merit review process to award new grants under the published NOFOs. Moreover, HUD must do so before funds become unavailable for obligation. *See Harris Cnty.*, 2025 WL 1707665, at *7. That is, HUD has a duty to do specific tasks by a specific time. These are discrete and routine "agency actions" that may be compelled if unlawfully withheld or unreasonably delayed. *See, e.g.*, *Meina Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015) (plaintiff stated a claim under Section 706(1) by alleging that the Department of State failed to adjudicate visa applications according to "a specific principle of temporal priority that clearly reins in the agency's discretion"); *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 27, 41 (D.D.C. 2017) (statute providing that the Department of Defense "shall determine" whether veteran citizenship applicants had served honorably, which "shall be proved by a duly authenticated certification," created a nondiscretionary duty to approve or deny the certification).[6]

### B.    Plaintiffs allege "final agency action" under Section 706(2).

Plaintiffs have also adequately pleaded unlawful agency action under Section 706(2). Plaintiffs allege that HUD made a decision to stop the finalization of continuing years' PEI grants, and to stop the execution of its merit review process and issue no new FY2024 grants. These well-pleaded allegations describe final agency actions that are subject to judicial review because they embody HUD's final decision-making process, bind plaintiffs, and are sufficiently discrete and required by law.

---

[6] Indeed, in *Meina Xie*, the Court found that – at the pleading stage – the plaintiff could rely on apparent discrepancies in the comparative speed of visa issuances to plausibly allege that the State Department was violating the statutory criteria for prioritizing visa review. 780 F.3d at 408. So too here, where HUD's departure from historical practice "is quite consistent with [Plaintiff's] allegations that [HUD] has inadequately heeded" its statutory and regulatory obligations. *Id.*

The APA defines "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*." 5 U.S.C. § 551(13) (emphasis added). This expansive definition is "meant to cover comprehensively every manner in which an agency may exercise its power." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (cleaned up). However, for an agency action to be "final," it must meet two criteria: it must "mark the consummation of the agency's decisionmaking process," *i.e.*, it must not be "merely tentative or interlocutory," and it must "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). The finality inquiry "is a 'pragmatic' and 'flexible' one." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005).

As discussed in Sec. II, *supra*, Plaintiffs allege that "HUD made the decision not to continue its ordinary and planned expenditures of appropriated FHIP funds more than two months ago, and HUD has implemented this decision in the intervening months by withholding FHIP funding[.]" Compl. ¶ 13.[7]  HUD's decision to discontinue the use of FY2024 funds for FHIP is the agency action challenged by Plaintiffs, and it is supported by well-pleaded allegations that demonstrate that a final decision has been made, to which HUD has consistently adhered by refusing to perform the actions that are both required by law and are necessary to facilitate the use of those funds. *See, e.g.*, Compl. ¶¶ 66–70 (Active PEI Plaintiffs whose continued years funding had been announced by HUD were informed by HUD representatives that "HUD instructed them not to negotiate the required HUD-1044 contracts for upcoming years

---

[7] At this juncture, Plaintiffs do not know whether this decision has been memorialized in writing; however, "agency action need not be in writing to be judicially reviewable as a final action." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018) (collecting cases). In any event, HUD cannot both claim no decision has been made and refuse to produce the administrative record to substantiate such an assertion, as it is attempting to do here.

of active PEI grants"); *Id.* ¶ 71 ("a HUD grant officer has repeatedly told NFHA that HUD has instructed her that it cannot move forward with the procedures necessary to begin year two" and that HUD has similarly refused to negotiate years two and three for other Active PEI Plaintiffs"); *Id.* ¶ 95 (noting that HUD has failed to finalize the second year of NFHA's PEI award despite the June 30, 2025 expiration of its first year). Nothing about these allegations is "tentative or interlocutory"—Plaintiffs have not, for example, been informed of any date by which HUD will or expects to finalize their awards or been provided any details about any ongoing decision-making process.[8]

