**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, <br><br>                Plaintiffs, <br><br>     v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al*., <br><br>                Defendants. | No. 25-cv-01965-SLS |

**<u>DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ ii

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION .......................................................................................................................... 1

BACKGROUND ............................................................................................................................ 2

    A.   Statutory Framework .......................................................................................................... 2

    B.   Factual Background ............................................................................................................ 2

LEGAL STANDARD ..................................................................................................................... 3

ARGUMENT .................................................................................................................................. 5

    I.    Plaintiffs Cannot Establish Likelihood Of Success On The Merits. ................................... 5

        A. Plaintiffs' Claims Regarding Potential Future Injury Are Not Ripe. ............................ 5

        B. Plaintiffs Have Not Established Article III Standing. ................................................... 7

        C. To The Extent They Are Justiciable, Plaintiffs' Claims Belong In The Court Of Federal Claims. ......................................................................................................................... 9

        D. Plaintiffs Are Not Entitled To The Broad Relief They Seek. .................................... 12

        E. Plaintiffs' APA Claims Fail. ..................................................................................... 14

            1. Plaintiffs Do Not Seek Review Of Discrete, Final Agency Action. ........................ 14

            2. Plaintiffs Cannot Sue Over Executive Action Committed To Agency Discretion. . 16

        F. Plaintiffs' Appropriations Claim Fails. ..................................................................... 18

        G. Plaintiffs' Separation Of Powers Claim Is Without Merit. ....................................... 20

        H. Plaintiffs Do Not Have A Viable Due Process Claim. .............................................. 20

    II.   Plaintiffs Have Failed to Demonstrate that They Will Suffer Irreparable Harm Unless the Court Grants the Requested Relief. ................................................................................... 22

    III.  The Balance of the Equities and the Public Interest Support Rejection of Plaintiffs' Motion. ............................................................................................................................ 24

    IV.  Plaintiffs Should Be Ordered to Post Security in Connection with Any Preliminary Injunctive Relief And Any Preliminary Relief Should Be Stayed To Allow Consideration of Whether to Appeal .......................................................................................................... 25

CONCLUSION ............................................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014) ............................................................ 3, 4

*AIDS Vaccine Advoc. Coal. v. Dep't of State*, 770 F. Supp. 3d. 121 (D.D.C. 2025) ................... 19

*Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62 (D.C. Cir. 2004) ................................. 9, 10, 12

*Alphapointe v. Dep't of Veterans Affairs*, 745 F. Supp. 3d 1 (D.D.C. 2020) .............................. 10

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................... 14

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ................ 22, 23

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ........................................................... 5

*City of New Haven v. United States*, 634 F. Supp. 1449 (D.D.C. 1986) ................................. 19

*Clapper v. Amnesty Intern. USA*, 568 U.S. 398 (2013) ..................................................... 5

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017) .................................. 20

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099 (D.C. Cir. 2022) ........... 9, 10, 11

*Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11 (D.D.C. 2017) ................................. 15

*Daimler Chrysler v. Cuno*, 547 U.S. 332 (2006) ............................................................. 7

*Dep't of Educ v. California*, 145 S. Ct. 966 (2025) ....................................................... 11, 12

*Diamond Alternative Energy, LLC v. Envtl. Prot. Agency*, 145 S. Ct. 2121 (2025) ..................... 7

*Dist. 4 Lodge of the Int'l Assoc. of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity*, 18 F.4th 38 (1st Cir. 2021) .......................................... 25

*Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969) ....................................................... 4

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999) .................................................. 25

*Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32 (D.D.C. 2014) ......................................... 4

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ..................................................... 19

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ............................................................. 14

*Franklin-Mason v. Mabus*, 742 F.3d 1051 (D.C. Cir. 2014) ................................................. 9

*FTC v. Std. Oil Co.*, 449 U.S. 232 (1980) ...................................................................... 14

*Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374 (S.D.N.Y. 2014) ................................................... 21

*Greater New Orleans Hous. Action Ctr. v. HUD*, 639 F.3d 1078 (D.C. Cir. 2011)...................... 4

*Haaland v. Brackeen*, 599 U.S. 255 (2023) ........................................................... 19, 20

*Heckler v. Chaney*, 470 U.S. 821 (1985) ................................................................. 17

*Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1 (D.D.C. 2008) ............................. 22

*Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985)............................. 10

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855 (D.C. Cir. 1984) ................................................................................ 18

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279 (D.C. Cir. 1995)........... 10, 11

*Lance v. Coffman*, 549 U.S. 437 (2007) .................................................................. 19

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ................................................................. 17, 18

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................ 5

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) ...................................... 16

*Maryland v. King*, 567 U.S. 1301 (2012) ............................................................... 25

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) ...... 9

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)............................................................. 4

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ........................................ 10, 11

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003)................................. 5

*New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12 (D.D.C. 2014) ...................................................................................................... 21

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ............................................. 16

*Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414 (1990).............................................. 18

*Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8 (D.D.C. 2020) ...................................... 24

*Or. Nat. Desert Ass'n. v. U.S. Forest Serv.*, 465 F.3d 977 (9th Cir. 2006) .................... 14

*Perry v. Sindermann,* 408 U.S. 593 (1972)............................................................. 21

quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002)................... 11

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1 (1st Cir. 2005).................... 21

*S & D Maintenance Co. v. Goldin*, 844 F.2d 962 (2d Cir. 1988) .................................. 21

*Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29 (D.D.C. 2014)..................................... 23

iv

*Shaffer v. Veneman*, 325 F.3d 370 (D.C. Cir. 2003) ........................................................ 9

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ........................................................ 4

*South Dakota v. Dole*, 483 U.S. 203 (1987) ........................................................ 20

*Spokeo v. Robins,* 578 U.S. 330 (2016) ........................................................ 7, 8

*State v. Musk*, 769 F. Supp. 3d 1 (D.D.C. 2025) ........................................................ 22

*Town of Castle Rock v. Gonzalez*, 545 U.S. 748 (2005) ........................................................ 21

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992) ......... 10

*Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ...................... 13, 14

*Trump v. New York*, 529 U.S. 125 (2020) ........................................................ 5

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) ........................................................ 4

*Veitch v. Danzig*, 135 F. Supp. 2d 32 (D.D.C. 2001) ........................................................ 4

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ........................................................ 22, 23

## STATUTES

28 U.S.C. § 1491(a)(1) ........................................................ 9

31 U.S.C. § 1502 ........................................................ 12

31 U.S.C. § 1553 ........................................................ 13

42 U.S.C. § 3616a ........................................................ 2, 6

5 U.S.C. § 701 ........................................................ 17

5 U.S.C. § 702 ........................................................ 9

5 U.S.C. § 704 ........................................................ 14, 16

5 U.S.C. § 706 ........................................................ 15

Pub. L. No. 118–42, 138 Stat. 370 (Mar. 9, 2024) ........................................................ 2, 6

