UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL FAIR HOUSING ALLIANCE, et al.,

Plaintiffs,

vs.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,

Defendants.

CASE NO. 1:25-cv-01965-SLS

TRANSCRIPT OF MOTION HEARING
**BEFORE THE HONORABLE SPARKLE L. SOOKNANAN, DISTRICT JUDGE**
Thursday - July 24, 2025
10:00 a.m. - 11:54 a.m.
Washington, DC

**FOR THE PLAINTIFFS:**
Relman, Dane & Colfax, PLLC
BY: REED COLFAX, ROBERT W. HUNTER and LILA MILLER
1225 19th Street, NW, Suite 600
Washington, DC 20036

**FOR THE DEFENDANTS:**
United States Department of Justice
BY: HEIDY L. GONZALEZ
1100 L Street, NW, Suite 3528
Washington, DC 20005

---

**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**
333 Constitution Avenue, NW
Washington, DC 20001
Transcript Produced from the Stenographic Record

(Call to Order of the Court at 10:00 a.m.)

DEPUTY CLERK: Your Honor, we're on the record for Civil Case 25-1965, *National Fair Housing Alliance, et al. versus U.S. Department of Housing and Urban Development*.

Starting with the plaintiff, please approach and identify yourselves for the record.

MR. COLFAX: Good morning, Your Honor. Reed Colfax for plaintiffs. I'm joined by Lila Miller and Robert Hunter.

THE COURT: Good morning.

MS. GONZALEZ: Heidy Gonzalez for the Department of Justice on behalf of defendants, and I also have Joseph Robbins, who is counsel for HUD.

THE COURT: Good morning. We are here this morning on the plaintiffs' motion for a temporary restraining order. This lawsuit is about certain grant funding under the Fair Housing Act.

For over 30 years, Congress has appropriated funding under the Fair Housing Initiatives Program, and HUD has distributed that funding through grants to private nonprofit fair housing organizations.

I think everyone here would agree that Congress had a clear goal when it developed this program to ensure that there is dedicated enforcement of the Fair Housing Act to both prevent and remediate housing discrimination across our country.

I think the parties agree that HUD is required to distribute the appropriated funding. The statute says that HUD shall use the funds. HUD has promulgated certain regulations to implement this statutory program. And I'll walk through my understanding of the process, and the parties should correct me when it's your turn up here.

But as I understand it, HUD posts certain notices of funding opportunities, after which fair housing organizations may submit applications by a date set by HUD.

HUD then convenes a panel to evaluate the submissions and select applicants. HUD then goes through its internal approval process and then commits funds for the awards. By statute, HUD must notify Congress at least 30 days before entering into a new grant agreement, and funds are available to be awarded until September 30th. So that means HUD must notify Congress and grantees of new grants by August 31st. There are also multi-year grants where funding is available for multiple years.

So for the current fiscal year, my understanding is that Congress appropriated over $86 million for grants, and that funding must be awarded by September 30, 2025, which means that for the new grants, the congressional notifications need to go out in about a month, by August 31st of 2025.

There are two named plaintiffs here, the National Fair Housing Alliance has an active three-year grant that is in year

two. And the Tennessee Fair Housing Council applied for new grants. The plaintiffs claim that HUD is ignoring statutes and regulations by refusing to spend the money that Congress appropriated. They allege that HUD is neither awarding new grants nor administering existing multi-year grants, and they filed a class action complaint on behalf of themselves and other similarly situated fair housing organizations.

I will hear from the plaintiffs first. I will review that my practice is to ask a fair bit of questions during oral argument. I use argument to help me work through what I think are the more difficult issues in the case and the ones I'm grappling with.

And I know everyone comes in with sort of a plan of what they want to say. I have been in your seat. But I'm going to ask you to bear with me and answer my questions in the order that I ask them, even if it's not how you would frame the issues. And I assure you everyone will have to time to say everything they want to say once I work through my questions.

Okay. So we'll start with the plaintiffs, Mr. Colfax. So I'm going to work through your claims and try to keep the plaintiffs on the claims in two buckets, the multi-year grants and the new grants because the analysis is a little bit different for those buckets.

And I will say at the outset that I understand how much these organizations depend on HUD funding and how much

very real harm has already happened as a result of what looks like to me a deviation of practice by HUD with respect to these delays.

But we are here on a motion for TRO more than two months before the deadline that Congress actually set for the awards, which I'm struggling with a little bit when it comes to standing and some of your claims.

So let's start with NFHA and its members, which have these multi-year grants, and let's start with standing. So I read your papers to allege two types of injury, what I have been thinking about as a future injury, which is HUD letting the September 30 deadline come and go; and current injury, which the members are already experiencing because of the funding gap and because of the steps they have had to take.

So starting with what I have been calling the future injury, we have more than two months before that September 30 deadline. HUD obviously hasn't missed a deadline. I don't understand how that injury is imminent enough right now for me to find standing at the TRO stage.

MR. COLFAX: The key injury for the continuing grants really is what is occurring right now, and that is the injury that started the day the fiscal year ended for that particular organization.

As the Court is aware, these PEI grants have different expiration dates. A large number of them that are at issue

currently expired on May 30th, and so those organizations now are coming on close to two months with no funding. Of course, the PEI grants make up a substantial portion of a lot of these organization's budgets, and so that's what is causing the injury of organizations having to close, which we presented some evidence that that has happened, in the specific context of a PEI grant not being continued.

THE COURT: Okay. So let me just stop you, because that's important for me to understand. I will say that on both sides your standing briefing sort of conflates everything into one, which is why I'm trying to separate it out and understand what injuries you're claiming for each of the buckets, and, of course, standing is assessed claim by claim.

For the multi-year grants, you're not relying on that future injury of HUD letting the deadline go, you're only relying on the current harm of the funding gap at this point and everything that the organizations have had to do as a result of the funding gap?

MR. COLFAX: That's correct, for the TRO purpose for those ongoing grants, that is correct.

THE COURT: Okay. And so I'm with you on what that injury is. So I want to talk through then traceability and redressability for each of the claims.

So starting with, say, separation of powers on appropriations -- the appropriations clause. So the funding

gap is the injury. And your brief seemed to say that that's traceable to HUD's inaction in not renewing the grant and paying out year two. But HUD's inaction isn't an appropriations clause violation or a separation of powers, right? The claim is about HUD spending the funds by September 30.

And so how do you trace your current harm to a speculative future violation? And even assuming there is traceability, how is there redressability, because if I order them to meet the September 30 deadline, wouldn't there still be a funding gap, which is your injury? And so how does an order from me redress your injury?

MR. COLFAX: So as it pertains to redressability, what an order from the Court would do would actually stop the injury. So --

THE COURT: How would it do that? I can't order them to -- I can't order them to pay you year two now, because the only deadline in place is the September 30 deadline.

So if I order them to comply with the statute, that would mean meeting the September 30 deadline, which would mean there is still a funding gap.

Unless I'm missing something, I don't see any statute or regulations requiring them to do anything before September 30, even if in the past they had awarded year two before the deadline. Am I right about that?

MR. COLFAX: For the appropriations and separation of powers claims, correct. For the APA and due process claims, it would be different.

THE COURT: We'll get to that. So for appropriations and separation of powers, you agree with me that there isn't standing at this stage because any order I could issue would not redress the injury that you're claiming?

MR. COLFAX: Limited to the multi-year PEI --

THE COURT: Totally. We're just in that bucket for now.

Let's move to procedural due process, which I understand a little better. And I think your argument is the funding gap is traceable to what you're calling their termination of the multi-year grant, and so if I order them to stop the termination, as you call it, that would fill the funding gap.

MR. COLFAX: That's correct.

THE COURT: Okay. And so then let's move to APA. So 706(1), I think I'm with you. You're saying that the injury, which is the funding gap, is traceable to their unreasonable delay, which would be redressed by an order from me telling them to no longer delay. Is that right?

MR. COLFAX: That's right.

THE COURT: So then 7062, so you say that they have made a final decision to pause grant making authority, but I

have got a declaration from them saying that there was a pause, but that it was temporary and that they are now working on the remaining steps. So tell me how I get to redressability on the 7062 claim.

MR. COLFAX: To start with, a temporary pause can be a final agency action that is arbitrary and capricious --

THE COURT: Let's stick to standing though. So if they have -- if the temporary pause is over and they are now working on getting those applications done, they have resumed the grant-making activity, what would I order that would redress your injury?

MR. COLFAX: Well, there is virtually no factual basis for their assertion that the pause is over. Yes, they have articulated that they have resumed this process to negotiate with the organizations to get the second or third year continuing, but they have given zero detail on what they are actually doing.

What I can say as an update to the Court -- I don't have any evidence to put in for this because it's something we just heard from our clients in the last couple days -- is that now the organizations that already had contracts negotiated and had started work on their second or third years of their PEI grants are being told by HUD that HUD is considering those grants a nullity, so that the process for those organizations that previously weren't even before the Court are now in the

same box as the organizations that have, at least from HUD's perspective, as organizations that don't have contracts in place.

THE COURT: Tell me -- who are these organizations?

MR. COLFAX: Sure.

THE COURT: They have multi-year grants?

MR. COLFAX: Of all of the organizations that HUD is funding with multi-year PEI grants, some had already had their contracts negotiated. They are not before the Court because they are already proceeding into their second or third year.

So the organizations that were before the Court were those who had not completed that process. What HUD is now saying is that group that already had their contracts negotiated, they are throwing out those contracts and restarting the process. So all that to say is that when you get one line in a declaration saying, hey, we have restarted the process, that's not sufficient for the Court or anyone else to have any confidence that HUD is going to actually proceed through that process.

What we're asking for the Court as an action that redresses the harm is to get a very specific set of deadlines in place for HUD to follow and to meet so that we ensure that there is an expeditious process to be able to get that funding restarted.

THE COURT: This is bleeding past standing, but, like,

what authority do you think I have to set deadlines for them other than the one deadline that's in the statute, because where Congress said September 30, you must appropriate these funds by then, it would seem to me that their internal deadlines to do that is left to their discretion.

So why do you think I can set deadlines for them other than asking them to comply with the deadline that Congress set?

MR. COLFAX: Because the claims under the APA and the due process claims set deadlines, essentially, create a need for acts separate from the September 30th deadline.

For our 706(1) claim, we're saying that their action is unreasonably delayed, the Court can stop that unreasonable delay by setting a prompt deadline. Due process claim of the suspension or the termination of these grants, the Court can end the suspension or the termination by setting a deadline that's much sooner than September 30th.

THE COURT: So you think the pause is not over? You think the pause is ongoing despite what they are telling me in their declaration?

MR. COLFAX: I think the pause is not over. There is zero guarantee that it will actually be completed in a timely fashion, and all of the action that HUD is supposedly taking now is in response to this lawsuit. So it's not as if this is an organic process that HUD was planning from the get-go, it is they have started a process, or at least articulating they have

started a process in response to this lawsuit. That doesn't give anybody the confidence that the pause has actually been completed.

THE COURT: So let's move to the merits of a couple of these claims. Actually, before I do that, is there anything else you want to say on standing just for the multi-year bucket? We'll get to the new grants after.

MR. COLFAX: No, I think for the moment the focus on the due process and the APA claims is a key to those claims.

THE COURT: So let's start with the APA, and I'll start with 706(1). So you cited very little case law to support that claim on the merits.

Tell me why you think it's unreasonable for HUD to delay making decisions so that it can align with the current administration's goals and priorities? Why is that an unreasonable reason for an agency to have a delay in decision making?

MR. COLFAX: Because 706(1) turns on a host of factors to determine whether or not there is unreasonable delay.

THE COURT: In looking at the TRAC factors, talk to me about the first two, because that's where I'm struggling the most for you. I'm not sure that it's unreasonable for an agency to say, okay, there is a new administration, we may have different policy priorities. Yes, we have to spend this money, Congress said we have to spend this money, but let's just,

like, take a wait and figure out how we want to spend that money consistent with our current priorities. Why is that unreasonable?

Admittedly, you have not cited cases going to this scenario, and I haven't found a ton either.

MR. COLFAX: The scenario may be somewhat unique. But let me touch on three facts that are important here.

The first fact is the legal proposition that you look at the timing in conjunction with what Congress has prescribed as the timeframe. So the September 30th deadline is important here and is a measure when you're thinking about what the timing is.

What's the timing? HUD has known about the September 30th deadline, even after the administration change, for six months. They have done, as far as anybody can tell, nothing to align their priorities with the existing grants that they are under a requirement to continue.

So the fact of taking no action for six months, the other fact that HUD knew when those grants would expire. The very purpose of the PEI grants for the last 15 years is to ensure continuous funding for these organizations.

Because of the percentage of the budgets that these grants represent, right, a day of non-funding has a significant consequence. HUD knows that. They know the purpose of the grants. And they knew four months after the administration

changed that those dates were coming; yet, they did nothing to align their priorities with the existing grants to make sure they could get through that process and ensure that continuous funding.

And then on the flip side, the September 30th date gets closer and closer with every day, and there is zero indication of what's visible to anybody outside of HUD that HUD was doing anything until we filed this lawsuit.

So when you think about what their timing has been and what efforts they have taken to resolve that, one, they ignored the severe consequences that doing nothing would have and let those dates hit, let the grants end creating these funding gaps; two, they see the September 30th date coming, which is the drop-dead date, we cannot go past that, and still nothing happens until we filed this lawsuit.

HUD has come forward with no evidence whatsoever that justifies this delay. What were they doing? And this is also not a particularly taxing project that they are going through. They are aligning their priorities with the existing grants, but, of course, within the very tight constraints of the Fair Housing Act.

The FHIP statute says you have to use these grant moneys for these particular purposes. Is there room to wiggle in there? Yes, but it's not a huge amount. This is not something where there has to be a complete overhaul of the

grant awards. It's merely, as they articulated, an aligning of priorities. With the minor task, the huge amount of time that they have already blown, and the severity of the consequences, that, under the TRAC factors, strongly supports a finding of unreasonable delay.

THE COURT: So you would say it's fine for a new administration to take time at the outset to figure out how to align its priorities with its statutory obligations, HUD could have started doing that in January, it sounds like when they paused all of this grant making activity. But in light of the September 30 deadline that is looming, they should have already done that?

And you also seem to -- you also seem to suggest that all of the representations they make in the declaration about working through what they need to do in advance of the deadline is prompted by you filing a lawsuit and not by normal process at HUD. You don't think they stopped in January to reassess where they were, and then they started back up, and now they are processing these applications in earnest? You think they never intended to comply with the September 30 deadline? You filed this lawsuit, and now they are scrambling to get something done in order to defend the lawsuit.

Do I have that right?

MR. COLFAX: You have that right, and it's a reasonable interpretation of that declaration. That's the only

insight we have into HUD's operations. There are no dates in there. They didn't say we started in February, we started in January, we even started in March.

What we know is they didn't start in time to get it done before these grant years ended, and it created the funding gap. September 30th, but certainly from the perspective of the organizations, and it should have been from the perspective of HUD, the dates those grants ended was even more significant.

And when you think about it in the context of the TRAC factors, which includes essentially what are the consequences of the actions, allowing those dates to pass and the grants to lapse, right, multi-year grants, it's not as if this is a new grant, this is a multi-year grant, and they just didn't go through the procedural process to continue the funding, that's very, very strong evidence that the delay here is unreasonable.

THE COURT: Okay. Let's move to your 706(1) claim that the funding has been unlawfully withheld. So you allege that they failed to take a discrete agency action that they were required to take under the APA. I read your papers as relying on three things, and I just want to make sure I have that right and there is not something else.

So you first cite the statute, which I think there is no disagreement about. It says they shall make the funds available. But I don't read anything in the statute to say that the funds must be used in a way in order to avoid a

funding gap for multi-year grants. Is that right?

MR. COLFAX: Well, that is true that doesn't appear in the statute. In the FHIP regulations, 125 C.F.R. 401, I believe.

THE COURT: 401 says, because that's my next one, so the statute doesn't provide that discrete. So 125.401 says that "multi-year funding may be contingent upon annual performance reviews and annual appropriations." And I read that language as limiting the bases on which they can terminate funding or on which funding may be contingent, so when neither basis is there, the funding must flow. But that doesn't say anything again about timing or the gaps from year to year.

MR. COLFAX: Well, what it does say is that you can't terminate or effectively terminate, which they have done by --

THE COURT: So that's the crux of this. It's not -- that just says -- first of all, that doesn't say you can't terminate, right? The language says, "Multi-Year funding may be contingent upon annual performance reviews and annual appropriations."

And so, again, you read that language as limiting when they can -- the bases on which funding may be contingent. You take that a step further to say that language prevents termination.

But getting back to, like, this claim, we're in 706(1) land at this point, which is the agency failed to take a

discrete agency action that it is required to take. So what is -- what's the -- like what is that action, because there is nothing in 125.401 that requires them to do anything.

MR. COLFAX: But it precludes them from terminating, or as we would argue, effectively suspending -- not effectively suspending, actually suspending. When you look at the OMB regulations, termination and suspension run together. You need to have the same processes and procedures if you terminate or you suspend. And what they --

THE COURT: This is a failure to act claim. What's the action that you think they have not taken? And I think that action is not funding year two as of July 1st, when NFHA's grant expired on June 30, for example. But what requires them to do that? What requires them to not have a funding gap for the multi-year grants?

MR. COLFAX: So this is a double negative, but they are required not to allow the termination to occur, and that's what they did through their inaction.

THE COURT: I don't think -- I think the termination comes into play when we're talking about procedural due process and 706(2), but when we're in 706(1) land and we're talking about a failure to act, I'm not seeing a discrete agency action that they were required to take that they didn't take.

And I just want to make sure I'm not missing a piece you want to rely on. You point to the statute and then you

point to 125.401, and I don't see anything in either of those. You rely on *Widakuswara versus Lake*, but there, the grants were terminated by letters from one of the defendants, and so I'm not sure that case helps you.

I'm not missing any statute or regulation that identifies something they are supposed to do that you're alleging they didn't do that would give rise to a failure to act claim under 706(1), right?

MR. COLFAX: Think about it this way. What the regulation provides is that there is funding that is available to the organization absent a performance issue or a non-appropriation.

So what that means is that HUD cannot, through its inaction, effectively terminate the grant. And so the action that is unlawfully withheld is taking the steps necessary to ensure that that grant funding continues to be available, which it has to be, it's required to be, absent the appropriations not being there or their performance being poor.

THE COURT: Okay. I understand your argument.

So moving to procedural due process. I agree with you that these organizations have a vested property interest, but as I previewed a little bit on termination, I am struggling a bit with your argument that the agency actually terminated these awards.

How can you say they terminated when the deadline is

more than two months away? I mean, first of all, there is -- they haven't said they terminated. They haven't notified you. There is no letter.

You are saying they effectively terminated because they didn't provide year two right when year one ended, and that's what they historically have done, but if they are not required to actually fund year two until September 30, and that's more than two months away, how can I find termination there?

MR. COLFAX: So again, seeing it through the property interest lens, what is the property interest that the organizations have in the grant? They have a property interest that the grant funding will continue to be available over the three-year period that the grant agreement covers.

What HUD has done --

THE COURT: What is the grant -- sorry. What does the grant agreement say about when funding is going to happen?

So they are funded through June 30th. Does the grant agreement promise year two funds without a gap or on July 1, or does it say anything about when year two funds will come?

MR. COLFAX: What it says is that the grant agreement is from a date certain to a date three years from that date. So it covers the entirety of the time period.

What the grant award does is it creates a property interest in that funding being available over that three-year

period. And the only thing that interrupts that is the need to have a contract from one year to the next. The only basis that HUD could possibly articulate for not continuing that contract from one year to the next is that they don't have the money, Congress hasn't appropriated it, or this organization is not performing its duties under the agreement.

THE COURT: I think they would say, yes, you have a three-year grant, the only deadlines we have are deadlines to fund you by the September 30 deadline, which is set by statute, we fully intend to do that.

And I know you don't put too much stock in the declaration, but I have still got to rely on government declarations provided under penalty of perjury somewhat, absent evidence that I shouldn't, but they say that's exactly what they are planning to do, FHU already approved a recommendation that includes obligating those funds, those funds being the second and third year PEI grants, before the end of the fiscal year. The only thing that is left to do is process the HUD 718 commitment forms and negotiate and execute the HUD 1044 forms and grant agreements. And they assert that there is more than enough time to complete those steps before the end of the fiscal year.

Do you disagree that it will take longer than two-plus months to get those forms done?

MR. COLFAX: They can do it. The injury by HUD

suspending these grants has already occurred at the termination.

THE COURT: I know, but this is because you're calling it a termination, and they don't think they have terminated. And they haven't taken steps to terminate. And they are under no obligation to provide those year two funds until September 30th.

And so, I mean, you're calling it a termination, but I'm just not sure that you're pointing to anything that would allow me to find that they terminated when the deadline is more than two months away.

MR. COLFAX: Well, it is a termination or a suspension of the grant. They are creating a gap in the midst of the performance period. Under the OMB regulations for a contract, the agency cannot withhold funds during the performance period of the contract.

THE COURT: They haven't -- if September 30 comes, then they are withholding funds, but if there is no other deadline for them to pay the funds before September 30, how are they withholding the funds?

I understand that in the past they didn't have a funding gap, but am I missing anything that talks about not having a funding gap in the regulations?

Is there anything requiring them to process these multi-year grants in a way that there isn't a funding gap?

MR. COLFAX: Well, I think there are two sources that are important to illuminate the regulation and how the FHIP regulation operates for these multi-year grants. One is the purpose, right, and this is undisputed, what the purpose of that requirement that the multi-year grants continue during the entirety of the performance period, absent appropriations and performance, and that is to allow the organizations to budget, plan and operate on a continuing basis for that entire three-year period.

So if HUD were allowed to say, all right, we're just, in this funding period, we're just going to stop -- tell you to stop working, which they have done in this case, they do not initiate any activities under this grant for six months, a year, two years, that would completely undermine the purpose of the statute, as well as the purpose of the regulation. So you can't just divorce reality and the practicalities of what is occurring from what the legal requirements are.

And the very purpose of having a property interest that these organizations have is that they have a reasonable expectation of what is going to happen under that contract. There is no basis whatsoever that would be a reasonable expectation that there could just be a suspension of payments under the grants for any unlimited period of time, and that's what HUD would suggest. They say we can stop, tell you not to work, even though you're still in the performance period, for

however long we want. And that's completely contrary to what the purpose of the law and the regulations are.

