**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>    *Defendants*. | Civil Action No. 25‑1965 (SLS)<br>Judge Sparkle L. Sooknanan |

## <u>MEMORANDUM OPINION</u>

Almost sixty years ago, Congress enacted the Fair Housing Act to combat rampant discrimination in housing plaguing vulnerable communities across our country. And recognizing that it would take more than the federal government to end housing discrimination, for more than three decades Congress has provided annual funding through the Fair Housing Initiatives Program (FHIP) to ensure dedicated enforcement of the Fair Housing Act. The United States Department of Housing and Urban Development (HUD) is responsible for administering the FHIP program and awarding grants to private nonprofit fair housing organizations on an annual basis. And while HUD may select the grant recipients and make other decisions about how to use or allocate the funds appropriated by Congress, it may not refuse to award those funds altogether. Congress made clear that HUD "shall" use the funds, 42 U.S.C. §§ 3616a(b)(1), (c)(1), (d)(1), and it must do so annually by the end of each fiscal year, *i.e.*, September 30, *see* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 370.

The Plaintiffs in this case are fair housing organizations that have worked hand in hand with HUD for decades through the FHIP program. They claim that HUD has now taken the

unprecedented step of halting its grantmaking activities, and they fear that HUD will not meet the fast-approaching September 30, 2025, deadline to award millions of dollars appropriated by Congress for FHIP grants this fiscal year. The Plaintiffs' claims fall into two categories. The first challenges HUD's failure to complete the grantmaking process for the 2024 fiscal year. And the second challenges HUD's failure to implement multi-year grants from prior years by withholding the second or third years of funding. HUD's delayed processing has already had a lasting impact. Organizations that expected continued funding have shuttered or are at risk of shuttering. The Plaintiffs brought this lawsuit under the Administrative Procedure Act (APA) and the Constitution to challenge HUD's conduct, and they recently moved for a temporary restraining order.

HUD tells a different story. It admits that it is taking longer than usual to process FHIP grants and that it temporarily paused grantmaking activity for the first time in the program's 30-year history. But it maintains that it plans to meet the upcoming statutory deadline, and it argues that the Court lacks jurisdiction to even hear this case until after that deadline has come and gone. If HUD blows past the deadline, however, the appropriated funds are no longer available for awards for the current fiscal year. And HUD takes the position that the Court has no authority to order that the funds be held or remain available through the conclusion of this litigation. If HUD is correct, it is free to ignore duly enacted and constitutional statutes directing it to award millions of dollars in grant funding by a certain date and this Court is powerless to hear the dispute or take steps to ensure compliance with the statutes. That is not the law.

The Court has jurisdiction to hear the Plaintiffs' claims. When it comes to the claims concerning new grants, the organizations have identified an imminent injury. Based on the current record, there does not appear to be sufficient time for HUD to take the necessary steps between now and September 30, 2025, to award funds in compliance with the statutes. The Court also finds

a likelihood of success on the merits on at least two claims—either of which is sufficient at this stage. And because irreparable harm and the balance of equities and public interest weigh in the Plaintiffs' favor, a temporary restraining order is warranted. For the claims concerning the multi-year grants, the Plaintiffs have asked the Court to defer its ruling until later this week.

While the Court agrees that the Plaintiffs are entitled to emergency relief, it is not convinced that all of the Plaintiffs' requested relief is appropriate at this time. The Plaintiffs ask the Court to order the appropriated funds for the current fiscal year remain available through the pendency of this litigation and to order HUD to comply with its statutory obligations, including by setting certain deadlines for the processing of new grants. With two months left until the September 30, 2025, deadline, the Court orders only that the agency comply with its statutory obligations and that it come up with a detailed plan to do so. If it becomes clear in the coming weeks that HUD will not meet the statutory deadline, the Court will revisit the Plaintiffs' remaining requests. The Court thus grants in part the Plaintiffs' motion for a temporary restraining order, though on narrower terms than the Plaintiffs requested.

## BACKGROUND

### A.    Statutory Background

Congress enacted the Fair Housing Act (FHA) in 1968 "following urban unrest of the mid 1960s and in the aftermath of the assassination of the Rev. Dr. Martin Luther King, Jr.," H.R. Rep. No. 100-711, at 15 (1988) (cleaned up), to "provide, within constitutional limitations, for fair housing throughout the United States," 42 U.S.C. § 3601. The FHA thus made it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin." Fair Housing Act, Pub. L. No. 90-284, § 804, 82 Stat. 73, 83 (1968) (codified at 42 U.S.C. § 3604(a) (Supp. IV 1968)). And the FHA also made it unlawful to

"discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" on the basis of the same protected characteristics. *Id.* Congress later amended the FHA to add sex, disability, and familial status as additional protected characteristics. *See* 42 U.S.C. §§ 3604(a), (b), (f)(1); *see also id.* §§ 3604(f)(2), 3605–06.

"Under the 1968 Act, limited enforcement powers were available to the federal government, and, therefore, private entities played the primary role of enforcing the law." Lawyers' Committee for Civil Rights Under Law and Fred Freiberg's Amicus Br. Supp. Plaintiffs' Mot. TRO at 19 (Amicus Brief), ECF No. 20-2. "In 1988, the Fair Housing Initiatives Program was established to assist all parties in fighting housing discrimination." *Id.* In 1992, after recognizing "the proven efficacy of private nonprofit fair housing enforcement organizations and community-based efforts" that were serving as "a necessary component of the fair housing enforcement system," Pub. L. 102-550, § 905(a)(9), 106 Stat. 3672, 3869, Congress amended the FHA to provide sustainable support for these organizations, *see id* § 905(b). Congress made FHIP permanent and authorized FHIP funds to implement various programs. *Id.*

Since 1992, FHIP "has been supported by members of Congress from both parties." Amicus Brief at 20. And if Congress has appropriated funds, the FHA requires HUD to use those funds for three purposes: private enforcement initiatives (PEI), fair housing organizations, and education and outreach. *See* 42 U.S.C. § 3616a. These grants are meant to fund "programs or activities designed to obtain enforcement of the rights granted by" the FHA. *Id.* And for all three types of grants, statutory language provides that the Secretary *shall* use the funds made available. *See* 42 U.S.C. § 3616a(b)(1) ("The Secretary shall use funds made available under this subsection to conduct, through contracts with private nonprofit fair housing enforcement organizations,

investigations of violations of the rights granted under [the FHA], and such enforcement activities as appropriate to remedy such violations."); *id.* § 3616a(c)(1) ("The Secretary shall use funds made available under this section to enter into contracts or cooperative agreements with qualified fair housing enforcement organizations, other private nonprofit fair housing enforcement organizations, and nonprofit groups organizing to build their capacity to provide fair housing enforcement[.]"); *id.* § 3616a(d)(1) ("The Secretary, through contracts with one or more qualified fair housing enforcement organizations, . . . shall establish a national education and outreach program" to "provide a centralized, coordinated effort for the development and dissemination of fair housing media products[.]").