HUD has similarly adhered to its decision not to issue new awards under the FY2024 NOFOs, notwithstanding that it is well past the time when awards would have been made if not for that decision. *See* Compl. ¶ 86 ("HUD has not announced or issued any new grants under any of the FY2024 NOFOs" or otherwise indicated that it intends to announce awards); ¶ 81 (explaining that HUD generally announces awards by April or March when NOFOs were posted the prior fall); *id.* ¶ 82 (HUD's inaction has stretched wildly beyond HUD's estimated FY2024 NOFO timeline, which contemplated awarding new grants with sufficient time start work by April 30, 2025); *see also id.* ¶ 75 (noting that, consistent with HUD's decision to stop FHIP, the executive has requested eliminating all FHIP funding for Fiscal Year 2026. The finality of HUD's decision is reinforced by the practical difficulty of making new awards at this late stage

---

[8] Indeed, HUD makes no representation in its brief that it has made plans to finalize the FY2024 awards in the near term—and even if it had, this would only create a factual dispute that is inappropriate for resolution on a motion to dismiss. Moreover, the fact that HUD *could* eventually change its policy and decide to again fund the FY2024 continuing awards does not make its present decision nonfinal. *See Nat. Env't Dev. Ass'n Clean Air Project v. EPA*, 752 F. 3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future.") (quoting *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000)).

of the fiscal year without this Court's intervention.[9] As discussed in Sec. II, *supra*, HUD's estimated timeline to follow its merit review process and make awards was ninety days, and that is on top of the statutory thirty-day period necessary to notify Congress of new awards before funds are obligated. *See* Compl. ¶¶ 82, 87. This timeline would only be extended if HUD attempted to issue new NOFOs. *Id.* ¶ 38. Defendants' behavior is thus eminently consistent with what Plaintiffs have alleged: a decision not to take any of these actions.

Plaintiffs' allegations thus strongly indicate that HUD, acting consistently with its decision to cease funding FY2024 FHIP awards, is taking no action on existing multiyear grants or on the FY2024 NOFOs. HUD's application and communication of this decision to Plaintiffs evidences the consummation of the agency's decision-making process. *See Croplife Am. v. EPA*, 329 F.3d 876, 881 (D.C. Cir. 2003) (agency directive to disregard certain studies was a final decision that created a binding norm aimed at the plaintiffs); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) ("[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding … or is applied by the agency in a way that indicates it is binding."); *Nat. Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 44 (D.D.C. 2011) (agency action was final when the agency had made decision to change the permitting process and communicated that decision to plaintiffs). It is immaterial that the Pending NOFO Plaintiffs' FY2024 NOFO applications have not been affirmatively rejected: an agency's final decision to change an application process affects the rights of all applicants. *See Jackson*, 768 F. Supp. 2d at 44 ("[I]t is possible for an agency to take final agency actions during a permit

---

[9] This court has the authority to order that FY2024 funds remain available pending resolution of this case. *See Nat. Ass'n of Reg. Councils v. Costle*, 564 F.2d 583, 588 (D.C. Cir. 1977) (affirming the authority of a court to order that funds be held available beyond their statutory lapse); 31 U.S.C. § 1502(b) (same).

assessment process prior to actually determining whether to grant or deny an application for a permit."). In *Jackson*, for example, the court considered statements such as from an EPA official that the EPA would apply a certain (purportedly nonfinal) review criteria to applications, noting that the statement "can only be interpreted as reflecting the EPA's settled, final stance on its current application of the [permitting criteria]." *Id.* at 45; *see also Appalachian Power*, 208 F.3d at 1023 (agency action was final when it had been applied to affect *how* an agency was reviewing permit applications and negotiations).