## OTHER AUTHORITIES

11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 (2d ed. 1995) ..... 4

**RULES**

Fed. R. Civ. P. 65(c) ................................................................................................................. 25

**REGULATIONS**

2 C.F.R. § 200.204 ...................................................................................................................... 2

24 C.F.R. § 125.104 .................................................................................................................... 2

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl. 1........................................................................................................ 20

U.S. Const. art. I, § 9, cl. 7........................................................................................................ 18

**INTRODUCTION**

Plaintiffs' request for extraordinary relief is unfounded. The Department of Housing and Urban Development ("HUD") has made no indication that it intends to impound funds appropriated for the Fair Housing Initiatives Program ("FHIP"). In fact, HUD has taken significant internal steps to realign FHIP in accordance with the current Administration's policies and priorities, while mindful of the September 30 obligation deadline. HUD's interim re-alignment decisions have been entirely within the bounds of its grant administration authority. Plaintiffs, two organizations opposed to this change in Federal policy, ask this Court to intervene and superintend HUD's administration of its grant programs by issuing a sweeping emergency order, forcing HUD to administer FHIP grants in the manner most convenient to Plaintiffs. For several reasons, this Court cannot and should not issue such relief.

Plaintiffs cannot establish a concrete and particularized injury that is redressable by this Court. Additionally, Plaintiffs' claims are not ripe because they are grounded in speculative fears about the possibility that HUD may not administer FHIP grants before the end of the fiscal year. Moreover, to the extent they are justiciable, Plaintiffs' contract-based claims cannot be addressed by this Court, or any district court, but rather must be heard by the Court of Federal Claims. And Plaintiffs' constitutional claims are without merit because speculation about potential, future impoundment does not establish the violation of any constitutional provision.

Additionally, Plaintiffs have made no showing of cognizable irreparable harm likely to result in the absence of preliminary relief. The speculative, economic injuries claimed do not establish irreparable harm to the named Plaintiffs or their members. Any harm stemming from HUD's failure to administer existing grant agreements stems from the government's purported failure to pay under a contractual scheme, which is only redressable in the Court of Federal Claims. HUD's interim decision to review the policies underlying FHIP grants and to re-align those policies with the current Administration's priorities is within the bounds of its authority, the balance of equities and the public interest cut against Plaintiffs' request. As a result, the Court should deny the Plaintiffs' request for a temporary restraining order.

1

# BACKGROUND

## A. Statutory Framework

Under the Fair Housing Initiatives Program ('FHIP"), HUD may issue grants and enter into contracts with "private nonprofit organizations or institutions . . . that are formulating or carrying out programs to prevent or eliminate discriminatory housing practices." 42 U.S.C. § 3616a(a). The three main types of FHIP grants are private enforcement initiative ("PEI") grants, *id*. at § 3616a(b), education and outreach initiative ("EOI") grants, *id*. at § 3616a(d), and fair housing organizations initiative ("FHOI") grants, *id*. at § 3616a(c). As part of the FHIP grantee selection process, HUD issues notices of funding opportunities ("NOFO"), which "announce amounts available for award, eligible applicants, and eligible activities, and may limit funding to one or more of the Initiatives." 24 C.F.R. § 125.104(d). HUD must announce NOFOs, 2 C.F.R. § 200.204, and "design and execute a merit review process of applications . . . to select [grant] recipients," *id*. § 200.205. Through the 2024 Consolidated Appropriations Act, Congress appropriated funds for FHIP grant programs "to remain available until September 30, 2025." Pub. L. No. 118–42, 138 Stat. 370 (Mar. 9, 2024).

## B. Factual Background

On June 24, 2025, Plaintiffs filed a putative class action, claiming that if HUD fails to administer certain grant programs before September 30, 2025—the end of the fiscal year—the funds will lapse, thereby impacting programs upon which they rely. *See* Compl., ECF No. 1, ¶ 1. First, Plaintiffs challenge HUD's administration of the second and third years of multi-year Private Enforcement Initiative ("PEI") grants. *Id*. ¶ 6. In September 2024, HUD earmarked $31.7 million of the FY2024 appropriations for multi-year PEI grant programs first awarded in FY2022 and FY2023. *Id*. ¶ 65. Plaintiffs claim that "[d]espite this announcement, HUD has refused to administer or implement these ongoing grants." *Id*. ¶ 68. Specifically, Plaintiffs allege that HUD has "refused to negotiate" the "required HUD-1044 contracts for upcoming years of active PEI grants." *Id*. ¶ 70. Plaintiffs claim that HUD's actions to date suggest that

HUD will not administer the PEI grants before the end of the fiscal year and that the appropriated funds will lapse, resulting in an impoundment of appropriated funds. *See id*. ¶ 74.

Second, Plaintiffs complain that HUD has not announced or issued any new, first-year awards pertaining to FY24 funds for EOI, FHOI, or PEI grants under NOFOs published in September 2024 by the previous Administration. *Id*. ¶¶ 76–78, 86. Plaintiffs claim that "[i]n recent years, when HUD has posted NOFOs announcing the availability of funds for new FHIP grants in the fall, it has promptly made awards and announced recipients in the early spring." *Id*. ¶ 81. Plaintiffs allege that because HUD has yet to announce or issue new, first-year grants under those FY2024 NOFOs, this suggests that HUD will not finalize the NOFOs and issue the associated grants before the end of the fiscal year and that the appropriated funds will lapse, resulting in impoundment. *See id*. ¶¶ 86–90.

Based on the conjecture that HUD may not administer FHIP grants before the end of the fiscal year, Plaintiffs assert various Administrative Procedure Act ("APA") and constitutional claims. *See id.* at 30–33. On July 4, 2025, Defendants filed a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* ECF No. 7. Thereafter, Plaintiffs filed the instant Motion for a Temporary Restraining Order. *See* ECF No. 11. Plaintiffs seek a temporary restraining order mandating *inter alia* that FHIP funds "remain available through the pendency of this litigation and the implementation of any final relief"; HUD reach agreement with existing PEI grantees on terms for second- and third-year grant agreements (including statements of work and other documents); and that HUD use the previous Administration's NOFOs to finalize new, first-year awards of FY24 funds, including by entering into grant agreements for EOI, FHOI, and PEI grants. *See* Proposed Order Granting Temporary Restraining Order, ECF No. 11-11 at 1–2.