THE COURT: Okay. Let us move to the new grants. And I am more convinced here that there is an imminent injury, because accepting everything I have seen in these papers, I don't see how there is enough time for HUD to get everything done in advance of the August 31 deadline for congressional notifications in order to make the awards on September 30.

Just help me so that I make sure I have this all right, all the steps you think HUD still needs to take in order to get those notifications out in about a month and your understanding of how long those steps will take based on prior cycles.

MR. COLFAX: As an initial matter, let me just say there are at this moment two paths. There is the path that we and the organization think are required and the only theoretical way to be able to meet the deadlines, which is resume the process.

In September 2024, assistance listing and NOFOs went out, applications were submitted. So as of November, there was two or three months of this process had already been completed. So if you pick up that process, you're much further advanced than what HUD is saying in its declaration is we're starting over.

THE COURT: I saw that. So you think if they go back

to the NOFOs from September 2024, there is enough time in the next five weeks to get this done, meaning having a panel evaluate all these applications, select their applications, going through internal approval process?

I walked through sort of my understanding of what this process is. Is that right, and do you think they can get that done in five weeks if they are using the September 24th NOFOs and evaluating all the applications that came in in response to that?

MR. COLFAX: I think it would undoubtedly take Court intervention to set deadlines that this has to happen by this particular date, because certainly on the normal course, which takes six or seven months -- well, it doesn't take six or seven months from where they are, but it takes multiple months from where they are, then it's theoretically possible.

And it's critical that it's theoretically possible and the Court intervene immediately to do it, because HUD, as you can see from their papers, they are challenging whether or not this Court can keep those funds available past September 30th.

We cited statutory powers as well as the Court's equitable powers to be able to extend that, but HUD, through DOJ, is saying we're not so sure. At this point, we really have no choice but try to hit that September 30th deadline, because if it hits, HUD and DOJ are going to be saying the funds are lost and they can't be obligated at all.

THE COURT: And I'm not as steeped in this process as you, but I'm not really understanding how you could have new notice of funding posted at this point. The declaration says they have been drafted and they are in HUD's internal clearance review process and implementation as being expedited, but is there any path to starting the process and finishing it in five weeks at this point?

MR. COLFAX: There is not.

THE COURT: Because they need to hold those open for at least 30 days; is that right?

MR. COLFAX: That is, as a general matter, right. If there is a finding of exigent circumstances, that can be shortened, but it is going to really prejudice the organizations who are submitting their applications to be able to get that done if it is less than 30 days.

And then there is a mandatory merit review process. That obviously takes time. And then all this has to happen before the announcements at the end of August.

So starting anew, I do not see a path, and so that's why part of our request is, as a starting point, they have to resume the process that has already begun.

THE COURT: Okay. I have a couple questions for you on remedies. So you filed a class action complaint. You have not moved for class certification or provisional class certification. And there are various arguments in the brief

about whether what you're asking is a universal injunction, and I see your arguments about why you think I can order the relief under *CASA*, and it seems like all of the multi-year PEI grantees are members of NFHA and so are properly before me.

But putting all of that to the side, why haven't you sought provisional class certification is what ordinarily happens at this stage. If a party has filed a class action complaint and they are coming for emergency relief, it would ordinarily get motion for a provisional class cert.

MR. COLFAX: Our class certification motion only related to the multi-year PEI grant organizations, and since it's actually, I believe, 23 out of 25 are NFHA members, so the class action in a way overlaps with the membership standing, with the exception of the two organizations.

THE COURT: So you're not seeking class cert on the new grantees?

MR. COLFAX: That's correct. Let me just say a little bit about the new grantees, which is 77 percent of those organizations that have submitted applications are NFHA members.

THE COURT: Those, we're assuming we're in a land where we're using the NOFOs from 2024, there are 76 percent of the entities that already submitted applications in response to that?

MR. COLFAX: That is correct. So if the Court orders

a resumption of the process, the next step will be the merit review process. Of course, if you're doing it for NFHA and its members, you have got to do it for everybody who has applied. So the effect of the order would benefit everybody with no need for a class action.

THE COURT: I understand that. So you referenced this earlier. Why would I need to order that funds be held at this stage when we're more than two months out? There has been lots of grant litigation ongoing, lots of cases being appealed, all the way up and back.

I'm a little surprised you're asking me to do that now. Like, why isn't the answer to wait and see if the awards are made. If the August 31 deadline gets hit for new grantees, you could come back to me and ask me for such an order, but my understanding is that you filed your complaint before the September 30 deadline.

If you come and ask me for such an order and I decide it's within my authority, I understand the government disagrees, I could enter such an order closer to the September 30 deadline. Why do you think I need to order it now?

MR. COLFAX: So I can't remember exactly the language we used in our briefing, but the intent was if necessary that we would have the Court extend that deadline. And the "if necessary" depends on what else the Court orders. If the Court

orders, here is the schedule, HUD, you have to meet it and you have to obligate these funds by September 30th, fine, let's follow that process, get it done.

And so if at some point the process isn't followed, then, yes, we would come back and say let's get the injunction to ensure the funds are available after the fact. Or if the Court fashions a different remedy that potentially says it's not actually possible for HUD to get this done in a fair and equitable way before September 30th, I'm going to extend it to October 30th so we can get everything done in an expeditious way, because being speedy here is critical because of the ongoing injury, but still that is fair to all of the applicants. So it's out there as an additional tool that the Court can use to make sure this is done correctly.

THE COURT: You have referenced a couple times me setting deadlines for HUD. I mean, I will put out there that we are dealing with a statute and a regulatory scheme that sets only one deadline for them, that they have lots of discretion in figuring out how to meet that deadline.

They are telling me they are going to meet that deadline. I understand you don't believe them. But we are so far out, and I understand that for you and for these organizations it doesn't seem that we're that far out because they are already experiencing very real harms with the funding gap. But I also have the authority, if it looks like they are

not going to do all the things they say they are going to do in this declaration, to modify relief over the course of the next two and a half months.

I am not inclined to enter, if I find for you, to enter pretty broad relief more than two months out from a deadline that the government is going to, understandably, take issue with in the face of representations that they are actually going to meet that deadline.

And so I'm going to hear from the government and you will have a chance again to come back up, but I -- you have asked for pretty broad relief in your proposed order, and I need to think through what makes sense at this point given where we are on the clock, understanding that we're all going to be at this for the next two and a half months to hopefully get this done, and you can come back to me at any point based on what's happening and what we hear from HUD is happening.

MR. COLFAX: Understood. Let me just add that we're not suggesting that the Court pull out of thin air an uninformed set of deadlines. HUD had the opportunity with that declaration to say we're working this as quickly as possible and here are our target dates, this is what we're trying to hit. And then we would all have had something to react to.

The organization is saying, actually, if you change that date, it would be significant to us for the following reasons. The Court, of course, could react to that. We don't

have that. All we have is "we're working as quickly as possible." I'm hopeful --

THE COURT: We might hear it. Ms. Gonzalez might have dates for us today. If not, I might ask her to go get those.

So understood. Is there anything else you want to cover before I turn to the government? And you will have a chance to come back on rebuttal after they are finished.

MR. COLFAX: No, Your Honor, nothing further to cover.

THE COURT: Great. Thank you.

Are you going to make my life easy and give me a schedule and a nice table, because I like spreadsheets, about how you're getting this all done by September 30?

MS. GONZALEZ: Maybe not, but I hope we can get there at the end. I think I have options for the Court.

THE COURT: Let me start with some factual questions about where we are.

So HUD is -- just a high level question. HUD has been administering this program since 1992. There have obviously been lots of prior changes in administration. Has processing stopped, as it did here in January, in any other change in administration for there to be an evaluation of new priorities, or is this the first time that HUD has just paused, as you even admitted, processing new grant applications and these multi-year grants?

MS. GONZALEZ: I'm not aware of the timing that other

administrations have taken in the past. HUD's position here is that it has the authority to take that time before the September 30th deadline.

THE COURT: I understand that that's -- I'm trying to understand as I'm -- I'm hearing from the plaintiffs, and you have seen in the papers, that based on past practice, this type of pause, as you would call it, is unprecedented and it's led to some pretty significant harms from these organizations who expected to receive their year two and year three funding. And I'm trying to understand whether this is the first time that has happened or whether this is something HUD has done in the past from time to time, or whether it's something HUD routinely does when there is a change in administration.

MS. GONZALEZ: HUD concedes through the briefing that this year in 2025 it has taken longer to administer FHIP grants than it did in the years preceding under the previous administration. We understand that, and we concede that in the briefing.

THE COURT: So I have the declaration, which is dated July 16. Tell me where we are today and what process has happened in the last week. And if you can keep it in the two buckets. You heard me tell the plaintiffs I'm thinking about those in the multi-year buckets and the new grant bucket.

And so the last representation I have, just starting with the multi-year bucket, is that FHU had approved a

recommendation that includes obligating those funds before the end of the fiscal year, they had to process the HUD 718s and the HUD 1044s. What has happened in the past week? Have any of those forms been processed or what's left to be done?

MS. GONZALEZ: To clarify, in the complaint plaintiffs identify 75 grants. 56 of those -- for 56 of those, second and third year agreements have already been executed, and that leaves 19. From those 19, one of those was terminated for cause, and that for cause termination is not an issue in this case, which leaves 18 grants.

From those 18, it is my understanding that HUD has begun or is about to begin the process of negotiating the second and third year agreements. In fact, we received an email from plaintiffs on Friday indicating, quote, "We understand from our clients that HUD has begun implementing the subsequent years of existing multi-year PEI awards."

So that information from plaintiffs, as well as the information that I have received from my client, suggests that HUD has already begun negotiating some of those 18 grant agreements. And as to others, it will begin negotiations in the next week or two.

THE COURT: And so just because, again, I'm not as steeped in this process, so the 56 where the grant agreements have been executed, what does that mean practically? Have the awards been made? What's left to be done given that the

agreement has been executed?

MS. GONZALEZ: It's my understanding those 56 are not at issue in this case because the second and third year funds have been obligated.

THE COURT: So for 56 of the 75, we're not -- the money has gone to them and they are not at issue? We're talking about 18 at this point?

MS. GONZALEZ: For those 56, the funds have been obligated, and so they are not at issue in this case. There is 19 of them. Again, one of those is terminated for cause, so really there's 18 that we're discussing in this case.

THE COURT: For those 18, you're negotiating second and third year grants. And when do you expect to be finished and have executed agreements on funds obligated?

MS. GONZALEZ: Those forms can be executed within a week or two. And so HUD anticipates that it will be completed well in advance of the September 30th deadline, but certainly by the deadline.

THE COURT: We'll cover this all. Actually, I will issue an order, so it's really clear on what I want, but I'm going to ask for status reports from HUD to understand what's happening, and I want to understand specifics.

So if there are 18 left, where are you with those 18? And my hope is we're not waiting until September 30 on these. If there are forms that can be done in the next week or two, my

hope is that, based on what you're telling me, in two weeks, we should no longer have a dispute about the multi-year grants because all the agreements should be executed and the funds obligated, correct?

MS. GONZALEZ: Part of the challenge with representing to the Court that can be done in one or two weeks is that it is a negotiation with plaintiffs and HUD has no control over how plaintiffs engage in those negotiations. Of course, HUD is engaging in good faith and it is attempting to finalize these as quickly as possible, which is why we keep saying we have until September 30th, because we have to have some time to complete those negotiations.

It's my understanding that the negotiations have at least been scheduled for most of these and so we have dates in the books for when HUD and the plaintiffs for those grants will be discussing the terms and proceeding with obligating the funds.

THE COURT: I will ask you to update me on that, but I'll do that very clearly afterwards.

So let's move to the new grants, which is where I'm having more trouble, as I think you could tell from my discussion with Mr. Colfax.

So I am very confused about you saying you plan to meet the deadlines. And by the way, your representations with this bucket are far less clear and absolute, right. You place

a lot of stock in your briefing on the fact that they are asking for relief and the deadline is not until September 30, but you say that you're doing everything you can on expedited basis to issue new first year FHIP awards and execute grant agreements under those new NOFOs before the funds lapse.

You're not representing to me that you're going to meet the August 31st congressional notification deadline, and you're really not representing to me that you're going to meet the September 30 deadline, which gives me a lot of pause, because based on what we know now, I'm not sure there is enough time to meet that August 31 deadline, which sounds like a fairly imminent injury to me.

So let me start with this bucket with asking does HUD plan to award these grants based only on the new NOFOs that have recently been drafted, or does it plan to rely on the September 24 NOFOs?

MS. GONZALEZ: My understanding is that HUD intends to rely on the new NOFOs. And part of the challenge with those NOFOs is that we're not working with just realignment pursuant to a new administration. HUD has also had to review the FHIP grant terms to ensure that they comply with the executive orders that were issued earlier this year, not just in January, but through March.

Many of those executive orders contain specific provisions that control government contracting, and so HUD has

had to review all of the NOFOs to ensure that there are no provisions in those NOFOs that contradict or that do not align with the executive orders.

THE COURT: Just to be clear, you're not -- you're telling me now you're not going to rely on any of the September 2024 NOFOs?

MS. GONZALEZ: I believe HUD's plan is to proceed with new NOFOs.

THE COURT: I just want to be clear, that's a yes, you are not relying on the '24 NOFOs?

MS. GONZALEZ: As of today, yes, it's my understanding that --

THE COURT: We're going to go with "as of today," because I need to make a decision on this TRO.

So then, you're telling me that HUD has drafted new NOFOs. What's the status? As of a week ago, they were in the internal clearance review process. Are they still in the internal clearance review process?

MS. GONZALEZ: The latest I have heard from my client is that HUD intends to publish those NOFOs imminently. I don't have a date today, but I've heard that they intend to publish them imminently.

THE COURT: They have not been published, and, as far as you know, they have not been approved. They need to be held open for 30 days, and HUD then needs to -- applicants need to

submit their applications, HUD needs to convene a panel to evaluate the submissions, HUD needs to select applicants. HUD then needs to go through its internal approval process.

How is all of that getting done in five weeks in order to notify Congress on August 31 of the new grants?

MS. GONZALEZ: So the first piece for 30-day requirement, the C.F.R. is quite permissive in its language, so it says that the funds should remain open for at least 30 days, but it provides that HUD can reduce that period for, I believe the language is exigent circumstances.

I'm not suggesting to the Court that HUD has made a finding that there are exigent circumstances in this case or that it has decided to keep that period open for less than 30 days, but that is an avenue. I mean, HUD could theoretically reduce the period during which applications remain open.

It is also my understanding that HUD is expediting its internal process to ensure that the applications, once the application period closes, they are reviewed on an expedited basis to comply with the September 30th deadline.

THE COURT: Are you representing to me that HUD is going to post those new NOFOs, solicit applications, in less than 30 days, I presume, review them, approve them, and be in a position to notify the grantees and Congress in five weeks on August 31st?

MS. GONZALEZ: That is what I've heard from my client

and that is their plan to comply with the September 30th deadline for the NOFOs. But I would suggest to the Court that, if it is inclined to grant any relief and it is inclined to order HUD to submit status reports, it can order HUD to submit a status report early in August to inform the Court of the status of the NOFO publication process.

THE COURT: I just -- because your papers don't talk at all really about any commitments about the August 31 deadline. You talk about September 30, which seems it gets a longer ways away, but my understanding is that the August 31 congressional notification deadline is not something you can ignore on your own or reduce in exigent circumstances.

So are you telling me that the plan is to get all of that done and notify Congress on August 31st, in five weeks?

MS. GONZALEZ: For the congressional reporting deadline, it is not a condition on obligation. So yes, there is a congressional reporting deadline, but HUD does not need to clear that deadline in order to complete an obligation.

So it is a deadline upon HUD, but it is not a requirement that must be completed before any obligation can be finalized.

THE COURT: So you're not representing to me that you can meet that deadline?

MS. GONZALEZ: I have not seen any indication from HUD that it does not intend to do that.

THE COURT: That's different. You're asking me -- I have the plaintiffs telling me that you're not going to meet either deadline. And you have said you plan to meet the September 30 deadline.

Either you plan to meet the August 31 deadline or not, and if you're saying you can't make that representation to me, then you say that and then I have to take that into account.

So yes or no, can you represent to me that HUD will meet the August 31 deadline?

MS. GONZALEZ: I cannot make that representation because it is HUD's position that that is not a condition on obligation, and that even if it does not comply with the August 31st deadline, it is still on track to comply with the September 30th deadline.

THE COURT: Okay. So walk me through your plan in the next five weeks to get there, or if you're planning to skip that deadline, your plan for posting, reviewing, all of the various steps that have to happen. Tell me -- I mean, you don't want me to set deadlines for you, I assume, so how would you propose meeting those deadlines?

MS. GONZALEZ: HUD intends to publish the NOFOs imminently. I would suggest to the Court we could file a status report by August 5th to report to the Court whether HUD has in fact -- HUD's status as to the publication of the NOFOs.

I have seen no indication that HUD intends to use the

exigent circumstance exception, so presumably the NOFOs would be available for 30 days. And then within the remaining period, HUD has indicated that it could review and finalize and obligate the funds by September 30th.

THE COURT: You don't have -- you don't have an internal plan to get it done that you can share with me?

MS. GONZALEZ: Not at this time. HUD has been working to finalize and to issue the NOFOs as quickly as it can so that it can have those open for at least 30 days.

It has determined internally that it has sufficient time to obligate the funds once the application period closes.

THE COURT: When can you get that to me, because, you know, the government is saying to me that it does not want me to set deadlines, that this is committed to agency discretion, but it's not presenting me with a plan by which it can get this done.

And based on what I know, I am extremely skeptical that it can get done. If you don't have a plan for me today, when can you get me one? Can you get me one tomorrow? Can you file something tomorrow telling me what HUD's plan is in order to get this done and meet the deadlines?

MS. GONZALEZ: I can talk to my client. Again, what HUD has represented is that it plans to issue the NOFOs imminently.

THE COURT: I know that, but "imminently" doesn't

really mean anything to me. Imminently to me means they should have been out already, means today. To HUD it might mean two weeks from now.

I mean, I have before me a motion from the plaintiffs asking for a temporary restraining order. And in response, I'm not really getting a concrete plan from HUD to get it done. And based on everything I know in the record, I don't think you can get it done.

And so I am going to ask you that you go back and talk to your client today and file something with me tomorrow morning letting me know what HUD's plan is to get this done, because I assume you would rather come up with with a plan than me set deadlines for you. And sitting here today, I'm not sure you can get it done.

MS. GONZALEZ: I will reiterate to the Court that HUD has been operating under the September 30th deadline, and so I understand the Court's instructions and today, at this moment, I am not prepared to offer the Court a specific deadline. I would only ask if the Court would allow us until Monday so that I can confer with HUD leadership.

It's not just a decision that is taken by the lawyers. It has to be approved by the FHEO as well, and so if you give defendants a little bit more time to offer a schedule to the Court.

THE COURT: Okay. I assume HUD has a plan, that you

can go back and ask them and they can give you one, because you're assuring me they are going to meet the deadline. And so I would like you to file something in the morning, and if in the morning you don't have an answer, you should file something saying "HUD doesn't have a plan yet that it can share, and it's going to work on one for Monday."

But you came here today to argue that I shouldn't issue a TRO and you have argued in all of your papers that you're going to meet the deadline, I assume there is a plan to meet those deadlines, and if you don't have one today, then I'm not sure why you have represented to me that there is a plan and you're going to meet the deadline.

I would like you to file something in the morning. If there isn't a plan that you can share, you should just say that in that filing.

MS. GONZALEZ: I think we can share something with the Court. I would just ask for a little bit more time so I can confer with -- even it's close of business on Friday or tomorrow, that would be very helpful for me in order to confer.

THE COURT: I will give you until noon, which means you will have about 24 hours. I have a TRO in front of me, and so I have an obligation to act expeditiously.

Okay. So let's talk about standing, and, again, I'm going to keep things in the two buckets. And so I want to start with the multi-year grants, and you heard Mr. Colfax sort

of zero on their APA and procedural due process claim.

On the APA claims, right, NFHA's grants already lapsed as of June 30, 2025, which means there is a current injury, and you heard the plaintiffs not relying on this future speculative injury. As I said earlier, I think your briefing and the plaintiffs' briefing sort of collapses everything and talks about imminence.

Focusing in on the current harm and not this future injury of HUD missing the September 30 deadline, the current harm of the funding gap and the very real consequences that have flowed from that, to me, there seems to be a concrete injury, the injury of current harm, that is traceable to HUD's delay in finalizing the year two, year three of the multi-year grants that would be redressed by an order from me regarding unreasonable delay. Tell me why that standing analysis is wrong.

MS. GONZALEZ: So the funding gap, it is so unclear to us what order the Court could issue that would redress plaintiffs' injuries, particularly in light of the fact that HUD is negotiating those multi-year PEI grants, and there is no legal requirement that HUD obligate those funds before September 30th.

THE COURT: But if I find that there is -- you're talking -- you are getting into merits now. I'm talking about standing, right. And they have said there is an unreasonable

delay. That's the conduct they are complaining about. Their injury is traceable to that unreasonable delay, and it would be redressed from an order from me regarding the unreasonable delay. So just on standing, why is that wrong?

MS. GONZALEZ: I recognize that the funding gap piece is a little bit more difficult than the rest of the grants that have -- for which there isn't a funding gap.

THE COURT: Do you concede there is standing just on the multi-year grants and just on the 706(1) claim? Do you concede there is standing on that claim?

MS. GONZALEZ: No. Again, I'm still having a hard time understanding the -- I still think that the redressability piece has not been satisfied in this case because the only thing that the Court could order is that HUD negotiate those second and third year agreements as required by law. And HUD is doing that, because it has until September 30th to obligate the funds.

THE COURT: We might -- let's move on. Procedural due process. They say there is a concrete injury, again, because of the funding gap that's traceable to what they call termination of the grant, and if I order HUD to stop the termination, that would fill the funding gap.

So not on merits, and I understand everyone sort of wants to move to merits. I think in a very sequential fashion and I'm just talking about standing. Why isn't that enough for

standing, because that seems to be a pretty straightforward standing analysis to me.

MS. GONZALEZ: Again, with the due process claim, they cannot meet the redressability piece.

THE COURT: But why? They say that you have terminated the grant, and they are asking me to order that you stop the termination. And for standing, why is that not enough? Would you agree that if there was a termination, and I understand you're pushing back on that idea on the merits, but do you agree that if there is a termination that I can -- and there is an order stopping that termination, that there is traceability and redressability?