Once funding is available, HUD publishes Notices of Funding Availability (NOFAs), 24 C.F.R. §§ 125.104(c), (d), also known as NOFOs, *see, e.g.*, 2 C.F.R. § 200.204. The NOFOs "announce amounts available for award, eligible applicants, and eligible activities, and may limit funding to one or more of the Initiatives." 24 C.F.R. § 125.104(d); *see also* 2 C.F.R. § 200.204. Absent exigent circumstances, funding opportunities are to remain open for at least thirty calendar days. *See* 2 C.F.R. § 200.204(b). And before announcing a NOFO, HUD "must . . . create an Assistance Listing," *id.* § 200.202(a)(1), which describes "the statutory or regulatory requirements of the program and its intended outcome," "[g]eneral eligibility requirements," and the like, *id.* § 200.203(b).

Following publication of a NOFO, qualified applicants may submit applications up to a designated deadline after which applications will not be accepted for review by HUD. U.S. Dep't of Housing and Urban Development, *HUD FHIP Application and Award Policies and Procedures Guide* 23 (Sept. 2017) (FHIP Guide), https://perma.cc/SQ92-BD3N. "All FHIP applications" are then "evaluated through use of a HUD approved review criteria." *Id.* at 43; *see also id.* at 21

5

("The application should present the merits of the proposed project and provide sufficient application information to enable HUD Technical Evaluation Panel (TEP) reviewers to evaluate the application in accordance with the FHIP review criteria established by HUD."). The team of reviewers then makes award recommendations to HUD. *See id.* at 58–59. Under the FHA, HUD must notify Congress of any "proposed grant, contract, or cooperative agreement" at least thirty days "before providing a grant or entering into any contract or cooperative agreement[.]" 42 U.S.C. § 3616a(e).

"Immediately following grant award approval," HUD and the grant recipients enter into a negotiation phase, FHIP Guide at 65, during which a Government representative will work with grantees "to develop a payment schedule based on the deliverable dates outlined in the Statement of Work," *id.* at 66. The process ends in "a binding agreement between HUD and the grantee that details the terms and conditions for award and the amount of funds awarded based on the application submission and the available funds." *Id.* For multi-year grants, grantees "are required to approve and sign a new grant agreement" annually. *Id.* at 82. A grant's "[p]eriod of performance" is "the time interval between the start and end date of a Federal award, which may include one or more budget periods." 2 C.F.R. § 200.1.

As relevant here, Congress appropriated money for FHIP in 2022, 2023, and 2024. *See* Consolidated Appropriations Act 2022, Pub. L. No. 117-103, 136 Stat. 49, 750; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 5166; Consolidated Appropriations Act, 2024, Pub. L. No. 118–42, 138 Stat. 25, 370. In 2024, Congress appropriated $86,355,000 for "contracts, grants, and other assistance, not otherwise provided for, as authorized by title VIII of the Civil Rights Act of 1968 . . . and section 561 of the Housing and Community

Development Act of 1987[.]" Consolidated Appropriations Act, 2024, Pub. L. No. 118–42, 138 Stat. 25, 370. And this money is "available until September 30, 2025." *Id.*

### B.    Factual Background

"The following facts are alleged in the Complaint or drawn from declarations in the record that are not disputed in relevant part, except where otherwise noted." *Postal Police Officers Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 415 (D.D.C. 2020).

In September 2024, HUD published a "FY2024 PEI NOFO, which formally announced the availability of approximately $9,691,793 in FY2024 funding for *new* PEI grants with a four-year performance period." Compl. ¶ 78, ECF No. 1 (citation omitted). It also published a FY2024 NOFO "announcing the availability of approximately $3,700,000 in funding . . . to help build the capacity of nonprofit fair housing organizations and [to] establish new, separate organizations in areas that are underserved by existing organizations." *Id.* ¶ 77. And it did the same for the third category of FHIP funding, publishing a FY2024 NOFO "announcing the availability of approximately $8,350,000 in FY2024 funds under its EOI program to develop, implement, carry out, and coordinate education and outreach programs designed to inform members of the public concerning their rights and obligations under the FHA." *Id.* ¶ 76 (cleaned up). "All funds available in the FY2024 NOFOs were appropriated by Congress in the FY2024 Appropriations Act." *Id.* ¶ 80. And applications for all of these grants closed in November 2024. *Id.* ¶¶ 76–78. The FY2024 NOFOs "indicated that HUD expected its evaluation period to last approximately ninety days, and that grantees would begin their performance periods around April 30, 2025." *Id.* ¶ 82. The funds made available by the FY2024 Appropriations Act are available only until September 30, 2025. *See id.* ¶ 84. And HUD must notify Congress of any new grants by August

31, 2025. *See* 42 U.S.C. § 3616a(e). Yet as of today, "HUD has not announced or issued any new grants under any of the FY2024 NOFOs." Compl. ¶ 86.

Also in September 2024, "HUD designated $31.7 million from Congress's FY2024 Appropriation to fund active PEI awards." *Id.* ¶ 65. It directed this money to support the "second and third years of seventy-five ongoing multi-year PEI grants first awarded through the FY2022 and FY2023 PEI NOFOs." *Id.* But HUD has refused to implement some of these multi-year grants. *Id.* ¶ 68. More specifically, it has "refused to negotiate years two and three of active PEI grants even after the first year of the grant has completed[.]" *Id.* ¶ 70.