As discussed in more detail in Plaintiffs' motion for a temporary restraining order, ECF 11-1, Plaintiffs have also alleged that HUD's action has legal consequences that harm them *right now.* The Active PEI Plaintiffs have been instructed not to start work—and cannot rely on reimbursement if they do start work—under grants that would be active but for HUD's unlawful and unexplained refusal to finalize continuing years' awards. *See, e.g.*, Compl. ¶¶ 71, 73. Such dictates instruct Plaintiffs to stop actions they would otherwise take; this is quintessential final agency action. *See Nat'l Council of Nonprofits*, 763 F. Supp. 3d at 54 (final agency action found when OMB memorandum instructed a temporary pause on all activities related to the obligation or disbursement of all Federal financial assistance). In *Nat'l Council of Nonprofits*, it did not matter that the agency action was framed as a "pause" of activities rather than a permanent termination—what mattered was that the unlawful and unexplained pause *immediately* affected the Plaintiffs. *Id.* So too here: Active PEI Plaintiffs, including NFHA and many of its member organizations, are now experiencing funding shortfalls as a result. The consequences of these shortfalls have been devastating, with one organization already having to shutter operations.

Compl. ¶ 106.[10] Plaintiffs that have applied for FY2024 awards have been similarly thrust into budgetary chaos and uncertainty and cannot start work on grants that otherwise would have begun in the ordinary course. Compl. ¶¶ 110–12. Such action has undoubtedly impacted Plaintiffs' rights and obligations. *See Jackson*, 768 F. Supp. 2d at 45 (*Bennett*'s second prong met when agency had implemented changes to its review of permit applications and those changes affected applicants); *Appalachian Power Co.*, 208 F.3d at 1023 (agency policy change that affected plaintiffs' negotiation of permits met final agency action requirement).

Finally, the Court should reject Defendants' argument that Plaintiffs impermissibly seek review of a "general program or policy." Mot. at 12. As discussed in the context of Plaintiffs' § 706(1) claim, *see* Section V.A, *supra*., Plaintiffs' § 706(2) claim is predicated on HUD's violation of several discrete duties imposed by statute and regulation that dictate how it must administer FHIP.

HUD's decision to stop funding continuing years' PEI grants violates: (1) the mandatory command of Section 3616a; (2) the substantive prohibition set forth in 24 C.F.R. § 125.401 against denying continuing years' funds on bases other than appropriations or performance; and (3) the proper procedures for terminating a grant under 2 C.F.R. § 200.340 *et seq.* Similarly, HUD's decision to unlawfully stop funding *new* FY2024 awards violates the mandatory commands of Section 3616a and HUD's duty to execute the merit review process it has set up pursuant to 2 C.F.R. § 200.205. Plaintiffs seek to have these decisions set aside, which would obligate HUD to take two forms of discrete action: (1) finalize the Active PEI Plaintiffs'

---

[10] The financial loss and operational impact on Plaintiffs distinguishes this case from *FTC v. Standard Oil Co.*, 449 U.S. 232 (1980), in which—by Defendants' own description—the purported agency action had no effect on the daily operations of the plaintiff's business, nor did it compel the business to do or refrain from doing anything.

continued year's funding and (2) review and make decisions on Plaintiffs' applications for

funding under the new FY2024 NOFOs. Plaintiffs thus seek only the discrete actions required by

a "completed universe" of HUD and OMB regulations; they do not seek to micromanage any

discretionary aspect of HUD's administration of FHIP, such as to whom FY2024 grants should

be awarded, nor do they seek review of an amorphous "program" writ large. *Cf. Lujan v. Nat'l*

*Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (Court could not review the Bureau of Land

Management's "land withdrawal review program" when such program was not derived from an

authoritative text or alleged with reference to specific Bureau orders or regulations); *Norton*, 542

U.S. at 65 (when an agency is compelled by law to act within a certain period of time, a court

may compel the act that is required by law, even if *how* the agency complies is left to its

discretion).

**VI.     The challenged conduct is not committed to agency discretion.**

There is a "strong presumption favoring judicial review of administrative action."