## LEGAL STANDARD

A plaintiff seeking a temporary restraining order "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration in

original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)); *Abdullah*, 753 F.3d at 197–98 (same).  The last two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Preliminary injunctive relief  such as a temporary restraining order "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)).  The Court of Appeals has emphasized that the "first and most important factor" is whether the moving party has "established a likelihood of success on the merits."  *Aamer*, 742 F.3d at 1038.  "[W]hen a plaintiff has not shown a likelihood of success on the merits, we need not consider the other factors."  *Greater New Orleans Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).

The D.C. Circuit has expressly cautioned that "[t]he power to issue a preliminary injunction, especially a mandatory one, should be 'sparingly exercised.'"  *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted).  Heeding this caution, where, as here, the requested injunction is "mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act," the Court requires the moving party to "meet a higher standard than in the ordinary case by showing a clear entitlement to relief to avoid extreme or very serious damage."  *See, e.g., Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (collecting cases); *Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 & n.2 (D.D.C. 2001) (holding that where "a ruling would alter, not preserve, the status quo," the plaintiff "must meet a higher standard than were the injunction he sought merely prohibitory," in light of the Supreme Court's holding that "'[t]he purpose of a preliminary injunction is merely to preserve the relative position of the parties until a trial on the merits can be held'" (alteration in original) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981))).

# ARGUMENT

## I.  Plaintiffs Cannot Establish Likelihood Of Success On The Merits.

### A.  Plaintiffs' Claims Regarding Potential Future Injury Are Not Ripe.

Plaintiffs contend that they will suffer irreparable harm if HUD fails to "administer funds appropriated by Congress under the FY2024 NOFOs and to finalize the second and third years of existing PEI grants."  Mot. at 12.  However, Article III requires that an alleged injury be "certainly impending."  *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (emphasis omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992)).  A claim is not ripe if it is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Trump v. New York*, 592 U.S. 125, 131 (2020) (citation omitted).  "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted).

First, Plaintiffs state that finalized HUD-1044 forms (with attachments including the statement of work) and grant agreements are required for the second and third years of three-year PEI grants to ensure that funds for those years are administered before they lapse.  Mot. at 7.  Plaintiffs allege that HUD will not execute the second- and third-year HUD-1044 forms and grant agreements before the end of the fiscal year, which will result in an impoundment of funds.  *Id*. at 16–17.  Plaintiffs' claims stemming from the possibility that HUD will not negotiate HUD-1044 forms and grant agreements before the end of the fiscal year and from the speculation that this will lead to impoundment within several months are not ripe because they are "no more than conjecture."  *Trump*, 592 U.S. at 131 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)).  Although Plaintiffs claim that recipients of existing PEI grants have already been harmed by the lack of continued funding, Mot. at 12, they have not pointed to any requirement that HUD negotiate and execute HUD-1044s and grant agreements on their desired timetable, nor have they established that it is too late for HUD to obligate funds without judicial

5

intervention.  HUD has sufficient time to administer existing PEI grants before the end of the fiscal year, and indeed, it plans to do so.  *See* Kevin R. Cooke, Jr. ("Cooke") Decl. ¶ 6. Plaintiffs' reliance on emails from HUD staff indicating that PEI grants were on hold pending "further guidance and direction from FHEO leadership" bolsters that point.  ECF No. 11-2 at 10. The new HUD administration has been diligently working "to align FHEO's grantmaking activity with the new Administration's priorities."  Cooke Decl. ¶¶ 4–5.  During this re-alignment period, HUD temporarily paused FHIP grantmaking activity, as the emails attached to the TRO motion reflect.  *See id*. ¶ 4.  HUD has taken internal steps to resume the grantmaking process and to obligate funds for existing PEI grants before the end of the fiscal year.  *Id*. ¶ 6. Plaintiffs' speculation regarding the timing of HUD's administration of existing PEI grants do not amount to a ripe claim.

Second, Plaintiffs state that HUD issued NOFOs for various grant programs in September 2024, and that under ordinary circumstances, selected grantees should have begun performance by April 2025.  Mot. at 7, 31.  Plaintiffs allege that HUD's failure to conform with ordinary practice is indicative that the agency will not take action under the FY2024 NOFOs before the associated funds lapse at the end of the fiscal year.  *See id*.  Again, Plaintiffs' claims are merely speculation about potential future action.  Indeed, neither the 2024 Consolidated Appropriations Act, Pub. L. 118–42, nor FHIP, 42 U.S.C. § 3616a, require that HUD administer NOFOs on the earlier timeline Plaintiffs desire or that a new presidential Administration forgo aligning HUD's grantmaking process with the new Administration's priorities.  *See* Cooke Decl. ¶ 3.  As with existing PEI grants, Plaintiffs' allegation as to new, first-year awards of FY24 funds for EOI, FHOI, and PEI awards—that HUD so far has not moved as fast as Plaintiffs would like—does not establish that HUD lacks sufficient time to administer these awards before the end of the fiscal year.  HUD has been working to review the FY2024 NOFOs to ensure that they comply with the current Administration's policies and priorities.  *Id*. ¶ 5.  HUD evaluated the NOFOs issued under previous leadership, and recently "approved a recommendation to issue four new FHIP NOFOs . . . and [to] make new/first-year FHIP awards under those new NOFOs."  *Id*.  The

new NOFOs have already been drafted and placed into HUD's internal clearance review process, and their implementation is being expedited." *Id.* "HUD is doing everything it can on an expedited basis to issue new/first-year FHIP awards and execute grant agreements under those new NOFOs before the FY24 FHIP funds lapse." *Id.* Because Plaintiffs' claims are "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" *Trump*, 592 U.S. at 131, their claims are not ripe for judicial resolution. It is unclear what the Court would be assessing, how, and on what grounds, as well as what relief it could grant. As a result, Plaintiffs' speculation about future harm stemming from the possibility that HUD may not administer funds by September 30, 2025, is insufficient to establish a case or controversy as required by Article III and cannot form the basis for the Court's jurisdiction.

Because Plaintiffs' claims are "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" *Trump*, 592 U.S. at 131, their claims are not ripe for judicial resolution. It is unclear what the Court would be assessing, how, and on what grounds, as well as what relief it could grant. As a result, Plaintiffs' speculation about future harm stemming from the possibility that HUD may not administer funds by September 30, 2025, is insufficient to establish a case or controversy as required by Article III and cannot form the basis for the Court's jurisdiction.