MS. GONZALEZ: No, because to stop the termination, the Court would have to order HUD to negotiate the second and third year grants with plaintiffs. It's not just flipping a switch. And so to do that, the Court would still be requiring the government to negotiate contracts with specific people under specific terms. And again, I understand the Court doesn't want to get into the merits.

THE COURT: I know, but we're -- I'm just talking about standing. Do I have jurisdiction to hear this claim? Should I get to the merits at all? That's all I'm talking about.

MS. GONZALEZ: No, I still think plaintiffs cannot meet the redressability piece, even for due process because --

THE COURT: Your redressability arguments are there is no redressability because the relief they are seeking is not relief you think I can order? That's your redressability argument?

MS. GONZALEZ: In part, yes.

THE COURT: What's the other part?

MS. GONZALEZ: That to order the government to contract or to stop this termination or the suspension would be the only thing the Court could do is to order the government --

THE COURT: You said -- I'm just -- your redressability argument is the relief they have alleged in their complaint that they want that would address this injury is not relief I can order. That's your argument?

MS. GONZALEZ: In part, because --

THE COURT: What's the other part? Because the other part you were just talking about is exactly the same, it's that I don't think -- the relief I would have to order in order to redress that injury is not relief I can order.

MS. GONZALEZ: I apologize if I misstated that. The relief that the Court could order is that HUD negotiate the second and third year grants as required by law, which the only legal requirement is that HUD obligate these funds before September 30th. And that is not relief that would redress plaintiffs' claims, because negotiating them before September 30th, according to plaintiffs, is not enough, because

they want the funds -- or the obligations to happen today.

THE COURT: But again, you're focused on -- you focused on the relief you think I can order, which that's your redressability argument?

MS. GONZALEZ: Correct.

THE COURT: You said -- I'm just -- no trick questions. I do oral argument so I can make sure I'm not missing things, I can press you on the things that I'm struggling with.

And so you keep saying "in part." I want to make sure I'm not misunderstanding your argument and there is something else, because that I want to know. But I hear you saying that you think they can't meet redressability because I can't order the type of relief that they are saying they want that would redress the injury? That's your argument?

MS. GONZALEZ: Correct, because it would require negotiations of the second and third years.

THE COURT: Okay. Let's move to the new grants, and we have talked about this at the start. I will say, as I did, given what I know now, their injury sounds fairly imminent to me, given that we are five weeks from the congressional notification deadline and I hear you saying, you know, you think the congressional notification deadline doesn't bind HUD all the way, but we're now five weeks from that deadline and we are about a little over two months away from the September 30

deadline. You are scrapping all of the NOFOs from September '24. You have not issued the new NOFOs. You don't know when those will be issued, apart from saying they will be issued imminently. You're saying that HUD plans to leave them open for 30 days, even though they have the discretion to reduce that time period in exigent circumstances.

HUD has to convene a panel, review all those applications, make decisions, get approvals. Sitting here today, I don't see how that gets done in the time that's left. And I have asked you to file something in the morning. Now I forget. I don't know if I said noon. Did I say noon? Yes, 24 hours, by noon telling me what your plan is.

In the absence of that, sitting here, I don't think you can get that done, and I think that presents a pretty imminent injury to me for the bucket of new grants.

So assuming I find standing, I want to talk through the separation of powers claim on the merits. So just to clarify, I don't see any argument from you that the statutory mandate here is unconstitutional; is that right?

MS. GONZALEZ: Correct.

THE COURT: Good. So why wouldn't it violate separation of powers to not make the awards by the deadline that Congress set? Or maybe you're not saying that.

Is it your position that HUD can ignore the September 30 deadline?

MS. GONZALEZ: It's not. The argument that we have made in this case is that there hasn't been an impoundment and that plaintiffs don't have standing to assert a generalized prospective claim that the government may file --

THE COURT: Assuming I'm past standing and I think that based on this record the injury is imminent because HUD cannot meet the deadline right now, based on everything I know, what's your merits argument?

Because I think if you don't contest the constitutionality of the statute and you concede that HUD can't violate the statute, and I don't think you can meet the statutory deadline, then what's left?

MS. GONZALEZ: For the constitutional claims?

THE COURT: On a TRO, I don't need to decide the merits of every claim. If I find the plaintiffs can win on one of them, that's enough to grant a TRO. Again, as you have all seen, I don't hide my cards at argument. I'm pretty focused on the separation of powers claim, which seems like the most straightforward one to me.

Tell me, if I find standing, why isn't it really clear that they are likely to succeed on the merits of that claim?

MS. GONZALEZ: Because the Court does not have subject matter jurisdiction over the separation of powers claim. Our position has been that plaintiffs -- this generalized claim about a potential --

THE COURT: We're past standing. If I find standing and I reject your ripeness argument on the merits, like on the merits, what's your argument?

MS. GONZALEZ: I push back a little bit and say that even on this record it is only Congress who can sue the executive under the --

THE COURT: So you think -- expand on that.

MS. GONZALEZ: The only proper plaintiff for this separation of powers claim would be Congress, a claim by Congress under the Impoundment Control Act.

THE COURT: Okay.

MS. GONZALEZ: As to the NOFOs, I would like to push back a little bit and say that because HUD intends to issue new NOFOs, it's unclear whether plaintiffs would even qualify at this juncture under those new NOFOs. I would submit to the Court that there is no standing for those claims either.

THE COURT: Counsel, at this point, there have been no new NOFOs. NOFOs got put out in September. These plaintiffs applied. Those NOFOs have not been withdrawn.

I mean, sitting here today, you can't contest standing saying that you're going to issue new NOFOs, get rid of those old NOFOs at some point imminently.

I think, you know, your arguments on separation of powers to me seems to focus more on the threshold jurisdictional issues, because I'm having a hard time on the

merits once we get past -- and there is a reason you're sort of pressing to go back to jurisdiction, because I think that's where your true arguments are.

Tell me about your appropriations clause argument, which I don't think got a ton of time in the briefing.

MS. GONZALEZ: With all the constitutional claims, Your Honor is correct that they are largely threshold arguments and that our argument is that there has been no impoundment in this case on this record on the face of the complaint, but also on the TRO motion.

HUD has asserted that it intends to comply with the September 30th deadline and it is working to comply with that deadline. There has been no impoundment, and plaintiffs' claims to that effect are purely speculative.

THE COURT: Let's talk about your Tucker Act argument, and the government has made pretty broad arguments, both here and in similar cases. I do not read these as contract claims, and the plaintiffs are not seeking money damages. I'm not persuaded that these claims belong in the Court of Federal Claims, as some of my colleagues have also found.

Tell me why I'm wrong, if there is anything else you want to add beyond what's in your papers about that issue.

MS. GONZALEZ: Beyond what's in our papers, I would submit to the Court that at a minimum for the existing PEI grants, the only source of plaintiffs' rights and obligations

is the grant agreement. And so all of -- because plaintiffs' claims are to enforce those grant agreements and to have the government pay money under those grant agreements, those are contract claims that belong in the Court of Federal Claims.

THE COURT: Okay. So remedies, you heard me ask the plaintiffs about class cert. Putting that to the side, I want to talk about your arguments about *CASA*.

Just moving back to the two buckets. For the preexisting awards, all of the existing grantees are members of NFHA; isn't that right?

MS. GONZALEZ: Yes.

THE COURT: There is no *CASA* problem as to that group?

MS. GONZALEZ: Correct.

THE COURT: So then on the new grants, which I admit is less straightforward, but I think the plaintiffs are right, that this is like the loud music analogy in *CASA*. We have about 76 percent of the plaintiffs from that group before me.

I can't order you to process only their applications or have some separate competitive grant process just for them. I would order you, if I found for the plaintiffs, to timely process the awards by the statutory deadline, which would remedy their injury and remedy the other 24 percent or so who also happen to have applications before HUD. Why is that a problem under *CASA*?

MS. GONZALEZ: From what we have heard today from

plaintiffs, I don't believe it is. The *CASA* argument was more to address the plaintiffs' proposed order, which very broadly asked sort of that HUD process all of these grants in very specific terms and would have forced HUD to issue -- to proceed with the fiscal year 2024 NOFOs in the manner that plaintiffs wanted and the time that plaintiffs wanted, but also broadly not really tied to the plaintiffs in this case.

But hearing what we heard today, I think Your Honor is correct that *CASA* does not apply.

THE COURT: Okay, good. See, we have points of agreement.

I'm struggling a bit with you contesting that I have the authority to order that funds remain available through the pendency of this litigation if it looks like you're not going it meet the September 30 deadline.

Again, I don't hide my cards. You heard me preview that I'm not sure that we're there yet, because we have two and a little more months to go, but if we get to September, there have been no congressional notifications, you don't have a plan to get things done and I don't think these awards are going to be obligated by September 30, why can't I order the funds be held through the pendency of the litigation?

MS. GONZALEZ: So plaintiffs cite 31 U.S.C. 1502(b). Our position is that 1502(b) does not apply, because by its plain text, 1502(b) only applies when a statute calls for funds

to be -- to revert back to treasury at the end of a definite period, which is not the case here.

Here we have a lapsed statute. With lapsed cases, funds are held in the agency's treasury account for a period of five years and then they revert to treasury. Our footnote in our brief really was talking about 1502(b) and the fact that that provision doesn't apply in this case.

We recognize that there is a line of cases -- plaintiffs allude to the *Costle* case, and we just like to highlight that that case and that line of authority has been criticized, including in *Goodluck* in this circuit, as taking a freewheeling approach to the law of remedies and it is -- there is at least some criticism as to whether the Court can extend the lapse period, and our position is that it cannot.

THE COURT: So what happens to the money? If it doesn't revert to the treasury on October 1st and it stays with HUD for five years, can they obligate those funds, or is it just sitting in an account that can never be used?

MS. GONZALEZ: During that five-year period, the funds can only be utilized to satisfy obligations that arose before the lapse.

THE COURT: So the government's position is that HUD can violate the statute by missing the September 30 deadline, and I need to wait to see if that happens before I can grant relief to the plaintiffs, and, if that does happen and HUD

misses the deadline, those funds sit in a bank account, they never get used, and there is nothing a court can do to hold those funds available to ensure that the money gets spent as Congress required that it be spent.

MS. GONZALEZ: Our position is that funds must be --

THE COURT: Yes or no. Litigants like to do this a lot.

MS. GONZALEZ: Yes. Our position is that funds must be obligated before September 30th, and that after September 30th, the Court does not have authority.

COURT REPORTER: Can you slow down, please?

THE COURT: Just start over.

MS. GONZALEZ: Yes. Our position is that funds must be obligated by September 30th, and that after September 30th, the Court does not have authority to, both to extend the period, but also to require the government to satisfy financial commitments that were not obligated before September 30th.

THE COURT: But it's more than that. It's not that after September 30th, I can't do anything. It's why the plaintiffs are coming to me now.

They are coming to me now saying, hey, there is the statutory deadline that is September 30. Congress said you have to obligate these funds. It's something Congress has done for 30 years. It's the first time we are in July and nothing has happened from the agency. Court, you need to do something

now, because if we get to September 30th, there is nothing you can do. HUD can't spend that money. You can't order anything.

You are here telling me, I promise, Judge, we're going to spend that money. We don't have a plan to do it. You shouldn't do anything until we actually miss the deadline, but then once we miss the deadline, you can't do anything about it. And you can't ahead of time even order that money be held, not obligated, but held for the pendency of the litigation so that if the agency actually violates a congressional statute there is actually a remedy that can be ordered.

That's what you're saying, and that's a pretty extraordinary position, because you're asking me to believe you on the one hand and then saying, if I believe you and you actually don't meet that deadline, there is absolutely nothing I can do about it.

MS. GONZALEZ: I would submit to the Court that on this record HUD is intending to comply with the September 30th deadline. It has taken steps to do that. And certainly that is clear for the active PI grants.

We understand the Court's hesitation as to the NOFOs, and HUD is -- I mean, it's open and will comply with the Court's requirements to submit status reports to show that it is working to obligate those funds by September 30th.

THE COURT: Can I ask you one more thing. Do you think that the *Goodluck* case overruled the *Costle* line of

cases?

MS. GONZALEZ: *CASA* or *Costle*?

THE COURT: *Costle*.

MS. GONZALEZ: No, I don't think it overruled it. It just criticized it.

THE COURT: Okay. Your opposition brief says I should stay any injunctive relief for seven days to allow the SG to decide whether to appeal or seek a stay pending appeal.

If I enter a TRO in this case, say, ordering the government to comply with its statutory deadline, something you have told me you plan to do, do you view that as an appealable order that you want me to stay so you can go appeal, or was that sort of left over from other briefing at the PI stage?

MS. GONZALEZ: No, that was tailored to the specific relief that plaintiffs requested, which is that HUD immediately negotiate the existing PEI on the terms that plaintiffs wanted and the NOFOs on the terms -- like the 2024 NOFOs that were issued last year on the specific terms that plaintiffs wanted.

I mean, they submitted a pretty extensive proposed order that was pretty specific, and so our arguments were to address that.

THE COURT: Okay. All right. Thank you. That was really my last question. Is there anything else you want to say before you sit down?

MS. GONZALEZ: I would reiterate to the Court that HUD

has taken steps and is taking steps to obligate the funds for the existing multi-year PEI grants. Plaintiffs concede as much. And the only legal requirement on HUD is that it obligate funds before September 30th. HUD can do that. HUD's declaration attests, as Your Honor noted, under penalty of perjury that it is able to do that and that it is working to do that.

As to the NOFOs, again, HUD is working to issue those NOFOs, the new ones, imminently, to leave the application period open with sufficient time for plaintiffs to submit new applications, and to finalize and obligate those funds before September 30th.

We would submit to the Court that plaintiffs have not stated -- do not have standing because they don't have any imminent irreparable injury, or they don't have any concrete injury at this time, specifically with respect to the active PEI grants.

And the only piece that we did not discuss is the APA. I would like to just briefly talk about the 706(1) claim, because under 706(1), plaintiffs are required to identify discrete action that is legally required, and Your Honor spent quite a bit of time with plaintiffs discussing that. We would again reiterate that there is no legal requirement that HUD obligate funds at any point before September 30th. And plaintiffs' filings have not identified any requirement, and so

they can't state a 706(1) claim.

Under 706(2), plaintiffs have failed to state an arbitrary and capricious claim because they have not identified final agency action. In this case, all that HUD has done is taken a longer period of time to finalize the FHIP obligations, as we have explained to Your Honor, after review, not only of the new administration's policies but also the executive orders that control federal government contracting. And so on that basis, plaintiffs cannot state any APA claims.

HUD also has a lot of discretion. We have cited *Lincoln versus Vigil*, and we have emphasized to the Court that because the statute gives -- only imposes a September 30th deadline, it gives the government a lot of discretion in how it administers grants during that time.

THE COURT: Okay. On the unreasonable delay claim, you don't make any arguments about the TRAC factors. I understand your threshold arguments about the Tucker Act and *Lincoln*, but you don't -- do you concede that the TRAC factors weigh in the plaintiffs' favor, because I don't see any arguments in your papers about the TRAC factors.

MS. GONZALEZ: Our arguments for purposes of the TRO on a preliminary posture is that plaintiffs have not stated any -- or have not identified any discrete action that is legally required.

THE COURT: Okay. But so for their claim that HUD

unreasonably delayed, if I disagree with your threshold arguments under the APA, do you concede that the TRAC factors weigh in their favor?

MS. GONZALEZ: No, because, again, HUD has discretion -- I understand that Your Honor is not talking about *Lincoln*.

THE COURT: Putting *Lincoln* aside and putting the Tucker Act aside, if I reject those threshold arguments, I just don't see any -- and I get to analyzing the six factors, I don't see any arguments with respect to those factors.

MS. GONZALEZ: I agree that our briefing did not address the TRAC factors, but we would again submit to the Court that HUD has discretion in this case.

THE COURT: You go back to *Lincoln*? Again, I'm not trying to trick you. I just want to understand your argument. So you're resting your argument on *Lincoln*.

MS. GONZALEZ: Yes, on *Lincoln* and just the threshold arguments under the APA, and would just emphasize to the Court that plaintiffs are not entitled to the funds before September 30th. We understand their delay point, but there is no requirement that HUD administer these programs before September 30th, and HUD has been acting, pursuant to its discretion, has been operating under that deadline.

Because plaintiffs -- actually, the final piece is on irreparable harm. Plaintiffs have -- their briefing largely focuses on the active PEI grants. And again, that makes sense.

They don't really talk about the NOFOs because they have not been selected under those programs.

So we would submit to the Court that even for the active PEI grants they have failed to establish irreparable injury, because HUD is negotiating those programs and working with plaintiffs to finalize those obligations.

On this record, we would ask the Court that the Court deny the TRO. We understand that the Court is considering requiring status reports. We think that would adequately satisfy any concerns from plaintiff and it would give HUD the opportunity to explain its progress to the Court without imposing any requirements that exceed the statutory text and the statutory.

THE COURT: To be clear, I will wait for your filing tomorrow at noon before ruling on the TRO to give you an opportunity to convince me otherwise about the new grants and whether you can get this done by the deadline, but I think you heard me say, based on this record, I don't think you can.

And so I will wait to see what you file at noon, and give the plaintiffs a chance to respond before ruling on the TRO.

MS. GONZALEZ: Understood. Thank you, Your Honor. Again, we would reiterate that the TRO should be denied and the complaint should be dismissed on its face.

THE COURT: Thank you.

MR. COLFAX: I just wanted to touch on three or four points.

THE COURT: Before you start, can I ask you about these multi-year grants and whether you agree with what the defendant represented about what's left?

Have 56 of the 75 grants been executed and funds obligated, and are we talking about this 18?

MR. COLFAX: My understanding was that the number was 25.

THE COURT: That were yet to be negotiated and --

MR. COLFAX: That is correct. And I'll just reiterate the point that we have just heard, in the last couple of days that HUD has taken a position that those 56 previously negotiated grants are -- they are no longer considering them to actually be binding on HUD or to allow the organizations to commence and continue their work.

THE COURT: Even though counsel just said that those funds have already been obligated?

MR. COLFAX: That is the -- correct. That's the information that we have gotten from organizations being directed by their grant technical representatives and managers that --

THE COURT: Organizations who are not -- they must be NFHA members.

MR. COLFAX: They are NFHA members.

THE COURT: If that's the case, then you should file something letting me know that, and I'm going to ask HUD to respond. Or you should talk and figure out what's going on, but, you know, I have HUD saying those funds have already been obligated. It would be quite extraordinary to know here that funds that have been obligated, agreements that have been executed are being pulled back.

And so I'll ask HUD to look into that and update me on that when they file their notice tomorrow as well. And if you can talk to your clients and talk to HUD, and let me know what's going on, because that's troubling.

MR. COLFAX: We will do that.

THE COURT: Okay. Sorry, go ahead with your points.

MR. COLFAX: So I wanted to just emphasize on the continuing grants, on the active PEI grants, that essentially allowing HUD to set their process deadline in September -- as to September 30th has multiple problems.

One is the significant injury the organizations are suffering continues. There was another organization that closed this month. More are going to close in August and September. And the only thing I hear Ms. Gonzalez saying that they are committing to is meeting the September 30th deadline.

When the basis of the claim is unreasonable delay, September 30th is irrelevant to the analysis. It's not really irrelevant to the analysis. It plays into the TRAC factors,

but it is not what is most important in terms of what the organizations face today or this delay allowing the time to pass over when their current grants ended has caused significant damage.

And so that's the key date, May 30th, June 30th for NFHA, and dates that keep coming up. So I want the Court to -- I want to just articulate to the Court that this cannot just be a September 30th analysis for the active PEI grants.

And then related to that -- so that's the unreasonable delay claim. Related to that on the due process and property interest, a provision that I think is critical here that we cited in our brief, so I didn't highlight in my initial argument is 2 C.F.R. 200.339, which talks about -- this is the OMB regulation, of course -- that the federal government cannot withhold further federal funds, and in parenthesis, it says, "new awards or continuation of funding," which I believe is appropriately read as applying to a multi-year grant, as we have for the PEI organizations, that that provision creates the legal right we were talking about earlier for the continuation of funding.

So you have a grant performance period that goes from contract to contract from year to year, that's the continuation of funding that this regulation is referring to and it cannot be withheld. Yes, we spend a lot of time on the concept of termination. I used the phrase suspension, which I think is

accurate. The regulation talks about withholding of federal funds for a continuation of funding. I think that applies here, creates the property interest, and it's what HUD is violating, both under the APA for being contrary to law, as well as the due process argument that we discussed before.

Then again, related to dates, I want to emphasize the importance of the August 31st date. HUD seems to think that that date is not relevant in this situation. However, what the FHIP statute, 3616(a)(e) says, that the notice has to be given before the grants or the contracts are made.

The obligation statute, 31 U.S.C. 1501, says obligation occurs upon a written instrument, i.e., a contract in this context. So I don't see how that allows HUD to go past the August 31st deadline.

Of course, from our perspective, we want as much time and as much flexibility as possible. At the same time, we don't want HUD to blow a legally mandatory deadline that they or some third party later raises and say, hey, all of this is off, you lose the money, because you haven't met that deadline.

THE COURT: I don't understand it either, to be frank. And I heard Ms. Gonzalez saying repeatedly that HUD doesn't feel bound by that deadline. And I plan to go back and look at it again, but my understanding is that they need to notify Congress 30 days before the funds can be obligated. And so I will look at it again.

Ms. Gonzalez, if you have support for that assertion, it would be helpful, particularly if the schedule you give me tomorrow is not one that concludes on August 31, which I'm not sure how it could if you're going to leave the NOFOs open for 30 days and they haven't been issued yet, but at least preparing for today and reading this, I viewed the deadline, not for the multi-year grants, but for the new grants, as effectively being August 31, because of the congressional notification deadline.

So I will go back and look at that again and see what HUD's reason is for saying that we can ignore it.

MR. COLFAX: Then my final point, which I think maybe the Court doesn't necessarily need more argument on, but it was raised with Ms. Gonzalez and we hadn't discussed it when I was up here, is the *Lincoln v. Vigil* matter and the idea that HUD's position that this is an issue -- what we're asking HUD to do is something that is committed to HUD's discretion.

Obviously, in *Lincoln*, that was a lump sum appropriation. It was more than that. It was the funding of the Indian Health Services, and they decided we're going to use this for a national program rather than a program that focuses on the southwest. We're not here saying, HUD, fund organizations in the south versus funding organizations in the northeast, or put more money in EOI grants as opposed to PEI grants. We're saying follow the requirements that are clearly

articulated in the Fair Housing Act and the regulations. *Lincoln v. Vigil* just simply has no application.