The National Fair Housing Alliance (NFHA), founded in 1988, is a "national, nonprofit public service membership organization," *id.* ¶ 20, that "represents approximately 70 private, nonprofit fair housing organizations or operating members, 101 supporting member organizations, and 80 individual members," *id.* ¶ 93. It "has received and relied on FHIP grants since 1990." *Id.* at 20. NFHA currently "has an active three-year PEI grant, and the first year of that grant [ended] on June 30, 2025." *Id.* ¶ 71. But "a HUD grant officer has repeatedly told NFHA that HUD has instructed [the officer] that it cannot move forward with the procedures necessary to begin year two." *Id.* "The HUD representative has been unable to provide information about the elements necessary for completing NFHA's second-year HUD-1044, such as the statement of work, budget, payment schedule, performance, and deliverables schedule." *Id.* "HUD has similarly refused to negotiate years two and three for other" multi-year grantees. *Id.* "NFHA relies on multi-year PEI awards to provide consistency and stability," *id.* ¶ 100, and "[w]ithout years two and three of [NFHA's] PEI award, NFHA will lose $400,000 per year—money that would have effectuated Congress's goal of fair housing enforcement," *id.* ¶ 99. NFHA also applied for FHIP awards under the FY2024 NOFOs and has yet to hear the results. *See id.* ¶ 12; *see also id.* ¶¶ 96–97.

The Tennessee Fair Housing Council (TFHC), one of NFHA's members, *see id.* ¶ 107, is a nonprofit organization based in Nashville, Tennessee, *id.* ¶ 23. Since 1995, HUD has awarded it fifteen FHIP grants. *Id.* In preparation for the May 31, 2025, expiration of its most recent PEI grant, "TFHC applied for a new PEI grant through the FY2024 PEI NOFO." *Id.* ¶ 108. TFHC claims that HUD's failure to grant new awards has caused it to "drastically reduce[] staff operations." Pls.' Mot. TRO at 39, ECF No. 11. And "[a]s a result of HUD's failure to issue new PEI awards, TFHC has already stopped all testing work and systemic investigations, including an active investigation into discriminatory advertising practices." Compl. ¶ 112. "The unavailability of a new PEI award will fundamentally alter TFHC's operations and may force the organization to close entirely if it cannot find replacement funding in the next year." *Id.* ¶ 113.

### C.    Procedural Background

NFHA and TFHC filed a Complaint in this Court on June 24, 2025, suing HUD and its Secretary for various constitutional and APA violations. *See id.* On July 7, 2025, the Plaintiffs filed a Motion for a Temporary Restraining Order. *See* Pls.' Mot. TRO. The Court held a hearing on July 24, 2025. After that hearing, both Parties filed status reports at the Court's request. *See* Defs.' Status Report, ECF No. 22; Pls.' Status Report, ECF No. 23. In their status report, the Plaintiffs asked the Court to "stay resolution of the portion of the Motion for a Temporary Restraining Order regarding the [multi-year grants.]" Pls.' Status Report at 2. The Plaintiffs' motion for emergency relief is fully briefed and ripe for review. *See* Defs.' Opp'n TRO, ECF No. 15; Pls.' Reply TRO, ECF No. 18.

### LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a temporary restraining order must establish "that he is

likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). And a plaintiff "need only establish a likelihood of success on the merits of one claim to obtain . . . injunctive relief[.]" *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 218 (D.D.C. 2020) (citation omitted).

## DISCUSSION

Having considered the Parties' filings and their representations at oral argument, the Court will grant in part the Plaintiffs' motion for a temporary restraining order. As to the claims concerning new grants, the Plaintiffs have established a substantial likelihood of organizational standing, a likelihood of success on the merits for at least two of those claims, that they would suffer an irreparable injury without relief, and that the balance of the equities and the public interest favor them. And as to the Plaintiffs' claims concerning multi-year grants, the Court believes relief is likely warranted but will reserve judgment given the Plaintiffs' request that it stay resolution of these claims until later this week.

### A.     New Grants

The Plaintiffs challenge HUD's failure to award new grants using the 2024 appropriated funds under the Appropriations Clause, *see* Compl. ¶¶ 130–34, and the Separation of Powers, *see id.* ¶¶ 135–38. They also claim that it violates 5 U.S.C. § 706(2), *see* Compl. ¶¶ 123–29, because it is arbitrary, capricious, and contrary to law, *see* Pls.' Mot. TRO at 34–38, and 5 U.S.C. § 706(1), *see* Compl. ¶¶ 117–22, since the funds were allegedly withheld unlawfully and delayed unreasonably, *see* Pls.' Mot. TRO at 23–33.

### 1.    Likelihood of Success on the Merits

#### a.  Standing

"The first component of the likelihood of success on the merits prong usually examines whether the plaintiffs have standing in a given case." *Nat'l Immigr. Proj. of the Nat'l Lawyers Guild v. Exec. Off. of Immigr. Rev.*, 456 F. Supp. 3d 16, 25 (D.D.C. 2020) (cleaned up). "To have standing to bring a temporary restraining order, Plaintiffs must adduce record evidence establishing a substantial likelihood that '(i) they have "suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision."'" *Gomez v. Trump*, No. 20-cv-1419, 2020 U.S. Dist. LEXIS 110132, at *19 (D.D.C. June 23, 2020) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913–14 (D.C. Cir. 2015) (quoting *Osborn v. Visa*, 797 F.3d 1057, 1063 (D.C. Cir. 2015))). "The injury-in-fact element requires an injury that is 'concrete and particularized and actual or imminent, not conjectural or hypothetical.'" *Nat'l Immigr. Proj. of the Nat'l Lawyers Guild*, 456 F. Supp. 3d at 26 (quoting *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 54 (D.C. Cir. 2019) (cleaned up)). "To be judicially cognizable, an asserted imminent injury must be 'certainly impending and immediate—not remote, speculative, conjectural, or hypothetical.'" *Gomez*, 2020 U.S. Dist. LEXIS 110132, at *19–20 (quoting *Food & Water Watch, Inc.*, 808 F.3d at 913–14 (cleaned up)).

"Membership-based associations can establish standing in one of two ways: they can assert 'associational standing' to sue on behalf of their members, or 'organizational standing' to sue on behalf of themselves." *Widakuswara v. Lake*, No. 25-cv-1015, 2025 U.S. Dist. LEXIS 76500, at *20 (D.D.C. Apr. 22, 2025) (cleaned up). Organizational standing requires an organization, "like an individual plaintiff, to show actual or threatened injury in fact that is fairly traceable to

the alleged illegal action and likely to be redressed by a favorable court decision." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agriculture*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (cleaned up). When it comes to the injury-in-fact requirement, it is sufficient for the organization to "show that the defendant's actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Widakuswara*, 2025 U.S. Dist. LEXIS 76500, at *22 (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (cleaned up)); *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) ("To establish organizational standing, [the plaintiff] . . . must demonstrate that it has suffered injury in fact, including such concrete and demonstrable injury to the organization's activities—with a consequent drain on the organization's resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests." (cleaned up)).