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018). The exception for agency

action committed to agency discretion by law is "quite narrow[]" and applies only in the "rare

circumstances" in which a court would have "no meaningful standard against which to" review

an agency's conduct. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (describing the limits

of 5 U.S.C. § 701(a)(2)).

This case does not present those rare circumstances. As a threshold matter, it is important

to identify what agency decisions are at issue. This case does not concern HUD's discretion with

respect to a lump sum appropriation to the agency, as Defendants assert. *See* Mot. at 12–13.

Rather, Plaintiffs' claims address HUD's authority to refuse to spend FHIP-specific

appropriations and HUD's authority to functionally terminate existing grants without notice or

process.

As discussed above, Plaintiffs have alleged several interlocking sources of law that constrain Defendants' discretion by imposing legal duties upon them. *First*, the FHA requires that HUD "shall" use funds made available under FHIP to contract with private fair housing organizations to further the purposes set forth in Section 3616a: private fair housing enforcement, fair housing organization capacity-building, and education and outreach. *See* 42 U.S.C. § 3616a(b)–(d); *see also* FY2024 Appropriations Act (appropriated FY2024 funds for FHIP, to remain available until September 30, 2025). Plaintiffs thus allege that HUD has a legal duty to use appropriated funds in specified ways—which in practice means those funds must be obligated for those purposes by the September 30, 2025, end of the fiscal year, *see* FY2024 Appropriations Act; 31 U.S.C. § 1502(a), and that new awards must be announced by August 31, 2025. *See* 42 U.S.C. § 3616a(e) (HUD "shall" notify Congress of new awards "[n]ot less than 30 days before providing a grant . . . to carry out activities authorized by this section"). The executive branch has no discretion to unilaterally disregard a statutory mandate to spend funds in a particular manner simply because of policy objections. *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

*Second*, Plaintiffs allege several discrete regulatory duties that circumscribe HUD's discretion in its selection and administration of the program. For the Active PEI Plaintiffs, Plaintiffs allege that HUD may not deny continuing years' funding on bases not enumerated in 24 C.F.R. § 125.401—i.e., for reasons other than lack of appropriated funds or poor performance. *See Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) (finding that statute providing that the Navy Secretary "may delegate" powers to Coast Guard employees excluded the delegation of such powers to non-Coast Guard officials). Nor may HUD do so without following the notice and hearing opportunity procedures set forth in 2 C.F.R. § 200.341–02 (the agency "must"

provide a written notice of termination and "must" provide recipient with opportunity to object and provide information challenging the action). Finally, Plaintiffs allege that HUD must comply with 2 C.F.R. § 200.205, under which it "must . . . execute" the merit review process it has set up for the new FY2024 awards—meaning that it must apply the criteria set forth in the NOFOs to select award recipients for published NOFOs.[11]

The statutes, regulations, and appropriations legislation speak in mandatory terms: collectively, they require HUD to use appropriated funds to enter into grants or other agreements by September 30, 2025, and to do so in the manner permitted by HUD and OMB regulations. This case only requires the Court to determine whether HUD has complied with these statutory, regulatory, and constitutional mandates, none of which are committed to agency discretion. *See Pol'y & Rsch, LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018) (finding that HHS regulations that were substantially similar to the OMB regulations at issue here provided meaningful standards against which to measure agency action); *Climate United Fund v. Citibank, N.A.*, --- F. Supp. 3d ---, 2025 WL 1131412, at *13–14 (D.D.C. Apr. 16, 2025) (finding that statute requiring grants to be made by a specific date and setting forth certain eligibility requirements provided meaningful standards for review); *Kirwa,* 285 F. Supp. 3d at 36 (statute and regulations setting forth agency's mandatory duty to certify or deny certification of past honorable military service provided sufficient standards against which to analyze agency action); *see also California v. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025) (finding OMB regulations provided sufficient standards for agency review).

---

[11] In contrast, Plaintiffs do not seek to dictate which eligible applicants are ultimately selected for awards, nor do they challenge the substantive content of the merit review processes that HUD has set up in the FY2024 NOFOs.