### B.  Plaintiffs Have Not Established Article III Standing.

Under Article III, Plaintiffs must establish an injury that is concrete, particularized, and imminent rather than "conjectural or hypothetical," *Spokeo v. Robins,* 578 U.S. 330, 339 (2016) (citations omitted), for each claim and for each form of relief they seek, *Daimler Chrysler v. Cuno*, 547 U.S. 332, 352 (2006). And for each type of relief requested, Plaintiffs must show that relief will in fact redress their injury. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). [R]edressability requires the plaintiff to demonstrate that the injury would likely be redressed by judicial relief." *Diamond Alternative Energy, LLC v. Envtl. Prot. Agency*, 145 S. Ct. 2121, 2133 (2025) (quotation omitted). In other words, redressability "generally serves to ensure that there is a sufficient relationship between the judicial relief requested and the injury

suffered." *Id.* (quotation omitted). Plaintiffs claim that they are entitled to that relief now because HUD may not administer the grant programs by September 30. But Plaintiffs have not yet suffered any injury because none of the identified grant programs have been concretely impacted.

For the same reasons that Plaintiffs' claims are not ripe, Plaintiffs lack standing. Plaintiffs cannot assert a concrete, particularized, imminent injury with respect to any grant program because HUD has not taken action to withhold any funding. Plaintiffs' hypothetical injury—that HUD *may* in the future withhold funds appropriated by Congress—is too speculative for this Court to adjudicate or redress at this time. Specifically, it is too early to meaningfully assess the merits of any specific alleged future violation and injury. Plaintiffs heavily rely on Section 3616a(e), which imposes certain Congressional reporting requirements upon HUD "before providing a grant or entering into any contract or cooperative agreement," 42 U.S.C. § 3616a(e). *See* Mot. at 26. This procedural reporting requirement is not preclusive of HUD's ability to obligate funds and Plaintiffs—unlike Congress—do not have the legal right to enforce this reporting provision. *See generally Spokeo,* 578 U.S. at 341 (holding that "a bare procedural violation" is not justiciable under Article III).

As to the existing, multi-year PEI grants, Plaintiffs claim that some of Plaintiff NFHA's members have "shuttered operations" and others have been forced to "lay off staff and cut core services." Mot. at 38. As noted above, however, the period for administration for existing PEI grant programs remains open, and HUD has no obligation to administer those programs pursuant to Plaintiffs' desired timeline. Moreover, the claims regarding HUD's NOFO administration also fail because none of the Plaintiffs have been selected under the NOFO process or have any rights to the grants announced. As a result, they have no concrete, particularized, or imminent injury beyond the hope that they would be selected as grant recipients. And, in any event, HUD is already "doing everything it can on an expedited basis to issue new/first-year FHIP awards and execute grant agreements under those new NOFOs before the FY24 FHIP funds lapse." Cooke Decl. ¶ 5. Because HUD's grant administration process is ongoing, any relief would be

predictive and advisory, as opposed to remedial.  Plaintiffs' failure to establish standing warrants denial of their Motion.

### C.  To The Extent They Are Justiciable, Plaintiffs' Claims Belong In The Court Of Federal Claims.

To "bring a claim against the United States," the plaintiff must "identify an unequivocal waiver of sovereign immunity." *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014); *see Perry Capital*, 864 F.3d at 619 (noting that sovereign immunity is "jurisdictional in nature").  Plaintiffs here assert claims under the APA, *see* Compl. at 30–31, which "provide[s] a limited waiver of sovereign immunity for claims against the United States 'seeking relief other than money damages' for persons 'adversely affected or aggrieved by agency action.'"  *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022) (quoting 5 U.S.C. § 702).  "But even for claims that are not for money damages, the APA confers no 'authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'"  *Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 67 (D.C. Cir. 2004) (quoting 5 U.S.C. § 702).  This "important carveout" to the APA's sovereign immunity waiver "prevents plaintiffs from exploiting" that waiver "to evade limitations on suit contained in other statutes."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).  And here, Plaintiffs' attempt to use the APA to compel the federal government to administer grant programs is "impliedly forbid[den]," 5 U.S.C. § 702, by the Tucker Act.

The Tucker Act provides in relevant part that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).  The D.C. Circuit has "interpreted the Tucker Act . . . to 'impliedly forbid[]' contract claims against the Government from being brought in district court under . . . the APA."  *Perry Capital*, 864 F.3d at 618–19 (citing *Albrecht*, 357 F.3d at 67–68); *see Shaffer v. Veneman*, 325 F.3d 370, 373 (D.C. Cir. 2003) ("[T]his Court and others have interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government, at least *vis a vis* the

APA." (quoting *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992)); *Crowley*, 38 F.4th at 1106.  Thus, regardless of how a claim is styled, a district court lacks jurisdiction over that claim if it "is in 'its essence' contractual."  *Perry Capital*, 864 F.3d at 619 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)); *see Albrecht*, 357 F.3d at 67 ("[T]he district court lacks jurisdiction if [the plaintiff's] claim is essentially a contract action.").  That jurisdictional barrier ensures that contract claims against the federal government are channeled into a court "that possesses expertise in questions of federal contracting law," *Alphapointe v. Dep't of Veterans Affairs*, 745 F. Supp. 3d 1, 11 (D.D.C. 2020), and it respects Congress's deliberate choice to limit the remedies available for such claims, *see Megapulse*, 672 F.2d at 971 (recognizing that a plaintiff "cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract").  *See also Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) ("[W]e must implement the congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes.").

Determining whether a claim "is 'at its essence' contractual"—and therefore falls outside of the APA's waiver of sovereign immunity—"depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968).  In examining the "source of the rights" prong, the D.C. Circuit has "rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'"  *Id.* at 1107 (quoting *Megapulse*, 672 F.2d at 1107).  But the court has also warned that plaintiffs cannot avoid the Tucker Act and its jurisdictional consequences by artfully crafting a complaint to disguise what is essentially a contract claim as a claim for equitable relief under a separate legal authority.  *See id.*; *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995); *see also Megapulse*, 672 F.2d at 969–70 ("This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds.").  A court must therefore consider,

among other factors, whether "the plaintiff's asserted rights and the government's purported authority arise from statute"; whether "the plaintiff's rights 'exist[] prior to and apart from rights created under the contract'"; and whether "the plaintiff 'seek[s] to enforce any duty imposed upon' the government 'by the . . . relevant contracts to which' the government 'is a party.'" *Crowley*, 38 F.4th at 1107 (citation omitted).