Those were points, but I primarily want to emphasize that for the active PEI grants, we can't allow, under the pain of losing more organizations, just for HUD to trundle along until September 30th with whatever process is happening that is simply not being revealed to us or to the Court.

THE COURT: Do you -- NFHA, your clients, have done this for a long time. I asked HUD this at the beginning. Has this type of delay happened in the past? Is this the first time it's happened? Has it happened from time to time?

I assume it hasn't happened regularly. And HUD conceded that it's taken longer this time. But are you aware of any other instance where we're at July, the end of July, and HUD is where it is in its processing because there has been a change of administration?

MR. COLFAX: No, have not seen that. In fact, I've seen the opposite with the change of administrations. This process has gone smoothly, and the vast majority of the organizations before the Court or who are before Court as NFHA members have relied for literally decades at this point, 30-plus years, on this continued funding, and that's what has allowed them to operate, and this is the first time where they have had this sort of gap created by HUD that threatens their very existence.

THE COURT: Okay. Thank you.

I have a motion from the Lawyers' Committee for Civil Rights Under the Law and Fred Freiberg for leave to file an amicus brief supporting the plaintiffs' motion for a TRO. I will grant that motion.

I will wait to hear from HUD by tomorrow at noon.

MS. GONZALEZ: If I may, just one more point briefly in response to what plaintiff just said.

THE COURT: Sure.

MS. GONZALEZ: Plaintiffs point to 2 C.F.R. 200.339. That C.F.R. is not applicable in this case because HUD has not suspended or withheld funds. It's been our position that HUD has just taken longer to administer these particular FHIP awards.

And as to the congressional reporting requirement, I would direct the Court to ECF 16, which is our reply in support of the motion to dismiss. Footnote 1 at page 3, we describe or we compare the congressional reporting requirement in this case with other congressional reporting requirements and in other statutes to show that the one in this case does not impose a condition on obligation, it's just a requirement; whereas in other statutes, the reporting requirement, by its plain text, expressly requires the reporting as a condition to obligation.

THE COURT: Has HUD ever missed the congressional notification deadline and gone on to obligate funds, or is this

a new position HUD is taking?

MS. GONZALEZ: I have not looked into that, and I don't believe so.

THE COURT: So HUD has never missed that deadline? This is the first time it's now taking the position that it can disregard the congressional notification?

MS. GONZALEZ: Not to my knowledge.

THE COURT: Will you find out? And if it has missed it in the past, let me know in your filing tomorrow. Thank you.

Ms. Gonzalez, I think you have heard today, I'm pretty troubled by the government's position that there is a statute that you concede is constitutional, you agree if you miss the deadline you're going to violate that statute. You are telling me you're going to meet it, and I should trust you, and if you end up not meeting it, there is nothing I can do about it, and this money sits in an account that no one can use.

It's not unusual in these times for the government to take extraordinary positions, but it is another example of a pretty extraordinary position that you're taking, and you're doing that without giving me any concrete plan that you're going to get this done, and it's against the backdrop that it is the very first time in over 30 years that this agency is acting in this way, which all is very troubling.

So I will wait for your noon filing tomorrow. If

there is anything you want to add in that filing to address or alleviate my concerns, please do so.

I will note that your declaration does not swear under penalty of perjury that you are actually going to meet that deadline, and I'm hearing now that you don't actually think you're bound by the earlier deadline, and if we're all wrong about that, then all of the funds that get obligated on September 30 could be challenged.

So there are a lot of question marks in this case, and I am hopeful that your filing tomorrow will answer some of those questions and alleviate some of those concerns. And I will wait to see that before I rule on the current TRO.

MS. GONZALEZ: Understood.

THE COURT: Thank you.

And Mr. Colfax, you can respond to that filing by the end of the day tomorrow. The quicker the better. I assume you want me to rule on your motion as quickly as I can, so I will wait for a response so that you have a chance to respond.

MR. COLFAX: Thank you.

THE COURT: Anything else from either side?

Thank you both very much for being here and for putting up with all of my questions and answering them. You both did a very nice job and were very responsive, which is not always the case, so thank you both.

(Proceedings concluded at 11:54 a.m.)

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 24th day of July, 2025.

/s/ Sonja L. Reeves
SONJA L. REEVES, RDR-CRR
FEDERAL OFFICIAL COURT REPORTER

## $

**$86** [1] - 3:20

## '

**'24** [2] - 37:10, 49:2

## /

**/s** [1] - 72:8

## 1

**1** [2] - 20:19, 69:17
**1044** [1] - 21:19
**1044s** [1] - 33:3
**10:00** [2] - 1:12, 2:1
**1100** [1] - 1:18
**11:54** [2] - 1:12, 71:25
**1225** [1] - 1:15
**125** [1] - 17:3
**125.401** [3] - 17:6, 18:3, 19:1
**15** [1] - 13:20
**1501** [1] - 66:11
**1502(b** [3] - 54:24, 54:25, 55:6
**1502(b)** [1] - 54:23
**16** [2] - 32:20, 69:16
**18** [9] - 33:10, 33:11, 33:19, 34:7, 34:11, 34:12, 34:23, 63:7
**19** [3] - 33:8, 34:10
**1992** [1] - 31:18
**19th** [1] - 1:15
**1:25-cv-01965-SLS** [1] - 1:5
**1st** [2] - 18:12, 55:16

## 2

**2** [2] - 65:13, 69:10
**200.339** [2] - 65:13, 69:10
**20001** [1] - 1:24
**20005** [1] - 1:19
**20036** [1] - 1:16
**2024** [6] - 24:19, 25:1, 27:22, 37:6, 54:5, 58:17
**2025** [6] - 1:11, 3:21, 3:23, 32:15, 44:3, 72:6
**23** [1] - 27:12
**24** [5] - 1:11, 36:16, 43:21, 49:12, 53:22
**24th** [2] - 25:7, 72:6
**25** [2] - 27:12, 63:9
**25-1965** [1] - 2:3

## 3

**3** [1] - 69:17
**30** [49] - 2:17, 3:13, 3:21, 5:12, 5:16, 7:6, 7:10, 7:18, 7:20, 7:24, 11:3, 15:11, 15:20, 18:13, 20:7, 21:9, 22:17, 22:19, 24:8, 26:10, 26:15, 28:16, 28:20, 31:12, 34:24, 36:2, 36:9, 37:25, 38:8, 38:13, 38:22, 39:9, 40:4, 41:2, 41:9, 44:3, 44:9, 48:25, 49:5, 49:25, 54:15, 54:21, 55:23, 56:22, 56:24, 66:24, 67:5, 70:23, 71:8
**30-day** [1] - 38:6
**30-plus** [1] - 68:22
**30th** [51] - 3:15, 6:1, 11:10, 11:16, 13:10, 13:14, 14:5, 14:13, 16:6, 20:18, 22:7, 25:19, 25:23, 29:2, 29:9, 29:10, 32:3, 34:17, 35:11, 38:19, 39:1, 40:14, 41:4, 42:16, 44:22, 45:16, 47:23, 47:25, 52:12, 56:9, 56:10, 56:14, 56:17, 56:19, 57:1, 57:17, 57:23, 59:4, 59:12, 59:24, 60:12, 61:19, 61:21, 64:17, 64:22, 64:24, 65:5, 65:8, 68:6
**31** [12] - 24:7, 28:13, 36:11, 38:5, 39:8, 39:10, 40:5, 40:9, 54:23, 66:11, 67:3, 67:8
**31st** [8] - 3:16, 3:23, 36:7, 38:24, 39:14, 40:13, 66:7, 66:14
**333** [1] - 1:24
**3528** [1] - 1:18
**3616(a)(e** [1] - 66:9

## 4

**401** [2] - 17:3, 17:5

## 5

**56** [8] - 33:6, 33:23, 34:2, 34:5, 34:8, 63:6, 63:13
**5th** [1] - 40:23

## 6

**600** [1] - 1:15

## 7

**706(1** [11] - 8:19, 11:11, 12:18, 16:16, 17:24, 18:21, 19:8, 45:9, 59:19, 59:20, 60:1
**706(1)** [1] - 12:11
**706(2** [2] - 18:21, 60:2
**7062** [2] - 8:24, 9:4
**718** [1] - 21:18
**718s** [1] - 33:2
**75** [3] - 33:6, 34:5, 63:6
**76** [2] - 27:22, 53:17
**77** [1] - 27:18

## A

**a.m** [4] - 1:12, 2:1, 71:25
**able** [5] - 10:23, 24:17, 25:21, 26:14, 59:6
**above-entitled** [1] - 72:4
**absence** [1] - 49:13
**absent** [4] - 19:11, 19:17, 21:13, 23:6
**absolute** [1] - 35:25
**absolutely** [1] - 57:14
**accepting** [1] - 24:5
**according** [1] - 47:25
**account** [5] - 40:7, 55:4, 55:18, 56:1, 70:17
**accurate** [2] - 66:1, 72:3
**Act** [8] - 2:16, 2:23, 14:21, 51:10, 52:15, 60:17, 61:7, 68:1
**act** [4] - 18:10, 18:22, 19:8, 43:22
**acting** [2] - 61:21, 70:24
**action** [20] - 4:6, 9:6, 10:20, 11:11, 11:22, 13:18, 16:18, 18:1, 18:2, 18:11, 18:12, 18:22, 19:14, 26:23, 27:7, 27:13, 28:5, 59:21, 60:4, 60:23
**actions** [1] - 16:11
**active** [8] - 3:25, 57:19, 59:16, 61:25, 62:4, 64:15, 65:8, 68:4
**activities** [1] - 23:13
**activity** [2] - 9:10, 15:10
**acts** [1] - 11:10
**add** [3] - 30:17, 52:22, 71:1
**additional** [1] - 29:13
**address** [5] - 47:12, 54:2, 58:21, 61:11, 71:1
**adequately** [1] - 62:9
**administer** [3] - 32:15, 61:20, 69:13
**administering** [2] - 4:5, 31:18
**administers** [1] - 60:14
**administration** [10] - 12:23, 13:14, 13:25, 15:7, 31:19, 31:21, 32:13, 32:17, 36:20, 68:16
**administration's** [2] - 12:15, 60:7
**administrations** [2] - 32:1, 68:18
**admit** [1] - 53:14
**admitted** [1] - 31:23
**admittedly** [1] - 13:4
**advance** [3] - 15:15, 24:7, 34:17
**advanced** [1] - 24:22
**afterwards** [1] - 35:19
**agency** [14] - 9:6, 12:16, 12:23, 16:18, 17:25, 18:1, 18:22, 19:23, 22:15, 41:14, 56:25, 57:9, 60:4, 70:23
**agency's** [1] - 55:4
**ago** [1] - 37:16
**agree** [9] - 2:21, 3:1, 8:5, 19:20, 46:8, 46:10, 61:10, 63:4, 70:13
**agreement** [9] - 3:14, 20:14, 20:17, 20:19, 20:21, 21:6, 34:1, 53:1, 54:11
**agreements** [12] - 21:20, 33:7, 33:13, 33:20, 33:23, 34:14, 35:3, 36:5, 45:15, 53:2, 53:3, 64:6
**ahead** [2] - 57:7, 64:13
**air** [1] - 30:18
**al** [3] - 1:3, 1:7, 2:3
**align** [5] - 12:14, 13:16, 14:2, 15:8, 37:2
**aligning** [2] - 14:19, 15:1
**allege** [3] - 4:4, 5:10, 16:17
**alleged** [1] - 47:11
**alleging** [1] - 19:7
**alleviate** [2] - 71:2, 71:11
**ALLIANCE** [1] - 1:3
**Alliance** [2] - 2:3, 3:25
**allow** [7] - 18:17, 22:10, 23:7, 42:19, 58:7, 63:15, 68:4
**allowed** [2] - 23:10, 68:23
**allowing** [3] - 16:11, 64:16, 65:2
**allows** [1] - 66:13
**allude** [1] - 55:9
**amicus** [1] - 69:4
**amount** [2] - 14:24, 15:2
**analogy** [1] - 53:16
**analysis** [6] - 4:22, 44:15, 46:2, 64:24, 64:25, 65:8
**analyzing** [1] - 61:8
**AND** [1] - 1:7
**anew** [1] - 26:19
**announcements** [1] - 26:18
**annual** [4] - 17:7, 17:8, 17:18
**answer** [4] - 4:15, 28:12, 43:4, 71:10
**answering** [1] - 71:22
**anticipates** [1] - 34:16
**APA** [13] - 8:2, 8:18, 11:8, 12:9, 12:10, 16:19, 44:1, 44:2, 59:18, 60:9, 61:2, 61:17, 66:4
**apart** [1] - 49:3
**apologize** [1] - 47:19
**appeal** [3] - 58:8, 58:12
**appealable** [1] - 58:11
**appealed** [1] - 28:9
**appear** [1] - 17:2

**applicable** [1] - 69:11
**applicants** [4] - 3:11, 29:13, 37:25, 38:2
**application** [4] - 38:18, 41:11, 59:9, 68:2
**applications** [19] - 3:9, 9:9, 15:19, 24:20, 25:3, 25:8, 26:14, 27:19, 27:23, 31:23, 38:1, 38:15, 38:17, 38:21, 49:8, 53:18, 53:23, 59:11
**applied** [3] - 4:1, 28:3, 51:19
**applies** [2] - 54:25, 66:2
**apply** [3] - 54:9, 54:24, 55:7
**applying** [1] - 65:17
**approach** [2] - 2:5, 55:12
**appropriate** [1] - 11:3
**appropriated** [5] - 2:17, 3:2, 3:20, 4:4, 21:5
**appropriately** [1] - 65:17
**appropriation** [2] - 19:12, 67:19
**appropriations** [10] - 6:25, 7:4, 8:1, 8:4, 17:8, 17:19, 19:17, 23:6, 52:4
**approval** [3] - 3:12, 25:4, 38:3
**approvals** [1] - 49:8
**approve** [1] - 38:22
**approved** [4] - 21:15, 32:25, 37:24, 42:22
**arbitrary** [2] - 9:6, 60:3
**argue** [2] - 18:5, 43:7
**argued** [1] - 43:8
**argument** [27] - 4:10, 8:12, 19:19, 19:23, 47:4, 47:11, 47:13, 48:4, 48:7, 48:11, 48:15, 49:18, 50:1, 50:8, 50:17, 51:2, 51:3, 52:4, 52:8, 52:15, 54:1, 61:14, 61:15, 65:13, 66:5, 67:13
**arguments** [17] - 26:25, 27:2, 47:1, 51:23, 52:3, 52:7, 52:16, 53:7, 58:20, 60:16, 60:17, 60:20, 60:21, 61:2, 61:7, 61:9, 61:17
**arose** [1] - 55:20
**articulate** [2] - 21:3, 65:7
**articulated** [3] - 9:14, 15:1, 68:1
**articulating** [1] - 11:25
**aside** [2] - 61:6, 61:7
**assert** [2] - 21:20, 50:3
**asserted** [1] - 52:11
**assertion** [2] - 9:13, 67:1
**assessed** [1] - 6:13
**assistance** [1] - 24:19
**assume** [6] - 40:19, 42:12, 42:25, 43:9, 68:12, 71:16
**assuming** [4] - 7:8, 27:21, 49:16, 50:5
**assure** [1] - 4:17
**assuring** [1] - 43:2
**attempting** [1] - 35:9
**attests** [1] - 59:5
**August** [22] - 3:16, 3:23, 24:7, 26:18, 28:13, 36:7, 36:11, 38:5, 38:24, 39:5, 39:8, 39:10, 39:14, 40:5, 40:9, 40:12, 40:23, 64:20, 66:7, 66:14, 67:3, 67:8
**authority** [9] - 8:25, 11:1, 28:18, 29:25, 32:2, 54:13, 55:10, 56:10, 56:15
**available** [12] - 3:14, 3:17, 16:24, 19:10, 19:16, 20:13, 20:25, 25:19, 29:6, 41:2, 54:13, 56:3
**Avenue** [1] - 1:24
**avenue** [1] - 38:14
**avoid** [1] - 16:25
**award** [2] - 20:24, 36:14
**awarded** [3] - 3:15, 3:21, 7:24
**awarding** [1] - 4:4
**awards** [15] - 3:12, 5:6, 15:1, 19:24, 24:8, 28:12, 33:16, 33:25, 36:4, 49:22, 53:9, 53:21, 54:20, 65:16, 69:14
**aware** [3] - 5:24, 31:25, 68:13

## B

**backdrop** [1] - 70:22
**bank** [1] - 56:1
**based** [11] - 24:12, 30:15, 32:6, 35:1, 36:10, 36:14, 41:17, 42:7, 50:6, 50:7, 62:18
**bases** [2] - 17:9, 17:21
**basis** [9] - 9:12, 17:11, 21:2, 23:8, 23:21, 36:4, 38:19, 60:9, 64:23
**bear** [1] - 4:15
**BEFORE** [1] - 1:11
**begin** [2] - 33:12, 33:20
**beginning** [1] - 68:9
**begun** [4] - 26:21, 33:12, 33:15, 33:19
**behalf** [2] - 2:11, 4:6
**belong** [2] - 52:19, 53:4
**benefit** [1] - 28:4
**better** [2] - 8:12, 71:16
**beyond** [2] - 52:22, 52:23
**bind** [1] - 48:23
**binding** [1] - 63:15
**bit** [13] - 4:9, 4:22, 5:6, 19:22, 19:23, 27:18, 42:23, 43:17, 45:6, 51:4, 51:13, 54:12, 59:22
**bleeding** [1] - 10:25
**blow** [1] - 66:17
**blown** [1] - 15:3
**books** [1] - 35:15
**bound** [2] - 66:22, 71:6
**box** [1] - 10:1
**brief** [6] - 7:1, 26:25, 55:6, 58:6, 65:12, 69:4
**briefing** [11] - 6:10, 28:23, 32:14, 32:18, 36:1, 44:5, 44:6, 52:5, 58:13, 61:10, 61:24
**briefly** [2] - 59:19, 69:7
**broad** [3] - 30:5, 30:11, 52:16
**broadly** [2] - 54:2, 54:6
**bucket** [7] - 8:9, 12:7, 32:23, 32:25, 35:25, 36:13, 49:15
**buckets** [7] - 4:21, 4:23, 6:12, 32:22, 32:23, 43:24, 53:8
**budget** [1] - 23:7
**budgets** [2] - 6:4, 13:22
**business** [1] - 43:18
**BY** [2] - 1:15, 1:18

## C

**C.F.R** [5] - 17:3, 38:7, 65:13, 69:10, 69:11
**cannot** [12] - 14:14, 19:13, 22:15, 40:10, 46:4, 46:24, 50:7, 55:14, 60:9, 65:7, 65:14, 65:23
**capricious** [2] - 9:6, 60:3
**cards** [2] - 50:17, 54:16
**CASA** [8] - 27:3, 53:7, 53:12, 53:16, 53:24, 54:1, 54:9, 58:2
**Case** [1] - 2:3
**CASE** [1] - 1:5
**case** [27] - 4:11, 12:11, 19:4, 23:12, 33:10, 34:3, 34:9, 34:11, 38:12, 45:13, 50:2, 52:9, 54:7, 55:2, 55:7, 55:9, 55:10, 57:25, 58:9, 60:4, 61:12, 64:1, 69:11, 69:18, 69:20, 71:9, 71:24
**cases** [6] - 13:4, 28:9, 52:17, 55:3, 55:8, 58:1
**caused** [1] - 65:3
**causing** [1] - 6:4
**cert** [3] - 27:9, 27:15, 53:6
**certain** [4] - 2:15, 3:3, 3:7, 20:22
**certainly** [4] - 16:6, 25:12, 34:17, 57:18
**CERTIFICATE** [1] - 72:1
**certification** [4] - 26:24, 26:25, 27:6, 27:10
**Certified** [1] - 1:23
**certify** [1] - 72:3
**challenge** [2] - 35:5, 36:18
**challenged** [1] - 71:8
**challenging** [1] - 25:18
**chance** [4] - 30:10, 31:7, 62:20, 71:18
**change** [6] - 13:14, 30:23, 31:20, 32:13, 68:16, 68:18
**changed** [1] - 14:1
**changes** [1] - 31:19
**choice** [1] - 25:23
**circuit** [1] - 55:11
**circumstance** [1] - 41:1
**circumstances** [5] - 26:12, 38:10, 38:12, 39:12, 49:6
**cite** [2] - 16:22, 54:23
**cited** [5] - 12:11, 13:4, 25:20, 60:10, 65:12
**Civil** [2] - 2:3, 69:2
**claim** [33] - 4:2, 6:13, 7:5, 9:4, 11:11, 11:13, 12:12, 16:16, 17:24, 18:10, 19:8, 44:1, 45:9, 45:10, 46:3, 46:21, 49:17, 50:4, 50:15, 50:18, 50:21, 50:23, 50:24, 51:9, 59:19, 60:1, 60:3, 60:15, 60:25, 64:23, 65:10
**claiming** [2] - 6:12, 8:7
**Claims** [2] - 52:20, 53:4
**claims** [22] - 4:20, 4:21, 5:7, 6:23, 8:2, 11:8, 11:9, 12:5, 12:9, 44:2, 47:24, 50:13, 51:16, 52:6, 52:14, 52:17, 52:19, 53:2, 53:4, 60:9
**clarify** [2] - 33:5, 49:18
**class** [12] - 4:6, 26:23, 26:24, 27:6, 27:7, 27:9, 27:10, 27:13, 27:15, 28:5, 53:6
**clause** [3] - 6:25, 7:4, 52:4
**clear** [9] - 2:22, 34:20, 35:25, 37:4, 37:9, 39:18, 50:20, 57:19, 62:14
**clearance** [3] - 26:4, 37:17, 37:18