"Both NFHA and TFHC applied for FHIP awards under the as-of-yet unresolved FY2024 NOFOs." Compl. ¶ 12. And they have both done more than enough to establish a "substantial likelihood" of organizational standing. *Gomez*, 2020 U.S. Dist. LEXIS 110132, at *19. They have identified a concrete future harm because HUD's failure to issue new grants by the deadline will rob them of the opportunity for funding. *See Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 668 (D.C. Cir. 1987) ("Their complaint identifies concrete organizational interests detrimentally affected by HUD's actions—curtailment of the opportunity for funding and assistance."). And they have argued that this harm is imminent because "HUD does not even contend that the process to administer the awards has advanced to the stage necessary to make the awards on a permissible schedule prior to the appropriations deadline[.]" Pls.' Reply TRO at 5. The Court agrees.

The Court is skeptical that HUD could issue awards under the FY2024 NOFOs before the statutory deadline. HUD would still need to "execute a merit review process of applications for discretionary Federal awards," 2 C.F.R. § 200.205, and it originally estimated this process would "last[] for approximately 90 days" for the PEI NOFO, *see* U.S. Dep't of Hous. & Urban Dev., Fair Housing Initiatives Program—Private Enforcement Initiative Full Announcement (Sept. 2024), *available for download at* https://www.grants.gov/search-results-detail/356502; *see also* Pls.' Mot. TRO, Ex. 7 at 46, ECF No. 11-8. That means if the review process were to begin today, it would reasonably be expected to finish around October 27, 2025, well after the September 30, 2025, statutory deadline, *see* Consolidated Appropriations Act, 2024, Pub. L. No. 118–42, 138 Stat. 25, 370 (appropriating $86,355,000 to "remain available until September 30, 2025"). And more importantly, HUD said at oral argument and in a status report that there are no plans to issue awards under the FY2024 NOFOs and that it plans on publishing new NOFOs instead. *See* Motions Hr'g (July 24, 2025), Tr. at 36:13–37:14, ECF No. 21 ("I believe HUD's plan is to proceed with new NOFOs."); Defs.' Status Report at 2 ("HUD plans to publish the new NOFOs as soon as possible and in time for the subject grant applications to be allocated by September 30, 2025.").

The Court is even more skeptical that HUD could meet the deadline were it to list new NOFOs. HUD would first need to create an Assistance Listing with a description of the grant program. *See* 2 C.F.R. § 200.202(a); *see also id.* § 200.203(b). Then the new NOFOs would need to be made available for application for at least thirty days in the absence of exigent circumstances.

*See* 2 C.F.R. § 200.204(b).[1] And then HUD would have to process the applications, select new grantees, engage in negotiations, and finalize all paperwork before funds will eventually be obligated. *See supra*, at 5–6. The Plaintiffs' declarant stated that in her experience, it can take up to four weeks "for HUD and the grantee to complete and sign the required documents[.]" Kemple Decl. ¶ 13, ECF No. 11-2. And HUD's declarant does not assuage this Court's concerns. He stated that "HUD is doing everything it can on an expedited basis to issue new/first-year FHIP awards and [to] execute grant agreements . . . before the FY24 FHIP funds lapse." Cooke Decl. ¶ 5, ECF No. 15-1. But promising to try your best falls well short of guaranteeing, or even predicting, success. Nor does it eliminate the laundry list of outstanding tasks.[2] This is especially true given that HUD has never had to complete this process in such a short timeframe in the history of the FHIP program. *See* Motions Hr'g (July 24, 2025), Tr. at 32:14–18 ("HUD concedes through the briefing that this year in 2025 it has taken longer to administer FHIP grants than it did in the years preceding under the previous administration."); Defs.' Status Report at 3–4 (noting that

---

[1] HUD stated at oral argument that there are currently no plans to rely on exigent circumstances to shorten this period. *See* Motions Hr'g (July 24, 2025), Tr. at 38:11–12 ("I'm not suggesting to the Court that HUD has made a finding that there are exigent circumstances in this case[.]"); *id.* at 40:25–41:2 ("I have seen no indication that HUD intends to use the exigent circumstances exception, so presumably the NOFOs would be available for 30 days."). But in a status report filed after oral argument, it stated that "if necessary, the application period may be shorter than 30 days." Defs.' Status Report at 2. Given the time remaining before the statutory deadline, the Court assumes that HUD will rely on exigent circumstances to shorten the 30-day period, though that decision is of course one that the Court leaves to HUD at this juncture.

[2] At oral argument, the Court gave HUD an opportunity to file a status report detailing its plans to meet the statutory deadline. HUD's report states that it "plans to publish the new NOFOs as soon as possible and in time for the subject grant applications to be allocated by September 30, 2025." Defs.' Status Report at 2. And without providing specifics, it says that it "plans to complete application review and determine awards under the new NOFOs by mid-September 2025." *Id.* at 3. Without more from HUD, and in light of the declarations submitted by the Plaintiffs, the Court cannot find that HUD is likely to meet the statutory deadline. The Parties will, of course, have an opportunity to develop the record further at the preliminary injunction phase and convince the Court otherwise.

"HUD has not identified any . . . instances" of the agency "temporarily paus[ing] FHIP grantmaking activity").

NFHA and TFHC's asserted imminent injury is therefore "certainly impending and immediate—not remote, speculative, conjectural, or hypothetical." *Gomez*, 2020 U.S. Dist. LEXIS 110132, at *19 (cleaned up). This is not a case where funding can reasonably be expected to be doled out by the appropriations deadline. *See, e.g.*, *Child. Trends, Inc. v. U.S. Dep't of Educ.*, No. 25-cv-1154, 2025 U.S. Dist. LEXIS 111199, at *27 (D. Md. June 11, 2025) ("Here, the crucial deadline Plaintiffs identify in relation to their Program Claims is September 30, 2025, when the funds set aside by Congress for Comprehensive Centers and RELs in the 2024 Appropriations Act will lapse. That date is far enough away to make it difficult for the Plaintiffs to argue, and the Court to decide, that the harm of losing the opportunity to bid is imminent and therefore irreparable." (citation omitted)). And the imminent injury is traceable to the Defendants' actions and would be remedied by a court order requiring the funds to be spent. NFHA and TFHC have therefore established a "substantial likelihood" of organizational standing. *Gomez*, 2020 U.S. Dist. LEXIS 110132, at *19.