Defendants' arguments to the contrary are unavailing. Defendants invoke *Lincoln v. Vigil*, 508 U.S. 182 (1993), to argue that "allocation of funds from a lump-sum appropriation" is a matter of agency discretion. Mot. at 12–13. This was true in *Lincoln*, where neither the Congressional appropriation nor the statute pursuant to which the funds were appropriated mentioned the public health program that was terminated. 508 U.S. at 186 ("Congress never expressly appropriated funds for these centers."). But here, Congress has specifically appropriated funds for "contracts, grants and other assistance" under Section 3616a in the FY2024 Appropriations Act, and Section 3616a describes in detail the three possible categories of grants under FHIP. *See* 42 U.S.C. 3616a(b)–(d). Defendants make no attempt to explain how this constitutes a "lump-sum appropriation," nor could such an argument succeed. Moreover, Defendants' argument does not once mention the HUD and OMB regulations that further curb HUD's discretion by imposing several mandatory duties it must follow in its grant administration. Rather, Defendants' argument that "[a]ny decisions regarding HUD's administration of the grant programs, including interim steps and timing, are squarely committed to agency discretion," *see* Mot. at 13, would read FHIP's entire regulatory structure out of existence, as well as the timing requirement set forth in Section 3616a(e). Defendants' arguments that HUD's actions are committed to unreviewable agency discretion do not grapple with the actual statutory and regulatory scheme at issue, which confirms that HUD does not have the discretion it proclaims.

## VII.    Plaintiffs have adequately alleged Appropriations Clause and separation of powers claims.

### A.    Plaintiffs adequately allege an Appropriations Clause claim.

In the section of Defendants' Motion that refers to the Appropriations Clause, Defendants appear to take the position that Plaintiffs do not allege an "unlawful-withholding claim" because

the Appropriations Clause does no more than require that the payment of money be authorized by statute. Mot. at 14. Based on this cramped and incorrect understanding of the Clause, Defendants dismiss Plaintiffs' claim in summary fashion, fail to meet Plaintiffs' allegations, and instead offer a mélange of arguments that are more focused on Article III standing than on the identified cause of action. But Plaintiffs have sufficiently stated an Appropriations Clause violation, and Defendants' Article III arguments fail on the merits.

The Appropriations Clause reserves for Congress the unique power to appropriate funds. The D.C. Circuit has made clear that pursuant to this constitutional maxim, when Congress has appropriated funding, "the President does not have unilateral authority to refuse to spend the funds." *Aiken*, 725 F.3d at 261 n.1. The executive may not "decline to follow a statutory mandate or prohibition simply because of policy objections." *Id.* at 259. Plaintiffs allege, and HUD concedes, that Congress appropriated FY2024 money for FHIP. Plaintiffs allege that HUD has decided to withhold this funding, as evidenced by Defendants' current refusals to implement existing multi-year grants or award new ones. Taken as true, these allegations state a claim for an Appropriations Clause violation. *See, e.g.*, *Nat'l Council of Nonprofits*, 763 F. Supp. 3d at 56 (determining that OMB's failure to disburse appropriated funds ran afoul of the Appropriations Clause).

Rather than address these allegations, HUD first asserts that the Appropriations Clause has been "satisfied" because Congress appropriated money for FHIP. Mot. at 14. HUD is right that Congress has set aside FY2024 funds for FHIP, but the Appropriations Clause requires more, and the constitutional infirmity at issue arises from HUD's failure to make good on that appropriation. On this front, HUD offers no response.

HUD then contends that Plaintiffs have only a generalized grievance that deprives them of standing. Mot. at 14–15. Defendants never explain why or how that is the case, nor could they: Plaintiffs are the direct objects of Defendants' alleged misconduct, and they are challenging the particularized effects of that misconduct on their own operations.