The second prong "considers 'the type of relief sought.'" *Id.* (quoting *Megapulse*, 672 F.2d at 968). Money damages and specific performance are "explicitly contractual remed[ies]," for instance. *Perry Capital*, 864 F.3d at 619. The D.C. Circuit has recently explained, moreover, that "the crux of" this relief-focused inquiry "boils down to" whether the plaintiff, "in whole or in part, . . . explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government." *Crowley*, 38 F.4th at 1107 (quoting *Kidwell*, 56 F.3d at 284). Although a plaintiff does not necessarily seek monetary relief "merely because . . . success on the merits may obligate the United States to pay the complainant," as with the "source of the rights" prong, a plaintiff cannot avoid the Tucker Act's jurisdictional consequences by "converting" through creative pleading what is essentially a claim for money damages into one "requesting injunctive relief or declaratory actions." *Kidwell*, 56 F.3d at 284. In assessing the type of relief a plaintiff seeks, a court must accordingly "look to the complaint's substance, not merely its form." *Id.* And a plaintiff's request for injunctive or declaratory relief is truly non-monetary only if that requested relief "has 'considerable value' independent of any future potential for monetary relief." *Id.*

As the Supreme Court recently confirmed, this Court lacks jurisdiction under the APA "to enforce contractual obligation[s] to pay money" against the federal government. *Dep't of Educ v. California*, 145 S. Ct. 966, 968 (2025) (per curiam) (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Plaintiffs' requested relief—an order to "obligate[]" funds in performance of grant contracts and to "[i]ssue awards and finalize contracts," Compl. at 34—is contractual in nature. Like the *Department of Education* plaintiffs, Plaintiffs seek relief based upon a grant award; they have no statutory or constitutional right to

such funding.  Like the *Department of Education* plaintiffs, Plaintiffs assert a challenge under the APA, including on the ground that the agency action is arbitrary and capricious.  And like the district court in *Department of Education*, this Court too "lack[s] jurisdiction . . . under the APA" to compel Defendants "to pay money" under the grant awards.  *Dep't of Educ.*, 145 S. Ct. at 968.  The theories of standing and relief that Plaintiffs assert hinge entirely on contractual routing of funding to them as provided in grant agreements.  This doctrine should, at a minimum, apply to the existing multi-year PEI grant contracts.  Accordingly, the equitable relief they request is inseparable from their contractual claims and requires that the claims be adjudicated by the Court of Federal Claims.  Because this Court lacks jurisdiction "to enforce" Defendants' "contractual obligation[s] to pay money," *Dep't of Educ.*, 145 S. Ct. at 968, or to otherwise resolve claims against the federal government that are "essentially" contractual, *Albrecht*, 357 F.3d at 68, this Court does not have jurisdiction.

**D.  Plaintiffs Are Not Entitled To The Broad Relief They Seek.**

In their Complaint, Plaintiffs sought a three-part injunction ordering "HUD to administer FHIP awards" by (1) obligating all FY2024 FHIP funds before September 30, 2025; (2) implementing the second and third years of Plaintiffs' active PEI awards; and (3) issuing and finalizing contracts for new, first-year awards under FY2024 NOFOs.  Compl. at 34.  However, Plaintiffs' Motion for Temporary Restraining Order sweeps beyond the relief sought in the Complaint—for example, the proposed order purportedly applies to all existing PEI grant recipients whether or not they are parties, calls for extension of funding availability beyond the periods prescribed by the appropriations statute,[1] and requires grant program administration in

---

[1] Plaintiffs incorrectly suggest that 31 U.S.C. § 1502(b) affords the Court the authority to extend the period of availability for the appropriations at issue in this case.  *See* Mot. at 26 n.7.  Section 1502(b) provides that "a provision of law requiring that the balance of an appropriation or fund be returned to the general fund of the Treasury at the end of a definite period does not affect the status of lawsuits or rights of action involving the right to an amount payable from the balance." 31 U.S.C. § 1502(b).  In this case, the appropriations provision provides that available funds lapse if not obligated by September 30, not that the funds will be returned to the Treasury's general fund on that date.  *See* 138 Stat. 370.  When budget authority lapses, appropriated funds remain in an agency's Treasury account for a period of five years.  *See* 31 U.S.C. § 1553.  After

Plaintiffs' preferred fashion untethered to any statutory requirement. *See* Proposed Order Granting Temporary Restraining Order, ECF No. 11-11, at 1–2. For the reasons stated herein, Plaintiffs are not likely to prevail on the merits of their claims, and the Court should deny relief in full. To the extent the Court is inclined to grant any relief, it should be narrowly tailored to only address the injuries to Plaintiffs in this case.

In *Trump v. CASA, Inc.*, the Supreme Court addressed "universal injunctions," which are injunctions that bar the defendant from enforcing "a law or policy against *anyone*," in contrast to an injunction that bars the defendant from enforcing the challenged law or policy against the plaintiff. No. 24A884, 2025 WL 1773631, at *4 (U.S. June 27, 2025). The Supreme Court explained that "Congress has granted federal courts no such power," *id*. at *6, as universal injunctions have no historical analogue in equity practice, *id*. at *5–11. Instead, the governing principle is that a court granting equitable relief "may administer complete relief *between the parties*." *Id*. at *11 (quotation omitted). "Under this principle, the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id*. And even then, "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *Id*. at *12. Thus, "the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." *Id*. (quotation omitted).

In addition, the Supreme Court explained that "[w]hen a federal court enters a universal injunction against the Government, it improperly intrudes on a coordinate branch of the Government and prevents the Government from enforcing its policies against nonparties," and that intrusion is sufficient to demonstrate irreparable harm warranting a stay. *Id*. at *14; *see id*. at *15. And because limiting an injunction to plaintiffs causes them no harm, "the balance of equities does not counsel against awarding the Government interim relief." *Id*. at *15.

those five years, funds revert to the Treasury's general fund, as provided under 31 U.S.C. § 1551, *et seq*. Section 1502(b) thus cannot be read as authorizing courts to extend budget authority after it lapses; it only applies to discrete classes of claims for *already lapsed funds* that have not yet been returned to the Treasury's general fund.

These principles apply in full force.  Although Plaintiffs have filed a putative class action, no class has been certified in this case.  Plaintiffs improperly seek a temporary restraining order that would afford relief to existing and potential grant recipients that are not parties to this litigation.  Accordingly, under *CASA*, any relief must be confined to the particular plaintiffs who filed the instant suits and demonstrated entitlement to relief, whereas the Court would "lack authority to issue" broader equitable "relief that extended beyond the parties."  *See id*. at *7, 13.

### E.  Plaintiffs' APA Claims Fail.

#### 1.  Plaintiffs Do Not Seek Review Of Discrete, Final Agency Action.

Agency action is final only if two conditions are met: (1) the agency action marks "the 'consummation' of the agency's decisionmaking process"—it must not be of a merely tentative or interlocutory nature, and (2) the "action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences flow.'"  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted); 5 U.S.C. § 704.  *Both* conditions must be satisfied for agency action to be considered final.  *Id.* at 175.