**clearly** [2] - 35:19, 67:25
**CLERK** [1] - 2:2
**client** [5] - 33:18, 37:19, 38:25, 41:22, 42:10
**clients** [4] - 9:20, 33:15, 64:10, 68:8
**clock** [1] - 30:13
**close** [4] - 6:2, 6:5, 43:18, 64:20
**closed** [1] - 64:20
**closer** [3] - 14:6, 28:19
**closes** [2] - 38:18, 41:11
**Colfax** [6] - 1:14, 2:7, 4:19, 35:22, 43:25, 71:15
**COLFAX** [49] - 1:15, 2:7, 5:20, 6:19, 7:13, 8:1, 8:8, 8:17, 8:23, 9:5, 9:12, 10:5, 10:7, 11:8, 11:20, 12:8, 12:18, 13:6, 15:24, 17:2, 17:13, 18:4, 18:16, 19:9, 20:10, 20:21, 21:25, 22:12, 23:1, 24:14, 25:10, 26:8, 26:11, 27:10, 27:17, 27:25, 28:22, 30:17, 31:8, 63:1, 63:8, 63:11, 63:19, 63:25, 64:12, 64:14, 67:12, 68:17, 71:19
**collapses** [1] - 44:6
**colleagues** [1] - 52:20
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 72:3
**coming** [7] - 6:2, 14:1, 14:13, 27:8, 56:20, 56:21, 65:6
**commence** [1] - 63:16
**commitment** [1] - 21:19
**commitments** [2] - 39:8, 56:17
**commits** [1] - 3:12
**committed** [2] - 41:14, 67:17
**Committee** [1] - 69:2
**committing** [1] - 64:22
**compare** [1] - 69:18
**competitive** [1] - 53:19
**complaining** [1] - 45:1
**complaint** [8] - 4:6, 26:23, 27:8, 28:15, 33:5, 47:12, 52:9, 62:24
**complete** [4] - 14:25, 21:21, 35:12, 39:18
**completed** [6] - 10:12, 11:21, 12:3, 24:21, 34:16, 39:20
**completely** [2] - 23:14, 24:1
**comply** [13] - 7:19, 11:7, 15:20, 36:21, 38:19, 39:1, 40:12, 40:13, 52:11, 52:12, 57:17, 57:21, 58:10
**concede** [8] - 32:17, 45:8, 45:10, 50:10, 59:2, 60:18, 61:2, 70:13
**conceded** [1] - 68:13
**concedes** [1] - 32:14
**concept** [1] - 65:24
**concerns** [3] - 62:10, 71:2, 71:11
**concluded** [1] - 71:25
**concludes** [1] - 67:3
**concrete** [5] - 42:6, 44:11, 45:19, 59:15, 70:21
**condition** [4] - 39:16, 40:11, 69:21, 69:23
**conduct** [1] - 45:1
**confer** [3] - 42:20, 43:18, 43:19
**Conference** [1] - 72:5
**confidence** [2] - 10:18, 12:2
**conflates** [1] - 6:10
**conformance** [1] - 72:4
**confused** [1] - 35:23
**Congress** [23] - 2:17, 2:21, 3:13, 3:16, 3:20, 4:3, 5:5, 11:3, 11:7, 12:25, 13:9, 21:5, 38:5, 38:23, 39:14, 49:23, 51:5, 51:9, 51:10, 56:4, 56:22, 56:23, 66:24
**congressional** [16] - 3:22, 24:7, 36:7, 39:11, 39:15, 39:17, 48:21, 48:23, 54:19, 57:9, 67:8, 69:15, 69:18, 69:19, 69:24, 70:6
**conjunction** [1] - 13:9
**consequence** [1] - 13:24
**consequences** [4] - 14:11, 15:3, 16:10, 44:10
**considering** [3] - 9:23, 62:8, 63:14
**consistent** [1] - 13:2
**Constitution** [1] - 1:24
**constitutional** [3] - 50:13, 52:6, 70:13
**constitutionality** [1] - 50:10
**constraints** [1] - 14:20
**contain** [1] - 36:24
**contest** [2] - 50:9, 51:20
**contesting** [1] - 54:12
**context** [3] - 6:6, 16:9, 66:13
**contingent** [4] - 17:7, 17:10, 17:18, 17:21
**continuation** [4] - 65:16, 65:19, 65:22, 66:2
**continue** [5] - 13:17, 16:14, 20:13, 23:5, 63:16
**continued** [2] - 6:7, 68:22
**continues** [2] - 19:16, 64:19
**continuing** [5] - 5:20, 9:16, 21:3, 23:8, 64:15
**continuous** [2] - 13:21, 14:3
**contract** [11] - 21:2, 21:3, 22:14, 22:16, 23:20, 47:8, 52:17, 53:4, 65:22, 66:12
**contracting** [2] - 36:25, 60:8
**contracts** [7] - 9:21, 10:2, 10:9, 10:13, 10:14, 46:17, 66:10
**contradict** [1] - 37:2
**contrary** [2] - 24:1, 66:4
**Control** [1] - 51:10
**control** [3] - 35:7, 36:25, 60:8
**convene** [2] - 38:1, 49:7
**convenes** [1] - 3:10
**convince** [1] - 62:16
**convinced** [1] - 24:4
**correct** [16] - 3:5, 6:19, 6:20, 8:2, 8:17, 27:17, 27:25, 35:4, 48:5, 48:16, 49:20, 52:7, 53:13, 54:9, 63:11, 63:19
**correctly** [1] - 29:14
**Costle** [4] - 55:9, 57:25, 58:2, 58:3
**Council** [1] - 4:1
**counsel** [3] - 2:12, 51:17, 63:17
**country** [1] - 2:25
**couple** [5] - 9:20, 12:4, 26:22, 29:15, 63:12
**course** [10] - 6:2, 6:13, 14:20, 25:12, 28:2, 30:2, 30:25, 35:8, 65:14, 66:15
**court** [2] - 56:2, 56:25
**Court** [70] - 1:23, 2:1, 5:24, 7:14, 9:18, 9:25, 10:9, 10:11, 10:17, 10:20, 11:12, 11:14, 25:10, 25:17, 25:19, 27:25, 28:24, 28:25, 29:7, 29:14, 30:18, 30:25, 31:14, 35:6, 38:11, 39:2, 39:5, 40:22, 40:23, 42:15, 42:18, 42:19, 42:24, 43:17, 44:18, 45:14, 46:14, 46:16, 46:18, 47:9, 47:20, 50:22, 51:16, 52:19, 52:24, 53:4, 55:13, 56:10, 56:15, 57:16, 58:25, 59:13, 60:11, 61:12, 61:17, 62:3, 62:7, 62:8, 62:11, 65:6, 65:7, 67:13, 68:7, 68:20, 69:16, 72:2, 72:2
**COURT** [118] - 1:1, 2:9, 2:13, 6:8, 6:21, 7:16, 8:4, 8:9, 8:18, 8:24, 9:7, 10:4, 10:6, 10:25, 11:17, 12:4, 12:10, 12:20, 15:6, 16:16, 17:5, 17:15, 18:10, 18:19, 19:19, 20:16, 21:7, 22:3, 22:17, 24:3, 24:25, 26:1, 26:9, 26:22, 27:15, 27:21, 28:6, 29:15, 31:3, 31:9, 31:15, 32:4, 32:19, 33:22, 34:5, 34:12, 34:19, 35:18, 37:4, 37:9, 37:13, 37:23, 38:20, 39:7, 39:22, 40:1, 40:15, 41:5, 41:12, 41:25, 42:25, 43:20, 44:23, 45:8, 45:18, 46:5, 46:20, 47:1, 47:6, 47:10, 47:15, 48:2, 48:6, 48:18, 49:21, 50:5, 50:14, 51:1, 51:7, 51:11, 51:17, 52:15, 53:5, 53:12, 53:14, 54:10, 55:15, 55:22, 56:6, 56:11, 56:12, 56:18, 57:24, 58:3, 58:6, 58:22, 60:15, 60:25, 61:6, 61:13, 62:14, 62:25, 63:3, 63:10, 63:17, 63:23, 64:1, 64:13, 66:20, 68:8, 69:1, 69:9, 69:24, 70:4, 70:8, 71:14, 71:20, 72:9
**Court's** [4] - 25:20, 42:17, 57:20, 57:22
**cover** [3] - 31:6, 31:8, 34:19
**covers** [2] - 20:14, 20:23
**create** [1] - 11:9
**created** [2] - 16:5, 68:24
**creates** [3] - 20:24, 65:18, 66:3
**creating** [2] - 14:12, 22:13
**critical** [3] - 25:16, 29:11, 65:11
**criticism** [1] - 55:13
**criticized** [2] - 55:11, 58:5
**CRR** [1] - 72:8
**crux** [1] - 17:15
**current** [12] - 3:19, 5:12, 6:16, 7:7, 12:14, 13:2, 44:3, 44:8, 44:9, 44:12, 65:3, 71:12
**cycles** [1] - 24:13

## D

**damage** [1] - 65:4
**damages** [1] - 52:18
**Dane** [1] - 1:14
**date** [13] - 3:9, 14:5, 14:13, 14:14, 20:22, 25:12, 30:24, 37:21,

65:5, 66:7, 66:8
**dated** [1] - 32:19
**Dated** [1] - 72:6
**dates** [11] - 5:25, 14:1, 14:12, 16:1, 16:8, 16:11, 30:21, 31:4, 35:14, 65:6, 66:6
**days** [15] - 3:13, 9:20, 26:10, 26:15, 37:25, 38:8, 38:14, 38:22, 41:2, 41:9, 49:5, 58:7, 63:12, 66:24, 67:5
**DC** [4] - 1:12, 1:16, 1:19, 1:24
**dead** [1] - 14:14
**deadline** [100] - 5:5, 5:12, 5:17, 6:15, 7:10, 7:18, 7:20, 7:25, 11:2, 11:7, 11:10, 11:13, 11:15, 13:10, 13:14, 15:11, 15:15, 15:20, 19:25, 21:9, 22:10, 22:19, 24:7, 25:23, 28:13, 28:16, 28:20, 28:24, 29:18, 29:19, 29:21, 30:6, 30:8, 32:3, 34:17, 34:18, 36:2, 36:7, 36:9, 36:11, 38:19, 39:2, 39:9, 39:11, 39:16, 39:17, 39:18, 39:19, 39:23, 40:3, 40:4, 40:5, 40:9, 40:13, 40:14, 40:17, 42:16, 42:18, 43:2, 43:9, 43:12, 44:9, 48:22, 48:23, 48:24, 49:1, 49:22, 49:25, 50:7, 50:12, 52:12, 52:13, 53:21, 54:15, 55:23, 56:1, 56:22, 57:5, 57:6, 57:14, 57:18, 58:10, 60:13, 61:22, 62:17, 64:16, 64:22, 66:14, 66:17, 66:19, 66:22, 67:6, 67:9, 69:25, 70:4, 70:14, 71:5, 71:6
**deadlines** [18] - 10:21, 11:1, 11:5, 11:6, 11:9, 21:8, 24:17, 25:11, 29:16, 30:19, 35:24, 40:19, 40:20, 41:14, 41:21, 42:13, 43:10
**dealing** [1] - 29:17
**decades** [1] - 68:21
**decide** [3] - 28:17, 50:14, 58:8
**decided** [2] - 38:13, 67:20
**decision** [4] - 8:25, 12:16, 37:14, 42:21
**decisions** [2] - 12:14, 49:8
**declaration** [13] - 9:1, 10:16, 11:19, 15:14, 15:25, 21:12, 24:23, 26:3, 30:2, 30:20, 32:19, 59:5, 71:3
**declarations** [1] - 21:13
**dedicated** [1] - 2:23
**defend** [1] - 15:22
**defendant** [1] - 63:5
**defendants** [3] - 2:11, 19:3, 42:23
**Defendants** [1] - 1:8
**DEFENDANTS** [1] - 1:17
**definite** [1] - 55:1
**delay** [20] - 8:21, 8:22, 11:13, 12:14, 12:16, 12:19, 14:17, 15:5, 16:15, 44:13, 44:15, 45:1, 45:2, 45:4, 60:15, 61:19, 64:23, 65:2, 65:10, 68:10
**delayed** [2] - 11:12, 61:1
**delays** [1] - 5:3
**denied** [1] - 62:23
**deny** [1] - 62:8
**Department** [3] - 1:17, 2:4, 2:10
**DEPARTMENT** [1] - 1:6
**DEPUTY** [1] - 2:2
**describe** [1] - 69:17
**despite** [1] - 11:18
**detail** [1] - 9:16
**determine** [1] - 12:19
**determined** [1] - 41:10
**developed** [1] - 2:22
**DEVELOPMENT** [1] - 1:7
**Development** [1] - 2:4
**deviation** [1] - 5:2
**different** [6] - 4:23, 5:24, 8:3, 12:24, 29:7, 40:1
**difficult** [2] - 4:11, 45:6
**Diplomate** [1] - 1:22
**direct** [1] - 69:16
**directed** [1] - 63:21
**disagree** [2] - 21:23, 61:1
**disagreement** [1] - 16:23
**disagrees** [1] - 28:19
**discrete** [6] - 16:18, 17:6, 18:1, 18:22, 59:21, 60:23
**discretion** [10] - 11:5, 29:18, 41:14, 49:5, 60:10, 60:13, 61:4, 61:12, 61:22, 67:17
**discrimination** [1] - 2:24
**discuss** [1] - 59:18
**discussed** [2] - 66:5, 67:14
**discussing** [3] - 34:11, 35:16, 59:22
**discussion** [1] - 35:22
**dismiss** [1] - 69:17
**dismissed** [1] - 62:24
**dispute** [1] - 35:2
**disregard** [1] - 70:6
**distribute** [1] - 3:2
**distributed** [1] - 2:19
**District** [2] - 72:2
**DISTRICT** [3] - 1:1, 1:1, 1:11
**divorce** [1] - 23:16
**DOJ** [2] - 25:22, 25:24
**done** [43] - 9:9, 13:15, 15:12, 15:22, 16:5, 17:14, 20:6, 20:15, 21:24, 23:12, 24:7, 25:2, 25:7, 26:15, 29:3, 29:8, 29:10, 29:14, 30:15, 31:12, 32:11, 33:4, 33:25, 34:25, 35:6, 38:4, 39:14, 41:6, 41:16, 41:18, 41:21, 42:6, 42:8, 42:11, 42:14, 49:9, 49:14, 54:20, 56:23, 60:4, 62:17, 68:8, 70:22
**double** [1] - 18:16
**down** [2] - 56:11, 58:24
**drafted** [3] - 26:4, 36:15, 37:15
**drop** [1] - 14:14
**drop-dead** [1] - 14:14
**due** [13] - 8:2, 8:11, 11:9, 11:13, 12:9, 18:20, 19:20, 44:1, 45:18, 46:3, 46:25, 65:10, 66:5
**during** [6] - 4:9, 22:15, 23:5, 38:15, 55:19, 60:14
**duties** [1] - 21:6

## E

**early** [1] - 39:5
**earnest** [1] - 15:19
**easy** [1] - 31:10
**ECF** [1] - 69:16
**effect** [2] - 28:4, 52:14
**effectively** [6] - 17:14, 18:5, 19:14, 20:4, 67:8
**efforts** [1] - 14:10
**either** [7] - 13:5, 19:1, 40:3, 40:5, 51:16, 66:20, 71:20
**email** [1] - 33:14
**emergency** [1] - 27:8
**emphasize** [4] - 61:17, 64:14, 66:6, 68:3
**emphasized** [1] - 60:11
**end** [11] - 11:15, 14:12, 21:17, 21:21, 26:18, 31:14, 33:2, 55:1, 68:14, 70:16, 71:16
**ended** [5] - 5:22, 16:5, 16:8, 20:5, 65:3
**enforce** [1] - 53:2
**enforcement** [1] - 2:23
**engage** [1] - 35:8
**engaging** [1] - 35:9
**ensure** [10] - 2:22, 10:22, 13:21, 14:3, 19:16, 29:6, 36:21, 37:1, 38:17, 56:3
**enter** [4] - 28:19, 30:4, 30:5, 58:9
**entering** [1] - 3:14
**entire** [1] - 23:8
**entirety** [2] - 20:23, 23:6
**entities** [1] - 27:23
**entitled** [2] - 61:18, 72:4
**EOI** [1] - 67:24
**equitable** [2] - 25:21, 29:9
**essentially** [3] - 11:9, 16:10, 64:15
**establish** [1] - 62:4
**et** [3] - 1:3, 1:7, 2:3
**evaluate** [3] - 3:10, 25:3, 38:2
**evaluating** [1] - 25:8
**evaluation** [1] - 31:21
**evidence** [5] - 6:6, 9:19, 14:16, 16:15, 21:14
**exactly** [3] - 21:14, 28:22, 47:16
**example** [2] - 18:13, 70:19
**exceed** [1] - 62:12
**exception** [2] - 27:14, 41:1
**execute** [2] - 21:19, 36:4
**executed** [8] - 33:7, 33:24, 34:1, 34:14, 34:15, 35:3, 63:6, 64:7
**executive** [5] - 36:21, 36:24, 37:3, 51:6, 60:7
**exigent** [6] - 26:12, 38:10, 38:12, 39:12, 41:1, 49:6
**existence** [1] - 68:25
**existing** [9] - 4:5, 13:16, 14:2, 14:19, 33:16, 52:24, 53:9, 58:16, 59:2
**expand** [1] - 51:7
**expect** [1] - 34:13
**expectation** [2] - 23:20, 23:22
**expected** [1] - 32:9
**expedited** [3] - 26:5, 36:3, 38:18
**expediting** [1] - 38:16
**expeditious** [2] - 10:23, 29:10
**expeditiously** [1] - 43:22
**experiencing** [2] - 5:13, 29:24
**expiration** [1] - 5:25
**expire** [1] - 13:19
**expired** [2] - 6:1, 18:13
**explain** [1] - 62:11
**explained** [1] - 60:6
**expressly** [1] - 69:23
**extend** [5] - 25:21, 28:24, 29:9, 55:13,

56:15
**extensive** [1] - 58:19
**extraordinary** [4] - 57:12, 64:5, 70:19, 70:20
**extremely** [1] - 41:17

## F

**face** [4] - 30:7, 52:9, 62:24, 65:2
**fact** [10] - 13:8, 13:18, 13:19, 29:6, 33:13, 36:1, 40:24, 44:19, 55:6, 68:17
**factors** [12] - 12:18, 12:20, 15:4, 16:10, 60:16, 60:18, 60:20, 61:2, 61:8, 61:9, 61:11, 64:25
**facts** [1] - 13:7
**factual** [2] - 9:12, 31:15
**failed** [4] - 16:18, 17:25, 60:2, 62:4
**failure** [3] - 18:10, 18:22, 19:7
**fair** [6] - 2:20, 3:8, 4:7, 4:9, 29:8, 29:12
**FAIR** [1] - 1:3
**Fair** [8] - 2:3, 2:15, 2:18, 2:23, 3:24, 4:1, 14:20, 68:1
**fairly** [2] - 36:12, 48:20
**faith** [1] - 35:9
**far** [5] - 13:15, 29:22, 29:23, 35:25, 37:23
**fashion** [2] - 11:22, 45:24
**fashions** [1] - 29:7
**favor** [2] - 60:19, 61:3
**February** [1] - 16:2
**FEDERAL** [1] - 72:9
**Federal** [3] - 52:19, 53:4, 72:2
**federal** [5] - 1:23, 60:8, 65:14, 65:15, 66:1
**FHEO** [1] - 42:22
**FHIP** [9] - 14:22, 17:3, 23:2, 32:15, 36:4, 36:20, 60:5, 66:9, 69:13
**FHU** [2] - 21:15, 32:25
**figure** [3] - 13:1, 15:7, 64:3
**figuring** [1] - 29:19
**file** [12] - 40:22, 41:20, 42:10, 43:3, 43:4, 43:13, 49:10, 50:4, 62:19, 64:1, 64:9, 69:3
**filed** [7] - 4:6, 14:8, 14:15, 15:21, 26:23, 27:7, 28:15
**filing** [8] - 15:16, 43:15, 62:14, 70:9, 70:25, 71:1, 71:10, 71:15
**filings** [1] - 59:25
**fill** [2] - 8:15, 45:22
**final** [5] - 8:25, 9:6, 60:4, 61:23, 67:12
**finalize** [6] - 35:9, 41:3, 41:8, 59:11, 60:5, 62:6
**finalized** [1] - 39:21
**finalizing** [1] - 44:13
**financial** [1] - 56:16
**fine** [2] - 15:6, 29:2
**finished** [2] - 31:7, 34:13
**finishing** [1] - 26:6
**first** [15] - 4:8, 12:21, 13:8, 16:22, 17:16, 20:1, 31:22, 32:10, 36:4, 38:6, 56:24, 68:10, 68:23, 70:5, 70:23
**fiscal** [6] - 3:19, 5:22, 21:17, 21:22, 33:2, 54:5
**five** [12] - 25:2, 25:7, 26:6, 38:4, 38:23, 39:14, 40:16, 48:21, 48:24, 55:5, 55:17, 55:19
**five-year** [1] - 55:19
**flexibility** [1] - 66:16
**flip** [1] - 14:5
**flipping** [1] - 46:15
**flow** [1] - 17:11
**flowed** [1] - 44:11
**focus** [2] - 12:8, 51:24
**focused** [3] - 48:2, 48:3, 50:17
**focuses** [2] - 61:25, 67:21
**focusing** [1] - 44:8
**follow** [3] - 10:22, 29:3, 67:25
**followed** [1] - 29:4
**following** [1] - 30:24
**footnote** [2] - 55:5, 69:17
**FOR** [3] - 1:1, 1:14, 1:17
**forced** [1] - 54:4
**foregoing** [1] - 72:3
**forget** [1] - 49:11
**format** [1] - 72:4
**forms** [6] - 21:19, 21:24, 33:4, 34:15, 34:25
**forward** [1] - 14:16
**four** [2] - 13:25, 63:1
**frame** [1] - 4:16
**frank** [1] - 66:20
**Fred** [1] - 69:3
**freewheeling** [1] - 55:12
**Freiberg** [1] - 69:3
**Friday** [2] - 33:14, 43:18
**front** [1] - 43:21
**fully** [1] - 21:10
**fund** [3] - 20:7, 21:9, 67:22
**funded** [1] - 20:18
**funding** [61] - 2:15, 2:17, 2:19, 3:2, 3:8, 3:17, 3:21, 4:25, 5:14, 6:2, 6:16, 6:18, 6:25, 7:11, 7:21, 8:13, 8:16, 8:20, 10:8, 10:23, 13:21, 13:23, 14:4, 14:12, 16:5, 16:14, 16:17, 17:1, 17:7, 17:10, 17:11, 17:17, 17:21, 18:12, 18:14, 19:10, 19:16, 20:13, 20:17, 20:25, 22:22, 22:23, 22:25, 23:11, 26:3, 29:24, 32:9, 44:10, 44:17, 45:5, 45:7, 45:20, 45:22, 65:16, 65:20, 65:23, 66:2, 67:19, 67:23, 68:22
**funds** [63] - 3:3, 3:12, 3:14, 7:5, 11:4, 16:23, 16:25, 20:19, 20:20, 21:16, 22:6, 22:15, 22:18, 22:19, 22:20, 25:19, 25:25, 28:7, 29:2, 29:6, 33:1, 34:3, 34:8, 34:14, 35:3, 35:17, 36:5, 38:8, 41:4, 41:11, 44:21, 45:17, 47:22, 48:1, 54:13, 54:21, 54:25, 55:4, 55:17, 55:19, 56:1, 56:3, 56:5, 56:8, 56:13, 56:23, 57:23, 59:1, 59:4, 59:11, 59:24, 61:18, 63:6, 63:18, 64:4, 64:6, 65:15, 66:2, 66:24, 69:12, 69:25, 71:7
**future** [6] - 5:11, 5:15, 6:15, 7:8, 44:4, 44:8