### b. Ripeness

The Defendants next argue that the Plaintiffs' claims are not ripe for review. *See* Defs.' Opp'n TRO at 5–7; *see also id.* at 5 ("Article III requires that an alleged injury be 'certainly impending.'" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013))); *id.* at 7 ("Plaintiffs' speculation about future harm . . . is insufficient to establish a case or controversy as required by Article III and cannot form the basis for the Court's jurisdiction."). And both sides acknowledge that these arguments track those presented on the standing question. *See id.* at 8 ("For the same reasons that Plaintiffs' claims are not ripe, Plaintiffs lack standing."); Pls.' Reply

TRO at 8 ("Defendants' standing argument is simply a repackaging of their ripeness argument[.]");
*see also DKT Mem'l Fund v. Agency for Int'l Dev.*, 887 F.2d 275, 297 (D.C. Cir. 1989)
("[T]he constitutional requirement for ripeness is injury in fact."). The Court therefore reaches the
same conclusions on ripeness as it did on standing.

### c.  Merits

The "Plaintiffs need only establish a likelihood of success on the merits of one claim to
obtain the injunctive relief that they seek." *A.B.-B.*, 548 F. Supp. 3d at 218 (citation omitted).
And the Court finds that they are likely to succeed on the merits of at least two of their claims
concerning the new grants: (1) that HUD's failure to award new grants for the current fiscal year
violates the Separation of Powers, *see* Pls.' Mot. TRO at 17–19, and (2) that the new grants have
been unreasonably delayed in violation of Section 706(1), *see id.* at 29–33. Either provides a
sufficient basis for injunctive relief on this record. *See A.B.-B.*, 548 F. Supp. 3d at 218.

### i.  Separation of Powers

The Plaintiffs argue that "[t]he separation-of-powers principles embedded in the
Constitution require HUD to disburse Congress's FHIP appropriation." Pls.' Mot. TRO at 19.
"Under 'settled, bedrock principles of constitutional law,' the President 'must follow statutory
mandates so long as there is appropriated money available and the President has no constitutional
objection to the statute.'" *AIDS Vaccine Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 145
(D.D.C. 2025) (quoting *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.)).
The Defendants do not argue that the statutory mandate in this case is unconstitutional—to the
contrary, they assert that they are working to follow that mandate. Defs.' Opp'n TRO at 20;
*see also* Motions Hr'g (July 24, 2025), Tr. at 49:16–20 (responding "Correct" when asked, "So just
to clarify, I don't see any argument from you that the statutory mandate here is unconstitutional;

is that right?"). But the Court is not convinced that they are likely to meet the deadline on this record. Allowing the funding to lapse would therefore violate the Separation of Powers. *See AIDS Vaccine Coal.*, 770 F. Supp. 3d at 143–48. So the Plaintiffs have shown a likelihood of success on the merits of this claim.

The Defendants raised a counterargument for the first time at oral argument, arguing that only Congress may bring a Separation of Powers claim. *See* Motions Hr'g (July 24, 2025), Tr. at 51:8–10 ("The only proper plaintiff for this separation of powers claim would be Congress[.]"). But they cited no case law to support this claim. In the absence of any briefing or other support from the Defendants, and because other courts in this District have allowed Separation of Powers claims by private plaintiffs to proceed, *see, e.g.*, *AIDS Vaccine Coal.*, 770 F. Supp. 3d at 143–48, the Defendants' late-breaking argument does not move the needle. *See also Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (pushing back against the claim that the Supreme Court has not "recognized an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles" because the Government "offer[ed] no reason and cite[d] no authority" for why a "separation-of-powers claim should be treated differently than every other constitutional claim").

## ii.  Unreasonable Delay

The Plaintiffs also argue that "HUD's delay in acting on [the] Plaintiffs' FY2024 NOFOs is . . . unreasonable." Pls.' Mot. TRO at 31. And the APA provides that reviewing courts "shall . . . compel agency action . . . unreasonably delayed[.]" 5 U.S.C. § 706(1). The Defendants respond with two threshold arguments. *See* Defs.' Opp'n TRO at 9–12, 16–18. But neither is convincing,

and the Defendants have conceded any non-threshold arguments. *See infra*, at 24. So the Plaintiffs are likely to succeed on the merits of this claim.[3]

### 1. Tucker Act

The Defendants argue that the Plaintiffs' claims should be channeled to the Court of Federal Claims because they sound in contract. Defs.' Opp'n TRO at 9–12. More specifically, they argue that the Tucker Act impliedly forbids the Plaintiffs' APA claims. *See id.*

It is true that the D.C. Circuit has "interpreted the Tucker Act . . . to impliedly forbid[] contract claims against the Government from being brought in district court under the waiver [of sovereign immunity] in the APA." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017) (cleaned up). But it has also "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)). "Exclusive jurisdiction in Claims Court under the Tucker Act does not lie merely because

---

[3] The Defendants also argue that the Plaintiffs do not challenge a final agency action. *See* Defs.' Opp'n TRO at 14–16. But that requirement does not apply to unreasonable delay claims brought under Section 706(1). *See Am. Oversight v. U.S. Dep't of Veterans Affs.*, 498 F. Supp. 3d 145, 157 (D.D.C. 2020) ("Here, Plaintiffs sue under § 706(1), and thus they need not identify a final agency action or its functional equivalent." (cleaned up)); *Nat'l Parks Conservation Ass'n v. United States DOI*, No. 20-cv-3706, 2024 U.S. Dist. LEXIS 58169, at *28 (D.D.C. Mar. 29, 2024) ("[A] Section 706(1) claim concerns agency action that has been unreasonably delayed, while a Section 706(2)(A) claim challenges a final agency action that has been taken."); *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 29 (D.D.C. 2017) (saying *Public Citizen Health Research Group v. Commissioner, Food & Drug Administration*, 740 F.2d 21 (D.C. Cir. 1984), "describ[ed] review under § 706(1) as an exception to the 'final agency action' requirement").

[a plaintiff] hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant." *Id.* at 1108 (cleaned up). The question is "whether the action 'is *at its essence* a contract claim.'" *AIDS Vaccine Advocacy Coal.*, 770 F. Supp. 3d at 136 (emphasis in original) (quoting *Crowley Gov't Servs., Inc.*, 38 F.4th at 1106 (cleaned up)). And "[t]hat inquiry turns on (1) 'the source of the rights upon which the plaintiff bases its claims,' and (2) 'the type of relief sought (or appropriate).'" *Id.* (quoting *Crowley Gov't Servs., Inc.*, 38 F.4th at 1106 (cleaned up)).