Anticipating this response, HUD abruptly pivots to redressability and argues that the only remedy this Court may order is to make appropriated funds available for obligation, which would not resolve Plaintiffs' injuries. Mot. at 15. The funds at issue are already available for obligation, the problem is HUD's refusal to obligate funds for FHIP awards despite Congress making them available for just that purpose. Binding precedent makes clear that the Court has the authority to require HUD to not just make FHIP funds available for obligation, but to actually obligate them before the appropriations deadline. In the context of constitutional challenges, the Supreme Court has previously required an agency to "allot" all appropriated amounts. *Train v. City of New York*, 420 U.S. 35, 44, 49 (1975). The D.C. Circuit has likewise expressly rejected the executive's authority to refuse to "spend" appropriated amounts. *Aiken*, 725 F.3d at 261 n.1. This Court may therefore order HUD to not only make available, but to actually spend, the appropriated FHIP funding.

## B.    Plaintiffs adequately allege a separation of powers claim.

As to Plaintiffs' separation-of-powers claim, HUD states only that the executive has discretion as to *how* to spend appropriations and that HUD is within the bounds of its authority so long as it obligates the funds by September 30. These barebones assertions fail to defeat Plaintiffs' claims, for two key reasons.

First, as explained above, HUD does not have unfettered discretion to strip organizations of their grants midstream, nor does HUD have discretion not to spend appropriated FHIP funding. *See supra* Section VI. Second, this position ignores Plaintiffs' allegations that HUD

*already decided* not to administer FHIP funding, i.e., to create an impoundment, and that HUD is withholding funding pursuant to this decision. Compl. ¶ 13. Defendants simply ignore this facet of Plaintiffs' Complaint even though it is central to the separation-of-powers analysis.

Plaintiffs have adequately alleged this claim at any rate. The Complaint alleges that HUD has decided to withhold or impound the fund specifically appropriated for FHIP grants. Compl. ¶ 13. Taken as true, this means that HUD is not only acting beyond the scope of executive authority, but also encroaching upon Congress's unique power of the purse. This violates separation of powers.

Defendants' invocation of *AIDS Vaccine Advocacy Coalition* does not change the analysis. There, the court specifically noted that the executive has "discretion on how to spend *within the constraints set by Congress*." 770 F. Supp. 3d at 154 (emphasis added). Here, the constraints set by Congress require spending FY2024 appropriations on FHIP awards—i.e., exactly what Plaintiffs seek.

**VIII.    Active PEI Plaintiffs adequately allege a Procedural Due Process claim.**

Count V of the Complaint alleges a procedural Due Process violation as to the Active PEI Plaintiffs. The Fifth Amendment's Due Process Clause provides that no person "shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner" before being "finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Active PEI Plaintiffs have a protected interest in their multiyear PEI awards, yet HUD has effectively terminated these awards with neither notice nor an opportunity to be heard. That violates due process.

Defendants attack this claim by reflexively arguing that there is no protected property interest in ordinary or routine government contracts for goods and services. Mot. at 16–17.[12] Defendants spend multiple paragraphs on a general discussion of legal principles, yet fail to do any analysis whatsoever of FHIP grants and whether these grants, in particular, give rise to protected liberty or property interests. *Id.* When actually assessed, it is clear that FHIP grants do give the Active PEI Plaintiffs a protected interest in their multiyear awards.

To determine whether a particular statute creates a constitutionally property interest, courts evaluate whether the statute or implementing regulations place substantive limitations on official discretion. *See, e.g.*, *Barry v. Barchi*, 443 U.S. 55, 64 (1979) (protected property interest in license that could be suspended only under certain circumstances). Statutes or regulations limit official discretion if they contain "'explicitly mandatory language,' *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 463 (1989) (quoting *Hewitt v. Helms*, 459 U.S. 460, 471–72 (1983)).