Courts "look to whether the action 'amounts to a definitive statement of the agency's position' or 'has a direct and immediate effect on the day-to-day operations' of the subject party, or if 'immediate compliance [with the terms] is expected.'"  *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (alteration in original) (citation omitted).  For example, in *Federal Trade Commission v. Standard Oil Company of California*, the Supreme Court held that the Federal Trade Commission's issuance of a complaint averring there was "reason to believe" that a party was in violation of the Federal Trade Commission Act was insufficient to satisfy the finality requirement.  *FTC v. Std. Oil Co.*, 449 U.S. 232, 239, 243 (1980).  The Supreme Court explained that "reason to believe" was merely a determination that adjudicatory proceedings would begin, and the actual issuance of the complaint was sufficient only to initiate the proceedings.  *See id*. at 242.  The complaint had no effect on the daily operations of defendant's business, nor did it legally compel a party to do something or refrain from doing something.  *See id.*; *see also Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992)

14

(finding no final agency action where "the Secretary's report to the President carries no direct consequences for the reapportionment, it serves more like a tentative recommendation than a final and binding determination").

Additionally, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017) (cleaned up); *see* 5 U.S.C. § 706(1). "The discreteness limitation precludes using broad statutory mandates to attack agency policy, the better to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Id.* (cleaned up). Moreover, "the only agency action that can be compelled under the APA is action legally required." *Id.* (cleaned up).

Here, Plaintiffs do not challenge any discrete, final action taken by HUD. Rather, Plaintiffs seek to prohibit HUD from taking future action that could impact their federal funding. Plaintiffs claim that "[g]iven that funds must be obligated by September 30 or else disappear, HUD's failure to administer FY2024 FHIP funds is clearly unreasonable," Mot. at 30, and that "HUD has been completely silent regarding the FY2024 NOFOs," *id.* at 35. For example, Plaintiffs point to a June 2025 email from a HUD representative, stating that HUD staff was "still being directed by HQ to hold off on moving forward with the second year of funding until we receive further guidance and direction from FHEO leadership." ECF No. 11-2 at 10; *see also* ECF No. 11-7 at 34 ("Currently, I do not have any updates regarding negotiations and the start of years 2 and 3. I will get back to you as soon as I know more."). HUD's communication confirms its ongoing review process; it does not in any way indicate that the agency has refused to administer any grant programs before the end of the fiscal year. Indeed, Plaintiffs cannot point to any requirement, mandating that HUD obligate funds in accordance with their desired timeline. The fact that HUD has not taken action to date based on its ongoing review of FHIP grantmaking does not establish that HUD has made a final decision not to take action at all prior to the end of the fiscal year. The opposite is true: HUD is currently working to administer all FHIP grants and to obligate funds before the end of the fiscal year. *See* Cooke Decl. ¶¶ 4–6.

15

Moreover, the "agency action" requirement articulated in *Bennett* precludes "broad programmatic attack[s]" on an agency's administration of a program. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). In *Lujan v. National Wildlife Federation*, the Supreme Court emphasized that § 702 only allows for review of "'identifiable' agency action," and that the APA requires challenge to agency action on a "case-by-case" basis, rather than pursuing "wholesale improvement of [an agency] program by court decree." 497 U.S. 871, 890–94 (1990) (emphasis omitted). The Court's prohibition on programmatic challenges was motivated by institutional limits on Article III courts, which constrain their review to narrow and concrete actual controversies. *See id.* at 891–94. Thus, absent a discrete and final agency action, federal courts cannot review a general program or policy. *See Norton*, 542 U.S. at 64 ("The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in *Lujan*[.]").

Here, Plaintiffs challenge HUD's administration of the FHIP grant program. However, because no funding has yet been impacted, their suit cuts at the heart of anticipated, programmatic changes, which are squarely precluded from APA review. *See* 5 U.S.C. § 704. Plaintiffs have not demonstrated that HUD has made any decision to terminate Plaintiffs' funding under an existing grant award or not to award future grant funding made available under the FY2024 NOFOs. HUD's deliberations regarding the terms of the FY2024 FHIP grants remains ongoing. *See* Cooke Decl. ¶¶ 4–6.[2] Because Plaintiffs' conjecture about HUD's program administration is not actionable, Plaintiffs' APA claims fail.

### 2. Plaintiffs Cannot Sue Over Executive Action Committed To Agency Discretion.

As a general matter, agencies have broad discretion in administering grants. In *Lincoln v. Vigil*, the Supreme Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to

---

[2] Because HUD has not taken discrete, final agency action with respect to any of the subject FHIP grants, there is no administrative record.

changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." 508 U.S. 182, 192 (1993). In such circumstances, it is squarely within an agency's discretion to determine whether to fund any specific program at all to meet permissible statutory objectives. *Id.* at 193. "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* So long as the agency abides by the relevant statutes, the APA "gives the courts no leave to intrude." *Id.*

Plaintiffs' APA claims fail because they seek to challenge decisions quintessentially "committed to agency discretion by law," for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). Plaintiffs have not, and cannot, point to any authority that would require HUD to administer any FHIP grants within Plaintiffs' desired timeline. *See* Cooke Decl. ¶ 3 ("In general, HUD has broad discretion as to the process and timing for conducting FHIP grantmaking activity" and the subject statutes do not "[r]equire HUD to award and obligate FHIP funds to particular applicants like the Plaintiffs in this suit."). There is no question that unobligated FY24 funds lapse on September 30, and HUD is "working diligently to complete the remaining steps and obligate the funds as quickly as possible." *Id.* ¶ 6; *see also id.* ¶ 5 ("HUD is doing everything it can on an expedited basis to issue new/first-year FHIP awards and execute grant agreements under those new NOFOs before the FY24 FHIP funds lapse.").

An agency's determination of how best to administer appropriated funds to fulfill its legal mandates is classic discretionary agency action. *See Lincoln*, 508 U.S. at 193. Indeed, none of the grant programs are funded through targeted appropriations, but rather through the lump-sum appropriations that HUD receives from Congress. *See* Mot. at 8; Cooke Decl. ¶ 3. As *Lincoln* made clear, HUD's "allocation of funds" from those lump-sum appropriations to various programs and priorities "requires 'a complicated balance of a number of factors,'" including whether the agency's "'resources are best spent' on one program or another," and "whether a particular program 'best fits the agency's overall policies.'" *Lincoln*, 508 U.S. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). Any decisions regarding HUD's administration of the grant programs, including interim steps and timing, are squarely committed to agency

17

discretion.  *See Lincoln*, 508 U.S. at 193–94; *see also Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit.").  Consistent with this authority and discretion, "FHEO temporarily paused its FHIP grantmaking activity to review the prior Administration's policies and to align FHEO's grantmaking activity with the new Administration's priorities.  There has been no decision to withhold FHIP funds appropriated by Congress."  Cooke Decl. ¶ 4.  These discretionary policy decisions are "unreviewable under § 701(a)(2)" of the APA and cannot form the basis for Counts I and II of the Complaint.  *Lincoln*, 508 U.S. at 193.