## G

**gap** [25] - 5:14, 6:16, 6:18, 7:1, 7:11, 7:21, 8:13, 8:16, 8:20, 16:6, 17:1, 18:14, 20:19, 22:13, 22:22, 22:23, 22:25, 29:25, 44:10, 44:17, 45:5, 45:7, 45:20, 45:22, 68:24
**gaps** [2] - 14:13, 17:12
**general** [1] - 26:11
**generalized** [2] - 50:3, 50:24
**get-go** [1] - 11:24
**given** [6] - 9:16, 30:12, 33:25, 48:20, 48:21, 66:9
**goal** [1] - 2:22
**goals** [1] - 12:15
**GONZALEZ** [68] - 1:18, 2:10, 31:13, 31:25, 32:14, 33:5, 34:2, 34:8, 34:15, 35:5, 36:17, 37:7, 37:11, 37:19, 38:6, 38:25, 39:15, 39:24, 40:10, 40:21, 41:7, 41:22, 42:15, 43:16, 44:17, 45:5, 45:11, 46:3, 46:13, 46:24, 47:5, 47:7, 47:14, 47:19, 48:5, 48:16, 49:20, 50:1, 50:13, 50:22, 51:4, 51:8, 51:12, 52:6, 52:23, 53:11, 53:13, 53:25, 54:23, 55:19, 56:5, 56:8, 56:13, 57:16, 58:2, 58:4, 58:14, 58:25, 60:21, 61:4, 61:10, 61:16, 62:22, 69:7, 69:10, 70:2, 70:7, 71:13
**Gonzalez** [7] - 2:10, 31:3, 64:21, 66:21, 67:1, 67:14, 70:11
**Goodluck** [2] - 55:11, 57:25
**government** [19] - 21:12, 28:18, 30:6, 30:9, 31:6, 36:25, 41:13, 46:17, 47:7, 47:9, 50:4, 52:16, 53:3, 56:16, 58:10, 60:8, 60:13, 65:14, 70:18
**government's** [2] - 55:22, 70:12
**grant** [50] - 2:15, 3:14, 3:25, 6:7, 7:2, 8:14, 8:25, 9:10, 14:22, 15:1, 15:10, 16:5, 16:13, 18:13, 19:14, 19:16, 20:12, 20:13, 20:14, 20:16, 20:17, 20:18, 20:21, 20:24, 21:8, 21:20, 22:13, 23:13, 27:11, 28:9, 31:23, 32:23, 33:19, 33:23, 36:4, 36:21, 39:3, 45:21, 46:6, 50:16, 53:1, 53:2, 53:3, 53:19, 55:24, 63:21, 65:17, 65:21, 69:5
**grant-making** [1] - 9:10
**grantees** [7] - 3:16, 27:4, 27:16, 27:18, 28:13, 38:23, 53:9
**grants** [86] - 2:19, 3:16, 3:17, 3:20, 3:22, 4:2, 4:5, 4:21, 4:22, 5:9, 5:20, 5:24, 6:3, 6:14, 6:20, 9:23, 9:24, 10:6, 10:8, 11:14, 12:7, 13:16, 13:19, 13:20, 13:23, 13:25, 14:2, 14:12, 14:19, 16:8, 16:11, 16:12, 17:1, 18:15, 19:2, 21:17, 22:1, 22:25, 23:3, 23:5, 23:23, 24:3, 31:24, 32:15, 33:6, 33:10, 34:13, 35:2, 35:15, 35:20, 36:14, 38:5, 43:25, 44:2, 44:14, 44:20, 45:6, 45:9, 46:15, 47:21, 48:18, 49:15, 52:25, 53:14, 54:3, 57:19, 59:2, 59:17, 60:14, 61:25, 62:4, 62:16, 63:4, 63:6, 63:14, 64:15, 65:3, 65:8, 66:10, 67:7, 67:24, 67:25, 68:4
**grappling** [1] - 4:12
**great** [1] - 31:9
**group** [3] - 10:13,

53:12, 53:17
**guarantee** [1] - 11:21

## H

**half** [2] - 30:3, 30:14
**hand** [1] - 57:13
**hard** [2] - 45:11, 51:25
**harm** [8] - 5:1, 6:16, 7:7, 10:21, 44:8, 44:10, 44:12, 61:24
**harms** [2] - 29:24, 32:8
**Health** [1] - 67:20
**hear** [9] - 4:8, 30:9, 30:16, 31:3, 46:21, 48:12, 48:22, 64:21, 69:6
**heard** [15] - 9:20, 32:22, 37:19, 37:21, 38:25, 43:25, 44:4, 53:5, 53:25, 54:8, 54:16, 62:18, 63:12, 66:21, 70:11
**hearing** [3] - 32:5, 54:8, 71:5
**HEARING** [1] - 1:10
**HEIDY** [1] - 1:18
**Heidy** [1] - 2:10
**held** [6] - 28:7, 37:24, 54:22, 55:4, 57:7, 57:8
**help** [2] - 4:10, 24:9
**helpful** [2] - 43:19, 67:2
**helps** [1] - 19:4
**hereby** [1] - 72:3
**hesitation** [1] - 57:20
**hide** [2] - 50:17, 54:16
**high** [1] - 31:17
**highlight** [2] - 55:10, 65:12
**historically** [1] - 20:6
**hit** [4] - 14:12, 25:23, 28:13, 30:22
**hits** [1] - 25:24
**hold** [2] - 26:9, 56:2
**Honor** [10] - 2:2, 2:7, 31:8, 52:7, 54:8, 59:5, 59:21, 60:6, 61:5, 62:22
**HONORABLE** [1] - 1:11
**hope** [3] - 31:13, 34:24, 35:1
**hopeful** [2] - 31:2, 71:10
**hopefully** [1] - 30:14
**host** [1] - 12:18
**hours** [2] - 43:21, 49:12
**Housing** [9] - 2:3, 2:4, 2:15, 2:18, 2:23, 3:25, 4:1, 14:21, 68:1
**HOUSING** [2] - 1:3, 1:6
**housing** [4] - 2:20, 2:24, 3:8, 4:7
**HUD** [171] - 2:12, 2:18, 3:1, 3:2, 3:3, 3:7, 3:9, 3:10, 3:11, 3:13, 3:15, 4:2, 4:4, 4:25, 5:2, 5:11, 5:17, 6:15, 7:5, 9:23, 10:7, 10:12, 10:18, 10:22, 11:22, 11:24, 12:13, 13:13, 13:19, 13:24, 14:7, 14:16, 15:8, 15:17, 16:8, 19:13, 20:15, 21:3, 21:18, 21:19, 21:25, 23:10, 23:24, 24:6, 24:10, 24:23, 25:17, 25:21, 25:24, 29:1, 29:8, 29:16, 30:16, 30:19, 31:17, 31:22, 32:11, 32:12, 32:14, 33:2, 33:3, 33:11, 33:15, 33:19, 34:16, 34:21, 35:7, 35:8, 35:15, 36:13, 36:17, 36:20, 36:25, 37:15, 37:20, 37:25, 38:1, 38:2, 38:9, 38:11, 38:14, 38:16, 38:20, 39:4, 39:17, 39:19, 39:24, 40:8, 40:21, 40:23, 40:25, 41:3, 41:7, 41:23, 42:2, 42:6, 42:15, 42:20, 42:25, 43:5, 44:9, 44:20, 44:21, 45:14, 45:15, 45:21, 46:14, 47:20, 47:22, 48:23, 49:4, 49:7, 49:24, 50:6, 50:10, 51:13, 52:11, 53:23, 54:3, 54:4, 55:17, 55:22, 55:25, 57:2, 57:17, 57:21, 58:15, 58:25, 59:3, 59:4, 59:8, 59:23, 60:4, 60:10, 60:25, 61:4, 61:12, 61:20, 61:21, 62:5, 62:10, 63:13, 63:15, 64:2, 64:4, 64:8, 64:10, 64:16, 66:3, 66:7, 66:13, 66:17, 66:21, 67:16, 67:22, 68:5, 68:9, 68:12, 68:15, 68:24, 69:6, 69:11, 69:12, 69:24, 70:1, 70:4
**HUD's** [16] - 7:2, 7:3, 10:1, 16:1, 26:4, 32:1, 37:7, 40:11, 40:24, 41:20, 42:11, 44:12, 59:4, 67:11, 67:15, 67:17
**huge** [2] - 14:24, 15:2
**Hunter** [1] - 2:8
**HUNTER** [1] - 1:15

## I

**i.e** [1] - 66:12
**idea** [2] - 46:9, 67:15
**identified** [3] - 59:25, 60:3, 60:23
**identifies** [1] - 19:6
**identify** [3] - 2:6, 33:6, 59:20
**ignore** [3] - 39:12, 49:24, 67:11
**ignored** [1] - 14:10
**ignoring** [1] - 4:2
**illuminate** [1] - 23:2
**immediately** [2] - 25:17, 58:15
**imminence** [1] - 44:7
**imminent** [7] - 5:18, 24:4, 36:12, 48:20, 49:15, 50:6, 59:15
**imminently** [9] - 37:20, 37:22, 40:22, 41:24, 41:25, 42:1, 49:4, 51:22, 59:9
**implement** [1] - 3:4
**implementation** [1] - 26:5
**implementing** [1] - 33:15
**importance** [1] - 66:7
**important** [5] - 6:9, 13:7, 13:10, 23:2, 65:1
**impose** [1] - 69:20
**imposes** [1] - 60:12
**imposing** [1] - 62:12
**Impoundment** [1] - 51:10
**impoundment** [3] - 50:2, 52:8, 52:13
**inaction** [4] - 7:2, 7:3, 18:18, 19:14
**inclined** [3] - 30:4, 39:3
**includes** [3] - 16:10, 21:16, 33:1
**including** [1] - 55:11
**Indian** [1] - 67:20
**indicated** [1] - 41:3
**indicating** [1] - 33:14
**indication** [3] - 14:7, 39:24, 40:25
**inform** [1] - 39:5
**information** [3] - 33:17, 33:18, 63:20
**initial** [2] - 24:14, 65:12
**initiate** [1] - 23:13
**Initiatives** [1] - 2:18
**injunction** [2] - 27:1, 29:5
**injunctive** [1] - 58:7
**injuries** [2] - 6:12, 44:19
**injury** [39] - 5:10, 5:11, 5:12, 5:16, 5:18, 5:20, 5:21, 6:5, 6:15, 6:22, 7:1, 7:11, 7:12, 7:15, 8:7, 8:19, 9:11, 21:25, 24:4, 29:12, 36:12, 44:3, 44:5, 44:9, 44:12, 45:2, 45:19, 47:12, 47:18, 48:15, 48:20, 49:15, 50:6, 53:22, 59:15, 59:16, 62:5, 64:18
**insight** [1] - 16:1
**instance** [1] - 68:14
**instructions** [1] - 42:17
**instrument** [1] - 66:12
**intend** [3] - 21:10, 37:21, 39:25
**intended** [1] - 15:20
**intending** [1] - 57:17
**intends** [6] - 36:17, 37:20, 40:21, 40:25, 51:13, 52:11
**intent** [1] - 28:23
**interest** [8] - 19:21, 20:11, 20:12, 20:25, 23:18, 65:11, 66:3
**internal** [9] - 3:11, 11:4, 25:4, 26:4, 37:17, 37:18, 38:3, 38:17, 41:6
**internally** [1] - 41:10
**interpretation** [1] - 15:25
**interrupts** [1] - 21:1
**intervene** [1] - 25:17
**intervention** [1] - 25:11
**irrelevant** [2] - 64:24, 64:25
**irreparable** [3] - 59:15, 61:24, 62:4
**issue** [20] - 5:25, 8:6, 19:11, 30:7, 33:9, 34:3, 34:6, 34:9, 34:20, 36:4, 41:8, 41:23, 43:8, 44:18, 51:13, 51:21, 52:22, 54:4, 59:8, 67:16
**issued** [6] - 36:22, 49:2, 49:3, 49:4, 58:18, 67:5
**issues** [3] - 4:11, 4:17, 51:25

## J

**January** [5] - 15:9, 15:17, 16:3, 31:20, 36:22
**job** [1] - 71:23
**joined** [1] - 2:8
**Joseph** [1] - 2:11
**JUDGE** [1] - 1:11
**Judge** [1] - 57:3
**Judicial** [1] - 72:5
**July** [8] - 1:11, 18:12, 20:19, 32:20, 56:24, 68:14, 72:6
**juncture** [1] - 51:15
**June** [4] - 18:13, 20:18, 44:3, 65:5
**jurisdiction** [3] - 46:21, 50:23, 52:2
**jurisdictional** [1] - 51:25
**Justice** [2] - 1:17, 2:11
**justifies** [1] - 14:17

## K

**keep** [8] - 4:20, 25:19, 32:21, 35:10, 38:13, 43:24, 48:10, 65:6
**key** [3] - 5:20, 12:9, 65:5
**knowledge** [1] - 70:7
**known** [1] - 13:13
**knows** [1] - 13:24

## L

**Lake** [1] - 19:2
**land** [3] - 17:25, 18:21, 27:21

**language** [7] - 17:9, 17:17, 17:20, 17:22, 28:22, 38:7, 38:10
**lapse** [4] - 16:12, 36:5, 55:14, 55:21
**lapsed** [3] - 44:2, 55:3
**large** [1] - 5:25
**largely** [2] - 52:7, 61:24
**last** [7] - 9:20, 13:20, 32:21, 32:24, 58:18, 58:23, 63:12
**latest** [1] - 37:19
**Law** [1] - 69:3
**law** [6] - 12:11, 24:2, 45:15, 47:21, 55:12, 66:4
**lawsuit** [8] - 2:15, 11:23, 12:1, 14:8, 14:15, 15:16, 15:21, 15:22
**lawyers** [1] - 42:21
**Lawyers'** [1] - 69:2
**leadership** [1] - 42:20
**least** [9] - 3:13, 10:1, 11:25, 26:10, 35:14, 38:8, 41:9, 55:13, 67:5
**leave** [4] - 49:4, 59:9, 67:4, 69:3
**leaves** [2] - 33:8, 33:10
**led** [1] - 32:7
**left** [9] - 11:5, 21:18, 33:4, 33:25, 34:23, 49:9, 50:12, 58:13, 63:5
**legal** [7] - 13:8, 23:17, 44:21, 47:22, 59:3, 59:23, 65:19
**legally** [3] - 59:21, 60:24, 66:17
**lens** [1] - 20:11
**less** [5] - 26:15, 35:25, 38:13, 38:21, 53:15
**letter** [1] - 20:3
**letters** [1] - 19:3
**letting** [4] - 5:11, 6:15, 42:11, 64:2
**level** [1] - 31:17
**life** [1] - 31:10
**light** [2] - 15:10, 44:19
**likely** [1] - 50:21
**LILA** [1] - 1:15
**Lila** [1] - 2:8
**limited** [1] - 8:8
**limiting** [2] - 17:9, 17:20
**Lincoln** [10] - 60:11, 60:18, 61:5, 61:6, 61:13, 61:15, 61:16, 67:15, 67:18, 68:2
**line** [4] - 10:16, 55:8, 55:10, 57:25
**listing** [1] - 24:19
**literally** [1] - 68:21
**litigants** [1] - 56:6
**litigation** [4] - 28:9, 54:14, 54:22, 57:8
**look** [6] - 13:8, 18:6, 64:8, 66:22, 66:25, 67:10
**looked** [1] - 70:2
**looking** [1] - 12:20
**looks** [3] - 5:1, 29:25, 54:14
**looming** [1] - 15:11
**lose** [1] - 66:19
**losing** [1] - 68:5
**lost** [1] - 25:25
**loud** [1] - 53:16
**lump** [1] - 67:18

## M

**majority** [1] - 68:19
**managers** [1] - 63:21
**mandate** [1] - 49:19
**mandatory** [2] - 26:16, 66:17
**manner** [1] - 54:5
**March** [2] - 16:3, 36:23
**marks** [1] - 71:9
**matter** [5] - 24:14, 26:11, 50:23, 67:15, 72:4
**mean** [14] - 7:20, 20:1, 22:8, 29:16, 33:24, 38:14, 40:18, 42:1, 42:2, 42:4, 51:20, 57:21, 58:19
**meaning** [1] - 25:2
**means** [7] - 3:15, 3:21, 19:13, 42:1, 42:2, 43:20, 44:3
**measure** [1] - 13:11
**meet** [30] - 7:10, 10:22, 24:17, 29:1, 29:19, 29:20, 30:8, 35:24, 36:7, 36:8, 36:11, 39:23, 40:2, 40:3, 40:5, 40:9, 41:21, 43:2, 43:9, 43:10, 43:12, 46:4, 46:25, 48:13, 50:7, 50:11, 54:15, 57:14, 70:15, 71:4
**meeting** [4] - 7:20, 40:20, 64:22, 70:16
**members** [10] - 5:8, 5:13, 27:4, 27:12, 27:20, 28:3, 53:9, 63:24, 63:25, 68:21
**membership** [1] - 27:13
**merely** [1] - 15:1
**merit** [2] - 26:16, 28:1
**merits** [15] - 12:4, 12:12, 44:24, 45:23, 45:24, 46:9, 46:19, 46:22, 49:17, 50:8, 50:15, 50:21, 51:2, 51:3, 52:1
**met** [1] - 66:19
**midst** [1] - 22:13
**might** [5] - 31:3, 31:4, 42:2, 45:18
**Miller** [1] - 2:8
**MILLER** [1] - 1:15
**million** [1] - 3:20
**minimum** [1] - 52:24
**minor** [1] - 15:2
**miss** [3] - 57:5, 57:6, 70:13
**missed** [4] - 5:17, 69:24, 70:4, 70:8
**misses** [1] - 56:1
**missing** [7] - 7:22, 18:24, 19:5, 22:22, 44:9, 48:8, 55:23
**misstated** [1] - 47:19
**misunderstanding** [1] - 48:11
**modify** [1] - 30:2
**moment** [3] - 12:8, 24:15, 42:17
**Monday** [2] - 42:19, 43:6
**money** [16] - 4:3, 12:24, 12:25, 13:2, 21:4, 34:6, 52:18, 53:3, 55:15, 56:3, 57:2, 57:4, 57:7, 66:19, 67:24, 70:17
**moneys** [1] - 14:23
**month** [3] - 3:23, 24:11, 64:20
**months** [21] - 5:5, 5:16, 6:2, 13:15, 13:18, 13:25, 20:1, 20:8, 21:24, 22:11, 23:13, 24:21, 25:13, 25:14, 28:8, 30:3, 30:5, 30:14, 48:25, 54:18
**morning** [9] - 2:7, 2:9, 2:13, 42:11, 43:3, 43:4, 43:13, 49:10
**most** [4] - 12:22, 35:14, 50:18, 65:1
**MOTION** [1] - 1:10
**motion** [11] - 2:14, 5:4, 27:9, 27:10, 42:4, 52:10, 69:2, 69:4, 69:5, 69:17, 71:17
**move** [9] - 8:11, 8:18, 12:4, 16:16, 24:3, 35:20, 45:18, 45:24, 48:18
**moved** [1] - 26:24
**moving** [2] - 19:20, 53:8
**MR** [48] - 2:7, 5:20, 6:19, 7:13, 8:1, 8:8, 8:17, 8:23, 9:5, 9:12, 10:5, 10:7, 11:8, 11:20, 12:8, 12:18, 13:6, 15:24, 17:2, 17:13, 18:4, 18:16, 19:9, 20:10, 20:21, 21:25, 22:12, 23:1, 24:14, 25:10, 26:8, 26:11, 27:10, 27:17, 27:25, 28:22, 30:17, 31:8, 63:1, 63:8, 63:11, 63:19, 63:25, 64:12, 64:14, 67:12, 68:17, 71:19
**MS** [67] - 2:10, 31:13, 31:25, 32:14, 33:5, 34:2, 34:8, 34:15, 35:5, 36:17, 37:7, 37:11, 37:19, 38:6, 38:25, 39:15, 39:24, 40:10, 40:21, 41:7, 41:22, 42:15, 43:16, 44:17, 45:5, 45:11, 46:3, 46:13, 46:24, 47:5, 47:7, 47:14, 47:19, 48:5, 48:16, 49:20, 50:1, 50:13, 50:22, 51:4, 51:8, 51:12, 52:6, 52:23, 53:11, 53:13, 53:25, 54:23, 55:19, 56:5, 56:8, 56:13, 57:16, 58:2, 58:4, 58:14, 58:25, 60:21, 61:4, 61:10, 61:16, 62:22, 69:7, 69:10, 70:2, 70:7, 71:13
**multi** [33] - 3:17, 4:5, 4:21, 5:9, 6:14, 8:8, 8:14, 10:6, 10:8, 12:6, 16:12, 16:13, 17:1, 17:7, 18:15, 22:25, 23:3, 23:5, 27:3, 27:11, 31:24, 32:23, 32:25, 33:16, 35:2, 43:25, 44:13, 44:20, 45:9, 59:2, 63:4, 65:17, 67:7
**Multi** [1] - 17:17
**multi-year** [33] - 3:17, 4:5, 4:21, 5:9, 6:14, 8:8, 8:14, 10:6, 10:8, 12:6, 16:12, 16:13, 17:1, 17:7, 18:15, 22:25, 23:3, 23:5, 27:3, 27:11, 31:24, 32:23, 32:25, 33:16, 35:2, 43:25, 44:13, 44:20, 45:9, 59:2, 63:4, 65:17, 67:7
**Multi-Year** [1] - 17:17
**multiple** [3] - 3:17, 25:14, 64:17
**music** [1] - 53:16
**must** [11] - 3:13, 3:15, 3:21, 11:3, 16:25, 17:11, 39:20, 56:5, 56:8, 56:13, 63:23