The first prong favors the Plaintiffs because the source of their unreasonable delay claim is the APA—not contract law. And the second prong favors them as well since they do not seek money damages. *See id.* at 135 ("The complaints do not seek money damages."). While the requested injunctive relief may cause "the release of funds withheld," *id.*, the Supreme Court has "long recognized" that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages,'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). For example, the D.C. Circuit has held that a request for "injunctive relief enjoining defendants from reducing funds otherwise due to plaintiffs" was "not a claim for money damages, although it [was] a claim that would require the payment of money by the federal government." *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) (Bork, J.) (cleaned up). It explained that "any funds that would flow to the plaintiff as a result of agency action being held unlawful under the APA were not 'money in compensation for the losses, whatever they may be, that [the plaintiff] will suffer or has suffered by virtue of the withholding of those funds.'" *AIDS Vaccine Advocacy Coal.*, 770 F. Supp. 3d at 136 (quoting *Bowen*, 487 U.S. at 895 (quoting *Md. Dep't of Hum. Res.*, 763 F.2d at 1446)). That is the case here as well. The Plaintiffs do not seek compensation for any ancillary

harms that have befallen them due to the delay in granting new awards for the current fiscal year. Indeed, they do not even demand that they be chosen for the new grants. They only request that HUD "[i]ssue and finalize contracts for the FY2024 NOFOs." Compl., Prayer for Relief. The Tucker Act therefore does not make this APA claim unreviewable.

The Defendants point to a recent Supreme Court order to argue that this is essentially a contract claim. *See* Defs.' Opp'n TRO at 11–12 (citing *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam)). There, the Court stayed a district court order "enjoining the Government from terminating various education-related grants" and requiring "the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Dep't of Educ.*, 145 S. Ct. at 968. It explained that the Government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA" since "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). But the APA claim in that case "was premised on the terms of individual grants." *AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, No. 25-cv-400, 2025 WL 1380421, at *3 (D.D.C. May 13, 2025) (citation omitted). "And the government repeatedly urged this distinction in its briefing before the Supreme Court." *Id.* (citations omitted). That is not the case here, where the Plaintiffs bring this claim without reliance on any specific grant terms. Nor do the Plaintiffs ask for an injunction requiring HUD to necessarily provide them funds; they ask only that HUD complete its grantmaking process for the current fiscal year as it is statutorily required to do. *See* Compl., Prayer for Relief.

## 2.  Agency Discretion

The Defendants also argue that the challenged action is not subject to judicial review under the APA because it is committed to agency discretion by law. *See* Defs.' Opp'n TRO at 16–18; *see also* 5 U.S.C. § 701(a)(2) ("This chapter applies . . . except to the extent that . . . agency action is committed to agency discretion by law."). They point to *Lincoln v. Vigil*, 508 U.S. 182 (1993), *see* Defs.' Opp'n TRO at 16–18, which explained that "an agency's allocation of funds from a lump-sum appropriation requires a complicated balancing of a number of factors which are peculiarly within its expertise," *Lincoln*, 508 U.S. at 193 (cleaned up). *Lincoln* went on to hold that an agency's decision to discontinue a certain program and to redirect money to a different program was "unreviewable under § 701(a)(2)." *Id.*

But that language from *Lincoln* does not control this case. The Plaintiffs "do not challenge HUD's allocation of certain amounts to various grant programs within FHIP or the allocation of certain amounts to various applicants to FHIP; they challenge HUD's refusal to administer the program and make awards at all, which is not a decision within its lawful discretion." Pls.' Reply TRO at 19. Indeed, *Lincoln* itself was careful to state that "an agency is not free simply to disregard statutory responsibilities[.]" 508 U.S. at 193. And it held that "the decision to allocate funds [was] 'committed to agency discretion by law,'" *id.* (quoting 5 U.S.C. § 701(a)(2)), only "to [the] extent" that "the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives," *id.* (cleaned up). On this record, the Court is therefore unpersuaded that *Lincoln* forecloses relief.

## 3.  *TRAC* Factors

Having found that the Defendants' threshold arguments do not preclude this Court's review, the Court now turns to the Plaintiffs' claim that HUD's delay is unreasonable. "Courts in

this circuit consider six factors (the '*TRAC* factors') when evaluating unreasonable-delay claims: (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also consider the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action in unreasonably delayed." *Palakuru v. Renaud*, 521 F. Supp. 3d 46, 49 (D.D.C. 2021) (cleaned up) (citing *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70. 80 (D.C. Cir. 1984)). "The D.C. Circuit has emphasized that '[r]esolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court.'" *Id.* (quoting *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003)).

The third and fifth factors favor the Plaintiffs. A declarant for TFHC stated that "HUD's failure to award new PEI grants under the FY2024 NOFO has had a significant and immediate impact on [its] ability to serve [its] communities." Lafferty Decl. ¶ 18, ECF No. 11-4. She explained that TFHC has had to cut its staff size in half, *id.* ¶ 19, and that it "will likely have to decrease [its] primary service area by one-third or more," *id.* ¶ 20. And she even shared that TFHC is "now unable to provide any testing services at all[.]" *Id.* ¶ 21. This matters because private and local fair housing organizations process about seventy-six percent of fair housing complaints in the nation. *See* Pls.' Mot. TRO at 32 (citing National Fair Housing Alliance, *2024 Fair Housing*

*Trends Report* 6 (2024), https://nationalfairhousing.org/wp-content/uploads/2023/04/2024-Fair-Housing-Trends-Report-FINAL_07.2024.pdf). So their decreased capacity to enforce the FHA risks poorer health outcomes for the public. *See id.* n.13 (citing Roshanak Mehdipanah, *Without Affordable, Accessible, and Adequate Housing, Health Has No Foundation*, The Milbank Quarterly, 101 No. S1, 419, 425–26 (2023), https://perma.cc/7P8G-WBAS). And the fourth factor appears to favor the Plaintiffs as well since the Defendants have not identified any competing priorities, nor is this a case where the Plaintiffs are asking to be moved to the front of a line, *see, e.g.*, *Shen v. Pompeo*, No. 20-1263, 2021 U.S. Dist. LEXIS 67950, at *22–23 (D.D.C. Mar. 24, 2021). The sixth factor is neutral since the current record does not support any finding of "impropriety lurking behind agency lassitude." *Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 345 (D.C. Cir. 2023) (cleaned up).