The FHIP regulations, the NOFOs, and the OMB regulations all impose substantive limitations on HUD's discretion to deny continuing years' funding for the Active PEI Plaintiffs' multiyear awards.[13] The FHIP regulation permits multiyear awards to be "contingent upon annual performance reviews and annual appropriations"; no other bases for mid-grant

---

[12] The cases cited by Defendants address whether a contract alone is sufficient to give rise to a constitutionally protected interest. *See* Mot. at 16–17. By contrast, Plaintiffs here argue that the FHIP scheme itself gives rise to their protected interest in their existing multi-year awards.

[13] The D.C. Circuit has distinguished between the property rights of "applicants" and the rights of "holders" of existing benefits. *3883 Conn. LLC v. District of Columbia*, 336 F.3d 1068, 1072 (D.C. Cir. 2003). There is no dispute that Active PEI Plaintiffs have already received PEI awards, so the question of HUD's discretion asks not how much latitude HUD has to make an initial award, but rather how much discretion HUD has to terminate an existing award. *Id.* ("[O]ur inquiry focuses on the official's discretion to revoke or suspend the permit.").

termination are identified. Adequate performance and ongoing appropriations are the only two grounds on which HUD may terminate multiyear PEI awards. *See Halverson*,129 F.3d at 185 (finding that statute providing that the Navy Secretary "may delegate" powers to Coast Guard employees excluded the delegation of such powers to non-Coast Guard officials). This limiting language alone is sufficient, but the constraints on HUD are corroborated by the lack of permissive language: the FHIP regulations do not provide HUD with unfettered discretion to terminate multiyear PEI awards. *Accord Lopez v. Fed. Aviation Admin.*, 318 F.3d 242, 249 (D.C. Cir. 2003) (finding substantial discretion where statute and regulation explicitly permitted rescission "at any time for any reason"). The articulation of specified bases for termination renders HUD's discretion "constrained sufficiently to give [Plaintiffs] an expectation in the continued effect of the [grants]—and therefore a property interest in them." *3883 Conn. LLC*, 336 F.3d at 1073 (discretion constrained where applicable laws listed five grounds for revocation and two for stop-work orders).[14]

The OMB regulations are even more prescriptive, and act as a further limitation on HUD's ability to terminate a grant midstream. HUD is permitted to terminate grants only for noncompliance, with grantees' consent, or when "an award no longer effectuates the program goals or agency priorities" so long as such termination is "pursuant to the terms and conditions of the Federal award[.]" 2 C.F.R. § 200.340(a). In the event of a termination for cause, a hearing is required. 2 C.F.R. § 200.342. Based in large part on these limitations, a district court recently determined that a federal funding recipient "had a legitimate claim of entitlement to the [federal] award it had previously been granted." *La. Delta Serv. Corps v. Corp. for Nat'l and Cmty. Serv.*,

---

[14] The limiting language in the FHIP regulations sets this case apart from the analysis in *Vera*, where the court found that an OMB regulation, standing alone, did not impose substantive limits on agency discretion. 2025 WL 1865160, at *15–16. Here, such substantive limits exist.

No. 25-378-JWD-RLB, 2025 WL 1787429, at *26 (M.D. La. June 27, 2025). The same is true of the Active PEI Plaintiffs.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendant's Motion to Dismiss, permit Plaintiffs' claims to proceed, and grant the emergency relief contemplated by Plaintiffs' Motion for a Temporary Restraining Order.

Dated: July 11, 2025                    Respectfully submitted,

                                        /s/ Lila Miller
                                        Lila Miller (DC Bar No. 1643721)
                                        Reed Colfax (DC Bar No. 471730)
                                        Robert Hunter (DC Bar No. 90031794)
                                        Relman Colfax PLLC
                                        1225 19th Street NW, Suite 600
                                        Washington, DC 20036
                                        Tel: (202) 728-1888
                                        Fax: (202) 728-0848
                                        lmiller@relmanlaw.com
                                        rcolfax@relmanlaw.com
                                        rhunter@relmanlaw.com

                                        *Attorneys for Plaintiffs*