### F.  Plaintiffs' Appropriations Claim Fails.

Plaintiffs claim that HUD's "refusal to administer duly appropriated FHIP funding plainly runs afoul of the Appropriations Clause."  Mot. at 16.  The thrust of Plaintiffs' Appropriations Clause claim appears to be that Defendants' administration of FHIP grants effectively amounts to an allegedly unlawful withholding of funds appropriated for certain programs that Congress requires HUD to administer.  Even taking at face value Plaintiffs' suggestion that HUD will fail to administer the grant programs before the end of the fiscal year, potentially leading to an impoundment, Plaintiffs nonetheless fail to allege a viable unlawful-withholding claim.

The Appropriations Clause simply provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  "In other words," the Clause generally concerns whether a certain "payment of money from the Treasury" is "authorized by statute."  *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990).  As Plaintiffs acknowledge, however, the federal funds that HUD administers were appropriated by an act of Congress.  *See* Compl. ¶ 56.  In that respect, the Appropriations Clause has been satisfied.

But even if the Appropriations Clause afforded the remedy Plaintiffs seek, they lack

standing to assert such an "undifferentiated, generalized grievance about the conduct of government." *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam).  Indeed, the Supreme Court has long held that "[a] citizen may not sue" in federal court "based only on an 'asserted right to have the Government act in accordance with law.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citation omitted); *see Lance*, 549 U.S. at 439 ("Our refusal to serve as a forum for generalized grievances has a lengthy pedigree.").  Any effort by Plaintiffs to detach Defendants' alleged noncompliance with certain appropriations statutes from the grant-based remedies that Plaintiffs seek—*i.e.*, an order requiring specific performance of certain grant provisions—would effectively amount to Plaintiffs merely lodging "a general legal, moral, ideological, or policy objection to a particular government action," which they lack standing to do.  *All. for Hippocratic Med.*, 602 U.S. at 381.

Plaintiffs may counter that they have a "particularized stake" in a challenge to Defendants' alleged noncompliance with appropriations statutes, *Lance*, 549 U.S. at 442, given Plaintiffs' participation in the grant programs.  But even if Plaintiffs sufficiently claim that such noncompliance causes them an Article III injury, they fail to plausibly allege that such an injury "is 'likely' to be 'redressed by judicial relief'" here.  *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023).  As other courts in this district have recently recognized, this Court cannot "specifically order" the federal government "to continue to contract" with specific parties, as such relief would undermine the "Executive's discretion" that "both the Constitution and Congress's laws have traditionally afforded" with respect to "how to spend" appropriated funds "within the constraints set by Congress."  *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 770 F. Supp. 3d. 121, 154 (D.D.C. 2025).  Rather, "the appropriate remedy" for an allegedly impermissible withholding of congressionally appropriated funds by the Executive Branch is "to order" the agency in question "to 'make available for obligation the full amount of funds Congress appropriated' under the relevant laws."  *Id*. (quoting *City of New Haven v. United States*, 634 F. Supp. 1449, 1460 (D.D.C. 1986)).  Yet granting that limited remedy here would not address Plaintiffs' claims because it would not result in the administration of specific grants that would

19

disburse funds to Plaintiffs, as opposed to other applicants.  That absence of a redressable injury fails to satisfy Article III's standing requirements, *Haaland*, 599 U.S. at 294, and such a "defect[] of standing" requires rejection of Plaintiffs' claim.

### G.  Plaintiffs' Separation Of Powers Claim Is Without Merit.

Article I of the Constitution confers on Congress the authority to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  Congress therefore may, "[i]ncident to" its spending power, "attach conditions on the receipt of federal funds," *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 530 (N.D. Cal. 2017) (quoting *South Dakota v. Dole*, 483 U.S. 203, 206 (1987), and "Congress can delegate some discretion to the President to decide how to spend appropriated funds" so long as "any delegation and discretion is cabined by [relevant] constitutional boundaries."  *Id.* at 531.

That is precisely what has happened here.  Congress has authorized HUD to administer certain grant programs, including those at issue in this case.  The funding for the grants at issue must be obligated before the end of the fiscal year to prevent any lapses in funding.  HUD's administration of FHIP grants has been within the bounds of its authority.  HUD is not withholding or otherwise impounding funds, but rather working to administer the subject FHIP grants and to obligate the corresponding funds before the end of the fiscal year.  Cooke Decl. ¶¶ 4–6.  Therefore, Plaintiffs' separation of powers claim fails.

### H.  Plaintiffs Do Not Have A Viable Due Process Claim.

Plaintiffs claim that HUD violated procedural due process because Plaintiffs with existing, multi-year PEI grants "have a vested property interest in their multi-year PEI awards, yet HUD has effectively terminated these awards with neither notice nor an opportunity to be heard."  Mot. at 20.  This claim lacks merit for multiple reasons.

First, Plaintiffs have not established a protectable property interest.  "The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an

abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation omitted).  The Supreme Court has identified a narrow set of government benefits, so-called "new property," that are protected under the Due Process Clause.  *See Perry v. Sindermann,* 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collecting cases).  The Due Process protections afforded to this set of entitlement-like benefits, however, have not been extended to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev*., 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process." (citation omitted)).

The distinction makes sense.  As the Second Circuit explained in *S & D Maintenance Co. v. Goldin*, in the new-property line of cases, "the Due Process Clause [was] invoked to protect something more than an ordinary contractual right. Rather, procedural protection [was] sought in connection with a state's revocation of a *status*, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure[.]"  844 F.2d 962, 966 (2d Cir. 1988).  The same logic does not extend to "contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor."  *Id.* at 967.  Indeed, "the doctrinal implications of constitutionalizing all public contract rights would raise substantial concerns[.]"  *Id.* at 966. "[C]ourts have resisted application of due-process principles to government contracts because [w]ith scores of millions of government contracts in effect at any point in time, it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract."  *New Vision*, 54 F. Supp. 3d at 29

(citation omitted).  This Court should refrain from such an unprecedented expansion of the doctrine, particularly in this case where HUD has not taken any adverse action with respect to any of Plaintiffs' grants.  Moreover, Plaintiffs do not articulate a policy or procedure causing any alleged deprivation because there is no final agency action, as previously explained.  Therefore, Plaintiffs do not have any likelihood of success on the merits of their due process claims.