## N

**named** [1] - 3:24
**National** [2] - 2:3, 3:24
**national** [1] - 67:21
**NATIONAL** [1] - 1:3
**necessarily** [1] - 67:13
**necessary** [3] - 19:15, 28:23, 28:25
**need** [19] - 3:22, 11:9, 15:15, 18:7, 21:1, 26:9, 28:4, 28:7, 28:20, 30:12, 37:14, 37:24, 37:25, 39:17, 50:14, 55:24, 56:25, 66:23, 67:13
**needs** [5] - 24:10, 37:25, 38:1, 38:2, 38:3
**negative** [1] - 18:16
**negotiate** [7] - 9:14, 21:19, 45:14, 46:14, 46:17, 47:20, 58:16
**negotiated** [5] - 9:21, 10:9, 10:14, 63:10, 63:14

**negotiating** [6] - 33:12, 33:19, 34:12, 44:20, 47:24, 62:5
**negotiation** [1] - 35:7
**negotiations** [5] - 33:20, 35:8, 35:12, 35:13, 48:17
**never** [4] - 15:20, 55:18, 56:2, 70:4
**new** [43] - 3:14, 3:16, 3:22, 4:1, 4:4, 4:22, 12:7, 12:23, 15:6, 16:12, 24:3, 26:2, 27:16, 27:18, 28:13, 31:21, 31:23, 32:23, 35:20, 36:4, 36:5, 36:14, 36:18, 36:20, 37:8, 37:15, 38:5, 38:21, 48:18, 49:2, 49:15, 51:13, 51:15, 51:18, 51:21, 53:14, 59:9, 59:10, 60:7, 62:16, 65:16, 67:7, 70:1
**next** [10] - 17:5, 21:2, 21:4, 25:2, 28:1, 30:2, 30:14, 33:21, 34:25, 40:16
**NFHA** [11] - 5:8, 27:4, 27:12, 27:19, 28:2, 53:10, 63:24, 63:25, 65:6, 68:8, 68:20
**NFHA's** [2] - 18:12, 44:2
**nice** [2] - 31:11, 71:23
**NO** [1] - 1:5
**NOFO** [1] - 39:6
**NOFOs** [41] - 24:19, 25:1, 25:7, 27:22, 36:5, 36:14, 36:16, 36:18, 36:19, 37:1, 37:2, 37:6, 37:8, 37:10, 37:16, 37:20, 38:21, 39:2, 40:21, 40:24, 41:1, 41:8, 41:23, 49:1, 49:2, 51:12, 51:14, 51:15, 51:18, 51:19, 51:21, 51:22, 54:5, 57:20, 58:17, 59:8, 59:9, 62:1, 67:4
**non** [2] - 13:23, 19:12
**non-appropriation** [1] - 19:12
**non-funding** [1] - 13:23
**nonprofit** [1] - 2:19
**noon** [8] - 43:20, 49:11, 49:12, 62:15, 62:19, 69:6, 70:25
**normal** [2] - 15:16, 25:12
**northeast** [1] - 67:24
**note** [1] - 71:3
**noted** [1] - 59:5
**nothing** [11] - 13:16, 14:1, 14:11, 14:14, 18:3, 31:8, 56:2, 56:24, 57:1, 57:14, 70:16
**notice** [3] - 26:3, 64:9, 66:9
**notices** [1] - 3:7
**notification** [7] - 36:7, 39:11, 48:22, 48:23, 67:9, 69:25, 70:6
**notifications** [4] - 3:22, 24:8, 24:11, 54:19
**notified** [1] - 20:2
**notify** [6] - 3:13, 3:15, 38:5, 38:23, 39:14, 66:23
**November** [1] - 24:20
**nullity** [1] - 9:24
**number** [2] - 5:25, 63:8
**NW** [3] - 1:15, 1:18, 1:24

## O

**obligate** [14] - 29:2, 41:4, 41:11, 44:21, 45:16, 47:22, 55:17, 56:23, 57:23, 59:1, 59:4, 59:11, 59:24, 69:25
**obligated** [16] - 25:25, 34:4, 34:9, 34:14, 35:4, 54:21, 56:9, 56:14, 56:17, 57:8, 63:7, 63:18, 64:5, 64:6, 66:24, 71:7
**obligating** [3] - 21:16, 33:1, 35:16
**obligation** [10] - 22:6, 39:16, 39:18, 39:20, 40:12, 43:22, 66:11, 66:12, 69:21, 69:23
**obligations** [6] - 15:8, 48:1, 52:25, 55:20, 60:5, 62:6
**obviously** [4] - 5:17, 26:17, 31:18, 67:18
**occur** [1] - 18:17
**occurred** [1] - 22:1
**occurring** [2] - 5:21, 23:17
**occurs** [1] - 66:12
**October** [2] - 29:10, 55:16
**OF** [3] - 1:1, 1:6, 1:10
**offer** [2] - 42:18, 42:23
**Official** [2] - 1:23, 72:2
**OFFICIAL** [1] - 72:9
**old** [1] - 51:22
**OMB** [3] - 18:6, 22:14, 65:14
**once** [5] - 4:18, 38:17, 41:11, 52:1, 57:6
**one** [28] - 6:11, 10:16, 11:2, 14:10, 17:5, 19:3, 20:5, 21:2, 21:4, 23:3, 29:18, 33:8, 34:10, 35:6, 41:19, 43:1, 43:6, 43:10, 50:15, 50:19, 57:13, 57:24, 64:18, 67:3, 69:7, 69:20, 70:17
**ones** [2] - 4:11, 59:9
**ongoing** [4] - 6:20, 11:18, 28:9, 29:12
**open** [10] - 26:9, 37:25, 38:8, 38:13, 38:15, 41:9, 49:5, 57:21, 59:10, 67:4
**operate** [2] - 23:8, 68:23
**operates** [1] - 23:3
**operating** [2] - 42:16, 61:22
**operations** [1] - 16:1
**opportunities** [1] - 3:8
**opportunity** [3] - 30:19, 62:11, 62:16
**opposed** [1] - 67:24
**opposite** [1] - 68:18
**opposition** [1] - 58:6
**options** [1] - 31:14
**oral** [2] - 4:9, 48:7
**Order** [1] - 2:1
**order** [59] - 2:14, 4:16, 7:9, 7:11, 7:14, 7:16, 7:17, 7:19, 8:6, 8:14, 8:21, 9:10, 15:22, 16:25, 24:8, 24:10, 27:2, 28:4, 28:7, 28:14, 28:17, 28:19, 28:20, 30:11, 34:20, 38:4, 39:4, 39:18, 41:20, 42:5, 43:19, 44:14, 44:18, 45:3, 45:14, 45:21, 46:6, 46:11, 46:14, 47:3, 47:7, 47:9, 47:13, 47:17, 47:18, 47:20, 48:3, 48:13, 53:18, 53:20, 54:2, 54:13, 54:21, 57:2, 57:7, 58:12, 58:20
**ordered** [1] - 57:10
**ordering** [1] - 58:9
**orders** [7] - 27:25, 28:25, 29:1, 36:22, 36:24, 37:3, 60:7
**ordinarily** [2] - 27:6, 27:9
**organic** [1] - 11:24
**organization** [6] - 5:23, 19:11, 21:5, 24:16, 30:23, 64:19
**organization's** [1] - 6:4
**organizations** [37] - 2:20, 3:8, 4:7, 4:25, 6:1, 6:5, 6:17, 9:15, 9:21, 9:24, 10:1, 10:2, 10:4, 10:7, 10:11, 13:21, 16:7, 19:21, 20:12, 23:7, 23:19, 26:14, 27:11, 27:14, 27:19, 29:23, 32:8, 63:15, 63:20, 63:23, 64:18, 65:2, 65:18, 67:23, 68:5, 68:20
**original** [1] - 72:3
**otherwise** [1] - 62:16
**outset** [2] - 4:24, 15:7
**outside** [1] - 14:7
**overhaul** [1] - 14:25
**overlaps** [1] - 27:13
**overruled** [2] - 57:25, 58:4
**own** [1] - 39:12

## P

**page** [2] - 69:17, 72:4
**pain** [1] - 68:4
**panel** [4] - 3:10, 25:2, 38:1, 49:7
**papers** [10] - 5:10, 16:19, 24:5, 25:18, 32:6, 39:7, 43:8, 52:22, 52:23, 60:20
**parenthesis** [1] - 65:15
**part** [9] - 26:20, 35:5, 36:18, 47:5, 47:6, 47:14, 47:15, 47:16, 48:10
**particular** [4] - 5:22, 14:23, 25:12, 69:13
**particularly** [3] - 14:18, 44:19, 67:2
**parties** [2] - 3:1, 3:5
**party** [2] - 27:7, 66:18
**pass** [2] - 16:11, 65:3
**past** [15] - 7:24, 10:25, 14:14, 22:21, 25:19, 32:1, 32:6, 32:12, 33:3, 50:5, 51:1, 52:1, 66:13, 68:10, 70:9
**path** [3] - 24:15, 26:6, 26:19
**paths** [1] - 24:15
**pause** [11] - 8:25, 9:1, 9:5, 9:8, 9:13, 11:17, 11:18, 11:20, 12:2, 32:7, 36:9
**paused** [2] - 15:10, 31:22
**pay** [3] - 7:17, 22:19, 53:3
**paying** [1] - 7:3
**payments** [1] - 23:22
**PEI** [23] - 5:24, 6:3, 6:7, 8:8, 9:22, 10:8, 13:20, 21:17, 27:3, 27:11, 33:16, 44:20, 52:24, 58:16, 59:2, 59:17, 61:25, 62:4, 64:15, 65:8, 65:18, 67:24, 68:4
**penalty** [3] - 21:13, 59:5, 71:4
**pendency** [3] - 54:14, 54:22, 57:8
**pending** [1] - 58:8
**people** [1] - 46:17
**percent** [4] - 27:18, 27:22, 53:17, 53:22
**percentage** [1] - 13:22
**performance** [10] - 17:8, 17:18, 19:11, 19:18, 22:14, 22:15, 23:6, 23:7, 23:25, 65:21
**performing** [1] - 21:6
**period** [25] - 20:14, 20:23, 21:1, 22:14,

22:15, 23:6, 23:9, 23:11, 23:23, 23:25, 38:9, 38:13, 38:15, 38:18, 41:3, 41:11, 49:6, 55:2, 55:4, 55:14, 55:19, 56:16, 59:10, 60:5, 65:21
**perjury** [3] - 21:13, 59:6, 71:4
**permissive** [1] - 38:7
**perspective** [4] - 10:2, 16:6, 16:7, 66:15
**persuaded** [1] - 52:19
**pertains** [1] - 7:13
**phrase** [1] - 65:25
**PI** [2] - 57:19, 58:13
**pick** [1] - 24:22
**piece** [8] - 18:24, 38:6, 45:5, 45:13, 46:4, 46:25, 59:18, 61:23
**place** [4] - 7:18, 10:3, 10:22, 35:25
**plain** [2] - 54:25, 69:22
**plaintiff** [4] - 2:5, 51:8, 62:10, 69:8
**Plaintiffs** [1] - 1:4
**plaintiffs** [55] - 2:8, 3:24, 4:2, 4:8, 4:19, 4:21, 32:5, 32:22, 33:5, 33:14, 33:17, 35:7, 35:8, 35:15, 40:2, 42:4, 44:4, 46:15, 46:24, 47:25, 50:3, 50:15, 50:24, 51:14, 51:18, 52:18, 53:6, 53:15, 53:17, 53:20, 54:1, 54:5, 54:6, 54:7, 54:23, 55:9, 55:25, 56:20, 58:15, 58:16, 58:18, 59:2, 59:10, 59:13, 59:20, 59:22, 60:2, 60:9, 60:22, 61:18, 61:23, 61:24, 62:6, 62:20, 69:10
**PLAINTIFFS** [1] - 1:14
**plaintiffs'** [11] - 2:14, 44:6, 44:19, 47:24, 52:13, 52:25, 53:1, 54:2, 59:25, 60:19, 69:4
**plan** [30] - 4:13, 23:8, 35:23, 36:14, 36:15, 37:7, 39:1, 39:13, 40:3, 40:5, 40:15, 40:17, 41:6, 41:15, 41:18, 41:20, 42:6, 42:11, 42:12, 42:25, 43:5, 43:9, 43:11, 43:14, 49:12, 54:19, 57:4, 58:11, 66:22, 70:21
**planning** [3] - 11:24, 21:15, 40:16
**plans** [2] - 41:23, 49:4
**play** [1] - 18:20
**plays** [1] - 64:25
**PLLC** [1] - 1:14
**plus** [1] - 21:23
**point** [21] - 6:16, 17:25, 18:25, 19:1, 25:22, 26:3, 26:7, 26:20, 29:4, 30:12, 30:15, 34:7, 51:17, 51:22, 59:24, 61:19, 63:12, 67:12, 68:21, 69:7, 69:10
**pointing** [1] - 22:9
**points** [4] - 54:10, 63:2, 64:13, 68:3
**policies** [1] - 60:7
**policy** [1] - 12:24
**poor** [1] - 19:18
**portion** [1] - 6:3
**position** [19] - 32:1, 38:23, 40:11, 49:24, 50:24, 54:24, 55:14, 55:22, 56:5, 56:8, 56:13, 57:12, 63:13, 67:16, 69:12, 70:1, 70:5, 70:12, 70:20
**positions** [1] - 70:19
**possible** [7] - 25:15, 25:16, 29:8, 30:20, 31:2, 35:10, 66:16
**possibly** [1] - 21:3
**post** [1] - 38:21
**posted** [1] - 26:3
**posting** [1] - 40:17
**posts** [1] - 3:7
**posture** [1] - 60:22
**potential** [1] - 50:25
**potentially** [1] - 29:7
**powers** [12] - 6:24, 7:4, 8:2, 8:5, 25:20, 25:21, 49:17, 49:22, 50:18, 50:23, 51:9, 51:24
**practicalities** [1] - 23:16
**practically** [1] - 33:24
**practice** [3] - 4:9, 5:2, 32:6
**preceding** [1] - 32:16
**precludes** [1] - 18:4
**preexisting** [1] - 53:9
**prejudice** [1] - 26:13
**preliminary** [1] - 60:22
**prepared** [1] - 42:18
**preparing** [1] - 67:6
**prescribed** [1] - 13:9
**presented** [1] - 6:5
**presenting** [1] - 41:15
**presents** [1] - 49:14
**press** [1] - 48:8
**pressing** [1] - 52:2
**presumably** [1] - 41:1
**presume** [1] - 38:22
**pretty** [12] - 30:5, 30:11, 32:8, 46:1, 49:14, 50:17, 52:16, 57:11, 58:19, 58:20, 70:11, 70:20
**prevent** [1] - 2:24
**prevents** [1] - 17:22
**preview** [1] - 54:16
**previewed** [1] - 19:22
**previous** [1] - 32:16
**previously** [2] - 9:25, 63:13
**primarily** [1] - 68:3
**priorities** [9] - 12:15, 12:24, 13:2, 13:16, 14:2, 14:19, 15:2, 15:8, 31:21
**private** [1] - 2:19
**problem** [2] - 53:12, 53:24
**problems** [1] - 64:17
**procedural** [6] - 8:11, 16:14, 18:20, 19:20, 44:1, 45:18
**procedures** [1] - 18:8
**proceed** [3] - 10:18, 37:7, 54:4
**proceeding** [2] - 10:10, 35:16
**Proceedings** [1] - 71:25
**process** [60] - 3:5, 3:12, 8:2, 8:11, 9:14, 9:24, 10:12, 10:15, 10:17, 10:19, 10:23, 11:9, 11:13, 11:24, 11:25, 12:1, 12:9, 14:3, 15:16, 16:14, 18:20, 19:20, 21:18, 22:24, 24:18, 24:21, 24:22, 25:4, 25:6, 26:1, 26:5, 26:6, 26:16, 26:21, 28:1, 28:2, 29:3, 29:4, 32:20, 33:2, 33:12, 33:23, 37:17, 37:18, 38:3, 38:17, 39:6, 44:1, 45:19, 46:3, 46:25, 53:18, 53:19, 53:21, 54:3, 64:16, 65:10, 66:5, 68:6, 68:19
**processed** [1] - 33:4
**processes** [1] - 18:8
**processing** [4] - 15:19, 31:19, 31:23, 68:15
**Produced** [1] - 1:25
**Program** [1] - 2:18
**program** [5] - 2:22, 3:4, 31:18, 67:21
**programs** [3] - 61:20, 62:2, 62:5
**progress** [1] - 62:11
**project** [1] - 14:18
**promise** [2] - 20:19, 57:3
**prompt** [1] - 11:13
**prompted** [1] - 15:16
**promulgated** [1] - 3:3
**proper** [1] - 51:8
**properly** [1] - 27:4
**property** [8] - 19:21, 20:10, 20:11, 20:12, 20:24, 23:18, 65:10, 66:3
**propose** [1] - 40:20
**proposed** [3] - 30:11, 54:2, 58:19
**proposition** [1] - 13:8
**prospective** [1] - 50:4
**provide** [3] - 17:6, 20:5, 22:6
**provided** [1] - 21:13
**provides** [2] - 19:10, 38:9
**provision** [3] - 55:7, 65:11, 65:18
**provisional** [3] - 26:24, 27:6, 27:9
**provisions** [2] - 36:25, 37:2
**publication** [2] - 39:6, 40:24
**publish** [3] - 37:20, 37:21, 40:21
**published** [1] - 37:23
**pull** [1] - 30:18
**pulled** [1] - 64:7
**purely** [1] - 52:14
**purpose** [9] - 6:19, 13:20, 13:24, 23:4, 23:14, 23:15, 23:18, 24:2
**purposes** [2] - 14:23, 60:21
**pursuant** [2] - 36:19, 61:21
**push** [2] - 51:4, 51:12
**pushing** [1] - 46:9
**put** [5] - 9:19, 21:11, 29:16, 51:18, 67:24
**putting** [5] - 27:5, 53:6, 61:6, 71:22

## Q

**qualify** [1] - 51:14
**questions** [8] - 4:9, 4:15, 4:18, 26:22, 31:15, 48:7, 71:11, 71:22
**quicker** [1] - 71:16
**quickly** [5] - 30:20, 31:1, 35:10, 41:8, 71:17
**quite** [3] - 38:7, 59:22, 64:5
**quote** [1] - 33:14

## R

**raised** [1] - 67:14
**raises** [1] - 66:18
**rather** [2] - 42:12, 67:21
**RDR** [1] - 72:8
**RDR-CRR** [1] - 72:8
**react** [2] - 30:22, 30:25
**read** [7] - 5:10, 16:19, 16:24, 17:8, 17:20, 52:17, 65:17
**reading** [1] - 67:6
**real** [3] - 5:1, 29:24, 44:10
**realignment** [1] - 36:19
**reality** [1] - 23:16
**really** [16] - 5:21, 25:22, 26:2, 26:13, 34:11, 34:20, 36:8, 39:8, 42:1, 42:6, 50:20, 54:7, 55:6, 58:23, 62:1, 64:24
**Realtime** [1] - 1:23

**reason** [3] - 12:16, 52:1, 67:11
**reasonable** [3] - 15:25, 23:19, 23:21
**reasons** [1] - 30:25
**reassess** [1] - 15:17
**rebuttal** [1] - 31:7
**receive** [1] - 32:9
**received** [2] - 33:13, 33:18
**recently** [1] - 36:15
**recognize** [2] - 45:5, 55:8
**recommendation** [2] - 21:15, 33:1
**Record** [1] - 1:25
**record** [10] - 2:2, 2:6, 42:7, 50:6, 51:5, 52:9, 57:17, 62:7, 62:18, 72:4
**redress** [7] - 7:12, 8:7, 9:11, 44:18, 47:18, 47:23, 48:15
**redressability** [14] - 6:23, 7:9, 7:13, 9:3, 45:12, 46:4, 46:12, 46:25, 47:1, 47:2, 47:3, 47:11, 48:4, 48:13
**redressed** [3] - 8:21, 44:14, 45:3
**redresses** [1] - 10:21
**reduce** [4] - 38:9, 38:15, 39:12, 49:6
**REED** [1] - 1:15
**Reed** [1] - 2:7
**Reeves** [2] - 72:2, 72:8
**REEVES** [2] - 1:22, 72:8
**referenced** [2] - 28:6, 29:15
**referring** [1] - 65:23
**refusing** [1] - 4:3
**regarding** [2] - 44:14, 45:3
**Registered** [1] - 1:22
**regularly** [1] - 68:12
**regulation** [8] - 19:5, 19:10, 23:2, 23:3, 23:15, 65:14, 65:23, 66:1
**regulations** [10] - 3:3, 4:3, 7:23, 17:3, 18:7, 22:14, 22:23, 24:2, 68:1, 72:4
**regulatory** [1] - 29:17
**reiterate** [5] - 42:15, 58:25, 59:23, 62:23, 63:11
**reject** [2] - 51:2, 61:7
**related** [4] - 27:11, 65:9, 65:10, 66:6
**relevant** [1] - 66:8
**relied** [1] - 68:21
**relief** [20] - 27:2, 27:8, 30:2, 30:5, 30:11, 36:2, 39:3, 47:2, 47:3, 47:11, 47:13, 47:17, 47:18, 47:20, 47:23, 48:3, 48:14, 55:25, 58:7, 58:15
**Relman** [1] - 1:14
**rely** [6] - 18:25, 19:2, 21:12, 36:15, 36:18, 37:5
**relying** [5] - 6:14, 6:16, 16:20, 37:10, 44:4
**remain** [3] - 38:8, 38:15, 54:13
**remaining** [2] - 9:3, 41:2
**remediate** [1] - 2:24
**remedies** [3] - 26:23, 53:5, 55:12
**remedy** [4] - 29:7, 53:22, 57:10
**remember** [1] - 28:22
**renewing** [1] - 7:2
**repeatedly** [1] - 66:21
**reply** [1] - 69:16
**report** [3] - 39:5, 40:23
**Reporter** [4] - 1:22, 1:23, 1:23, 72:2
**REPORTER** [2] - 56:11, 72:9
**reporting** [7] - 39:15, 39:17, 69:15, 69:18, 69:19, 69:22, 69:23
**reports** [4] - 34:21, 39:4, 57:22, 62:9
**represent** [2] - 13:23, 40:8
**representation** [3] - 32:24, 40:6, 40:10
**representations** [3] - 15:14, 30:7, 35:24
**representatives** [1] - 63:21
**represented** [3] - 41:23, 43:11, 63:5
**representing** [5] - 35:5, 36:6, 36:8, 38:20, 39:22
**request** [1] - 26:20
**requested** [1] - 58:15
**require** [2] - 48:16, 56:16
**required** [14] - 3:1, 16:19, 18:1, 18:17, 18:23, 19:17, 20:7, 24:16, 45:15, 47:21, 56:4, 59:20, 59:21, 60:24
**requirement** [14] - 13:17, 23:5, 38:7, 39:20, 44:21, 47:22, 59:3, 59:23, 59:25, 61:20, 69:15, 69:18, 69:21, 69:22
**requirements** [5] - 23:17, 57:22, 62:12, 67:25, 69:19
**requires** [4] - 18:3, 18:13, 18:14, 69:23
**requiring** [4] - 7:23, 22:24, 46:16, 62:9
**resolve** [1] - 14:10
**respect** [3] - 5:2, 59:16, 61:9
**respond** [4] - 62:20, 64:3, 71:15, 71:18
**response** [7] - 11:23, 12:1, 25:8, 27:23, 42:5, 69:8, 71:18
**responsive** [1] - 71:23
**rest** [1] - 45:6
**restarted** [2] - 10:16, 10:24
**restarting** [1] - 10:15
**resting** [1] - 61:15
**restraining** [2] - 2:14, 42:5
**result** [2] - 5:1, 6:18
**resume** [2] - 24:18, 26:21
**resumed** [2] - 9:9, 9:14
**resumption** [1] - 28:1
**revealed** [1] - 68:7
**revert** [3] - 55:1, 55:5, 55:16
**review** [12] - 4:8, 26:5, 26:16, 28:2, 36:20, 37:1, 37:17, 37:18, 38:22, 41:3, 49:7, 60:6
**reviewed** [1] - 38:18
**reviewing** [1] - 40:17
**reviews** [2] - 17:8, 17:18
**rid** [1] - 51:21
**Rights** [1] - 69:3
**rights** [1] - 52:25
**ripeness** [1] - 51:2
**rise** [1] - 19:7
**Robbins** [1] - 2:12
**ROBERT** [1] - 1:15
**Robert** [1] - 2:8
**room** [1] - 14:23
**routinely** [1] - 32:12
**rule** [2] - 71:12, 71:17
**ruling** [2] - 62:15, 62:20
**run** [1] - 18:7