But factors one and two are more complicated. They "require the court to consider whether there is any rhyme or reason—congressionally prescribed or otherwise—for the agency's delay." *Ahmed v. Blinken*, 759 F. Supp. 3d 1, 11 (D.D.C. 2024) (cleaned up). And HUD has provided a reason for the delay: It was meant to allow FHEO to "review the prior Administration's policies and to align FHEO's grantmaking activity with the new Administration's priorities." Cooke Decl. ¶ 4. On the other hand, there is a congressionally prescribed timeline that requires HUD to provide funding before September 30, 2025, and the unreasonable delay claim is premised on the idea that the Defendants have waited too long to meet that deadline. And Congress has prescribed an even more compressed timeline in this case because the same statutory section requiring HUD to spend FHIP funds also requires HUD to notify Congress of any "proposed grant, contract, or cooperative agreement" at least thirty days before providing that grant or entering that contract or cooperative agreement. 42 U.S.C. § 3616a(e)(1).

In their briefing, the Defendants did not respond to the Plaintiffs' arguments that the *TRAC* factors weigh in their favor, thus conceding this point, *see* LCvR 7(b); *Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2014) ("[Local Rule 7(b)] is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded." (citations omitted)); *cf., e.g.*, *Parham v. District of Columbia*, 648 F. Supp. 3d 99, 106 (D.D.C. 2022) ("Defendants conceded these preliminary injunction factors by failing to respond to Plaintiffs' arguments whatsoever in its opposition papers." (citations omitted)); *Endo Par Innovation Co. v. Becerra*, No. 24-cv-999, 2024 U.S. Dist. LEXIS 104947, at *12 (D.D.C. May 1, 2024) (saying this concession rule applies with particular force when a plaintiff "need only demonstrate a likelihood of success on the merits" instead of "an absolute certainty of success" (cleaned up)). And when pressed at oral argument, the Defendants affirmed that they were relying on the threshold arguments the Court addressed above. *See* Motions Hr'g (July 24, 2025), Tr. at 61:10–11 ("I agree that our briefing did not address the TRAC factors[.]"); *id.* at 61:15–17 (responding when the Court asked, "So you're resting your argument on *Lincoln*[?]," with "Yes, on *Lincoln* and just the threshold arguments under the APA"). Having considered the Plaintiffs' arguments and the record before the Court, and in the absence of any argument whatsoever from HUD, the Court finds that the Plaintiffs are likely to succeed on the merits of their unreasonable delay claim at this stage of the proceedings.

## 2.    Irreparable Harm

The irreparable harm analysis is fairly straightforward in this case. The Plaintiffs have explained that they will suffer several harms without a temporary restraining order. *See* Pls.' Mot. TRO at 39 ("HUD's refusal to administer FHIP awards has already forced Plaintiffs to close offices, downsize, and lay off staff, posing an existential threat to TFHC and other NFHA

members' survival."). And these are the types of harms that courts have held to be irreparable. *See Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 57 (D.D.C. 2025) ("Some of these organizations are still waiting for funds to be disbursed . . . . In the meantime, they've been forced to dismiss employees, cut essential programs, and pay workers out of their own pockets . . . . Each day that the pause continues to ripple across the country is an additional day that Americans are being denied access to programs that heal them, house them, and feed them. Because the funding freeze threatens the lifeline that keeps countless organizations operational, Plaintiffs have met their burden of showing irreparable harm."); *Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, 770 F. Supp. 3d 822, 858 (D. Md. 2025) ("Plaintiffs have made a clear showing that their members will suffer irreparable harm in the absence of an injunction. According to the supporting declarations, the loss of funding will cause some Grant Recipients to shutter their programs entirely."), *reconsideration denied*, 2025 WL 863319 (D. Md. Mar. 19, 2025).

### 3.    Balance of Equities and Public Interest

The final two factors merge when the Government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief[,] . . . pay[ing] particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (cleaned up). On the side of the Defendants, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (cleaned up). Meanwhile, the Plaintiffs have provided evidence that their work enforcing the FHA would suffer dramatically from a lack of funding. *See* Pls.' Mot. TRO at 38–42. These factors

therefore favor the Plaintiffs. *See, e.g.*, *S. Educ. Found. v. U.S. Dep't of Educ.*, No. 25-cv-1079, 2025 WL 1453047, at *17 (D.D.C. May 21, 2025) ("As for defendants' public interest argument, any theoretical harms to members of the public who are opposed to EAC-South receiving grant funding do not outweigh the alleged concrete, irreparable harm in the form of programmatic closures and loss of funding that SEF has already experienced.").

### B.    Multi-Year Grants

The Plaintiffs also bring claims challenging HUD's failure to implement multi-year grants. These include grants to NFHA and its members. *See* Pls.' Mot. TRO at 1 ("[NFHA] should have started the second year of its multi-year FHIP grant on July 1, but HUD refused to finalize the paperwork."); Pls.' Reply TRO at 12 ("All of those Active PEI Plaintiff organizations are before the Court because they are members of NFHA[.]"). They allege that HUD's failure to administer these multi-year grants violates the Appropriations Clause, *see* Compl. ¶¶ 130–34; *see also* Pls.' Mot. TRO at 16–17, the Separation of Powers, *see* Compl. ¶¶ 135–38; *see also* Pls.' Mot. TRO at 17–19, and procedural due process, *see* Compl. ¶ 141. They also claim that it violates 5 U.S.C. § 706(2), *see* Compl. ¶¶ 123–29, because it is arbitrary, capricious, and contrary to law, *see* Pls.' Mot. TRO at 34–38, and 5 U.S.C. § 706(1), *see* Compl. ¶¶ 117–22; Pls.' Mot. TRO at 23–33, because the funds have been unlawfully withheld and unreasonably delayed.