## II.     Plaintiffs Have Failed to Demonstrate that They Will Suffer Irreparable Harm Unless the Court Grants the Requested Relief.

Apart from the lack of any likelihood of success, Plaintiffs also have failed to demonstrate that they will suffer irreparable harm if the Court does not enter the requested temporary restraining order.  To demonstrate irreparable harm, Plaintiffs must meet a "high standard"—Plaintiffs must show that they face injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citation omitted), and that are "beyond remediation."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Making that showing requires "proof" that the harm they identify "is certain to occur in the near future."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

Furthermore, the irreparable harm pled must be harm to the Plaintiffs; Plaintiffs may not rely on alleged harm to third parties in requesting a temporary restraining order.  "[H]arm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court."  *State v. Musk*, 769 F. Supp. 3d 1, 7 (D.D.C. 2025) (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021)).  Thus, in *State v. Musk*, although the Court noted that "[t]erminating thousands of federal employees may cause extreme harm to the individual employees, and potentially the institution writ large," *id*. at *4, the Court held that it could not consider alleged harm to parties not before the Court on a request for emergency injunctive relief.  *See id*.

22

Finally, as relevant here: "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Rather, it is black-letter law that economic harm is generally not irreparable. *Wis. Gas Co.*, 758 F.2d at 674. The only exceptions are "where the loss threatens the very existence of the movant's business," *id.* (citation omitted), or "where the claimed economic loss is unrecoverable." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014).

None of the alleged injuries Plaintiffs plead can support the entry of the requested temporary restraining order. The harms pled all are economic, speculative, or affect third parties rather than the Plaintiffs seeking relief. Plaintiffs' allegations illustrate why economic harms generally are not cognizable as "irreparable harm" for purposes of preliminary equitable relief; money is generally fungible, and, unless the very existence of an enterprise is threatened, *see Wis. Gas Co.*, 758 F.2d at 674, a litigant suffering financial loss may be made whole through money damages. Plaintiffs broadly state that they face the imminent threat of being forced to shutter programs and lay off staff if their own funding access is impeded. Mot. at 39.

In *California*, the Supreme Court considering an analogous suit found it "compelling" that grantees—that had been granted a temporary restraining order enjoining the Government from terminating various education-related grants—"[had] the financial wherewithal to keep their programs running." 2025 WL 1008354, *2. Against that backdrop, the Supreme Court held it was appropriate to stay the temporary restraining order, reasoning that "if [the grantees] ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum." *Id.* Just so in this case.

Moreover, even if economic injuries were cognizable as irreparable harm: Plaintiffs have only identified one organization that has been presumptively affected because it did not receive federal funds by its anticipated date. *See* Mot. at 38 ("One NFHA member and Active PEI Plaintiff shuttered operations at the end of May 2025, and others are poised to suffer the same fate. Short of closure, HUD's refusal to administer FHIP awards has forced Plaintiffs to lay off staff and cut core services."); *id.* at 39 ("Other NFHA members also predict they will be forced

23

to close completely without FHIP funding.").  Such alleged injury for one third-party does not come close to establishing that the same injury is "certain, great, actual, and imminent" for Plaintiffs themselves or for countless other organizational members.  And to the extent Plaintiffs' members identify any additional harms stemming from purported disbursement delays, those members could assert individual actions in the appropriate forums to address those concrete harms.  The expansive reach of the relief Plaintiffs seek—rather than targeting relief to any concrete injuries identified in Plaintiffs' Motion—underscores the overbreadth of the requested temporary restraining order.

Lastly, it is important to note that Plaintiffs' irreparable harm argument focuses on the consequences for an existing PEI grantee, such as Plaintiff NFHA, as opposed to new, first-year award applicants, such as Plaintiff TFHC.  *See* Mot. at 38-42. For the reasons set forth above, Plaintiffs cannot establish likelihood of success on the merits of these claims because this Court does not have jurisdiction over contract claims stemming from existing grant contracts.  *See supra* part I.C.

### III.   The Balance of the Equities and the Public Interest Support Rejection of Plaintiffs' Motion.

Preliminary relief also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor.  *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party").  In this setting, granting the temporary restraining order that Plaintiffs seek would disrupt HUD's authority to administer grant programs and act as a responsible steward of public funds.  In another case seeking preliminary equitable relief against a federal agency, the Court recognized that "thwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the public interest." *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020).  Plaintiffs' requested injunctive relief would effectively disable HUD, as well as the President himself, from implementing the President's priorities consistent with their legal authorities.  "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a

24

form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets omitted).

**IV.     Plaintiffs Should Be Ordered to Post Security in Connection with Any Preliminary Injunctive Relief And Any Preliminary Relief Should Be Stayed To Allow Consideration of Whether to Appeal**

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiffs' Motion in its entirety.  However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post security.  Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunctive relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c).  In the event the Court issues preliminary relief here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such order.  *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").  As Plaintiffs are, in part, seeking the disbursement of grant funds, the Court should order the posting of a bond equal to the size of any payment that the Court orders on a preliminary basis here.  Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were "wrongfully enjoined." *See* Fed. R. Civ. P. 65(c); *cf. California*, 2025 WL 1008354, at *2 ("respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed. No grantee promised to return withdrawn funds should its grant termination be reinstated, and the District Court declined to impose bond") (quotation omitted).

Finally, Defendants respectfully request that if this Court does enter injunctive relief, that relief be stayed for a period of seven days to allow the Solicitor General to determine whether to appeal and seek a stay pending appeal.

**CONCLUSION**

For all the reasons discussed herein, the Court should deny Plaintiffs' Motion.

Dated:  July 16, 2025                          Respectfully submitted,

                                               BRETT A. SHUMATE
                                               Assistant Attorney General
                                               Civil Division

                                               LESLEY FARBY
                                               Deputy Branch Director
                                               Federal Programs Branch

                                               */s/ Heidy L. Gonzalez*
                                               HEIDY L. GONZALEZ
                                               (FL Bar No. 1025003)
                                               *Trial Attorney*
                                               U.S. Department of Justice
                                               Civil Division, Federal Programs Branch
                                               1100 L Street, N.W.
                                               Washington, DC  20005
                                               Tel. (202) 598-7409
                                               heidy.gonzalez@usdoj.gov

                                               *Attorneys for Defendants*