**S**

**satisfied** [1] - 45:13
**satisfy** [3] - 55:20, 56:16, 62:10
**saw** [1] - 24:25
**scenario** [2] - 13:5, 13:6
**schedule** [4] - 29:1, 31:11, 42:23, 67:2
**scheduled** [1] - 35:14
**scheme** [1] - 29:17
**scrambling** [1] - 15:21
**scrapping** [1] - 49:1
**seat** [1] - 4:14
**second** [12] - 9:15, 9:22, 10:10, 21:17, 33:6, 33:13, 34:3, 34:12, 45:15, 46:14, 47:21, 48:17
**see** [19] - 7:22, 14:13, 19:1, 24:6, 25:18, 26:19, 27:2, 28:12, 49:9, 49:18, 54:10, 55:24, 60:19, 61:8, 61:9, 62:19, 66:13, 67:10, 71:12
**seeing** [2] - 18:22, 20:10
**seek** [1] - 58:8
**seeking** [3] - 27:15, 47:2, 52:18
**seem** [4] - 11:4, 15:13, 29:23
**select** [3] - 3:11, 25:3, 38:2
**selected** [1] - 62:2
**sense** [2] - 30:12, 61:25
**separate** [3] - 6:11, 11:10, 53:19
**separation** [10] - 6:24, 7:4, 8:1, 8:5, 49:17, 49:22, 50:18, 50:23, 51:9, 51:23
**September** [88] - 3:15, 3:21, 5:12, 5:16, 7:6, 7:10, 7:18, 7:20, 7:24, 11:3, 11:10, 11:16, 13:10, 13:14, 14:5, 14:13, 15:11, 15:20, 16:6, 20:7, 21:9, 22:7, 22:17, 22:19, 24:8, 24:19, 25:1, 25:7, 25:19, 25:23, 28:16, 28:20, 29:2, 29:9, 31:12, 32:3, 34:17, 34:24, 35:11, 36:2, 36:9, 36:16, 37:6, 38:19, 39:1, 39:9, 40:4, 40:14, 41:4, 42:16, 44:9, 44:22, 45:16, 47:23, 47:25, 48:25, 49:2, 49:25, 51:18, 52:12, 54:15, 54:18, 54:21, 55:23, 56:9, 56:14, 56:17, 56:19, 56:22, 57:1, 57:17, 57:23, 59:4, 59:12, 59:24, 60:12, 61:19, 61:21, 64:16, 64:17, 64:21, 64:22, 64:24, 65:8, 68:6, 71:8
**sequential** [1] - 45:24
**Services** [1] - 67:20
**set** [15] - 3:9, 5:5, 10:21, 11:1, 11:6, 11:7, 11:9, 21:9, 25:11, 30:19, 40:19, 41:14, 42:13, 49:23, 64:16
**sets** [1] - 29:17
**setting** [3] - 11:13, 11:15, 29:16
**seven** [3] - 25:13, 58:7
**severe** [1] - 14:11
**severity** [1] - 15:3
**SG** [1] - 58:7
**shall** [2] - 3:3, 16:23
**share** [4] - 41:6, 43:5, 43:14, 43:16
**shortened** [1] - 26:13
**show** [2] - 57:22, 69:20
**side** [4] - 14:5, 27:5, 53:6, 71:20
**sides** [1] - 6:10
**significant** [6] - 13:23, 16:8, 30:24, 32:8, 64:18, 65:4

**similar** [1] - 52:17
**similarly** [1] - 4:7
**simply** [2] - 68:2, 68:7
**sit** [2] - 56:1, 58:24
**sits** [1] - 70:17
**sitting** [5] - 42:13, 49:8, 49:13, 51:20, 55:18
**situated** [1] - 4:7
**situation** [1] - 66:8
**six** [6] - 13:15, 13:18, 23:13, 25:13, 61:8
**skeptical** [1] - 41:17
**skip** [1] - 40:16
**slow** [1] - 56:11
**smoothly** [1] - 68:19
**solicit** [1] - 38:21
**somewhat** [2] - 13:6, 21:13
**Sonja** [2] - 72:2, 72:8
**SONJA** [2] - 1:22, 72:8
**SOOKNANAN** [1] - 1:11
**sooner** [1] - 11:16
**sorry** [2] - 20:16, 64:13
**sort** [10] - 4:13, 6:10, 25:5, 43:25, 44:6, 45:23, 52:1, 54:3, 58:13, 68:24
**sought** [1] - 27:6
**sounds** [3] - 15:9, 36:11, 48:20
**source** [1] - 52:25
**sources** [1] - 23:1
**south** [1] - 67:23
**southwest** [1] - 67:22
**SPARKLE** [1] - 1:11
**specific** [10] - 6:6, 10:21, 36:24, 42:18, 46:17, 46:18, 54:4, 58:14, 58:18, 58:20
**specifically** [1] - 59:16
**specifics** [1] - 34:22
**speculative** [3] - 7:8, 44:4, 52:14
**speedy** [1] - 29:11
**spend** [7] - 4:3, 12:24, 12:25, 13:1, 57:2, 57:4, 65:24
**spending** [1] - 7:5
**spent** [3] - 56:3, 56:4, 59:21
**spreadsheets** [1] - 31:11
**stage** [5] - 5:19, 8:6, 27:7, 28:8, 58:13
**standing** [30] - 5:7, 5:9, 5:19, 6:10, 6:13, 8:6, 9:7, 10:25, 12:6, 27:13, 43:23, 44:15, 44:25, 45:4, 45:8, 45:10, 45:25, 46:1, 46:2, 46:7, 46:21, 49:16, 50:3, 50:5, 50:20, 51:1, 51:16, 51:20, 59:14
**start** [13] - 4:19, 5:8, 5:9, 9:5, 12:10, 12:11, 16:4, 31:15, 36:13, 43:25, 48:19, 56:12, 63:3
**started** [9] - 5:22, 9:22, 11:25, 12:1, 15:9, 15:18, 16:2, 16:3
**starting** [8] - 2:5, 5:15, 6:24, 24:23, 26:6, 26:19, 26:20, 32:24
**state** [3] - 60:1, 60:2, 60:9
**STATES** [1] - 1:1
**States** [3] - 1:17, 72:2, 72:5
**status** [9] - 34:21, 37:16, 39:4, 39:5, 39:6, 40:23, 40:24, 57:22, 62:9
**statute** [26] - 3:2, 3:13, 7:19, 7:22, 11:2, 14:22, 16:22, 16:24, 17:3, 17:6, 18:25, 19:5, 21:9, 23:15, 29:17, 50:10, 50:11, 54:25, 55:3, 55:23, 57:9, 60:12, 66:9, 66:11, 70:12, 70:14
**statutes** [3] - 4:2, 69:20, 69:22
**statutory** [10] - 3:4, 15:8, 25:20, 49:18, 50:12, 53:21, 56:22, 58:10, 62:12, 62:13
**stay** [3] - 58:7, 58:8, 58:12
**stays** [1] - 55:16
**steeped** [2] - 26:1, 33:23
**stenographic** [1] - 72:3
**Stenographic** [1] - 1:25
**step** [2] - 17:22, 28:1
**steps** [11] - 5:14, 9:3, 19:15, 21:21, 22:5, 24:10, 24:12, 40:18, 57:18, 59:1
**stick** [1] - 9:7
**still** [13] - 7:10, 7:21, 14:14, 21:12, 23:25, 24:10, 29:12, 37:17, 40:13, 45:11, 45:12, 46:16, 46:24
**stock** [2] - 21:11, 36:1
**stop** [11] - 6:8, 7:14, 8:15, 11:12, 23:11, 23:12, 23:24, 45:21, 46:7, 46:13, 47:8
**stopped** [2] - 15:17, 31:20
**stopping** [1] - 46:11
**straightforward** [3] - 46:1, 50:19, 53:15
**Street** [2] - 1:15, 1:18
**strong** [1] - 16:15
**strongly** [1] - 15:4
**struggling** [5] - 5:6, 12:21, 19:22, 48:9, 54:12
**subject** [1] - 50:22
**submissions** [2] - 3:10, 38:2
**submit** [12] - 3:9, 38:1, 39:4, 51:15, 52:24, 57:16, 57:22, 59:10, 59:13, 61:11, 62:3
**submitted** [4] - 24:20, 27:19, 27:23, 58:19
**submitting** [1] - 26:14
**subsequent** [1] - 33:16
**substantial** [1] - 6:3
**succeed** [1] - 50:21
**sue** [1] - 51:5
**suffering** [1] - 64:19
**sufficient** [3] - 10:17, 41:10, 59:10
**suggest** [4] - 15:13, 23:24, 39:2, 40:22
**suggesting** [2] - 30:18, 38:11
**suggests** [1] - 33:18
**Suite** [2] - 1:15, 1:18
**sum** [1] - 67:18
**support** [3] - 12:12, 67:1, 69:16
**supporting** [1] - 69:4
**supports** [1] - 15:4
**supposed** [1] - 19:6
**supposedly** [1] - 11:22
**surprised** [1] - 28:11
**suspend** [1] - 18:9
**suspended** [1] - 69:12
**suspending** [4] - 18:5, 18:6, 22:1
**suspension** [7] - 11:14, 11:15, 18:7, 22:12, 23:22, 47:8, 65:25
**swear** [1] - 71:3
**switch** [1] - 46:16

## T

**table** [1] - 31:11
**tailored** [1] - 58:14
**talks** [4] - 22:22, 44:6, 65:13, 66:1
**target** [1] - 30:21
**task** [1] - 15:2
**taxing** [1] - 14:18
**technical** [1] - 63:21
**temporary** [5] - 2:14, 9:2, 9:5, 9:8, 42:5
**Tennessee** [1] - 4:1
**terminate** [7] - 17:9, 17:14, 17:17, 18:8, 19:14, 22:5
**terminated** [10] - 19:3, 19:23, 19:25, 20:2, 20:4, 22:4, 22:10, 33:8, 34:10, 46:6
**terminating** [1] - 18:4
**termination** [24] - 8:14, 8:15, 11:14, 11:15, 17:23, 18:7, 18:17, 18:19, 19:22, 20:8, 22:2, 22:4, 22:8, 22:12, 33:9, 45:21, 45:22, 46:7, 46:8, 46:10, 46:11, 46:13, 47:8, 65:25
**terms** [8] - 35:16, 36:21, 46:18, 54:4, 58:16, 58:17, 58:18, 65:1
**text** [3] - 54:25, 62:12, 69:22
**THE** [119] - 1:1, 1:11, 1:14, 1:17, 2:9, 2:13, 6:8, 6:21, 7:16, 8:4, 8:9, 8:18, 8:24, 9:7, 10:4, 10:6, 10:25, 11:17, 12:4, 12:10, 12:20, 15:6, 16:16, 17:5, 17:15, 18:10, 18:19, 19:19, 20:16, 21:7, 22:3, 22:17, 24:3, 24:25, 26:1, 26:9, 26:22, 27:15, 27:21, 28:6, 29:15, 31:3, 31:9, 31:15, 32:4, 32:19, 33:22, 34:5, 34:12, 34:19, 35:18, 37:4, 37:9, 37:13, 37:23, 38:20, 39:7, 39:22, 40:1, 40:15, 41:5, 41:12, 41:25, 42:25, 43:20, 44:23, 45:8, 45:18, 46:5, 46:20, 47:1, 47:6, 47:10, 47:15, 48:2, 48:6, 48:18, 49:21, 50:5, 50:14, 51:1, 51:7, 51:11, 51:17, 52:15, 53:5, 53:12, 53:14, 54:10, 55:15, 55:22, 56:6, 56:12, 56:18, 57:24, 58:3, 58:6, 58:22, 60:15, 60:25, 61:6, 61:13, 62:14, 62:25, 63:3, 63:10, 63:17, 63:23, 64:1, 64:13, 66:20, 68:8, 69:1, 69:9, 69:24, 70:4, 70:8, 71:14, 71:20
**themselves** [1] - 4:6
**theoretical** [1] - 24:17
**theoretically** [3] - 25:15, 25:16, 38:14
**thin** [1] - 30:18
**thinking** [3] - 5:11, 13:11, 32:22
**third** [13] - 9:15, 9:22, 10:10, 21:17, 33:7, 33:13, 34:3, 34:13, 45:15, 46:15, 47:21, 48:17, 66:18
**threatens** [1] - 68:24
**three** [12] - 3:25, 13:7, 16:20, 20:14, 20:22, 20:25, 21:8, 23:9, 24:21, 32:9, 44:13, 63:1
**three-year** [5] - 3:25, 20:14, 20:25, 21:8, 23:9
**threshold** [6] - 51:24, 52:7, 60:17, 61:1, 61:7, 61:16
**throwing** [1] - 10:14
**Thursday** [1] - 1:11
**tied** [1] - 54:7
**tight** [1] - 14:20
**timeframe** [1] - 13:10

**timely** [2] - 11:21, 53:20
**timing** [6] - 13:9, 13:12, 13:13, 14:9, 17:12, 31:25
**today** [20] - 31:4, 32:20, 37:11, 37:13, 37:21, 41:18, 42:2, 42:10, 42:13, 42:17, 43:7, 43:10, 48:1, 49:9, 51:20, 53:25, 54:8, 65:2, 67:6, 70:11
**together** [1] - 18:7
**tomorrow** [12] - 41:19, 41:20, 42:10, 43:19, 62:15, 64:9, 67:3, 69:6, 70:9, 70:25, 71:10, 71:16
**ton** [2] - 13:5, 52:5
**tool** [1] - 29:13
**totally** [1] - 8:9
**touch** [2] - 13:7, 63:1
**TRAC** [9] - 12:20, 15:4, 16:9, 60:16, 60:18, 60:20, 61:2, 61:11, 64:25
**trace** [1] - 7:7
**traceability** [3] - 6:22, 7:9, 46:12
**traceable** [6] - 7:2, 8:13, 8:20, 44:12, 45:2, 45:20
**track** [1] - 40:13
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:10
**transcript** [3] - 72:3, 72:3, 72:4
**treasury** [4] - 55:1, 55:4, 55:5, 55:16
**trick** [2] - 48:6, 61:14
**TRO** [17] - 5:4, 5:19, 6:19, 37:14, 43:8, 43:21, 50:14, 50:16, 52:10, 58:9, 60:21, 62:8, 62:15, 62:21, 62:23, 69:4, 71:12
**trouble** [1] - 35:21
**troubled** [1] - 70:12
**troubling** [2] - 64:11, 70:24
**true** [3] - 17:2, 52:3, 72:3
**trundle** [1] - 68:5
**trust** [1] - 70:15
**try** [2] - 4:20, 25:23
**trying** [5] - 6:11, 30:21, 32:4, 32:10, 61:14
**Tucker** [3] - 52:15, 60:17, 61:7
**turn** [2] - 3:6, 31:6
**turns** [1] - 12:18
**two** [44] - 3:24, 4:1, 4:21, 5:4, 5:10, 5:16, 6:2, 7:3, 7:17, 7:24, 12:21, 14:13, 18:12, 20:1, 20:5, 20:7, 20:8, 20:19, 20:20, 21:23, 22:6, 22:11, 23:1, 23:14, 24:15, 24:21, 27:14, 28:8, 30:3, 30:5, 30:14, 32:9, 32:21, 33:21, 34:16, 34:25, 35:1, 35:6, 42:2, 43:24, 44:13, 48:25, 53:8, 54:17
**two-plus** [1] - 21:23
**type** [3] - 32:6, 48:14, 68:10
**types** [1] - 5:10

## U

**U.S** [2] - 1:6, 2:4
**U.S.C** [2] - 54:23, 66:11
**unclear** [2] - 44:17, 51:14
**unconstitutional** [1] - 49:19
**under** [34] - 2:15, 2:18, 11:8, 13:17, 15:4, 16:19, 19:8, 21:6, 21:13, 22:5, 22:14, 23:13, 23:20, 23:23, 27:3, 32:16, 36:5, 42:16, 46:18, 51:6, 51:10, 51:15, 53:3, 53:24, 59:5, 59:20, 60:2, 61:2, 61:17, 61:22, 62:2, 66:4, 68:4, 71:3
**Under** [1] - 69:3
**undermine** [1] - 23:14
**understandably** [1] - 30:6
**understood** [4] - 30:17, 31:5, 62:22, 71:13
**undisputed** [1] - 23:4
**undoubtedly** [1] - 25:10
**uninformed** [1] - 30:19
**unique** [1] - 13:6
**UNITED** [1] - 1:1
**United** [3] - 1:17, 72:2, 72:5
**universal** [1] - 27:1
**unlawfully** [2] - 16:17, 19:15
**unless** [1] - 7:22
**unlimited** [1] - 23:23
**unprecedented** [1] - 32:7
**unreasonable** [16] - 8:20, 11:12, 12:13, 12:16, 12:19, 12:22, 13:3, 15:5, 16:15, 44:15, 44:25, 45:2, 45:3, 60:15, 64:23, 65:9
**unreasonably** [2] - 11:12, 61:1
**unusual** [1] - 70:18
**up** [11] - 3:6, 6:3, 15:18, 24:22, 28:10, 30:10, 42:12, 65:6, 67:15, 70:16, 71:22
**update** [3] - 9:18, 35:18, 64:8
**URBAN** [1] - 1:7
**Urban** [1] - 2:4
**utilized** [1] - 55:20

## V

**various** [2] - 26:25, 40:18
**vast** [1] - 68:19
**versus** [4] - 2:4, 19:2, 60:11, 67:23
**vested** [1] - 19:21
**view** [1] - 58:11
**viewed** [1] - 67:6
**Vigil** [3] - 60:11, 67:15, 68:2
**violate** [4] - 49:21, 50:11, 55:23, 70:14
**violates** [1] - 57:9
**violating** [1] - 66:4
**violation** [2] - 7:4, 7:8
**virtually** [1] - 9:12
**visible** [1] - 14:7
**vs** [1] - 1:5

## W

**wait** [9] - 13:1, 28:12, 55:24, 62:14, 62:19, 69:6, 70:25, 71:12, 71:18
**waiting** [1] - 34:24
**walk** [2] - 3:4, 40:15
**walked** [1] - 25:5
**wants** [1] - 45:24
**Washington** [4] - 1:12, 1:16, 1:19, 1:24
**ways** [1] - 39:10
**week** [6] - 32:21, 33:3, 33:21, 34:16, 34:25, 37:16
**weeks** [12] - 25:2, 25:7, 26:7, 35:1, 35:6, 38:4, 38:23, 39:14, 40:16, 42:3, 48:21, 48:24
**weigh** [2] - 60:19, 61:3
**whatsoever** [2] - 14:16, 23:21
**whereas** [1] - 69:21
**Widakuswara** [1] - 19:2
**wiggle** [1] - 14:23
**win** [1] - 50:15
**withdrawn** [1] - 51:19
**withheld** [4] - 16:17, 19:15, 65:24, 69:12
**withhold** [2] - 22:15, 65:15
**withholding** [3] - 22:18, 22:20, 66:1
**written** [1] - 66:12

## Y

**year** [81] - 3:17, 3:19, 3:25, 4:5, 4:21, 5:9, 5:22, 6:14, 7:3, 7:17, 7:24, 8:8, 8:14, 9:15, 10:6, 10:8, 10:10, 12:6, 16:12, 16:13, 17:1, 17:7, 17:12, 18:12, 18:15, 20:5, 20:7, 20:14, 20:19, 20:20, 20:25, 21:2, 21:4, 21:8, 21:17, 21:18, 21:22, 22:6, 22:25, 23:3, 23:5, 23:9, 23:14, 27:3, 27:11, 31:24, 32:9, 32:15, 32:23, 32:25, 33:2, 33:7, 33:13, 33:16, 34:3, 34:13, 35:2, 36:4, 36:22, 43:25, 44:13, 44:20, 45:9, 45:15, 46:15, 47:21, 54:5, 55:19, 58:18, 59:2, 63:4, 65:17, 65:22, 67:7
**Year** [1] - 17:17
**years** [15] - 2:17, 3:18, 9:22, 13:20, 16:5, 20:22, 23:14, 32:16, 33:16, 48:17, 55:5, 55:17, 56:24, 68:22, 70:23
**yourselves** [1] - 2:6

## Z

**zero** [4] - 9:16, 11:21, 14:6, 44:1