At this stage, the Court is persuaded that NFHA has standing for its procedural due process and Section 706(1) claims. And it sees good reasons why NFHA would likely be entitled to injunctive relief as to the Section 706(1) claim for unreasonable delay, particularly because HUD conceded the *TRAC* factors. *See supra*, at 24. But the Court will reserve judgment on these issues given the Plaintiffs' request that it "stay resolution of the portion of the Motion for a Temporary Restraining Order regarding [these] claims[.]" Pls.' Status Report at 2. The Court instead orders

HUD to submit a status report on August 1, 2025, that confirms whether all multi-year grantees "have been authorized to start work under the upcoming year of their existing PEI grants" and whether "HUD remains on track to meet the beginning-of-August projection for finalized paperwork." *Id.*

## REMEDIES

Having found that the Plaintiffs are entitled to temporary injunctive relief with respect to new grants, the Court turns to remedies. The Plaintiffs ask for very broad remedies. First, they seek an order that FY2024 FHIP funding "shall remain available through the pendency of this litigation and the implementation of any final relief." Pls.' Proposed Order at 1, ECF No. 11-11 (citing 31 U.S.C. § 1502(b)). But given that the September 30, 2025, lapse date will not arrive for two months, the Court finds it premature to grant this relief now. The Court will revisit whether such an order is necessary in the coming weeks to ensure that the appropriated funds do not lapse and remain available for obligation. And, of course, if HUD's assurances bear true, there will be no need for the Court to issue a further order.[4]

---

[4] The Defendants argue that the Court may not order that the appropriated funds remain available through the pendency of this litigation. Defs.' Opp'n TRO at 12 n.1. Because the Court declines to enter such an order now, it need not decide this question for purposes of resolving the instant motion. But the Court notes that the D.C. Circuit has blessed this approach. *See City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1427 (D.C. Cir. 1994) ("[O]ur decisions specifically provide that if a case is timely filed, a court may grant a preliminary injunction so that funds from the appropriation that is about to lapse will remain available pending a dispute's resolution."); *see also Nat'l Ass'n of Reg'l Councils v. Costle*, 564 F.2d 583, 588 (D.C. Cir. 1977) ("In such situations, the courts simply suspend the operation of a lapse provision and extend the term of [the] already existing budget authority."). And the Defendants conceded at oral argument that the D.C. Circuit did not overrule this line of cases in *Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024). *See* Motions Hr'g (July 24, 2025), Tr. at 57:24–58:5 (responding when the Court asked, "Do you think that the *Goodluck* case overruled the *Costle* line of cases?," with "No, I don't think it overruled it. It just criticized it.").

Second, the Plaintiffs ask the Court to order HUD to comply with its statutory obligations, including by setting detailed deadlines for particular tasks and ordering HUD to move forward with the FY2024 NOFOs instead of posting new ones. *See* Pls.' Proposed Order; Pls.' Status Report at 2–3. But at this point, the Court orders only that HUD comply with its statutory obligations under the Fair Housing Act, *see, e.g.*, 42 U.S.C. § 3616a(b)(1) ("The Secretary shall use funds made available under this subsection to conduct, through contracts with private nonprofit fair housing enforcement organizations, investigations of violations of the rights granted under [the FHA], and such enforcement activities as appropriate to remedy such violations."); *id.* § 3616a(c)(1) ("The Secretary shall use funds made available under this section to enter into contracts or cooperative agreements with qualified fair housing enforcement organizations, other private nonprofit fair housing enforcement organizations, and nonprofit groups organizing to build their capacity to provide fair housing enforcement[.]"); *id.* § 3616a(d)(1) ("The Secretary, through contracts with one or more qualified fair housing enforcement organizations, . . . shall establish a national education and outreach program" to "provide a centralized, coordinated effort for the development and dissemination of fair housing media products[.]"), before the appropriations lapse on September 30, 2025, *see* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 370. *See AIDS Vaccine Advocacy Coal.*, 770 F. Supp. 3d at 154 (finding in a similar posture that "[t]he appropriate remedy is . . . to order [the] Defendants to 'make available for obligation the full amount of funds Congress appropriated' under the relevant laws" (quoting *City of New Haven v. United States*, 634 F. Supp. 1449, 1460 (D.D.C. 1986), *aff'd*, 809 F.2d 900

(D.C. Cir. 1987)).[5] Again, the Court will revisit whether it is appropriate to be more prescriptive in the coming weeks as the case develops.

The Court orders HUD to file a status report by August 4, 2025, that provides a detailed plan regarding how it intends to meet its statutory obligations for new grants for the current fiscal year. In its July 25, 2025, status report, HUD states that it "plans to publish the new NOFOs as soon as possible and in time for the subject grant applications to be allocated by September 30, 2025." Defs.' Status Report at 2. And it says that it "plans to complete application review and determine awards under the new NOFOs by mid-September 2025." *Id.* at 3. The Court is heartened to hear that "HUD is already working to assemble and train a large enough review team" and that it has "established expedited procedures for completing the award recommendation and approval process." *Id.* In its August 4, 2025, status report, HUD should provide a specific timetable with anticipated completion dates for all the tasks that must be accomplished in order

---

[5] At oral argument, the Defendants appeared to agree that this relief in appropriate. *See* Motions Hr'g (July 24, 2025), Tr. at 62:8–12 ("We understand that the Court is considering requiring status reports. We think that would adequately satisfy any concerns from [the] plaintiff[s] and it would give HUD the opportunity to explain its progress to the Court without imposing any requirements that exceed the statutory text[.]"). They argued in their briefing that the broad remedies requested by the Plaintiffs would violate the Supreme Court's recent ruling in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025). *See* Defs.' Opp'n TRO at 12–14. But when presented with the above narrower remedy, they conceded that it would not run afoul of *CASA*. *See* Motions Hr'g (July 24, 2025), Tr. at 54:1–9 ("The *CASA* argument was more to address the plaintiffs' proposed order . . . . But hearing what we heard today, I think Your Honor is correct that *CASA* does not apply."). Nor could it. "HUD cannot peel off TFHC, NFHA, and NFHA members and conduct a FHIP grant competitive process just for them." Pls.' Reply TRO at 14 (citing 2 C.F.R. § 200.205). So the Court is left providing a remedy with incidental benefits to applicants not before the Court. *See CASA*, 145 S. Ct. at 2557 ("To afford the plaintiff complete relief [from a noisy neighbor], the court has only one feasible option: order the defendant to turn her music down—or better yet, off. That order will necessarily benefit the defendant's surrounding neighbors too; there is no way to peel off just the portion of the nuisance that harmed the plaintiff." (cleaned up)). And the Court is even less troubled considering the Plaintiffs' "estimate that 75% of FHIP applicants are NFHA members." Pls.' Reply TRO at 14 (citing Second Kemple Decl. ¶ 13, ECF No. 18-1).

for grants to be obligated by September 30, 2025. The Court orders HUD to file status reports every seven days after the August 4, 2025, status report to detail its progress.

The Court further orders the Parties to meet and confer and to file a joint status report by July 29, 2025, at 5:00 PM. In that joint status report, the Parties should advise whether they consent to extending the current temporary restraining order beyond 14 days. If not, the Parties shall propose an expedited preliminary injunction briefing schedule.

## CONCLUSION

For the foregoing reasons, the Court grants in part the Plaintiffs' Motion for a Temporary Restraining Order, ECF No. 11.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   July 28, 2025